**EXHIBIT 3**

STATE OF MICHIGAN
IN THE WAYNE COUNTY CIRCUIT COURT

EWC MICHIGAN MANAGEMENT, INC.,

    Plaintiff,

v.

EWC FRANCHISE, LLC,

    Defendant.

Case No. 2026 -     - CB
Hon.

---

HOWARD & HOWARD ATTORNEYS PLLC
By:   Jon R. Steiger (P35505)
      Mark C. Vanneste (P73001)
450 W. 4th Street
Royal Oak, MI 48067
(248) 645-1483
mv@h2law.com

*Attorneys for Plaintiff*

STONE JUSTICE PC
By:  Erik J. Stone (P29088)
P.O. Box 1
416 N. Third Street
Rogers City, MI 49779
(248) 990-1779
erik@stonejustice.com

*Co-Counsel for Plaintiff*

---

**PLAINTIFF'S EX-PARTE MOTION FOR ENTRY OF (1) A TEMPORARY RESTRAINING ORDER; AND (2) AN ORDER REQUIRING DEFENDANT TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE ENTERED**

For the reasons set forth in Plaintiff's Verified Complaint and Brief in Support, the franchisee Plaintiff EWC Michigan Management, Inc. ("EMMI") moves this Court, pursuant to MCR 3.310, to issue a temporary restraining order and preliminary injunction enjoining the Defendant franchisor from disabling vendor services and accounts, including Zenoti, which is EMMI's centralized operating platform and essential to the business operations. In fact, under Michigan's Franchise Investment Law, a franchisee is *entitled* to a presumption of immediate and irreparable harm under these circumstances.

1

Pursuant to MCR 3.310(B)(1)(a), the facts contained in the Verified Complaint support EMMI's contention that immediate and irreparable injury, loss, or damage will result to EMMI from the delay required to effect notice or from the risk that notice will itself precipitate adverse action before an order can be issued. EWCF's most recent communication, explained below, confirms that any continued operation of the business is entirely discretionary and subject to immediate termination at EWCF's election. Under these circumstances, providing advance notice of this motion creates a substantial risk that EWCF will revoke the temporary extension and immediately disable EMMI's systems before the Court can act. However, the undersigned certifies that he has provided notice of this filing to counsel for Defendant via email on March __, 2026.

## BRIEF IN SUPPORT

### I.     INTRODUCTION

This case presents an urgent and straightforward question: whether a franchisor may disregard a franchisee's right to renewal under its own franchise agreement as amended, avoid its own dispute resolution provisions and termination procedures, and instead shut down a franchisee's business by unilaterally and without adequate notice disabling the systems necessary for the business to operate.

Defendant EWC Franchise, LLC ("EWCF") has informed Plaintiff EWC Michigan Management, Inc. ("EMMI") that on April 9, 2026, it will disable EMMI's systems and accounts currently allowing EMMI's Canton location to operate, including the Zenoti platform. As set forth in Plaintiff's Verified Complaint, these systems and accounts are not ancillary. They are the franchisor-controlled systems through which EMMI schedules appointments, processes payments, manages customer data, and conducts every core function of its business. Without access to that system, the business cannot function and it will cease to exist.

2

This is not a hypothetical situation.  In fact, EWCF has already done this once.  It used the same method to shut down a related West Bloomfield location by cutting off systems, removing that business from the Zenoti platform, and preventing customer bookings.  EWCF's actions resulted in the immediate destruction of that business.

The Franchise Agreement as amended does not permit EWCF to do this.  First, under the Franchise Agreement as amended, EMMI has a right to exercise a one-time, ten-year renewal to operate what the agreement refers to as a Successor Franchise.  Moreover, the Franchise Agreement (and Michigan law) requires notice of default and an opportunity to cure before termination.  EWCF provided neither and, instead, seeks to accomplish through technological disablement what it cannot accomplish through the contract as amended.

After initially setting March 31, 2026 as the arbitrary shutdown deadline, EWCF has now attempted to characterize its conduct as providing EMMI with an "opportunity" to sell the business.  In a March 25, 2026 email, EWCF stated that it would allow only an additional fifteen (15) days from the date of the email of continued operations, through April 9, 2026, while it evaluates whether the business can be "viably" sold.  This so-called extension is not contractual and is entirely discretionary, confirming that EWCF is actively controlling whether EMMI may continue operating on a day-to-day basis.  It also confirms that, absent intervention by this Court, EWCF intends to force a liquidation of the business under extreme time pressure.  A franchise business of this nature cannot be marketed, diligenced, approved by the franchisor, financed, and closed within a few weeks.  Any purported opportunity to sell under those conditions is illusory and ensures the destruction of the business as a going concern or requires a hasty, reckless firesale.

3

Absent immediate injunctive relief, EMMI's Canton business will suffer the same fate as the West Bloomfield location, which is nothing short of permanent destruction before the merits of this dispute can be adjudicated.

## II.      FACTUAL BACKGROUND

This dispute arises out of a calculated course of conduct by EWCF to deny EMMI its right to renew its Canton, Michigan franchise as required by the Franchise Agreement as amended, and to instead terminate EMMI's Canton location through a method that ensures immediate and irreversible destruction of the business, after EWCF already shut down a related franchise without warning.

### a.   The EWC Franchises

The two European Wax Center ("EWC") franchise locations, Canton and West Bloomfield, were acquired by Ms. Khan at extraordinary personal financial risk.  *See,* Ex. A – Affidavit of Farzana Khan.  Ms. Khan bought out her ex-husband's share of the business (via two entities: EMMI and EWC West Bloomfield, Inc.) and became liable for more than $1.2 million through a combination of cash, debt, and personal guarantees.  *Id*.  She sustained the business through the COVID period while taking on even more financial obligations.  *Id*.  Through her efforts, the business was transformed into a high-performing franchise generating approximately $1.9 million in annual revenue with a strong, loyal customer base and significant goodwill.  *Id*.

### b.   The Canton Store and Renewal

EMMI operates the EWC franchise in Canton, Michigan (the "Canton Store").  *Id*.  This EWC location is not a marginal or declining business, but rather a successful, fully functioning enterprise that now serves as the sole source of income for Farzana Khan, EMMI's sole shareholder, and supports employees, vendor relationships, and long-term lease obligations.  *Id*.

4

Under the Franchise Agreement as amended, EMMI holds not only the right to operate the Canton Store during the initial term, but also the right to obtain a ten-year Successor Franchise. *See*, Ex. B – Franchise Agreement.   The right to the ten-year Successor Franchise is not discretionary for EWCF, it is absolute under the Franchise Agreement.

### c.   EWCF Amends of Modifies the Renewal Process

Although the Franchise Agreement's original terms included formal requirements for renewal, EWCF did not insist on strict compliance with those provisions.  For example, the original Franchise Agreement terms required a franchisee to submit an intent to renew in writing and sign a new Successor Franchise agreement to initiate the renewal.  Instead of requiring these two items, EWCF repeatedly acknowledged EMMI's intent to renew and expressly represented that renewal was being processed but delayed due to an internal "backlog" of renewals of other franchises.

In fact, on multiple occasions, EWCF confirmed that the renewal process has been modified.  EWCF indicated that it had not yet provided a Successor Franchise agreement due to the "backlog" and that EMMI would continue operating under a short-term extension while the renewal process was ongoing.  EWCF issued that extension and continued to engage EMMI in renewal discussions throughout 2025, including requesting documentation, holding meetings, and discussing next steps for completing renewal.

By way of example, EWCF sent the following email to EMMI on September 9, 2025:

Sent: Monday, September 9, 2024 3:09 PM
To: farzana khan <farzana.khan@waxcenter.com>
Cc: Todd Cherry <Todd.Cherry@myewc.com>; Joyce Wrigley <joyce.wrigley@myewc.com>
Subject: Extension of Initial Term I Short-Term Extension Agreement - EWC Michigan Management, Inc.

Dear Farzana,

As you know, the Initial Term of the Franchise Agreement for the location identified above previously expired (or will expire soon), and EWC has not yet had an opportunity to have you sign the Successor Franchise Agreement for this location.

As we work through the backlog of renewals over the coming months, we would like to ensure that the location identified above has an active Short-Term Extension Agreement in place.

Accordingly, after receiving this email, you will receive a second email from DocuSign prompting you to e-sign the attached Short-Term Extension Agreement, which serves to extend (or further extend, as applicable) the Initial Term of the Franchise Agreement through December 31, 2025.

**As noted above, EWC is currently working to address the backlog with renewals, so you will receive additional information regarding the steps that will need to be completed in order to sign the Successor Franchise Agreement for this location at some point in the coming months.**

If you have any questions about the attached Short-Term Extension Agreement, please let me know. Otherwise, I will send a copy of the fully executed Short-Term Extension Agreement to you via email once the DocuSign has been completed.

Thank you,

MEREDITH TILLERY
LEGAL COORDINATOR

*See*, Ex. C – September 9, 2024 Email, emphasis added.

These writings and representations effectively modified, or waived, certain technical requirements originally contained in the Franchise Agreement.  By way of example, EMMI was excused from submitting in writing a request to renew – after all, why would EMMI need to submit a written request to renew after EWCF acknowledged EMMI's request to renew and indicated that EWCF was working on the renewal while managing a "backlog" of franchise renewals?  Likewise, EMMI was not required to sign a new franchise agreement while was waiting for EWCF to provide an agreement, which it promised it would do after it address the "backlog."

At no point during this process did EWCF provide a Successor Franchise agreement and at no point did it advise EMMI that renewal would be denied.  Instead, EMMI reasonably relied on EWCF's representations and simply continued to operate the business by retaining employees,

6

extending its lease through May 2030, and committing itself to long-term financial obligations in reliance on the expectation that the franchise would be renewed while waiting for EWCF to issue a Successor Franchise agreement once its "backlog" had been handled.

### d. EWCF reverses course despite its prior representations and conduct

Without warning, EWCF abruptly reversed course. On January 7, 2026, EWCF informed EMMI that it was closing the franchise location in West Bloomfield. The very next day, EWCF asserted, again without prior notice, that the term had expired and that it would disable all systems associated with the West Bloomfield Store. *See*, Ex. D – Letter Terminating West Bloomfield services and accounts. EWCF followed through, disabled the Zenoti platform and related systems, removed the location from the corporate website as "permanently closed," and prevented all customer bookings. *See*, EX. A at ¶ 12. The result was immediate. *Id*. The West Bloomfield business ceased to exist. *Id*.

EWCF then turned to the Canton Store. On January 16, 2026, again without any prior notice of default, EWCF asserted that the Canton franchise had expired and that it intended to shut it down, much in the way it shut down the West Bloomfield Store. *See*, Ex. E – Letter Terminating Canton Store. EWCF offered only a conditional extension that would have required EMMI to waive its legal claims against EWCF. *Id*. EWCF then confirmed that it would disable the Canton Store's systems and accounts, including the Zenoti platform, on March 31, 2026. *Id*. More recently, on March 25, 2026, after Ms. Khan had attended a conference for EWC franchisees, EWCF emailed to offer an "extension" to April 9, 2026 (effectively an additional eight days), to sell the franchise – an obviously impossible task. *See*, Ex. F – Email Extending to April 9, 2026.

This threat would not merely bring about a disruption in the Canton Store's operations. It is a functional death sentence for the business, just like it was for the West Bloomfield Store.

Without these systems and accounts, EMMI cannot operate the Canton Store, all its customer base and goodwill will vanish, and the business will permanently and irreversibly cease to exist.

The Franchise Agreement as amended does not permit EWCF to withhold renewal and prohibits termination in this manner. Unless enjoined, EWCF will carry out the same shutdown it already executed at the West Bloomfield Store. EMMI will lose its business, its goodwill, its employees, and its financial viability, and will eventually default on more than $1.2 million in obligations.

## III.   STANDARD FOR INJUNCTIVE RELIEF

Plaintiff moves this Court for a temporary restraining order (TRO) and preliminary injunction. The objective of preliminary injunctive relief is to maintain the status quo pending a final hearing regarding the parties' rights. *Alliance for Mentally of Mich v Dept of Community Health*, 231 Mich App 647, 655-656; 588 NW2d 133 (1998).

This Court may issue a temporary restraining order with or without notice. *See*, MCR 3.310(B). **The purpose of a TRO and a preliminary injunction is to preserve the status quo so that the rights of the parties may be determined without injury to either**. *Psychological Services of Bloomfield v. Blue Cross & Blue Shield of Mich.*, 144 Mich. App. 182; 375 N.W.2d 382 (1985).

Under Michigan law, the following four factors Courts routinely grant injunctive relief in aid of arbitration to preserve the status quo pending arbitration proceedings be considered in determining whether to grant a preliminary injunction:

> (1) The likelihood that the party seeking the injunction will prevail on the merits;
>
> (2) The danger that the party seeking the injunction will suffer irreparable injury if the injunction is not issued;
>
> (3) The risk that the party seeking the injunction would be harmed more by the absence of an injunction than the opposing party would be by the granting of the relief; and

(4) The harm to the public interest if the injunction is issued.

*See, Commissioner of Ins* v *Arcillio,* 221 Mich App 54, 77-78, 561 NW2d 412 (1997); *Fruehauf Trailer Corp* v *Hagelthorn,* 208 Mich, App 447, 449, 528 NW2d 778 (1995). These factors are not prerequisites to issuing an injunction; rather, they are factors to be balanced; and the decision to grant or deny preliminary injunctive relief should be based on the facts of the particular case. *Michigan State AFL-CIO v Secretary of State,* 230 Mich App 1, 14; 583 NW2d 701 (1998).

In deciding whether injunctive relief is appropriate, the trial court will generally balance the benefit of an injunction to the plaintiff against the inconvenience and damage to the [non-moving party] and decide in accordance with justice and equity under all the circumstances of the case. *Kernen,* 232 Mich. App. at 514, 591 N.W.2d 369; *Brown Dairy Equip, Inc v Lesoski*, No. 291372, 2010 WL 4485919, at *1 (Mich Ct App November 9, 2010).

Here, an examination of each factor demonstrates that the Court should preserve the status quo and issue injunctive relief and grant injunctive relief in aid of EMMI's contractual right to arbitration to preserve the status quo pending those proceedings.

## IV.   LAW AND ARGUMENT

### a.   EMMI IS LIKELY TO SUCCEED ON THE MERITS

#### i.   EWCF is liable for breach of contract

EMMI is likely to succeed on the merits of its breach of contract claim because EWCF has attempted to deny EMMI its right to renew the franchise and enter into a Successor Franchise agreement and is threatening to terminate the franchise in direct contravention of the Franchise Agreement's mandatory notice-and-cure provisions. The Franchise Agreement as amended provides EMMI with a contractual right to renew the franchise, and EWCF's own representations and conduct modified or amended the technical requirements to exercise that right including by

9

acknowledging, repeatedly, EMMI's intent to renew and by indicating that a Successor Franchise agreement would be delivered after EWCF worked through its "backlog" of renewals.

EWCF's apparent position regarding renewal is undermined by the well-established prevention doctrine, which precludes a party from relying on the non-occurrence of a condition precedent that it caused or prevented. As alleged in the Verified Complaint, EWCF repeatedly confirmed EMMI's intent to renew, represented that the renewal was in process, failed to provide a Successor Franchise agreement, and then claimed that EMMI's failure to provide written notice of its intent to renew and to execute that very agreement resulted in the loss of renewal rights. *See*, Verified Compl at ¶¶ 30--38. Under Michigan law, this conduct cannot support termination. *See*, e.g., *Harbor Park Market, Inc v Gronda*, 277 Mich App 126, 131 (2007) (a party may not rely on the failure of a condition precedent where that party's own conduct prevented its occurrence).

In addition, EWCF's course of conduct in acknowledging the apparent renewal backlog, issuing extensions to EMMI as a result, and allowing continued operation, all constitutes a modification and/or amendment of any technical renewal requirements. *See, Quality Products & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 372--73 (2003). Taken together, these facts establish not only a likelihood of success, but a strong probability that EWCF's attempted termination will be found unlawful.

Also, as alleged in the Verified Complaint, EWCF never issued a proper notice of default, never identified any specific breach in advance, and never provided EMMI with any opportunity to cure prior to declaring the franchise expired and initiating shutdown procedures. *See*, Verified Complaint at ¶¶ 17--19, 47-49. Michigan courts strictly enforce contractual notice and cure provisions, particularly where termination is at issue, and a party's failure to comply with those provisions constitutes a material breach as a matter of law. *See, e.g., Omnicom of Mich v Giannetti*

10

*Inv Co*, 221 Mich App 341, 348--49 (1997) (holding that failure to follow contractual notice requirements renders termination improper); *see also, McDonald v Farm Bureau Ins Co*, 480 Mich 191, 204 (2008) (contracts must be enforced as written). EWCF's attempt to bypass these requirements by disabling the systems necessary to operate the franchise is not merely a technical violation of the Franchise Agreement as amended, it is a complete circumvention of the contractual termination framework and effectively nullifies EMMI's bargained-for right to renew.

### ii.   EWCF is liable for promissory estoppel

EMMI is further likely to succeed on its promissory estoppel claim. The elements are plainly satisfied: clear promise, reasonable reliance, and resulting detriment. *See, Zaremba Equip, Inc v Harco Nat'l Ins Co*, 280 Mich App 16 (2008). EWCF made clear and definite promises that it had acknowledged EMMI's intent to renew, that renewal was in process, and that EMMI could continue operating during that process. EMMI reasonably relied on those promises to its detriment.

As alleged in the Verified Complaint, EWCF expressly acknowledged that it had not yet provided a successor franchise agreement due to internal backlog, issued a short-term extension, and continued to engage EMMI in the renewal process throughout 2025 without ever indicating that renewal would be denied. *See*, Verified Compl at ¶¶ 26--34. These were not vague assurances, but specific representations tied to an ongoing renewal process and continued operation of the franchise. Michigan law recognizes that promissory estoppel applies where a party makes a promise that it should reasonably expect to induce action, and the promise does in fact induce such action. *Zaremba, supra*, at 41 (2008).

EMMI's reliance on EWCF's representations was both reasonable and foreseeable as well. EMMI continued operating the business, retained employees, incurred ongoing expenses, and,

most significantly, extended its lease through May 2030, thereby committing itself to substantial long-term financial obligations in reliance on the expectation that the franchise would be renewed. *See*, Verified Compl at ¶¶ 32--34.  EWCF knew or should have known that EMMI would take precisely these steps given its representations that renewal was being processed and approved. Michigan courts have consistently held that where a party induces reliance of this nature and then repudiates its promise, enforcement is necessary to avoid injustice. *See*, e.g., *Crown Tech Park v D&N Bank*, FSB, 242 Mich App 538, 548--49 (2000).  Here, EWCF's abrupt reversal after inducing substantial reliance creates precisely the type of inequitable result that promissory estoppel is designed to prevent and further supports a strong likelihood that EMMI will prevail on this claim.

### iii.  EWCF is in violation of the Michigan Franchise Investment Law

Finally, EWCF's conduct constitutes bad-faith nonrenewal under the Michigan Franchise Investment Law, MCL 445.1501 et seq. (the "MFIL"), which prohibits unfair and deceptive practices in franchise relationships.  Critically, the MFIL provides that in an action to enjoin enforcement of a provision that is void and unenforceable under the MFIL, there is a presumption of immediate and irreparable harm to the franchisee where the court finds that such a prohibited provision is present. *See*, MCL 445.1535(3).

The MFIL broadly prohibits franchisors from engaging in conduct that is unfair, inequitable, or in bad faith toward franchisees, including for example actions that effectively terminate or refuse to renew a franchise through deceptive or coercive means. *See,* MCL 445.1527; *General Aviation, Inc v Cessna Aircraft Co*, 13 F3d 178, 181-82 (6th Cir 1993) (recognizing MFIL's purpose of protecting franchisees from unfair franchisor practices).  As alleged in the Verified Complaint, EWCF induced EMMI to continue operating under the belief that renewal

12

was being processed, while withholding the very agreement necessary to complete renewal and never issuing any notice of default or opportunity to cure. *See*, Verified Complaint at ¶¶ 26--34, 47-49. EWCF then reversed course and asserted that renewal rights had lapsed--conduct that is inherently misleading and inequitable under the MFIL framework.

EWCF's conduct further constitutes bad-faith nonrenewal and coercive dealing prohibited by the statute. After inducing EMMI's reliance, EWCF attempted to force EMMI to sign a short-term extension conditioned on waiving its legal claims, and when EMMI declined, EWCF moved forward with plans to shut down the business by disabling its operating systems. *See*, Verified Compl at ¶¶ 44-48. Michigan courts recognize that such conduct, where a franchisor uses its superior position to pressure a franchisee or to effectuate termination outside the contractual and statutory framework, falls squarely within the type of unfair practices the MFIL is designed to prevent. *See Little Caesar Enterprises, Inc v Smith*, 34 F Supp 2d 459, 463--64 (ED Mich 1998) (MFIL prohibits franchisor conduct that is arbitrary, coercive, or in bad faith).

EWCF's conduct also reflects coercive and bad-faith behavior prohibited by the Michigan Franchise Investment Law. After inducing EMMI's reliance and refusing to process renewal, EWCF has now attempted to force a rushed sale of the business within fifteen days while retaining full control over whether any buyer would be approved. This type of coercive, time-pressured "sale" is not a legitimate business opportunity--it is a mechanism to extract value or force exit under duress, and it falls squarely within the type of unfair and inequitable practices the MFIL is designed to prevent.

Given EWCF's pattern of inducing reliance, withholding critical information, and then attempting to terminate the franchise through system disablement, EMMI has established a strong likelihood of success on its MFIL claim.

13

### i. EWCF tortiously interfered with EMMI's business relationships

EMMI is also likely to prevail on its claim for tortious interference with business relationships because EWCF has intentionally and improperly interfered with EMMI's existing and prospective relationships with its customers, employees, and vendors by disabling and/or threatening to disable the systems and accounts necessary for the business to operate, including the Zenoti platform.

To establish tortious interference under Michigan law, a plaintiff must show (1) the existence of a valid business relationship or expectancy, (2) knowledge of that relationship by the defendant, (3) intentional interference inducing or causing a breach or termination of the relationship, and (4) resulting damages. *See*, *Health Call of Detroit v Atrium Home & Health Care Servs, Inc*, 268 Mich App 83, 90 (2005). As alleged in the Verified Complaint, EMMI maintains ongoing relationships with a substantial and recurring customer base, long-tenured employees, vendors, and its landlord, all of which are integral to the operation of the Canton Store. *See*, Verified Compl at ¶¶ 11--12, 50. EWCF, as franchisor, is fully aware of these relationships and their importance to EMMI's business.

EWCF's conduct satisfies the remaining elements because it has intentionally taken steps to disrupt and destroy those relationships through wrongful means. By disabling EMMI's systems and account and/or threatening to do so, EWCF is not merely interfering with EMMI's contractual rights, but is directly preventing EMMI from serving customers, scheduling appointments, processing transactions, and maintaining ongoing business relationships. *See*, Verified Compl at ¶¶ 47—50.

Michigan law requires that the interference be either per se wrongful or accomplished through improper means, and conduct that violates a contract or statutory duty satisfies that

requirement. *Dalley v Dykema Gossett*, PLLC, 287 Mich App 296, 323 (2010).  Here, EWCF's actions are independently wrongful because they violate the Franchise Agreement's termination provisions and constitute bad faith conduct under the MFIL.  By leveraging its control over the operating system to force the collapse of EMMI's business relationships, EWCF has engaged in intentional and improper interference, and EMMI has therefore established a strong likelihood of success on this claim.

Taken together, these claims establish a strong likelihood of success.

### b.  EMMI WILL SUFFER IRREPARABLE HARM

The harm here is not merely economic—it is existential.  "A preliminary injunction may be granted under MCR 3.310(A) where [the moving party] can make a particularized showing of irreparable harm that will occur before the merits of the claim are considered." *Lash v City of Traverse City*, 479 Mich 180, 196; 735 NW2d 628 (2007).

Michigan courts recognize that loss of customer goodwill constitutes irreparable harm. *See, Slis v Michigan*, 332 Mich App 312 (2020).  Courts further recognize that the threatened destruction of a business itself constitutes irreparable harm for which no adequate remedy at law exists.  "The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." *Basicomputer Corp v Scott*, 973 F2d 507, 512 (6th Cir 1992).  Competitive losses and losses of customer goodwill are inherently difficult to calculate and are sufficient to support an injunction. *Id.*; *Merrill Lynch, Pierce, Fenner & Smith Inc v Ran*, 67 F Supp 2d 764, 778-779 (ED Mich 1999).

Whether "loss of customer goodwill amounts to irreparable harm often depends on the significance of the loss to the plaintiff's overall economic well-being." *Apex Tool Grp, LLC v Wessels*, 119 F Supp 3d 599, 610 (ED Mich 2015) (citation omitted) (declining to issue injunction

based on loss of goodwill because it appeared to court "that plaintiff is a substantial company and would not be driven out of business in the absence of injunctive protection") (relied on by *Michigan First Credit Union v Palace Sports & Entm't*, No 340529 (Mich Ct App Feb 27, 2018) (per curiam) (unpublished)).  Here, EMMI would be driven out of business as a result of EWCF's threatened conduct.

Moreover, where economic harm threatens the very existence of a business, it is irreparable.  That is precisely the situation here.  EWCF's planned shutdown of EMMI's systems and accounts will eliminate EMMI's ability to operate, destroying its customer base, goodwill, and business relationships.  No damages award can restore a destroyed business or recreate lost customer relationships.  The harm is also certain.  In fact, EWCF has already done exactly this once to the West Bloomfield Store.

EWCF's recent attempt to provide a fifteen-day "extension" to sell the business further underscores the irreparable nature of the harm.  Rather than mitigating damages, this ultimatum confirms that EWCF intends to force a fire sale of the business under conditions that make any legitimate sale impossible.  Courts recognize that the destruction of a going concern, including the loss of goodwill, customer relationships, and enterprise value, constitutes irreparable harm for which no adequate remedy at law exists. *Apex Tool Grp, LLC, supra.*  Here, the forced liquidation of EMMI's business within days would eliminate any possibility of preserving its value and would result in losses that cannot be calculated or recovered through money damages.

### c.   BALANCE OF HARMS

In balancing the hardships, a court necessarily considers whether the injury to the plaintiff outweighs the damage an injunction may cause the opposing party. *Stormor, a Div of Fuotia*

16

*Industries, Inc v Johnson*, 587 F Supp 275, 280 (WD Mich 1984).  The court's analysis in *Superior Consulting* is instructive:

> If [plaintiff] suffered irreparable harm to its competitive position, the loss would be of incalculable quantity and duration. Also, the injunction sought by [plaintiff] only prevented [defendant] from violating his freely entered contractual obligations to [plaintiff].

*Id*. at 848.

The balance of harms overwhelmingly favors EMMI.  Michigan courts have routinely held that a preliminary injunction is proper when it preserves the status quo and returns the parties to the status quo prior to the controversy at issue.  *Campau v. McMath*, 463 N.W.2d 186, 190 (Mich. Ct. App. 1990).

Without relief, EMMI's business will be permanently destroyed.  With relief, EWCF will simply be required to maintain the status quo and continue to collect royalties from a thriving franchise.  The Court should grant injunctive relief where one party faces existential harm and the other faces only minimal inconvenience.

### d.  PUBLIC INTEREST

Courts have consistently recognized that injunctive relief is appropriate where necessary to preserve the status quo and ensure that disputes are resolved through the judicial process rather than unilateral action.  *Michigan State Employees Ass'n v Dep't of Mental Health*, 421 Mich 152, 160 (1984).  Allowing EWCF to shut down EMMI's business through system disablement without complying with the Franchise Agreement as amended, including rights to renewal and notice and cure provisions, would undermine the stability and predictability of commercial relationships and effectively sanction unilateral modifications to agreements and extra-contractual termination practices.

17

Michigan courts have further emphasized that the public has an interest in preventing unfair or deceptive business conduct and in maintaining fair dealing in franchise relationships. *See General Aviation, Inc v Cessna Aircraft Co*, 13 F3d 178, 181–82 (6th Cir 1993) (recognizing the protective purpose of the Michigan Franchise Investment Law). Granting injunctive relief here serves those interests by preserving the status quo, enforcing contractual rights, and preventing the type of unilateral, coercive conduct that Michigan law seeks to deter.

## V.    CONCLUSION

EWCF has made clear that it will shut down EMMI's business on April 9, 2026 through system disablement. That conduct is unlawful, imminent, and irreparable. EMMI respectfully requests that this Court enter a Temporary Restraining Order, preserve the status quo, order EWCF to show cause why a preliminary injunction should not issue, and grant all further appropriate relief.

Respectfully submitted,

**HOWARD & HOWARD ATTORNEYS PLLC**

*/s/ Mark C. Vanneste*

By:    Mark C. Vanneste
450 W. 4th Street
Royal Oak, MI 48067
Dated: March 31, 2026            248-645-1483 | mv@h2law.com

STATE OF MICHIGAN
IN THE WAYNE COUNTY CIRCUIT COURT

EWC MICHIGAN MANAGEMENT, INC.,

       Plaintiff,

v.

EWC FRANCHISE, LLC,

       Defendant.

Case No. 2026 -      - CB
Hon.

---

| HOWARD & HOWARD ATTORNEYS PLLC | STONE JUSTICE PC |
|---|---|
| By:  Jon R. Steiger (P35505) | By:  Erik J. Stone (P29088) |
|      Mark C. Vanneste (P73001) | P.O. Box 1 |
| 450 W. 4th Street | 416 N. Third Street |
| Royal Oak, MI  48067 | Rogers City, MI 49779 |
| (248) 645-1483 | (248) 990-1779 |
| mv@h2law.com | erik@stonejustice.com |
| | |
| *Attorneys for Plaintiff* | *Co-Counsel for Plaintiff* |

---

## AFFIDAVIT OF FARZANA KHAN

I, Farzana Khan, being first duly sworn, depose and state as follows:

1.     My name is Farzana Khan, I am over 18 years of age, I have personal knowledge of the facts and circumstances set forth in this Affidavit, and I am able to testify to these facts if called upon to do so.

2.     I am the sole shareholder of Plaintiff EWC Michigan Management, Inc. ("EMMI") and non-party EWC West Bloomfield, Inc., and I operated European Wax Center ("EWC") franchise locations in Canton, Michigan and (formerly) West Bloomfield, Michigan.  I submit this affidavit in support of my emergency motion for a temporary restraining order and preliminary injunction to maintain the status quo and prevent the franchisor, EWC Franchise,

1



LLC ("EWCF") from shutting down essential operating systems (including Zenoti), which EWCF has indicated it will cease to provide on April 9, 2026.

3.      These two EWC centers were the only marital asset able to produce income that I received in my divorce.  With no prior business experience (I was an elementary school teacher before raising four children and managing the household for 20 years), I personally bought out my ex-husband's interest by borrowing $250,000, forgoing $100,000 in alimony ($400/month), paying him $350,000 cash, and assuming the outstanding loans in amount of $850,000 approximately, thus acquiring the centers at a cost $1.2 million in total debt.  The businesses were not profitable at acquisition.  I sustained them through COVID with Economic Disaster Loans that I personally guaranteed.

4.      Through my efforts as the **first EWC franchisee in the entire state of Michigan**, both centers expanded dramatically.  In 2025 the two stores achieved a combined **24% year-over-year sales growth**, generating **$1.9 million** in revenue and approximately **$280,000–$350,000** in annual profitability (exceeding network averages).  Both locations ranked at the high in every key EWC metric: SPT, Wax Pass Conversion, Retail Conversion, and Rebooking. January 2026 sales were up **28%** and February 2026 sales were up **14%**.  I currently maintain a **4.8 out of 5** guest review rating with associates who have stayed with me for six years.

5.      In 2024 and 2025, I gave notice of my intent to renew both franchises for an additional 10 years.  On **September 9, 2024**, EWCF's Legal Coordinator Meredith Tillery (copying other high-level executives) emailed me that "**EWC has not yet had an opportunity to have you sign the Successor Franchise Agreement for this location**" and that "**as we work through the backlog of renewals over the coming months, we would like to ensure that the location identified above has an active Short-Term Extension Agreement in place**."  The

2

email further stated that I would receive a short-term extension agreement expiring December 31, 2025 and "**EWC is currently working to address the backlog with renewals, so you will receive additional information regarding the steps that will need to be completed in order to sign the Successor Franchise Agreement for this location at some time in the coming months**." EWCF, via Ms. Tillery, emailed a signed Short Term Extension agreement to me on October 1, 2024.

6. I was not told that I needed to do anything more to renew the franchises, although at some point I was told to register my intent to renew the franchises on an electronic registry maintained by the Franchisor, which I did. No receipt for the registration was provided.

7. There were subsequent discussions about renewing the franchises between myself and Korrie Bovee, the franchise business consultant advising hired by the Franchisor.

8. I also discussed the renewals with the Franchisor's representatives Patricia Halpin and Michele Reap. Ms. Reap contacted me on March 13, 2025 to schedule a meeting for renewal of both franchises. The meeting occurred on March 24, 2025. At that meeting Ms. Reap informed me of the next steps in the renewal process, during which I notified Ms. Reap of my intent to renew the franchises for both locations.

9. Ms. Halpin also emailed me on November 11, 2025 to discuss West Bloomfield real estate lease and franchise agreement.

10. Ms. Reap and Ms. Halpin had the authority to act for the franchisor, and I materially relied on that in dealing with them and accepting what they told me.

11. Kurt Smith, Franchisor's Chief Development Officer, notified the me on December 9, 2025 that Ms. Halpin had left the company and Ms. Reap would replace her. At no time was I told I was unqualified, in default, or that renewal was at risk or not being processed.

12.     There was no indication or notice in those discussions or since then that the franchises would not be renewed until the franchisor's Chief Development Officer, Kurt Smith, contacted me by phone on January 7, 2026 and told me the West Bloomfield center would be closed.  I objected to the closure and restated my objections in two emails on January 9, 2026. EWCF then cut off all services to West Bloomfield, removed it from their website as "permanently closed," and prevented customer appointments, even though I was still in possession of the leased space and had paid rent.

13.     EWCF now threatens to shut down all services, including the **Zenoti system**, to the Canton location on **April 9, 2026**.  Without Zenoti I cannot book appointments, process payments, manage guest data, or report royalties.  This would immediately and permanently destroy the Canton business as it has already done to West Bloomfield business

14.     If EWCF is allowed to shut down Zenoti and services on April 9, 2026, I will suffer immediate, permanent, and non-compensable harm: loss of my entire customer base and goodwill (built over a decade as Michigan's first EWC pioneer), loss of long-term employees, default on my personally guaranteed loans of approximately $1.2 million, and devastation to my family.  As a single mother of three daughters (two in college), this is my sole source of income. Monetary damages cannot replace a destroyed business or the relationships I have built.  The harm is certain and imminent.

15.     The September 9, 2024 email from Ms. Tillery modified the renewal process. The email and subsequent discussions are proof the Franchisor knew that I intended to operate a Successor Franchise for both locations.

4

16. There was no notice provide to me that I was not deemed qualified to extend the franchises, or that I had committed any breach of the franchise agreements that disqualified me from extending the franchises.

17. Neither was there any notice to me, that I needed to do anything further to advise the franchisor of my intention to renew the franchises while EWCF was repeatedly confirming that it was aware of my intention to renew. There was also confirmation that I could continue to operate during the renewal process, which is still ongoing.

18. Mr. Smith's January 16, 2026 termination notice primarily relies on purported lack of written notice of my intent to operate under a Successor Franchise Agreement and not having signed a Successor Franchise Agreement, which he alleges was required by Sections 4.2.6 and 4.27 of the Franchise Agreement.

19. However, the requirement for a written notice in Section 4.2.6 of the Franchise Agreement was excused and modified by the franchisor, multiple times.

20. The alleged failure to have signed a Successor Franchise Agreement is due to the agreement not being provided to me to sign and not due to any fault of mine.

21. The only notices I received purporting to claim that my right to renew the franchises had expired were from the franchisor' attorney Mr. Pfutzenreuter on January 8, 2026 and the franchisor's Chief Development Officer Kurt Smith on January 16, 2026. Prior to then the I had operated with the reasonable expectation it could operate during the renewal process as described by Ms. Tillery in the September 24, 2024 and eventually would be provided a Successor Franchise Agreement to sign when the 'backlog of renewals" described by Ms. Tillery was addressed.

5

22.     I was intentionally misled to believe the 10-year renewal for each location had been approved and that the Successor Franchise Agreements for both locations would be issued for me to sign.

23.     As the September 9, 2024 email from Ms. Tillery states, all that remained to be done to extend the franchises was for the Franchisor to work through its "backlog with renewals".

24.     My rights to obtain a Successor Franchiser both locations under Section 4.2 of the Franchise Agreement have not terminated due to the defaults alleged in either of Mr. Pfutzenreuter's or Mr. Smith's notices, or otherwise.

25.     By its own admission the franchisor has up to now been unable to extend the franchises due to the Franchisor's purported "backlog with renewals" and not having a Successor Franchise Agreement prepared for me to sign.

26.     I have maintained the real estate leases for both franchise locations and operated in the locations before and since September 9, 2024 when the franchisor's representative Meredith Tillery  in her September 9, 2024 email affirmed the Franchisee's notification of its intent to operate a Successor Franchise, excused its own inability to renew the franchises due to the "backlog with renewals", said it wanted to ensure the Franchisor it could operate during the renewal process and  promised more information on "the steps that will need to be completed in order to sign the Successor Franchise Agreement".

27.     Since September 9, 2024 I have operated in reliance on the franchises being renewed, as evidenced by having on May 5, 2025 extended the real estate lease for the Canton, Michigan location for a term ending May 30, 2030 and continued operating at the Canton location.

28.     Unfortunately, I believe what appears to be the true – and likely illicit – motivation underlying the franchisor's refusal to issue the Successor Franchise Agreements for

6

both locations is the franchisor's stated preference for franchisees who own several locations and not the small owners like me who have made huge personal investments of capital and time, successfully promoted the brand and developed the local markets, and taken great risks for the franchisor's benefit.

29. The franchisor's Chief Development Officer, Mr. Smith has threatened the franchisor would stop necessary services to my operations in Canton, MI on April 9, 2026.

30. The Franchisor previously interfered with my business at the West Bloomfield location by indicating on the franchise location map it advertises that the location was "permanently closed" and not provided the services and supplies need to operate the business.

31. The franchisor has ignored my right to arbitrate this dispute. The controlling franchise documents, and applicable Michigan franchise law, require that these disputes be resolved in Michigan under Michigan law whether by court proceedings or arbitration. Any different choice of law or forum selection provisions in the current Franchise Agreement are not enforceable.

32. I reserve my rights to arbitration and/or litigation, as the case may be, in Michigan should the parties be unable to agree on a Successor Franchise Agreement for both locations

33. For now, the *status quo* remains what is stated in the September 9, 2024 email from Ms. Tillery, i.e., that I have the right to continue in business in both locations pending being given the opportunity to sign a Successor Franchise Agreement for both locations.

34. I have fully performed all obligations and maintained the real estate leases (including extending the Canton lease through 2030 in reliance on renewal). My rights to 10-year successor agreements have not expired.

Further Affiant sayeth not.

By: Farzana Khan

On March 30th, 2026, before me, the undersigned, a Notary Public in and for said state, personally appeared personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that executed it.

Subscribed and sworn to before me this 30th day of March, 2026.

Notary Public
Wayne County, MI
Acting in Oakland County
My Commission Expires: NOV. 21, 2031

CIARA WHITMAN
NOTARY PUBLIC – STATE OF MICHIGAN
COUNTY OF WAYNE
My Commission Expires Nov. 21, 2031
Acting in the County of Oakland

8

# EWC FRANCHISE, LLC

## FRANCHISE AGREEMENT

## EWC MICHIGAN MANAGEMENT INC

## MAY 13, 2015

**Michigan Region**



TABLE OF CONTENTS

**SECTION**                                                                                              **PAGE**

1.          DEFINITIONS ..................................................................................................................2

2.          GRANT OF FRANCHISE; APPROVED LOCATION ......................................................5

     2.1    Grant of Franchise..................................................................................................5

     2.2    Approved Location Determined ..............................................................................5

     2.3    Approved Location Not Determined ......................................................................5

     2.4    Franchisee Shall Not Sublicense the System or Marks........................................6

     2.5    Territorial Protection - Protected Territory .........................................................6

     2.6    Map and Description of Protected Territory .........................................................7

     2.7    Franchisor's Retained Rights ................................................................................7

     2.8    Guest Services; Restrictions on Franchisee's Marketing Telephone Numbers......8

     2.9    Franchisee Designated Representative. .................................................................9

3.          FEES ............................................................................................................................9

     3.1    Franchise Fee ..........................................................................................................9

     3.2    Start-up Fees ..........................................................................................................10

     3.3    Point-of-Sale System Server Maintenance Fees ..................................................10

     3.4    Weekly Royalty Fee ...............................................................................................10

     3.5    Guest Services Fee .................................................................................................10

     3.6    Taxes .......................................................................................................................11

     3.7    Electronic Transfer of Fees Payable to Franchisor ............................................11

     3.8    Franchisor to Act as a Clearing House for Gift Cards and Membership Plans......11

     3.9    Late Fees.................................................................................................................11

     3.10   Application of Payments by Franchisor ...............................................................12

4.          TERM AND SUCCESSOR FRANCHISE AGREEMENTS .........................................12

     4.1    Term.........................................................................................................................12

     4.2    Successor Franchise Agreement...........................................................................12

5.          LOCATION FOR FRANCHISED CENTER; LEASE; DEVELOPMENT;
            OPENING..................................................................................................................13

     5.1    Selection of Site .....................................................................................................13

     5.2    Failure to Select Site .............................................................................................14

     5.3    Lease of Approved Location ..................................................................................14

     5.4    Development of Approved Location.......................................................................16

     5.5    Failure to Develop Approved Location .................................................................17

     5.6    Opening of the Franchised Center ........................................................................18

     5.7    Failure to Open ......................................................................................................19

     5.8    Use of Approved Location......................................................................................19

     5.9    Relocation of the Franchised Center.....................................................................19

6. FRANCHISOR'S MARKS ..................................................................................................20

6.1 Franchisor's Ownership of Marks ........................................................................20

6.2 Limitations on Franchisee's Use of the Marks ....................................................20

6.3 Notification of Infringements of the Marks; Claims Against the Marks ..............20

6.4 Franchisor's Indemnification for Franchisee's Use of Marks ..............................20

6.5 Franchisee's Discontinuance of Use of the Marks ..............................................21

6.6 Franchisor's Right to Inspect Franchisee's Use of the Marks .............................21

6.7 Franchisor's Sole Right to Domain Name ...........................................................21

6.8 Contributions and Donations ...............................................................................21

7. TRADE SECRETS AND OTHER CONFIDENTIAL INFORMATION ..........................21

7.1 Requirement of Confidentiality ...........................................................................21

7.2 Franchisor Owns All Additional Developments ..................................................22

7.3 No Competition with Franchisor ..........................................................................22

7.4 Designated Individuals Shall Enter Into Nondisclosure and Non-Competition
Agreements ..........................................................................................................23

7.5 Franchisee Acknowledges Reasonableness of Restrictions .................................23

7.6 Relief for Breaches of Confidentiality, Non-Solicitation, Non-Disparagement and
Non-Competition .................................................................................................23

8. TRAINING AND ASSISTANCE PROVIDED BY FRANCHISOR ................................24

8.1 Franchisor Shall Provide Initial Training ............................................................24

8.2 Personnel .............................................................................................................24

8.3 Franchisee's Failure to Complete Initial Training Program .................................24

8.4 Franchisor Shall Provide Opening Assistance .....................................................25

8.5 New Designated Manager Must Complete Initial Training Program ...................25

8.6 Franchisee and its Designated Manager Must Attend Ongoing Training .............25

8.7 Franchisor Reserves the Rights to Modify Training Programs .............................26

9. FRANCHISOR'S CONFIDENTIAL OPERATIONS MANUAL .....................................26

9.1 Franchisor Shall Loan Franchisee the Confidential Operations Manual ..............26

9.2 Franchisor May Modify the Confidential Operations Manual .............................26

9.3 Franchisee Must Maintain the Confidentiality of the Confidential Operations
Manual .................................................................................................................27

10. FRANCHISE SYSTEM ...................................................................................................27

10.1 Franchisee Shall Comply with Franchisor's Requirements, Specifications,
Standards, Operating Procedures and Rules ........................................................27

10.2 Franchisor May Modify the System ....................................................................27

10.3 Franchisor May Vary Standards, Materials or Specifications for any Franchisee ...27

11. ADVERTISING AND PROMOTIONAL ACTIVITIES ...................................................28

11.1 Grand Opening Advertising ................................................................................28

11.2 Local Advertising ...............................................................................................28

11.3 Marketing Fund ..................................................................................................28

| | 11.4 | Special Marketing Programs; Cooperative Advertising | 30 |
| | 11.5 | Internet Advertising | 30 |
| 12. | | ACCOUNTING, RECORDS AND REPORTING OBLIGATIONS | 30 |
| | 12.1 | Franchisee Shall Maintain Full, Complete and Accurate Books, Records and Accounts | 30 |
| | 12.2 | Franchisee Shall Submit Gross Sales Reports | 31 |
| | 12.3 | Franchisee Shall Submit Financial Statements to Franchisor | 31 |
| | 12.4 | Franchisee Shall Submit Other Reports | 31 |
| | 12.5 | Computer/Point of Sale Systems | 31 |
| | 12.6 | Surveillance Camera System | 32 |
| | 12.7 | Telephone and Music System | 32 |
| | 12.8 | Franchisor May Inspect Franchisee | 32 |
| | 12.9 | Franchisor May Inspect Franchisee's Records | 33 |
| 13. | | FRANCHISEE SHALL COMPLY WITH FRANCHISOR'S STANDARDS OF OPERATION | 33 |
| | 13.1 | Franchisee Shall Only Sell Franchisor's Authorized Products and Services and Purchase from Approved Suppliers | 33 |
| | 13.2 | Franchisee Shall Sell All European Wax Center Products | 33 |
| | 13.3 | Franchisee Shall Only Purchase from Suppliers Approved by Franchisor | 34 |
| | 13.4 | Franchisee Shall Sell All Approved Package and Membership Programs | 35 |
| | 13.5 | Approved Customer Rewards and Loyalty Programs | 35 |
| | 13.6 | Appearance and Condition of the Franchised Center | 35 |
| | 13.7 | Management of the Franchised Center | 36 |
| | 13.8 | Hours of Operation of the Franchised Center | 36 |
| | 13.9 | No Discrimination | 36 |
| | 13.10 | Franchisee Shall Secure All Necessary Licenses and Permits and Comply with All Applicable Laws | 36 |
| | 13.11 | Franchisee Shall Provide Franchisor Notification of All Proceedings Against Franchisee | 37 |
| | 13.12 | Franchisee shall Comply with Good Business Practices | 37 |
| | 13.13 | Franchisee Shall Comply with Franchisor's Uniform Requirements | 37 |
| | 13.14 | Franchisee Shall Accept All Methods of Payment Prescribed for European Wax Centers | 37 |
| | 13.15 | Franchisee Shall Use Its Best Efforts | 38 |
| | 13.16 | E-mail | 38 |
| | 13.17 | Data Protection Laws; Personal Information | 38 |
| 14. | | FRANCHISOR'S ADDITIONAL OPERATIONS ASSISTANCE | 39 |
| | 14.1 | Franchisor May Provide General Advice and Guidance to Assist Franchisee | 39 |
| | 14.2 | Franchisor May Make Periodic Visits to Assist Franchisee | 39 |
| 15. | | INSURANCE REQUIREMENTS | 39 |

|       |       |                                                                                                |     |
|-------|-------|------------------------------------------------------------------------------------------------|-----|
|       | 15.1  | Types and Amounts of Coverage Required by Franchisee                                            | 39  |
|       | 15.2  | Franchisor May Increase Future Requirements                                                     | 40  |
|       | 15.3  | Carrier Standards for Franchisee's Insurance                                                    | 40  |
|       | 15.4  | Franchisee Shall Provide Franchisor Evidence of Franchisee's Insurance Coverage                | 40  |
|       | 15.5  | Franchisee's Failure to Maintain Insurance Coverage                                            | 40  |
| 16.   |       | DEFAULT AND TERMINATION                                                                         | 40  |
|       | 16.1  | Termination of Term by Franchisee                                                               | 40  |
|       | 16.2  | Termination of Term by Franchisor                                                               | 40  |
|       | 16.3  | Reinstatement and Extension                                                                     | 43  |
|       | 16.4  | Right of Franchisor to Discontinue Services to Franchisee                                      | 43  |
|       | 16.5  | Right of Franchisor to Operate Franchised Center                                               | 43  |
| 17.   |       | RIGHTS AND DUTIES UPON EXPIRATION OR TERMINATION                                                | 44  |
|       | 17.1  | Actions to be Taken by Franchisee Upon Termination                                              | 44  |
|       | 17.2  | Franchisee Shall Not Unfairly Compete with Franchisor                                           | 45  |
|       | 17.3  | Franchisor's Option to Purchase Certain Business Assets                                         | 45  |
|       | 17.4  | Survival of Certain Provisions of this Agreement Following Termination or Expiration of the Term | 46  |
| 18.   |       | TRANSFERABILITY OF INTERESTS IN THIS AGREEMENT                                                  | 46  |
|       | 18.1  | Transfer by Franchisor                                                                          | 46  |
|       | 18.2  | Transfer by Franchisee                                                                          | 46  |
|       | 18.3  | Restrictions on Transfer by Franchisee to a Controlled Entity                                   | 48  |
|       | 18.4  | Franchisor's Disclosure to Transferee                                                           | 50  |
|       | 18.5  | Advertising the Sale of the Franchisee                                                          | 50  |
|       | 18.6  | Transfer by Death or Incapacity                                                                 | 50  |
|       | 18.7  | No Release of Transferor.                                                                       | 50  |
| 19.   |       | RIGHT OF FIRST REFUSAL                                                                          | 51  |
|       | 19.1  | Submission of Offer                                                                             | 51  |
|       | 19.2  | Sale or Transfer to Family Members                                                              | 51  |
|       | 19.3  | Franchisor's Right to Purchase                                                                  | 51  |
|       | 19.4  | Non Exercise of Right of First Refusal                                                          | 51  |
| 20.   |       | BENEFICIAL OWNERS OF FRANCHISEE                                                                 | 51  |
| 21.   |       | RELATIONSHIP OF FRANCHISOR AND FRANCHISEE AND INDEMNIFICATION                                   | 52  |
|       | 21.1  | Description of Relationship of Franchisor and Franchisee                                        | 52  |
|       | 21.2  | Franchisor May Act in its Own Interest                                                          | 52  |
|       | 21.3  | Indemnification by Franchisee                                                                   | 52  |
|       | 21.4  | Franchisor's Right to Retain Counsel                                                            | 52  |
| 22.   |       | GENERAL CONDITIONS AND PROVISIONS                                                               | 53  |
|       | 22.1  | No Waiver                                                                                       | 53  |

| | | |
|---|---|---|
| 22.2 | Franchisor Entitled to Injunctive Relief | 53 |
| 22.3 | Addresses and Procedures for Sending Communications | 53 |
| 22.4 | Unlimited Guaranty and Assumption of Obligations | 54 |
| 22.5 | Approvals | 54 |
| 22.6 | Entire Agreement | 54 |
| 22.7 | Severability and Modification | 54 |
| 22.8 | Headings are for Convenience Only | 55 |
| 22.9 | Force Majeure | 55 |
| 22.10 | Timing is of the Essence | 55 |
| 22.11 | Withholding Payments | 55 |
| 22.12 | Further Assurances | 55 |
| 22.13 | Third-Party Beneficiaries | 55 |
| 22.14 | Multi-State Addenda | 56 |
| 22.15 | This Agreement May be Signed in One or More Counterparts | 56 |
| 23. | DISPUTE RESOLUTION | 56 |
| 23.1 | Choice of Law | 56 |
| 23.2 | Consent to Jurisdiction | 56 |
| 23.3 | Cumulative Rights and Remedies | 56 |
| 23.4 | Limitations of Claims | 56 |
| 23.5 | Limitation of Damages | 57 |
| 23.6 | Waiver of Jury Trial | 57 |
| 23.7 | Arbitration | 57 |
| 23.8 | Remedies in the Event of Breach of This Agreement | 57 |
| 24. | ACKNOWLEDGMENTS | 58 |
| 24.1 | Receipt of this Agreement and the Franchise Disclosure Document | 58 |
| 24.2 | Consultation by Franchisee | 58 |
| 24.3 | True and Accurate Information | 58 |
| 24.4 | Risk | 58 |
| 24.5 | No Guarantee of Success | 58 |
| 24.6 | Franchisee's Representations and Warranties | 58 |
| 24.7 | Notice of Potential Franchisor and Affiliate Profit | 59 |
| 24.8 | Anti-Terrorism and Money Laundering Representation | 59 |
| 24.9 | Franchisor Must Sign Franchise Agreement to be Effective | 59 |
| 24.10 | Franchisee Minimum Deliverables Upon Signing this Franchise Agreement | 59 |

**SCHEDULES**
1. MAP OF PROTECTED TERRITORY

**EXHIBITS**

1. GENERAL RELEASE
2. NONDISCLOSURE AND NON-COMPETITION AGREEMENT

3. NONDISCLOSURE AND NON-SOLICITATION AGREEMENT
4. UNLIMITED GUARANTY AND ASSUMPTION OF OBLIGATIONS
5. FRANCHISEE DESIGNATED REPRESENTATIVE; HOLDERS OF LEGAL OR BENEFICIAL INTEREST IN FRANCHISEE; OFFICERS; DIRECTORS; MANAGERS
6.  MULTI-STATE ADDENDA
7. LETTER AGREEMENT REGARDING APPROVED LOCATION AND PROTECTED TERRITORY (IF APPLICABLE)

**EWC FRANCHISE, LLC**

**FRANCHISE AGREEMENT**

This Franchise Agreement (this "Agreement") is entered into and effective this 13th day of May, 2015 (the "**Effective Date**"), by and between EWC Franchise, LLC, a Florida limited liability company, having its principal place of business at The Village at Gulfstream Park, 600 Silks Run, Suite 2270, Hallandale Beach, FL 33009 ("**Franchisor**"), and EWC Michigan Management Inc, a Michigan corporation ("**Franchisee**").

**RECITALS:**

A.    Franchisor and its predecessor and Affiliates*, over a period of time and as a result of extensive research and the expenditure of substantial money, effort and time, have developed, and are in the process of further developing, a business system of uniform standards, methods, procedures and specifications (as may be added to, changed, modified, withdrawn or otherwise revised by Franchisor, from time to time, for the operation of European Wax Centers, the "System") identified by the service mark "EUROPEAN WAX CENTER®" and which relates to the establishment and operation of a business that provides facial and body hair removal services to women and men predominantly through the use of hot wax, referred to in this Agreement as a "European Wax Center".

B.    Franchisor and its predecessor and Affiliates have developed and/or acquired products and may from time to time, continue to develop and/or acquire products for sale and/or use within European Wax Centers, which may include, custom-designed products and other private-labeled products, including the depilatory wax, bearing the Marks (collectively, "**European Wax Center Products**"), which, from time to time, may be supplied to Franchisee and other franchisees on a for-profit basis by Franchisor and its Affiliates.

C.    Franchisor and its predecessor and Affiliates have developed and/or produced and may, from time to time, continue to develop and/or produce marketing and advertising materials, catalogues, point-of-sale display signs, posters and other items specially suited for promoting European Wax Centers and their products and services (collectively, "**European Wax Center Marketing Materials**"), which may be supplied to Franchisee and other franchisees on a for-profit basis by Franchisor and its Affiliates.

D.    Franchisor and its predecessor and Affiliates have developed, and are in the process of further developing, as an integral part of the System, a distinctive marketing strategy for offering and selling services which requires all European Wax Centers to grant access and extend privileges to any customer who presents a valid package or membership card ("**Approved Package and Membership Programs**").

E.    In addition to the service mark "EUROPEAN WAX CENTER®" and certain other Marks, the European Wax Center Products, the European Wax Center Marketing Materials and the Approved Package and Membership Programs, the distinguishing characteristics of the System include, among other things, distinctive hot wax hair removal techniques, uniform standards and procedures for efficient European Wax Center business operations; educational and training materials, procedures and distinctive strategies for marketing, advertising and promotion; customer service and development techniques; distinctive interior and exterior design, signage, layout and décor; other strategies, techniques and Trade Secrets and other Confidential Information, including the Confidential Operations Manual.

F.    Franchisor grants to qualified persons and business entities the right to own and operate European Wax Center franchise locations using the System and the Marks.

G.    Franchisee desires to operate a European Wax Center, has applied for the Franchise and such application has been approved by Franchisor in reliance upon all of the representations made herein and therein.

H.    Franchisee understands and acknowledges the importance of Franchisor's high and uniform standards of quality, operations and service and the necessity of operating the Franchised Center in strict conformity with the System.

---

*Capitalized terms not otherwise defined are defined in Section 1.

1

NOW, THEREFORE, Franchisor and Franchisee, intending to be legally bound, agree as follows:

## 1. DEFINITIONS

Whenever used in this Agreement, the following words and terms have the following meanings:

"**Affiliate**" means any business entity that controls, is controlled by, or is under common control with a Person (for purposes of this definition, "controls," "is controlled by," or "is under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise).

"**Agreement**" means this agreement entitled "EWC Franchise, LLC Franchise Agreement," any supplementary attachments, amendments or confirmation incorporated in this Agreement by reference.

"**Approved Location**" means the site for the operation of the Franchised Center selected by Franchisee and approved in writing by Franchisor.

"**Area Representative**" means a party that entered into an Area Representative Agreement with Franchisor, that provides certain services for the benefit of Franchisor, including soliciting prospective European Wax Center franchisees and proving certain support services to franchisees within its designated territory.

"**Competitive Business**" means any business that, directly or indirectly, offers hair removal services, or in which Trade Secrets and other Confidential Information could be used to the disadvantage of Franchisor, any Affiliate of Franchisor or its other franchisees. "Competitive Business" excludes (a) any business operated by Franchisee under a Franchise Agreement with Franchisor, or (b) any business operated by a publicly-held entity in which Franchisee owns less than a five percent (5%) legal or beneficial interest.

"**Confidential Information**" means technical and non-technical information used in or related to European Wax Centers that is not commonly known by or available to the public, including, without limitation, Trade Secrets and information contained in the Confidential Operations Manual and training guides and materials. In addition, any other information identified as confidential when delivered by Franchisor shall be deemed Confidential Information. Confidential Information shall not include, however, any information that: (a) is now or subsequently becomes generally available to the public through no fault of Franchisee or its employees, agents, officers, directors, shareholders, managers, members or other representatives; (b) Franchisee can demonstrate was rightfully in its possession, without obligation of nondisclosure, prior to disclosure pursuant to this Agreement; (c) is independently developed without the use of any Confidential Information; or (d) is rightfully obtained from a third party who has the right, without obligation of nondisclosure, to transfer or disclose such information. For the avoidance of doubt, guest (customer) information shall be deemed Confidential Information.

"**Confidential Operations Manual**" means a set of one or more manuals made available by Franchisor to franchisees in writing, (including in electronic format), and which is currently provided on Franchisor's internal intranet, and which includes modifications, updates, deletions and other revisions made over time, and which contains or describe the standards, methods, procedures and specifications of the System, including advertising and marketing promotions, including other operations, administration and managers' manuals and all books, computer programs, password-protected portions of an Internet site, pamphlets, memoranda and other publications prepared by, or on behalf of, Franchisor.

"**Cooperative Advertising**" means an advertising program designed to promote or benefit two (2) or more franchisees, which may be established within a common market or broader regions, and which Franchisor may require for European Wax Centers as a whole or within a particular region.

"**Designated Manager**" means the individual Franchisee designates as having primary responsibility for managing the day-to-day operations of the Franchised Center. Unless otherwise approved by Franchisor in writing, if Franchisee is an individual and not a business entity, the Designated Manager shall be Franchisee.

"**Effective Date**" is the date set forth in the preamble of this Agreement, which thereby commencing its effectiveness and Term.

2

"**Electronic Depository Transfer Account**" means an account established by Franchisee at a national banking institution approved by Franchisor and providing Franchisor with access to electronically withdraw any funds due Franchisor.

"**Franchise**" means the right granted to Franchisee by Franchisor to use the System and the Marks for the operation of a Franchised Center.

"**Franchised Center**" means the European Wax Center to be established and operated by Franchisee pursuant to this Agreement.

"**Franchisee Affiliate**" means any other franchisee of Franchisor: (i) that is directly or indirectly controlling, controlled by, or under common control with Franchisee, or (ii) in which twenty percent (20%) or more of its outstanding voting or ownership interest is held by the same person or entity, directly or indirectly, as the outstanding voting or ownership interest, directly or indirectly, of Franchisee. For purposes of this definition, the term "controls," "is controlled by," or "is under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities, by contract or otherwise.

"**Generally Accepted Accounting Principles**" or "**GAAP**" means the standards, conventions and rules accountants follow in recording and summarizing transactions for financial statements.

"**Gross Sales**" means the Franchised Center's total revenue encompassing all sources, including product and service sales, gift card sales, sales of Approved Package and Membership Programs, and specifically including proceeds from business interruption insurance, whether for cash, credit, charge account, check, exchange, deferred payment obligations or other valuable consideration (whether or not Franchisee has received payment therefor), regardless of where such orders originated from, including any applicable call center. "Gross Sales" specifically excludes (a) refunds, credits, and other monetary allowances issued in good faith; (b) sales and equivalent taxes collected by Franchisee for or on behalf of governmental taxing authorities and paid thereto; (c) any rebate received by Franchisee from a manufacturer or supplier; (d) any proceeds Franchisee receives from the re-sale of pre-packaged products or branded goods Franchisee purchases from Franchisor or its Affiliates (e.g. European Wax Center branded products); or (e) proceeds Franchisee receives for Franchisor.

"**Incapacity**" means the inability of Franchisee, or any holder of a controlling legal or beneficial interest in Franchisee, to operate or oversee the operation of the Franchised Center on a regular basis by reason of any continuing physical, mental or emotional condition, chemical dependency or other limitation; provided, that any dispute as to the existence of any "Incapacity" shall be resolved by a decision of a licensed medical physician unaffiliated with Franchisor or Franchisee but selected by Franchisor in good faith, the costs of such medical physician shall be split equally between Franchisor and Franchisee.

"**Internet**" means the global interactive communications network that now exists, as such network may be modified from time to time, including sites and domain names on the World Wide Web.

"**Marks**" means the service mark "EUROPEAN WAX CENTER®" and any other trade names, trademarks, service marks, trade dress, designs, graphics, logos, emblems, insignia, fascia, slogans, copyrights, drawings, and commercial symbols Franchisor may designate to be used in connection with European Wax Centers.

"**Person**" means a human being, a legal or business entity devised or constructed by for the purpose of carrying out business activities under the name of such devised or constructed entity, which shall not be limited to sole proprietorships, corporations, partnerships, limited liability companies, or other entities; and in the case of entities, a Person shall include, any other entity with a majority or controlling interest in another entity, as well as the individual officers, directors, and other Persons controlling the activities of such entity.

"**Personal Information**" means any information about an identifiable individual.

"**Protected Territory**" means the geographic area of territorial granted to Franchisee under this Agreement as defined by Section 2.5.

"**Start-up Marketing Package**" means an initial supply of European Wax Center Marketing Materials, to be used with the establishment and operation of the Franchised Center which is supplied by Franchisor, its Affiliates or a third-party Approved Supplier to Franchisee on a for-profit basis prior to opening the Franchised Center and commencing operations.

"**Start-up Package**" means an initial supply of European Wax Center Products, necessary for the establishment and operation of the Franchised Center which is supplied by Franchisor, its Affiliates or a third-party Approved Supplier to Franchisee on a for-profit basis prior to opening the Franchised Center and commencing operations.

"**Term**" means the period during which the rights granted by this Agreement are in effect, commencing on the Effective Date of this Agreement and, unless terminated earlier pursuant to the Agreement, ending ten (10) years from the Effective Date.

"**Trade Secrets**" means information in any form (including, but not limited to, technical or non-technical data, formulas, patterns, compilations, programs, devices, methods, techniques, drawings, processes, financial data, financial plans, product plans, passwords, lists of actual or potential customers or suppliers) related to or used in European Wax Centers that is not commonly known by or available to the public and that information: (a) derives economic value, actual or potential, from not being generally known to, and not being readily ascertained by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section | Term | Section |
|---|---|---|---|
| ADA | 13.6.5 | Grand Opening Advertising | 11.1 |
| Approved Customer Rewards and Loyalty Programs | 13.5 | Gross Sales Report | 12.2 |
| Approved Package and Membership Programs | Recitals | Initial Inspection | 5.5 |
| Approved Suppliers | 13.1.1 | Local Advertising | 11.2.1 |
| Centralized Guest Services Center | 2.8 | Marketing Fund | 11.3 |
| Centralized Point-of-Sale System Server | 3.3 | Marketing Fund Contribution | 11.3 |
| Controlled Entity | 18.3 | Multi-State Addenda | 21.14 |
| Designated Area | 2.3 | Nonconformance Notice | 5.5 |
| European Wax Center Marketing Materials | Recitals | Plans | 5.4 |
| European Wax Center Products | Recitals | Point-of-Sale System Server Maintenance Fee | 3.3 |
| European Wax Center Roll-Call Method | 5.1.5 | Royalty Fee | 3.4 |
| Franchise Certificate | 24.10(vi) | Start-up Marketing Package Fee | 3.2 |
| Franchise Fee | 3.1 | Start-up Package Fee | 3.2 |
| Franchisee | Preamble | Subsequent Inspection | 5.5 |
| Franchisee Designated Representative | 2.9 | Successor Franchise | 4.1 |
| Franchisee Obligations | 5.3 | System | Recitals |
| Franchisor | Preamble | Third-Party Guest Services Center | 2.8 |
| Franchisor Indemnitees | 21.3 | Web site | 9.2.2 |

4

Definitions for the other defined terms used in this Agreement are set forth in this Agreement. In this Agreement, unless a clear contrary intention appears: (a) the singular number includes the plural number and vice versa; (b) reference to any Person includes such Person's heirs, successors and assigns but, if applicable, only if such heirs, successors and assigns are not prohibited by this Agreement, and reference to a person in a particular capacity includes such person in any other applicable capacity or individually; (c) reference to any gender includes each other gender; (d) reference to any agreement, document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof; (e) reference to any law, means such law, as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder, and reference to any section or other provision of any law means that provision of such law, from time to time, in effect and constituting the substantive amendment, modification, codification, replacement or reenactment of such section or other provision; (f) "hereunder," "hereof," "hereto," "herein" and words of similar import shall be deemed references to this Agreement as a whole and not to any particular Article, Section or other provision of this Agreement; (g) "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term; (h) "or" is used in the inclusive sense of "and/or"; (i) with respect to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding"; (j) references to a governmental authority also refer to any regulatory body that succeeds the function of such authority; (k) references to documents, instruments or agreements shall be deemed to refer as well to all addenda, exhibits, schedules or amendments thereto; (l) all references to "Dollars" or "$" shall mean U.S. Dollars; and (m) references to any right under this Agreement which a party "may" exercise shall imply that such party shall in no way be deemed obligated to exercise such right.

## 2. GRANT OF FRANCHISE; APPROVED LOCATION

### 2.1 Grant of Franchise

Franchisor hereby grants to Franchisee, and Franchisee undertakes and accepts, upon the terms and conditions contained in this Agreement, a revocable, limited license to: (a) operate one (1) European Wax Center using the System and Marks, as each may be changed, further developed or improved by Franchisor and its Affiliates from time to time; and (b) use the Marks solely in connection with the operation of such European Wax Center and for no other purpose, and in accordance with the terms and conditions of this Agreement. Franchisee undertakes the obligation to operate the European Wax Center strictly in accordance with the System and this Agreement, as the System may be changed, further developed or improved from time to time. Unless Franchisor otherwise consents in writing in its sole discretion, Franchisee may not operate more than seven (7) separate rooms for providing hair removal services in its European Wax Center.

### 2.2 Approved Location Determined

The street address (or detailed description of the premises) of the Approved Location is:

NOT YET DETERMINED, SEE SECTION 2.3 BELOW

### 2.3 Approved Location Not Determined

If the Approved Location is determined as of the Effective Date, then this Section shall be inapplicable. If the Approved Location of the Franchised Center is not determined as of the Effective Date, then the geographic area in which the Franchised Center is to be located shall be within the geographic area described below ("**Designated Area**"). Franchisee shall select and submit possible sites within the Designated Area for Franchisor's evaluation in accordance with Section 5.1. When the Approved Location is determined, Franchisor and Franchisee shall execute a letter agreement in the same form and substance as set forth on Exhibit 7 setting forth the Approved Location and the Protected Territory or otherwise insert the Approved Location's address into Section 2.2 and attach the Protected Territory as Schedule 1 to this Agreement, in which case each such insertion shall be initialed and dated by Franchisee and Franchisor, and upon such determination, the Designated Area shall lapse. The failure to insert such address into Section 2.2 shall not automatically affect the enforceability of this Agreement. The Designated Area is delineated for the sole purpose of site selection and does not confer any territorial exclusivity or protection. A detailed description of the geographic area or boundaries of the Designated Area is:

the State of Michigan

5

; provided, that in the event Franchisee desires, in its good faith determination, to locate its Franchised Center outside such area, Franchisor will, upon request from Franchisee to locate such Franchised Center in a different region, not unreasonably withhold, condition or delay such request to modify the Designated Area to such alternate region, subject to the following conditions: (a) in Franchisor's reasonable determination, there is sufficient available areas in such alternate region to develop a Franchised Center at the time of the request; (b) Franchisee complies with Franchisor's then-existing requirements and procedures for changing regions; (c) Franchisee agrees to execute an amendment to this Agreement documenting the change in the Designated Area, which such amendment shall include other provisions that Franchisor determines, in its good faith discretion, should be included, including any provisions applicable to the specific region, such as alternate applicable demographics for the Protected Territory and any state specific addendums: (d) the proposed alternate location is located in a territory in which the Area Representative for the current Designated Area set forth above acts, either directly or through affiliated entities, as the Area Representative; (e) Franchisee and the applicable Area Representatives execute such additional agreements reasonably required by Franchisor to document the amendment and change in location, including agreements with respect to commissions that may have been paid or may become payable to the respective Area Representatives in connection with this Agreement; and (f) Franchisee pays to Franchisor, prior to the execution of such an amendment, an administrative fee (not expected to exceed one thousand dollars ($1,000.00)) for Franchisor's administrative and legal fees and expenses associated with effectuating such a change in location.

### 2.4 Franchisee Shall Not Sublicense the System or Marks

Franchisee shall not sublicense the use of the System or Marks to any person or entity; provided, that Franchisees may grant authorized vendors the rights to use the Marks in connection with services to be provided for the benefit of the Franchised Center. Except as may be permitted pursuant to Section 18, Franchisee shall not grant any person or entity the right to perform any part of Franchisee's rights or obligations licensed under this Agreement and any attempt by Franchisee to do so shall be void and of no force and effect.

### 2.5 Territorial Protection - Protected Territory

During the Term, provided Franchisee is not in default of this Agreement beyond any applicable notice and cure period, Franchisor shall not license, franchise, establish, own or operate any other European Wax Centers within the geographic area ("**Protected Territory**") surrounding the Franchised Center depicted in the map in Section 2.6 below. This grant to the Protected Territory is subject to Franchisor's reservation of rights set forth in Section 2.7.

[The remainder of this page is intentionally left blank.]

**2.6**     **Map and Description of Protected Territory**

The Protected Territory and the Approved Location for the Franchised Center are not yet mutually agreed upon. Accordingly, Section 5.1 shall be applicable. Franchisor and Franchisee intend for the Approved Location for the Franchised Center to be located in the Designated Area described in Section 2.3 above and to have a Protected Territory of including 14,000 females, ages of 16-64, living in such area at the time the Protected Territory is determined. While the Protected Territory will be based on the demographics described in the previous sentence, other factors may be considered, including population, density, traffic, median population age, proximity to competitors, proximity to other franchisees and natural, physical or political boundaries. Upon determination of the Approved Location and the Protected Territory, Franchisor and Franchisee shall execute a letter agreement in the same form and substance as set forth on Exhibit 7 setting forth the Approved Location and the Protected Territory or otherwise insert the Approved Location's address into Section 2.2 and attach the Protected Territory as Schedule 1 to this Agreement, in which case each such insertion shall be initialed and dated by Franchisee and Franchisor, and the application of the above referenced demographics shall lapse.

**2.7**     **Franchisor's Retained Rights**

Except to the extent provided in Section 2.5, Franchisor retains all of its rights with respect to and all control of the System and Marks, including the right to:

2.7.1    own, acquire, establish, license, franchise or operate, and license or franchise to any Person the right to establish, license, franchise or operate, European Wax Centers or other businesses using the Marks, or other proprietary trademarks, tradenames, commercial symbols or the like, and the System, outside the Protected Territory (which businesses may solicit customers inside the Protected Territory, including through the Internet);

2.7.2    own, acquire, establish, license, franchise or operate, and license or franchise to any Person the right to establish, license, franchise or operate, businesses using other proprietary trademarks, tradenames, commercial symbols or the like, at any location within or outside the Protected Territory; provided, that if such businesses are to be located within the Protected Territory, such businesses are not substantially similar to or related to the business carried out at European Wax Centers;

2.7.3    establish Area Representative franchises and businesses in connection with the System within and outside the Protected Territory;

2.7.4    subject to Franchisee's rights to its Protected Territory, allow other Franchisees the right to search for a site within the Designated Area;

2.7.5    engage in joint marketing programs with partner companies and all forms of sales through the Internet or any other forms of electronic media (including social technology, social media and social networking platforms);

2.7.6    advertise the System on the Internet, and to create, operate and maintain and modify, or discontinue the use of one or more websites;

2.7.7    purchase or otherwise acquire the assets or an ownership interest of one (1) or more businesses identical or similar to European Wax Centers (or acquire franchise, license or similar agreements for such businesses), some or all of which may be located anywhere, including within the Protected Territory; provided, that if Franchisor purchases or acquires franchises, licenses or other businesses identical or substantially similar to European Wax Centers, Franchisor may, in its sole discretion, act as franchisor or licensor with respect to such franchisee(s) or licensee(s) wherever located, pursuant to the individual franchise or license agreement(s) then existing between Franchisor and such franchisee(s) or licensee(s); provided, further that if Franchisor purchases or acquires such business(es) within the Protected Territory which are not franchised or licensed, and elects to sell such business(es) to a third party, Franchisor shall first offer to sell any such business(es) to Franchisee at the business(es)' fair market value, as determined in the reasonable discretion of Franchisor, and on other terms deemed acceptable to Franchisor and Franchisee shall have thirty (30) days from the date of Franchisor's offer, which shall state the business(es)' fair market value as the purchase price and the other material terms of the offer and if Franchisee fails or declines to exercise its right to so purchase such business(es) within such thirty (30) day period,

7

Franchisor may sell such business(es) to a third party on terms not materially more favorable to such third party than those terms offered to Franchisee, it being understood that at all times prior to or after any such sale to Franchisee or a third party, subject to the terms of this Section 2.7.7, Franchisor may operate such franchises, licenses or other businesses without liability to Franchisee;

      2.7.8   be acquired (regardless of the form of transaction) by any business, even if the other business operates, franchises and/or licenses Competitive Businesses within the Protected Territory;

      2.7.9   sell or distribute, at retail or wholesale, directly or indirectly, or license other Persons to sell or distribute, at retail or wholesale, any products whether or not authorized for use in European Wax Centers, using the Marks or other trademarks, service marks and commercial symbols through any channel of distribution, including the Internet and catalogue sales and pursuant to terms Franchisor or Franchisor's Affiliates deem appropriate, within or outside the Protected Territory, it being understood that Franchisor and Franchisor's Affiliates retain all rights with respect to distribution of products and Franchisee shall not be commissionable on the sale of any products within or outside the Protected Territory, including, but not limited to, European Wax Center Products and other bath and body and skin care products, gift certificates and gift cards, and prepaid services or packages; provided, that no such products shall be provided from or sold to any Competitive Business within the Protected Territory; and

      2.7.10   engage in any activities not expressly forbidden by this Agreement.

**2.8**     **Guest Services; Restrictions on Franchisee's Marketing Telephone Numbers**

In accordance with the Confidential Operations Manual, Franchisee may choose to either (a) use an independent, third-party call center pre-approved by Franchisor to receive and handle all incoming calls to the Franchised Center ("**Third-Party Guest Services Center**") or (b) use its own employees to receive and handle all incoming calls to the Franchised Center; provided, that in the event Franchisee and its Franchisee Affiliates at any time own and are operating three (3) or more Franchised Centers, Franchisee shall, and shall cause its applicable Franchisee Affiliates, to utilize a call center for these operations, which may be operated by Franchisee, its Franchisee Affiliates or such a pre-approved Third-Party Guest Services Center, and which shall comply in all material respects with Franchisor's standards and specifications set forth in the Confidential Operations Manual or otherwise provided or made available to Franchisee in writing. In accordance with the Confidential Operations Manual, Franchisee will (i) handle all incoming calls to the Franchised Center, (ii) unless the caller requests an appointment at another location or expresses a preference for an appointment at another location during such call (e.g. a location more convenient for the caller), book appointments for customers calling the Franchised Center, and (iii) handle caller requests for appointments at other locations or appointments for callers expressing a preference for an appointment at another location (e.g. a location more convenient for the caller) as set forth in the Confidential Operations Manual.

If Franchisee desires to utilize a third-party call center, Franchisee shall first send Franchisor sufficient information for Franchisor to determine whether the third-party call center complies with Franchisor's standards, specifications and criteria. Franchisee shall bear all reasonable expenses incurred by Franchisor in connection with determining whether Franchisor shall approve such third-party call center. Franchisor will decide within a reasonable time (usually thirty [30] days) after receiving the required information whether Franchisee may utilize such third-party call center. Approval of a third-party call center may be conditioned on requirements related to the standards of service, consistency, reliability and general reputation. Nothing in this Section shall be construed to require Franchisor to approve any third-party call center. Franchisor has the right to review, from time to time, its approval of any third-party call center. Franchisor may revoke its approval of any third-party call center at any time, and in its reasonable discretion, by notifying Franchisee shall, at its own expense, promptly cease using any previously approved third-party call center that is subsequently disapproved by Franchisor.

In all telephone directory listings or advertisements and in all advertising, marketing and promotional materials to be obtained and used to advertise and promote the Franchised Center, Franchisee shall only include telephone numbers related to the Third-Party Guest Services Center or the phone lines of the Franchised Center or Franchisee's operated call center, as applicable, in accordance with the Confidential Operations Manual or applicable specifications provided by Franchisor or made available to Franchisee in writing.

At any time, Franchisor may choose to establish and operate a centralized guest services center which, among other things, for as long as Franchisor elects, would receive and handle all incoming calls to the Franchised Center and to other European Wax Centers ("**Centralized Guest Services Center**"). If Franchisee chooses to use a Centralized Guest Services Center established by Franchisor, then Franchisee shall be required to make payments to Franchisor for its use of the Centralized Guest Services Center as set forth in a separate agreement between Franchisor and Franchisee and shall use such Centralized Guest Services Center as set forth in the Confidential Operations Manual.

**2.9** **Franchisee Designated Representative.**

Upon the execution of this Agreement, Franchisee will designate and retain an individual to serve as the designated representative of Franchisee (the "**Franchisee Designated Representative**"). As between Franchisor and Franchisee, the Franchisee Designated Representative shall have the full authority to act on behalf of Franchisee in all matters related to the performance of this Agreement and the operation of the Franchised Center. Franchisor may rely on any and all directions, elections, information and other communication from the Franchisee Designated Representative as being made on behalf of Franchisee, even if Franchisor receives information from any other owner or Person who claims to have an ownership interest in Franchisee, or any other Person whatsoever, which may be contrary to or different from the information provided by Franchisee Designated Representative. Franchisor has no duty or obligation to inquire into or resolve any conflicting information provided by the Franchisee Designated Representative and any other Person on behalf of Franchisee. If Franchisee is an individual, Franchisee shall perform all obligations of the Franchisee Designated Representative. The Franchisee Designated Representative shall, during the entire period he or she serves as such, meet the following qualifications:

2.9.1 unless otherwise consented to by Franchisor in writing, the Franchisee Designated Representative shall maintain a direct or indirect ownership interest in Franchisee equal to at least twenty-five percent (25%) of the ownership interests in Franchisee; and

2.9.2 the Franchisee Designated Representative shall devote his or her best efforts to the supervision and conduct of the Franchised Center.

If during the Term, (a) the Franchisee Designated Representative is not able to continue to serve in the capacity of Franchisee Designated Representative; (b) the Franchisee Designated Representative no longer qualifies to act as such in accordance with this Section 2.9; or (c) Franchisee desires to replace the Franchisee Designated Representative with another Person who is qualified to act as such in accordance with this Section 2.9, Franchisee shall promptly notify Franchisor and, within thirty (30) days after the Franchisee Designated Representative ceases to serve or be so qualified, provide evidence satisfactory to Franchisor that shows the owners of more than fifty percent (50%) of the ownership interests in Franchisee designated a duly qualified replacement Franchisee Designated Representative who is qualified to act as such in accordance with this Section 2.9. Any failure to comply with the requirements of this Section 2.9 shall be deemed a material breach of this Agreement.

**3.** **FEES**

**3.1** **Franchise Fee**

Upon execution of this Agreement, Franchisee shall pay a fee ("**Franchise Fee**") to Franchisor of THIRTY SIX THOUSAND DOLLARS ($36,000.00) in immediately available funds, by wire transfer to an account designated by Franchisor. The Franchise Fee shall be deemed fully earned upon execution of this Agreement and is nonrefundable, except under certain limited conditions set forth under Sections 5.2, 5.5 and 8.3. The Franchise Fee is payment, in part, for expenses incurred by Franchisor in furnishing assistance and services to Franchisee as set forth in this Agreement and for costs incurred by Franchisor, including costs incurred by Franchisor in offering and selling franchises, franchise sales and marketing activities to promote the sale of a franchise to qualified franchisees, Franchisor's participation in the franchise sale, legal compliance with franchise laws and regulations, site selection assistance and guidelines, the development and hosting of initial training programs, marketing expenses, legal, accounting and other professional fees.

### 3.2 Start-up Fees

Prior to commencing operation of the Franchised Center, Franchisee shall pay to Franchisor, its Affiliates or third-party Approved Suppliers, a one (1) time fee representing the purchase price of a Start-up Package of European Wax Center Products ("**Start-up Package Fee**"), as well as a one (1) time fee representing the purchase price of a Start-up Marketing Package of European Wax Center Marketing Materials ("**Start-up Marketing Package Fee**"). Franchisee's requirement to purchase a Start-up Package and a Start-up Marketing Package is set forth in Section 5.4.5 of this Agreement.

### 3.3 Point-of-Sale System Server Maintenance Fees

3.3.1 Franchisor has established and maintains a centralized point-of-sale system server for the purpose of centralizing all point-of-sale systems and systems data ("**Centralized Point-of-Sale System Server**"). The point-of-sale system for the Franchised Center shall be connected to Franchisor's Centralized Point-of-Sale System Server. Franchisee shall be required to make monthly payments to Franchisor in an amount, and at such times and in such manner, specified by Franchisor, from time to time, in the Confidential Operations Manual or otherwise in writing ("**Point-of-Sale System Server Maintenance Fee**"). Franchisee shall back up its point-of-sale system or may obtain backup services from Franchisor for an additional fee, as may be specified by Franchisor in the Confidential Operations Manual or otherwise in writing, from time to time. Backup service fees may vary depending on the method of backup.

3.3.2 As set forth in Section 12.5, Franchisor has the right to, in manner not disruptive to Franchisee's normal business operations (except in cases of emergency where Franchisor may act in its sole discretion), (i) access at any time and without any advance notice, Franchisee's point-of-sale system data maintained on the Centralized Point-of-Sale System Server or within Franchisee's point-of-sale local server or any backup point-of-sale system maintained by Franchisee; or (ii) view, program or modify any part of Franchisee's point-of-sale local server or the Centralized Point-of-Sale System as needed to maintain Franchisee's point-of-sale local server or Centralized Point-of-Sale System Server. Franchisor may restrict Franchisee's access to the point-of-sale system at any time in its sole and absolute business discretion.

3.3.3 Franchisor shall not be liable nor responsible for any delays or disruption in the Centralized Point-of-Sale System and the maintenance services it provides due to strikes, lockouts, casualties, acts of God, war, terrorism, governmental regulation or control or other causes beyond the reasonable control of Franchisor.

### 3.4 Weekly Royalty Fee

On a weekly basis (or at such other times as Franchisor may designate from time to time), Franchisee shall pay to Franchisor without offset, credit or deduction of any nature, a fee ("**Royalty Fee**") equal to six percent (6%) of Gross Sales. Each Royalty Fee shall accompany a Gross Sales Report, as required by Section 12.2, for the same period.

### 3.5 Program and Network Fees

Franchisee acknowledges that over time, the System will likely evolve, and in connection with such evolution, Franchisor and its Affiliates may develop programs, systems and other initiatives, directly and/or through third-party vendors and suppliers, that may not be contemplated as of the Effective Date. Initiatives may include secret shopper programs, reputation management programs, a Centralized Guest Services Center, and other programs, systems and initiatives. Franchisee agrees that Franchisor may assess reasonable fees and other costs, including management fees, in connection with the implementation, maintenance and/or operation of any such programs, systems and initiatives, and as applicable, Franchisee's participation in such programs, systems and initiatives, which may be initiated on a network basis, a regional basis or any other basis Franchisor and its Affiliates may determine in their sole reasonable but non-discriminatory discretion. Franchisee acknowledges that such programs, systems and initiatives may be optional or participation may be required by Franchisor.

10

### 3.6    Taxes

Franchisee shall pay to Franchisor, and as applicable, Franchisor's Affiliates, an amount equal to all sales taxes, excise taxes, withholding taxes, use taxes and similar taxes imposed on the fees or other amounts payable by Franchisee to Franchisor or Franchisor's Affiliates under this Agreement and on services or goods furnished to Franchisee by Franchisor or Franchisor's Affiliates at the same time as Franchisee remits such fees to Franchisor or, as applicable, Franchisor's Affiliates, whether such services or goods are furnished by sale, lease or otherwise. In no event shall Franchisee be obligated to pay any of Franchisor's or Franchisor's Affiliates' income taxes.

### 3.7    Electronic Transfer of Fees Payable to Franchisor

Franchisee shall pay all Royalty Fees, Marketing Fund Contributions, amounts due for purchases by Franchisee from Franchisor, or by Franchisee from any of Franchisor's Affiliates, and other amounts due to Franchisor or Franchisor's Affiliates through an Electronic Depository Transfer Account. Franchisee shall open and notify Franchisor of the account details of an Electronic Depository Transfer Account within one hundred eighty (180) days after the Effective Date (but in no event later than the opening of the Franchised Center). Franchisee shall sign Franchisor's standard draft authorization to authorize and direct Franchisee's Electronic Depository Transfer Account to transfer electronically directly to Franchisor's or its applicable Affiliates' account and to charge to Franchisee's Electronic Depository Transfer Account all such amounts. Franchisee shall provide Franchisor with continuous access to such account for the purpose of receiving any payments due to Franchisor and Franchisor's Affiliates. Franchisee must maintain a balance in this Electronic Depository Transfer Account sufficient to allow Franchisor and its Affiliates to collect the amounts owed when due. In the event the Electronic Depository Transfer Account should not have sufficient funds at the time of any applicable payment from such account, in addition to other fees set forth in this Agreement for failure to pay such amounts, for each occurrence of delinquent funds, Franchisee shall pay Franchisor's then current reasonable fee for delinquient funds. Franchisee is responsible for any other penalties, fines or other similar expenses associated with the transfer of funds described in this Section. Once established, Franchisee shall not close the Electronic Depository Transfer Account without Franchisor's consent. In the event Franchisee desires to change its Electronic Depository Transfer Account, it shall provide Franchisor at least thirty (30) days prior written notice by completing an updated draft authorization with the updated account information. Franchisor reserves the right to assess a reasonable fee upon each such change request.

Any alleged non-performance or breach of Franchisor's or Franchisor's Affiliates' obligations under this Agreement or any related agreements does not establish a right at law or in equity for Franchisee to withhold payment due to Franchisor for the Royalty Fees, Marketing Fund Contributions, amounts due for purchases by Franchisee from Franchisor, or by Franchisee from any of Franchisor's Affiliates, or any other amounts due to Franchisor or Franchisor's Affiliates. Franchisee hereby waives any and all existing and future claims and offsets against any such amounts due hereunder, which amounts must be paid when due. Franchisor and its Affiliates are entitled to apply or cause to be applied against amounts due to either of them, any amounts that may from time to time be held by Franchisor or its Affiliates on Franchisee's behalf or owed to Franchisee by Franchisor or its Affiliates.

### 3.8    Franchisor to Act as a Clearing House for Gift Cards and Membership Plans

Franchisor may act as a clearing house, pursuant to which it may collect amounts received by European Wax Center locations for gift cards, membership plans and the like, and remit all or a portion of these amounts to the European Wax Center locations where these gift cards, membership plans and the like are actually redeemed. If Franchisor chooses to operate any such clearing house established by Franchisor or its Affiliates, then Franchisee shall fully cooperate with any electronic method of monetary collection of funds utilized by Franchisor with respect to the clearing house. Terms and conditions related to the operation of the clearing house may be further detailed in the Confidential Operations Manual or as otherwise prescribed by Franchisor in writing.

### 3.9    Late Fees

All Royalty Fees, Marketing Fund Contributions, amounts due for purchases by Franchisee from Franchisor or Franchisor's Affiliates and other amounts that are not received by Franchisor within five (5) days after the due date shall bear interest at the rate of one and one-half percent (1.5%) per month (or the highest rate allowed by law of the state where Franchisee is located, whichever is lower) from the date payment is due to the date

11

payment is received by Franchisor. Franchisee shall pay Franchisor for all costs incurred by Franchisor in the collection of any unpaid and past due Royalty Fees, Marketing Fund Contributions or any other amounts due Franchisor or Franchisor's Affiliates, including reasonable legal and professional fees.

### 3.10 Application of Payments by Franchisor

Notwithstanding any designation by Franchisee, Franchisor has the right to apply any payments by Franchisee to any past due indebtedness of Franchisee and accrued interest thereon for Royalty Fees, Marketing Fund Contributions, purchases from Franchisor or any other amount owed to Franchisor or any Franchisor Affiliate.

### 4. TERM AND SUCCESSOR FRANCHISE AGREEMENTS

#### 4.1 Term

The Term shall be ten (10) years from the Effective Date, unless sooner terminated pursuant to this Agreement. The Term shall be renewable pursuant to the terms of this Agreement for one (1) ten-year renewal period (a "Successor Franchise") as provided in Section 4.2.

#### 4.2 Successor Franchise Agreement

Subject to the conditions below, if this Agreement is at such time in full force and effect, Franchisee has the right to obtain one (1) Successor Franchise at the expiration of the Term by entering into a new franchise agreement with Franchisor. Franchisee's right to obtain a Successor Franchise is limited to one (1) additional successive term of ten (10) years, such that the total term of the Franchise shall not exceed twenty (20) years. To qualify for a Successor Franchise, each of the following conditions shall have been fulfilled and remain true as of the last day of the Term:

4.2.1    Franchisee complied with all material terms of this Agreement during the Term (Franchisee will deemed to have "complied" with a material term if Franchisee timely cures any breach of such term within the time periods required by this Agreement);

4.2.2    Franchisee has access to and, for the duration of the Successor Franchise's term, the right to remain in possession of the Approved Location, or a suitable substitute location in the Protected Territory reasonably approved by Franchisor, which is in full compliance with Franchisor's then-current specifications and standards, it being understood that if Franchisee does not have rights to the Approved Location or any suitable substitute location at the time of renewal, Franchisor may still agree to allow Franchisee to renew for a Successor Franchise, but that in such an event, Franchisee will be required to comply with Franchisor's then-current terms and conditions (which are currently set forth in Section 5 of this Agreement) in connection with locating and obtaining rights to a location within the Protected Territory for the operation of the Franchised Center and in such an event, Franchisee shall not continue to operate the Franchised Center until such time as Franchisee obtains and develops a replacement location pursuant to the terms of Section 5;

4.2.3    Franchisee, at its expense, made such capital expenditures as were necessary to maintain uniformity with any Franchisor-required System modifications such that the Franchised Center reflects Franchisor's then-current standards and specifications;

4.2.4    Franchisee satisfied all monetary obligations owed by Franchisee to Franchisor (or any Franchisor Affiliate);

4.2.5    Franchisee is not currently in default of any provision of this Agreement or any other agreement between Franchisee and Franchisor or Franchisor's Affiliates and has not been given written notice of default, whether relating to the same or different defaults, more than twice during the Term, regardless of whether such defaults were cured;

4.2.6    Franchisee gave written notice of its intent to operate a Successor Franchise not less than nine (9) months nor more than twelve (12) months prior to the end of the Term;

4.2.7     Franchisee executed Franchisor's then-current form of franchise agreement and related agreements as offered to new franchisees (including similar unlimited guarantees to those signed in connection with this Agreement), or if Franchisor ceased offering franchises, to renewing franchisees generally, or executed renewal documents at Franchisor's election (with appropriate modifications to reflect the fact that as offered to new franchisees, or if Franchisor ceased offering franchises, to renewing franchisees generally, the franchise agreement relates to the grant of a Successor Franchise), which franchise agreement shall supersede this Agreement in all respects, and the terms of which may differ from the terms of this Agreement by requiring, among other things, a different Royalty Fee; provided, however that under the succeeding franchise agreement, (a) Franchisee shall not be required to pay any Franchise Fee; (b) the amount Franchisee must spend on Local Advertising shall remain unchanged; (c) Franchisee's Marketing Fund Contribution shall not exceed one percent (1%) of Gross Sales; (d) the Royalty Fees shall not exceed 6%; (e) there shall be no further right to another successor term; and (f) unless otherwise agreed to by Franchisor and Franchisee, the Protected Territory shall remain unchanged (subject to the terms set forth in Section 5.9 with respect to the relocation of the Approved Location);

4.2.8     Franchisee complied with Franchisor's then-current qualifications for a new franchisee and has agreed to comply with any training requirements; and

4.2.9     Franchisee has executed, to the extent allowable under applicable law, a general release, in a form the same as or similar to the General Release attached as Exhibit 1, of any and all claims against Franchisor, any Affiliate and against their officers, directors, shareholders, managers, members, partners, owners, employees and agents (in their corporate and individual capacities), except to the extent prohibited by the laws of the state where the Franchised Center is located.

## 5.     <u>LOCATION FOR FRANCHISED CENTER; LEASE; DEVELOPMENT; OPENING</u>

### 5.1     <u>Selection of Site</u>

5.1.1     If an Approved Location for the Franchised Center has not been determined as of the Effective Date, Franchisee shall promptly after the Effective Date select a site for the Franchised Center and shall notify Franchisor of such selection, in accordance with Franchisor's then-current policies and procedures for site selection. Franchisor shall evaluate the site and notify Franchisee of its approval or disapproval of the site within a reasonable time (usually thirty [30] days) of receiving notice of the site from Franchisee or as applicable, the Area Representative. If Franchisor approves of such selection, the site will be designated as the Approved Location for purposes of Section 2.2. If Franchisor does not approve of such selection, Franchisee shall continue to select a new site until Franchisor approves of such selection. Franchisor or its designees shall provide Franchisee with general guidelines to assist Franchisee in selecting a site suitable for the Approved Location. Franchisor has the right to approve or disapprove a proposed location based on such factors as it deems appropriate, including, without limitation, the condition of the premises, demographics and population density of the surrounding area, proximity to other European Wax Centers, proximity to Competitive Businesses, lease requirements, visibility, ease of access, available parking and overall suitability. Franchisee shall not locate the Franchised Center on a selected site without the prior written approval of Franchisor.

5.1.2     Franchisor or Franchisor's designees, including Area Representatives, at Franchisor's option, may also present sites to Franchisee for consideration. Franchisee agrees that Franchisor does not guarantee that the terms, including rent, will represent the most favorable terms available in that market. If Franchisor presents Franchisee with a site that meets Franchisor's criteria, as determined in Franchisor's sole discretion, and Franchisee refuses to secure the site for any reason, Franchisor may present the site to another franchisee, and Franchisee would then have to find another suitable site for the Franchised Center. If Franchisee rejects a site for any reason, including because Franchisee does not agree with the proposed lease provisions, Franchisor may permit another franchisee to enter into a lease for such site, whether on the terms rejected by Franchisee or on other terms, or to search for a site in Franchisee's Designated Area. Franchisee will then have to search for another suitable site, which may be in that area or outside of that area.

5.1.3     Franchisee must not, without Franchisor's prior written consent, enter into any contract to purchase or lease the premises Franchisee intends to use as the Franchised Center. Franchisee acknowledges that doing so may result in Franchisee incurring costs in connection with, and being obligated on a lease for premises which Franchisor will not allow to be developed as the Franchised Center.

13

5.1.4    Franchisor does not represent that it, any Affiliate or any of its owners or employees have special expertise in selecting sites. Neither Franchisor's assistance nor approval is intended to indicate or indicates that the Franchised Center will be profitable or successful at the Approved Location. Franchisee is solely responsible for finding and selecting an acceptable site for the Franchised Center. Franchisee acknowledges that Franchisor's lease negotiations, if any, and approval of locations are for Franchisor's sole benefit and are not intended to imply or guarantee the success or profitability of the Franchised Center, and Franchisee agrees that it is not relying on Franchisor's lease negotiations or site approval for such purposes. *Franchisee acknowledges that it has been advised to obtain the advice of its own professional advisors before Franchisee signs a lease. Franchisor's review of a lease or purchase agreement, or any advice or recommendation offered by Franchisor, shall not constitute an expression of Franchisor's opinion regarding the terms of such lease or purchase agreement. Franchisee acknowledges and agrees that Franchisee shall solely rely on its review and that of its advisors of any such lease or purchase agreement.*

5.1.5    Franchisee acknowledges that Franchisor and certain of its Area Representatives may choose to utilize the European Wax Center Roll-Call Method for awarding potential locations within a particular region. The "**European Wax Center Roll-Call Method**" generally provides franchisees within a region priority for available locations based on seniority. If applicable, sites located by Franchisor, its Area Representatives, Franchisee, other franchisees, brokers or other applicable third-parties will be subject to the European Wax Center Roll-Call Method. *Therefore, if Franchisee locates a site within a region utilizing the European Wax Center Roll-Call Method, Franchisee may not obtain rights to use that site.* Seniority is generally based on the date each applicable franchisee signed their franchise agreement, with those franchisees signing earlier having higher seniority. Franchisor and its Area Representatives may take into account other factors they deem relevant in awarding locations through the European Wax Center Roll-Call Method, including, each franchisee's diligence in trying to secure a location and compliance with the terms of this Agreement and their respective development schedule. Applicable regions subject to the European Wax Center Roll-Call Method may be limited to a particular region within a state, the entire state or possibly regions covering multiple states. In the event a franchisee changes its region, which such change will require Franchisor's approval, its ranking will likely be based on the date it changes to the new region rather than the date it signs the franchise agreement.

## 5.2    Failure to Select Site

Should Franchisee fail to select a site for the Franchised Center, which meets with Franchisor's approval within one hundred twenty (120) days after the Effective Date, Franchisor has the right to terminate the Term; provided, that, in the event Franchisee has failed to select a site within such 120-day period, but Franchisee is diligently working to locate a site to develop its Franchised Center, as determined in Franchisor's sole reasonable discretion, taking into account all reasonable facts and circumstances, Franchisee shall not be in breach of its obligations under this Section 5.2, and Franchisor shall not terminate the Term, but shall reasonably increase such applicable period up to an additional thirty (30) days (which may be further extended in Franchisor's reasonable discretion) to provide Franchisee additional time to locate a site for the development of its Franchised Center. If the Term is terminated pursuant to this Section 5.2, Franchisor shall return to Franchisee fifty percent (50%) of the Franchise Fee paid by Franchisee upon Franchisor's receipt of a general release, the same as or similar to the General Release attached as Exhibit 1, releasing any and all claims against Franchisor, any Affiliates and their officers, directors, shareholders, managers, members, partners, owners, employees and agents (in their corporate and individual capacities).

## 5.3    Lease of Approved Location

5.3.1    After the designation of the Approved Location (and if the site is to be leased or purchased), Franchisee shall execute a lease for, or a binding agreement to purchase, the Approved Location, the terms of which must have been previously presented to and approved by Franchisor. Franchisor shall not unreasonably withhold its approval. Franchisor shall be entitled to require that nothing therein contained is contradictory to, or likely to interfere with, Franchisor's rights or Franchisee's duties under this Agreement. *Franchisee acknowledges that it has been advised to obtain the advice of its own professional advisors before Franchisee signs a lease. Franchisor's review of a lease or purchase agreement, or any advice or recommendation offered by Franchisor, shall not constitute an expression of Franchisor's opinion regarding the terms of such lease or purchase agreement. Franchisee acknowledges and agrees that Franchisee shall solely rely on its review and that of its advisors of any such lease or purchase agreement.*

14

5.3.2    Franchisee shall take all actions necessary to maintain the lease, if any, of the Approved Location during the Term.  Any default for which the lease may be terminated shall also be deemed a default under this Agreement and the time to cure the same shall expire when the lease is terminated.  Franchisor has the right to require that the lease for the Approved Location be assigned by Franchisee to Franchisor upon termination or expiration of the Franchise grant to Franchisee.  Franchisor's approval of a lease shall be conditioned upon inclusion of terms in the lease acceptable to Franchisor and, at Franchisor's option, the lease shall contain such provisions as Franchisor may reasonably require; provided that Franchisor may waive any such provisions in providing its approval in its sole reasonable discretion.

5.3.3    Notwithstanding any terms in the lease to the contrary, Franchisee agrees that:

5.3.3.1    following approval of the lease by Franchisor, Franchisee shall not amend or otherwise modify the lease in any manner that would affect any of Franchisor's rights under the lease, including, without limitation, those rights set forth in the lease related to the terms required by Section 5.3.2 above, without Franchisor's prior, written consent;

5.3.3.2    in the event that Franchisee does not timely cure any default or breach under its lease within the applicable notice and cure periods under the lease, then Franchisor shall have the right, but not the obligation, subject to the terms and conditions set forth in the lease, to cure such default or breach, on behalf of Franchisee, and (a) to the extent permitted by the lease, allow Franchisee to remain in possession of the leased premises, or (b) at Franchisor's option, take an assignment of the lease from Franchisee (to the extent permitted by law), pursuant to the terms of the lease and if Franchisor exercises its option to take any such assignment under the lease, Franchisor shall notify Franchisee of such intention and Franchisee shall promptly assign its leasehold interest in the lease to Franchisor pursuant to and subject to the terms of the lease;

5.3.3.3    upon termination or expiration of the franchise rights granted by Franchisor to Franchisee, Franchisor has the right, at Franchisor's election, to receive an assignment of Franchisee's leasehold interest in the lease and in the event Franchisor desires to exercise this option in its sole and absolute discretion, Franchisor shall notify Franchisee of such intention and Franchisee shall promptly assign its leasehold interest in the lease to Franchisor pursuant to and subject to the terms of the lease;

5.3.3.4    in the event Franchisor takes an assignment of the lease pursuant to the terms of the lease and in accordance with Franchisor's rights described above in this Section 5.3.3, Franchisee shall be solely responsible for all obligations, debts and payments under the lease arising and/or accruing under the lease prior to the effective date of the assignment or otherwise while Franchisee is in possession of the leased premises (the "**Franchisee Obligations**") and shall indemnify and hold harmless Franchisor for any losses, liabilities, costs and expenses (including reasonable legal and professional fees) incurred by Franchisor arising out of or related to the Franchisee Obligations, including without limitation, any losses, liabilities, costs and expenses incurred by Franchisor in curing a default or breach on behalf of Franchisee pursuant to Section 5.3.3.2 above;

5.3.3.5    Franchisee shall immediately provide Franchisor with a copy of all lease amendments and assignments, and a copy of all letters and notices that the lessor sends to Franchisee relating to the lease or the leased premises;

5.3.3.6    upon expiration and non-renewal or immediately prior to termination of the lease or this Agreement, Franchisee shall provide access to Franchisor to enter the leased premises, to the extent such access and removal is not prohibited by the lease, to remove any signs containing Franchisor's proprietary marks or trade fixtures or other franchise identifying items and will, at Franchisor's expense, and to the extent necessary, enforce Franchisor's rights set forth in this Section with respect to such removal of any franchise identifying items; and

5.3.3.7    solely with respect to Franchisor's rights explicitly granted to Franchisor under the lease, Franchisee agrees to take such actions as reasonably requested by Franchisor, at Franchisor's expense, to enforce Franchisor's rights granted to Franchisor in the lease, as necessary, as if Franchisor was a party to the lease, with or without the consent or joinder of the lessor, provided that Franchisor shall not bear any costs in connection with Franchisee's assignment to Franchisor of the lease  nor should the foregoing relieve Franchisee from its Franchisee Obligations.

15

The rights in this Section 5.3.3 shall survive the expiration or earlier termination of the Term indefinitely.

### 5.4 Development of Approved Location

Franchisor shall make available to Franchisee, at no charge to Franchisee, specifications for the development of a European Wax Center, including specifications for the exterior and interior design and layout, fixtures, equipment, décor and signs. Franchisee shall cause the Approved Location to be developed, equipped and improved at Franchisee's sole cost and expense, in accordance with such plans and specifications within two hundred forty (240) days after the Effective Date. In connection with the development of the Approved Location, Franchisee shall:

5.4.1 employ a competent licensed architect, engineer or general contractor to prepare, for Franchisor's approval, preliminary specifications (the "**Plans**") for improvement of the Approved Location adapted from the specifications furnished by Franchisor and in compliance with applicable law and Franchisee will not deviate from any such Plans following approval by Franchisor without Franchisor's approval; provided if, due to unique circumstances disclosed to Franchisor prior to the date the specifications are submitted to Franchisor, it is necessary to deviate from Franchisor's standard specifications for the development of a European Wax Center, all deviations, including those that are necessary to adapt the standard specifications to the Approved Location, must be clearly designated in a separate document and submitted to Franchisor along with the Plans;

5.4.2 obtain all zoning classifications and clearances that may be required by state and local laws, ordinances or regulations, and submit to Franchisor, for Franchisor's approval, final plans for construction based upon the preliminary specifications;

5.4.3 obtain all building, utility, sign, health, and business permits and licenses, and any other permits and licenses required for the build-out and operation of the Franchised Center and certify in writing and provide evidence to Franchisor that all such permits and certifications have been obtained;

5.4.4 employ a qualified, licensed general contractor approved by Franchisor to complete construction of all required improvements to the Approved Location;

5.4.5 purchase the Start-up Package of European Wax Center Products and Start-up Marketing Package of European Wax Center Marketing Materials necessary for the establishment and operation of the Franchised Center; the exact size and composition of the Start-up Package and corresponding Start-up Package Fee, as well the Start-up Marketing Package and corresponding Start-Up Marketing Package Fee may vary depending on the capacity, condition, location and layout of the Approved Location and other like factors;

5.4.6 purchase any other supplies or inventory and purchase and install any other equipment, signs, furniture and fixtures, including any surveillance camera system equipment, computer system equipment, point-of-sale system equipment and telephone system equipment, meeting Franchisor's specifications, that are necessary for the operation of the Franchised Center;

5.4.7 establish Internet access; and

5.4.8 open an Electronic Depository Transfer Account and notify Franchisor of the pertinent account information by completing Franchisor's standard draft authorization form as required in Section 3.7.

Prior to retaining any architect or design firm, engineer or general contractor, Franchisee will provide to Franchisor the name, address, and relevant work experience on similar projects for any architect or design firm, engineer or general contractor that Franchisee wishes to retain. Franchisor may request that Franchisee hire a different architect or design firm or engineer or general contractor based on prior experiences of Franchisor, its Affiliates or other franchisees' with such person or entity, such person's or entity's general business reputation, and such person's or entity's relevant work experience on similar projects. Franchisor's response or non-response to Franchisee's use of any such person will not be deemed an endorsement or recommendation by Franchisor of any such person. Franchisee acknowledges and agrees that Franchisor is not liable for the unsatisfactory performance of any person retained by Franchisee.

16

If Franchisee elects or is required by this Agreement or its lease to perform construction work or renovations or refurbishment of the Franchised Center affecting the design, character, or appearance of the Franchised Center, Franchisee will obtain the prior approval of Franchisor that any such construction work or significant renovations or refurbishment complies with the specifications for the development of a European Wax Center.

Franchisor or its designees will promptly review the Plans for compliance with Franchisor's standard specifications. If Franchisor determines that the Plans do not comply with such specifications, Franchisor will provide recommended changes to Franchisee that Franchisee will incorporate into the Plans and resubmit to Franchisor for its review. Each party will act speedily and in good faith in the preparation, submission, review and revision of the Plans. Franchisee will not begin the construction, renovation or refurbishment until Franchisor notifies Franchisee that the Plans comply with Franchisor's standard specifications. Once finalized, the Plans will not be changed, including changes required by governmental authorities, without the prior written consent of Franchisor.

Franchisee agrees that Franchisee, and not Franchisor or its Affiliates or their designees (including any Area Representative), is responsible for: (i) ensuring that any design, construction documents, specifications, and any construction, renovation, or refurbishment complies with any applicable law, including any requirements relating to disabled persons; (ii) any errors or omissions; or (iii) discrepancies (of any nature) in any drawings or specifications. Franchisee further acknowledges and agrees that: (a) Franchisor's review of the Plans is limited solely to determining whether the Plans comply with Franchisor's standard specifications; and (b) Franchisor will have no liability or obligation with respect to renovation, upgrading or furnishing of the Franchised Center. Except for Franchisee's own uses related to its construction or operation of the Franchised Center, Franchisee will not reproduce, use or permit the use of any of the design concepts, drawings, or specifications.

### 5.5     Failure to Develop Approved Location

Should Franchisee fail to develop the Approved Location for the Franchised Center within two hundred forty (240) days after the Effective Date, Franchisor has the right to terminate the Term; provided, that, in the event Franchisee has failed to develop the Approved Location for the Franchised Center within such 240-day period, but Franchisee is diligently working to develop the Approved Location, as determined in Franchisor's sole reasonable discretion, taking into account all reasonable facts and circumstances, Franchisee shall not be in breach of its obligations under this Section 5.5 or Section 5.4 above, and Franchisor shall not terminate the Term, but shall reasonably increase such applicable period up to an additional thirty (30) days (which may be further extended in Franchisor's reasonable discretion) to provide Franchisee additional time to develop the Franchised Center. If this Agreement is terminated pursuant to this Section 5.5, Franchisor shall return to Franchisee fifty percent (50%) of the Franchise Fee paid by Franchisee upon Franchisor's receipt of a general release, the same as or similar to the General Release attached as Exhibit 1, releasing any and all claims against Franchisor, any Affiliate and their officers, directors, shareholders, managers, members, partners, owners, employees and agents (in their corporate and individual capacities).

Franchisee acknowledges that Franchisor or its designees will conduct an on-site inspection of the Franchised Center within thirty (30) days following Franchisor's receipt of a certificate of completion from Franchisee or its contractor (the "**Initial Inspection**"). Within five (5) business days following the Initial Inspection, Franchisor will provide written notice to Franchisee that either: (i) the Franchised Center conforms with the applicable Plans, at which point Franchisor shall approve the Franchised Center; or (ii) the Franchised Center does not conform with such Plans, in which case Franchisor shall also provide to Franchisee a written description of such nonconformities (the "**Nonconformance Notice**").

In the event Franchisor provides Franchisee a Nonconformance Notice (whether as a result of the Initial Inspection or any Subsequent Inspection (as defined below)), Franchisee, at its expense, shall correct such nonconformities within a reasonable amount of time and then notify Franchisor in writing when such nonconformities have been corrected at which point Franchisor or its designees shall conduct a subsequent on-site inspection of the Franchised Center within ten (10) business days following Franchisor's receipt of such notice from Franchisee (each such subsequent inspection shall be referred to as a "**Subsequent Inspection**"). Within five (5) business days following any such Subsequent Inspection, Franchisor will provide written notice to Franchisee that either: (i) the Franchised Center now conforms with the applicable Plans, at which point Franchisor shall approve the Franchised Center; or (ii) the Franchised Center does not conform with such Plans, in which case Franchisor

shall also provide to Franchisee another Nonconformance Notice, and in such event, Franchisee, at its expense, shall again correct such nonconformities within a reasonable amount of time and then notify Franchisor in writing when such nonconformities have been corrected at which point Franchisor or designees shall conduct a Subsequent Inspection within ten (10) business days following Franchisor's receipt of such notice from Franchisee. The provisions of this paragraph shall continue to apply until such time as Franchisor provides approval of the Franchised Center as described above.

The parties agree that Franchisor shall be entitled to a fee of $1,000, to be paid by Franchisee, for each Subsequent Inspection performed by Franchisor or its designees, which such amount is intended to reimburse Franchisor for its costs and expenses in performing such Subsequent Inspection, up to a total of $10,000 for all such Subsequent Inspections.

For purposes of this Section 5.5, Franchisor's approval of the Franchised Center only indicates that the Franchised Center complies with the Plans for the Franchised Center, as approved by Franchisor, and the parties agree that Franchisor's approval or disapproval will not impose any liability or obligation on Franchisor.

### 5.6 **Opening of the Franchised Center**

5.6.1 Before opening the Franchised Center and commencing business, Franchisee shall:

5.6.1.1 be in good standing in Franchisee's jurisdiction of formation, and validly existing for the purpose of owning and operating the Franchised Center, duly authorized to conduct such business;

5.6.1.2 fulfill all of the obligations of Franchisee pursuant to the other provisions of this Section 5;

5.6.1.3 furnish Franchisor with copies of all insurance policies required by this Agreement, or by the lease, or such other evidence of insurance coverage and payment of premiums as Franchisor may request;

5.6.1.4 complete initial training to the satisfaction of Franchisor, and ensure that the Designated Manager has completed initial training to the satisfaction of Franchisor;

5.6.1.5 hire the personnel necessary or required for the operation of the Franchised Center;

5.6.1.6 obtain all necessary permits and licenses;

5.6.1.7 obtain Franchisor's permission and approval of an opening date; Franchisor shall not unreasonably withhold consent to open. Permission to open shall be based on Franchisor's determination that Franchisee has complied with all material pre-opening obligations under this Agreement, is ready to open and satisfactorily prepared to operate; and

5.6.1.8 pay in full all amounts due to Franchisor and each Franchisor Affiliate.

5.6.2 Franchisee shall comply with these conditions and be prepared to open and continuously operate the Franchised Center within two hundred forty (240) days after the Effective Date.

5.6.3 Franchisee shall not suffer any mechanics', laborers' or materialmen's liens to be filed against the Franchised Center or the Approved Location or any interest in either of them by reason of any work, labor, services or materials performed at or furnished to, or claimed to have been performed at or furnished to, the Franchised Center or the Approved Location, by, or at the direction or sufferance of, Franchisee or anyone holding the Franchised Center or the Approved Location through or under the Franchisee; if any liens shall at any time be filed or claimed, Franchisee shall have the right to contest them in good faith and with reasonable diligence, provided Franchisee has bonded over the lien claim or has taken other measures reasonably satisfactory to Franchisor to assure payment and to prevent any sale, foreclosure or forfeiture of the Franchised Center or the Approved Location by reason of non-payment. On final determination of the lien or claim for lien, Franchisee shall

18

immediately pay any judgment, with all costs and charges, and shall have the lien released of record and any judgment satisfied. If Franchisee shall fail to contest the liens with due diligence or shall fail to cause the liens to be discharged within thirty (30) days after being notified of their filing and in any case, before any sale, foreclosure or forfeiture then, in addition to any other right or remedy of Franchisor, Franchisor or its Affiliates may discharge the liens by paying the amount claimed to be due or by bonding or other proceeding deemed appropriate by Franchisor, and the amount paid by Franchisor or Franchisor's Affiliates and all costs and expenses, including reasonable attorneys' fees, expenses and court costs, incurred by Franchisor or Franchisor's Affiliates in procuring the discharge of the liens or judgment, shall be due and payable by Franchisee to Franchisor or its applicable Affiliates within ten (10) days after demand by Franchisor. Under no circumstances shall an interest of Franchisor in the Franchised Center or the Approved Location be subject to any mechanic's, laborer's or materialman's lien or any other lien or charge on account of or arising from any contract or obligations of Franchisee and all such parties must look exclusively to Franchisee to obtain payment for same. Franchisee shall deliver written notice of the foregoing provisions to all persons performing work on or in the Franchised Center or the Approved Location. Additionally, if requested by Franchisor, Franchisee shall promptly execute and deliver to Franchisor a notice of non-responsibility, in a form provided by Franchisor.

### 5.7     Failure to Open

Notwithstanding any provision in this Agreement to the contrary, Franchisee shall commence operations at the Approved Location for the Franchised Center in accordance with the terms and conditions of this Agreement no later than three hundred (300) days after the Effective Date. Should Franchisee fail to commence operations at the Approved Location for the Franchised Center within three hundred (300) days after the Effective Date, Franchisor has the right to terminate the Term, with time being of the essence. If this Agreement is terminated pursuant to this Section 5.7, Franchisor shall be entitled to retain the entire Franchise Fee paid by Franchisee. The Franchise Fee retained shall be specifically understood and agreed by the parties to be in consideration of the services provided, time expended, work performed, and other efforts of Franchisor up to the date of Franchisee's failure to timely commence operations of the Franchised Center and shall not be construed as nor considered to be a penalty.

### 5.8     Use of Approved Location

Franchisee shall not use the Approved Location for any purpose other than for the operation of a European Wax Center in full compliance with this Agreement and the Confidential Operations Manual, unless approved in writing by Franchisor.

### 5.9     Relocation of the Franchised Center

Franchisee shall not relocate the Franchised Center without the prior written consent of Franchisor. If the lease for the Approved Location expires or terminates without the fault of Franchisee or if the Franchised Center's premises is destroyed, condemned or otherwise rendered unusable, or as otherwise may be agreed upon in writing by Franchisor and Franchisee, Franchisor may allow Franchisee to relocate the Franchised Center. If the lease for any such replacement location of the Franchised Center expires or terminates without Franchisee's fault or the replacement location of the Franchised Center's premises is destroyed, condemned or otherwise rendered unusable, or as otherwise may be agreed upon in writing by Franchisor and Franchisee, Franchisor may allow Franchisee to further relocate the location of the Franchised Center. Franchisor will approve or disapprove a proposed location based on such factors as Franchisor deems appropriate, including the condition of the premises, demographics and population density of the surrounding area, proximity to the European Wax Centers located in the Protected Territory, lease requirements, visibility, ease of access, available parking and overall suitability. Any such relocation shall be at Franchisee's sole expense, and shall proceed in accordance with the requirements set forth in Sections 5.1 through 5.7, to the extent applicable, and to the extent necessary, shall be documented in an amendment to this Agreement by the parties, including, amending the address the Approved Location for the Franchised Center and as applicable, the designated Protected Territory. Franchisor has the right to charge Franchisee for any costs incurred by Franchisor in providing assistance to Franchisee, including legal and professional fees. Notwithstanding the foregoing, Franchisor has no obligation to provide relocation assistance. If Franchisor and Franchisee do not agree upon a substitute site within ninety (90) days after the lease expires or is terminated or the Approved Location is rendered unusable, this Agreement shall terminate as if the Term expired. Notwithstanding any provision in this Agreement to the contrary, Franchisor may condition Franchisor's approval of any such relocation on Franchisor and Franchisee agreeing on a Protected Territory for such new location (which may be the same Protected Territory

19

as the current Approved Location), which may take into account such factors as Franchisor deems appropriate, including, nearby locations and Protected Territories and current demographics.

## 6. FRANCHISOR'S MARKS

### 6.1 Franchisor's Ownership of Marks

Franchisee's right to use the Marks is derived solely from this Agreement, is nonexclusive and is limited to the conduct of the business of the Franchised Center by Franchisee pursuant to, and in compliance with, this Agreement and all applicable standards, specifications and operating procedures prescribed from time to time by Franchisor. Any unauthorized use of the Marks by Franchisee is a breach of this Agreement and an infringement of the rights of Franchisor in and to the Marks. Franchisee's use of the Marks, and any goodwill created thereby, shall inure to the benefit of Franchisor. Franchisee shall not at any time acquire an ownership interest in the Marks by virtue of any use it may make of the Marks. This Agreement does not confer any goodwill, title or interest in the Marks to Franchisee. Franchisee shall not, at any time during the Term or after its termination or expiration, contest the validity or ownership of any of the Marks or assist any other person in contesting the validity or ownership of any of the Marks.

### 6.2 Limitations on Franchisee's Use of the Marks

Franchisee shall not use any Mark or portion of any Mark as part of any business entity name without Franchisor's written consent which may be withheld by Franchisor in its sole discretion. Franchisee shall not use any Mark in connection with the sale of any unauthorized product or service or in any other manner not expressly authorized in writing by Franchisor. Franchisee shall give such notices of trademark and service mark registrations as Franchisor specifies, in a manner and in a format specified by Franchisor, and obtain such fictitious, assumed name or other business registrations as may be required under applicable law to do business as a Franchised Center. Franchisee shall not register or seek to register as a trademark or service mark, either with the United States Patent and Trademark Office or any state or foreign country, any of the Marks or a trademark or service mark that includes, consists of or is confusingly similar to any Mark. Franchisee shall include on its letterhead, forms, cards and other such identification, and shall display at the Approved Location, a prominent notice stating that the Franchised Center is an "*Independently Owned and Operated Franchise*" of Franchisee, and any such notice shall also include the legal name of Franchisee. Franchisee shall not claim any rights in or to any Mark or modification or variation thereof.

### 6.3 Notification of Infringements of the Marks; Claims Against the Marks

Franchisee shall immediately notify Franchisor of any infringement of the Marks or challenge to its use of any of the Marks or claim by any person of any rights in any of the Marks. Franchisee shall not communicate with any person other than Franchisor and, through Franchisee's counsel, Franchisor's counsel in connection with any such infringement, challenge or claim; provided, however, Franchisee may communicate with Franchisee's counsel at Franchisee's expense. Franchisor has the right to take any action in connection with any such infringement, challenge or claim and has the right to exclusively control any litigation or other proceeding arising out of any infringement, challenge, or claim or otherwise relating to any of the Marks but Franchisor shall not be required to take such action. Franchisee shall execute any and all instruments and documents, render such assistance, and do such acts and things as Franchisor may, in the opinion of Franchisor's counsel, be necessary or advisable to protect and maintain Franchisor's interests in any such litigation or other proceeding or to otherwise protect and maintain Franchisor's interest in the Marks.

### 6.4 Franchisor's Indemnification for Franchisee's Use of Marks

Franchisor shall reimburse Franchisee for all expenses reasonably incurred by Franchisee in any trademark or similar proceeding disputing Franchisee's authorized use of any Mark, provided that Franchisee has timely notified Franchisor of such proceeding and has complied with this Agreement and Franchisor's directions in responding to such proceeding. At Franchisor's option, Franchisor or its designees may defend and control the defense of any proceeding arising directly from Franchisee's use of any Mark. This indemnification shall not include the expense to Franchisee of removing signage or discontinuance of the use of the Marks. This indemnification shall not apply to litigation between Franchisor and Franchisee wherein Franchisee's use of the Marks is disputed or challenged by Franchisor. This indemnification shall not apply to any separate legal or

20

professional fees or costs incurred by Franchisee in seeking independent counsel separate from the counsel representing Franchisor and Franchisee in the event of litigation disputing Franchisor and Franchisee's use of the Marks.

### 6.5 Franchisee's Discontinuance of Use of the Marks

If it becomes necessary for Franchisee to modify or discontinue use of any of the Marks, or use one (1) or more additional or substitute trade names, trademarks, service marks or other commercial symbols, Franchisee shall, at its sole cost and expense, comply with Franchisor's directions within ten (10) business days after notice to Franchisee by Franchisor and subject to the limitations in Section 10.2. Franchisor shall not reimburse Franchisee for its expenses in modifying or discontinuing the use of a Mark or any loss of goodwill associated with any modified or discontinued Mark or for any expenditures made by Franchisee to promote a modified or substitute Mark, it being understood and agreed that all goodwill associated with any Marks inures to the benefit of Franchisor.

### 6.6 Franchisor's Right to Inspect Franchisee's Use of the Marks

To preserve the validity and integrity of the Marks and any copyrighted materials licensed under this Agreement, and to ensure that Franchisee is properly employing the Marks in the operation of the Franchised Center, Franchisor and its designees have the right to conduct real time surveillance of the Franchised Center and the right to enter and inspect the Franchised Center and the Approved Location at all reasonable times and, additionally, have the right to observe the manner in which Franchisee renders services and conducts activities and operations, and to inspect facilities, equipment, products, supplies, reports, forms and documents and related data to ensure that Franchisee is operating the Franchised Center in accordance with the quality control provisions and performance standards established by Franchisor and this Agreement. Franchisor and its designees shall have the right, at any reasonable time, to remove sufficient quantities of products, supplies or other inventory items offered for retail sale, or used in rendering services, to test whether such products or items meet Franchisor's then-current standards. Franchisor or its designee has the right to observe Franchisee and its employees during the operation of the Franchised Center and to interview and survey (whether in person or by mail) customers and employees and to photograph and videotape the premises.

### 6.7 Franchisor's Sole Right to Domain Name

Franchisee shall not establish, create or operate an Internet site or Web site using a domain name or uniform resource locator containing the Marks or the words "European Wax Center" or any variation thereof. Franchisee shall not advertise on the Internet using the "European Wax Center" name and any other Mark without Franchisor's prior written approval, including the means and manner and content of any such advertisement. Franchisor is the sole owner of all right, title and interest in and to the domain "waxcenter.com" and any other domain names containing any Marks.

### 6.8 Contributions and Donations

In order to protect the Marks, Franchisee must obtain written consent from Franchisor before making any contributions or donations of items, services or funds to any individual or entity, or provide any type of other benefit to any charitable, religious, political, social, civic or other type of organization (or to any individual on behalf of any organization). Franchisor may withhold any such consent in its sole and absolute discretion.

## 7. TRADE SECRETS AND OTHER CONFIDENTIAL INFORMATION

### 7.1 Requirement of Confidentiality

7.1.1 Franchisee acknowledges that Franchisor will disclose Trade Secrets and other Confidential Information to Franchisee during the training program, through the Confidential Operations Manual, training guides and materials and as a result of guidance furnished to Franchisee during the Term. Franchisee shall not acquire any interest in the Trade Secrets or other Confidential Information, other than the right to utilize it in the development and operation of the Franchised Center and in performing its duties during the Term.

7.1.2    Franchisee acknowledges that the use or duplication of the Trade Secrets or other Confidential Information in any other business venture would constitute an unfair method of competition. Franchisee acknowledges that the Trade Secrets and other Confidential Information are proprietary and are disclosed to Franchisee solely on the condition that Franchisee (and all holders of a legal or beneficial interest in Franchisee and all officers, directors, executives, managers and members of the professional staff of Franchisee): (a) shall not use the Trade Secrets or other Confidential Information in any other business or capacity; (b) shall maintain the absolute confidentiality of the Trade Secrets and other Confidential Information during and after the Term; (c) shall not make any unauthorized copies of any portion of the Trade Secrets or other Confidential Information disclosed in written or other tangible form; and (d) shall adopt and implement all reasonable procedures prescribed, from time to time, by Franchisor to prevent unauthorized use or disclosure of the Trade Secrets and other Confidential Information.

7.1.3    Franchisee shall enforce this Section as to its employees, agents and representatives and shall be liable to Franchisor for any unauthorized disclosure or use of Trade Secrets or other Confidential Information by any of them.

7.1.4    This Section shall survive the termination of the Term indefinitely.

**7.2     Franchisor Owns All Additional Developments**

All ideas, concepts, techniques or materials concerning the Franchised Center and the System, including all data related to guests (customers), whether or not protectable intellectual property and whether created by or for Franchisee or its owners or employees, must be promptly disclosed to Franchisor and will be deemed the sole and exclusive property of Franchisor and works made-for-hire for Franchisor, and no compensation will be due to Franchisee or its owners or employees, therefore, and Franchisee hereby assigns to Franchisor all right, title and interest in any intellectual property so developed. Franchisor may incorporate such items into the System.  To the extent any item does not qualify as a "work made-for-hire" for Franchisor, Franchisee hereby assigns ownership of that item, and all related rights to that item, to Franchisor and shall sign, or cause the assignment of, any assignment or other document as Franchisor requests to assist Franchisor in obtaining or preserving intellectual property rights in the item.  Franchisee also waives any author's or moral rights in and to such items, and shall ensure its employees do the same. Franchisor shall disclose to Franchisee concepts and developments of other franchisees that are made part of the System.  As Franchisor may reasonably request, Franchisee shall take all actions to assist Franchisor's efforts to obtain or maintain intellectual property rights in any item or process related to the System, whether developed by Franchisee or not.

**7.3     No Competition with Franchisor**

Franchisee acknowledges that Franchisor would be unable to protect the Trade Secrets and other Confidential Information against unauthorized use or disclosure and would be unable to encourage a free exchange of ideas and information among European Wax Center franchisees if owners of European Wax Centers and members of their immediate families and households were permitted to hold an interest in or perform services for any Competitive Business.  Therefore, during the Term, and for a period of two (2) years after the expiration or termination of the Term, regardless of the cause of expiration or termination, neither Franchisee nor any holder of a legal or beneficial interest in Franchisee, nor any officer, director, executive, manager or member of the professional staff of Franchisee, either directly or indirectly, for themselves, or through, on behalf of or in conjunction with any person, partnership, corporation, limited liability company or other business entity, shall:

7.3.1    Divert or attempt to divert any business or customer of the Franchised Center to any Competitive Business, by direct or indirect inducement or otherwise;

7.3.2    Do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks or the System;

7.3.3    Carry on, be engaged in or take part in, render services to, or own or share in the earnings of any Competitive Business anywhere in the United States; or

7.3.4    Solicit or otherwise attempt to induce or influence any employee or other business associate of Franchisee, Franchisor or any other European Wax Center to compete against, or terminate or modify

22

his, her or its employment or business relationship with, Franchisee, Franchisor or any other European Wax Center or any Area Representative.

Following the expiration or termination of the Term (unless renewed as set forth in Section 4.2 above), the geographic scope of the restriction set forth in this Section 7.3 shall be limited to the Protected Territory and within 50 miles of any other company-owned location, or Franchised Center existing at the time of such expiration or termination.

In addition, Franchisee agrees and covenants that Franchisee will not, at any time, either directly or indirectly, and shall cause Franchisee's affiliates, employees, agents and representatives not to, make, publish or communicate to any person or entity or in any public forum (including through social media) any defamatory or disparaging remarks, comments or statements concerning Franchisor, its Affiliates, any franchisees or Area Representatives and/or any of their respective employees, agents and representatives, or the System or its Marks, other than as part of the judicial, arbitration or other dispute resolution process in connection with any litigation, mediation, arbitration or administrative or other judicial proceeding arising under any claim brought in connection with this Agreement, or other than when compelled to testify under oath by subpoena, regulation or court order.

### 7.4 Designated Individuals Shall Enter Into Nondisclosure and Non-Competition Agreements

In addition to the restrictive covenants set forth in Section 7.3 above, Franchisor has the right to require that Franchisee obtain from any holder of a legal or beneficial interest in Franchisee, and any officer, director, executive, manager or member of the professional staff of Franchisee, an executed nondisclosure and non-competition agreement, in a form the same as or similar to the Nondisclosure and Non-Competition Agreement attached as Exhibit 2, upon execution of this Agreement or prior to each such person's affiliation with Franchisee or at any time thereafter. In addition, Franchisor has the right to require that Franchisee obtain from any other personnel an executed nondisclosure and non-solicitation agreement, in a form the same as or similar to the Nondisclosure and Non-Solicitation Agreement attached as Exhibit 3, upon execution of this Agreement or prior to each such person's affiliation with Franchisee or at any time thereafter. Franchisee shall provide Franchisor with originals of all nondisclosure and non-competition agreements signed pursuant to this Section. Franchisor shall be a third party beneficiary with the right to enforce covenants contained in such agreements.

Without limiting Franchisee's obligations and restrictions under Section 18 and Section 19 of this Agreement, Franchisee shall promptly notify Franchisor of all holders of a legal or beneficial interest in Franchisee and any officer, director, executive or manager of Franchisee and any additions or deletions to any of the foregoing.

### 7.5 Franchisee Acknowledges Reasonableness of Restrictions

Franchisee acknowledges that the restrictive covenants contained in this Section and Section 17.2 are essential elements of this Agreement and that without their inclusion, Franchisor would not have entered into this Agreement. Franchisee acknowledges that each of the terms set forth in this Agreement, including the restrictive covenants, is fair and reasonable and is reasonably required for the protection of Franchisor, Trade Secrets and other Confidential Information, the System and the Marks and Franchisee waives any right to challenge these restrictions as being overly broad, unreasonable or otherwise unenforceable. If, however, a court of competent jurisdiction determines that any such restriction is unreasonable or unenforceable, then Franchisee shall submit to the reduction of any such activity, time period or geographic restriction necessary to enable the court to enforce such restrictions to the fullest extent permitted under applicable law. It is the desire and intent of Franchisor and Franchisee that the provisions of this Agreement shall be enforced to the fullest extent permissible under the laws and public policies applied in any jurisdiction where enforcement is sought. Franchisor may, at its discretion and at any time, reduce the scope, restricted activities and/or duration of any of the restrictive covenants effective immediately upon notice to Franchisee.

### 7.6 Relief for Breaches of Confidentiality, Non-Solicitation, Non-Disparagement and Non-Competition

Franchisee acknowledges that an actual or threatened violation of the covenants contained in Section 7 of this Agreement will cause Franchisor immediate and irreparable harm, damage and injury that cannot be fully compensated for by an award of damages or other remedies at law. Accordingly, Franchisor shall be entitled, as a matter of right, to seek an injunction from any court of competent jurisdiction restraining any further violation by

23

Franchisee of Section 7 of this Agreement without any requirement to show any actual damage, irreparable harm or establish a balance of convenience, or to post any bond or other security. Such right to an injunction shall be cumulative and in addition to, and not in limitation of, any other rights and remedies that Franchisor may have at law or in equity.

## 8. TRAINING AND ASSISTANCE PROVIDED BY FRANCHISOR

### 8.1 Franchisor Shall Provide Initial Training

8.1.1 Franchisor shall make an initial training program available to Franchisee, if Franchisee is an individual, or to each equity holder of Franchisee, if Franchisee is a business entity. Prior to the opening of the Franchised Center, Franchisee must attend and successfully complete, to Franchisor's satisfaction, this initial training program pertaining to operation of the Franchised Center. Franchisor or its representatives shall conduct the initial training program at its headquarters or at another designated location determined by Franchisor. Franchisor shall not charge tuition or similar fees for initial training, however, all expenses incurred by Franchisee and its principal group in attending such program including, but not limited to, travel costs, room and board expenses and employees' salaries, shall be the sole responsibility of Franchisee.

8.1.2 Franchisor, in its discretion, may make an initial training program available to Franchisee's Designated Manager. Any such Designated Manager training may be attended by other personnel and representatives of Franchisee approved by Franchisor. Prior to the opening of the Franchised Center, the Designated Manager must attend and successfully complete, to Franchisor's satisfaction, any required Designated Manager training program pertaining to operation of the Franchised Center. Franchisor or its representatives shall conduct the Designated Manager training program at its headquarters or at another designated location determined by Franchisor. Franchisor shall not charge tuition or similar fees for any such Designated Manager training, however, all expenses incurred by any such Designated Manager or other personnel or representatives of Franchisee in attending such program including, but not limited to, travel costs, room and board expenses and employees' salaries, shall be the sole responsibility of Franchisee.

### 8.2 Personnel

8.2.1 Franchisee will be required to adequately staff the Franchised Center to operate the Franchised Center, including, without limitation, which will likely include at a minimum, waxers and guest services personnel. Franchisee shall be solely responsible for the hiring of all of its required employees, and is solely responsible for the terms of each such person's employment or engagement, maintaining supervision over such persons and compensation for such persons, including complying with all employment, tax (including withholding taxes) and wage related laws with respect to such persons. Franchisee's will remain, as between Franchisee on the one hand and Franchisor on the other, employees of Franchisee, and shall not be deemed to be employees of Franchisor for any purpose.

8.2.2 Franchisee must comply with Franchisor's minimum operating standards and procedures included in the Confidential Operations Manual or otherwise in writing from time to time with respect to staffing of the Franchised Center. Franchisee acknowledges and agrees that neither Franchisor, nor its Affiliates nor their respective employees or representatives assume any responsibility or liability for the hiring or engaging of any employees or service providing contractors of Franchisee or satisfaction of any pre-employment or pre-engagement conditions, which Franchisee understands is its sole responsibility.

8.2.3 Except as otherwise specifically provided in this Section 8. Franchisee shall be responsible for training its employees subject to the terms of this Section 8. Notwithstanding the foregoing, Franchisor may make available training materials and programs for certain personnel of Franchisee, which Franchisor may require in its discretion to be completed by such persons prior to the provision of any services by such persons to guests of the Franchised Center.

### 8.3 Franchisee's Failure to Complete Initial Training Program

8.3.1 If Franchisor determines that Franchisee, its principals and/or its Designated Manager fails to complete the applicable training program described in Section 8.1 to Franchisor's reasonable satisfaction within a reasonable time of signing the Franchise Agreement, Franchisor has the right to terminate the Term. For

24

the avoidance of doubt, a reasonable time, as described in the previous sentence, shall mean no later than sixty (60) days prior to the projected date for Franchisee to commence operations of the Approved Location for the Franchised Center. If the Term is terminated pursuant to this Section 8.3, Franchisor shall return to Franchisee fifty percent (50%) of the Franchise Fee paid by Franchisee upon Franchisor's receipt of a general release in a form the same as or similar to the General Release attached as Exhibit 1 and acceptable to Franchisor.

8.3.2     Notwithstanding the provisions of Section 8.3.1, if Franchisee is a business entity and the Designated Manager fails to timely complete the training program to Franchisor's reasonable satisfaction, Franchisee may be permitted to select a substitute Designated Manager and such substitute Designated Manager must complete the initial training to Franchisor's reasonable satisfaction. Franchisee may be required to pay Franchisor's then-current rates for additional training for providing the substitute manager with an initial training program.

## 8.4     Franchisor Shall Provide Opening Assistance

In conjunction with the beginning of operation of the Franchised Center, Franchisor shall make available to Franchisee, at Franchisor's expense, one (1) or more of Franchisor's representatives (which may be provided by Area Representatives) for the purpose of providing general assistance and guidance in connection with the opening of the Franchised Center for a total of approximately seven (7) days before and/or after the grand opening of the Franchised Center. If Franchisee requests additional assistance with respect to the opening or continued operation of the Franchised Center, and should Franchisor deem it necessary and appropriate to comply with such request, Franchisee shall pay Franchisor's then-current standard rates, plus expenses, for such additional assistance.

## 8.5     New Designated Manager Must Complete Initial Training Program

After beginning operations, should Franchisee name a new Designated Manager, Franchisee must notify Franchisor of the identity of any new Designated Manager and the new Designated Manager must complete the initial training program to Franchisor's satisfaction within thirty (30) days of the new Designated Manager assuming the duties of the Designated Manager. The new Designated Manager may attend the initial training program without charge, provided that Franchisor has the right to require Franchisee to pay the costs of training if Franchisor determines that manager changes by Franchisee are excessive or caused by poor hiring practices. Franchisee shall be responsible for all travel costs, room and board and employees' salaries incurred in connection with the new Designated Manager's attendance at such training.

## 8.6     Franchisee and its Designated Manager Must Attend Ongoing Training

8.6.1     From time to time, Franchisor may provide, and, if it does, has the right to require that Franchisee, its principals, its Designated Manager and/or other applicable personnel attend, ongoing or refresher training programs or seminars, including webinars and teleconferences conducted by Franchisor and its representatives or third parties engaged by Franchisor, during the Term. Franchisor shall not charge a fee for any mandatory ongoing training, provided that Franchisor may require Franchisee to reimburse Franchisor for any attendance fees paid by Franchisor on behalf of the Franchisee for seminars or training programs conducted by unaffiliated third parties. Without limiting the generality of the foregoing, solely with respect to such ongoing training and without limiting the other training programs described in Sections 8.1 through 8.5 and Section 8.6.2 below, Franchisor shall not require Franchisee, its principals, its Designated Manager and/or other applicable personnel to travel to more than three (3) sessions in any calendar year and collectively not more than two (2) days in any training session. For the avoidance of doubt, the phrase "**travel to**", as used in the previous sentence, shall be deemed to mean the attendance in person at any session located more than sixty (60) miles from its Franchised Center. Franchisee shall be responsible for all travel costs, room and board and employees' salaries incurred in connection with Franchisee's, its principals, its Designated Manager's and/or other applicable personnel's attendance at any such ongoing training session.

8.6.2     In addition, Franchisor, in its discretion, may periodically conduct an annual conference or convention from time to time. Franchisee, its principals, its Designated Manager and/or other personnel may be required to attend such conferences or conventions at its own cost and expense, as reasonably determined by Franchisor. For the avoidance of doubt, Franchisee shall be responsible for all admission tickets for conference activities as well as all travel costs, room and board and employees' salaries incurred in connection with its and its employees' attendance at any such conference, convention or training session.

25

8.6.3    Franchisor may, as it deems advisable, coordinate periodic teleconferences or video conferences of franchisees and/or its personnel on a local, regional or national level and may require that Franchisee, its representatives and/or its personnel, as applicable, attend these meetings. Franchisee and its principals shall attend any such meeting required by Franchisor for franchisees unless Franchisee receives Franchisor's permission to not attend any such meeting.

### 8.7    Franchisor Reserves the Rights to Modify Training Programs

Franchisor may add or otherwise modify or reduce (in each case in a non-material manner) training components or requirements in its discretion based on changes to the market conditions or other circumstances applicable to the operation of a Franchised Center during the Term. Franchisor may also adapt any training program or create special training programs based on the needs of a particular franchisee or its personnel.

### 9.    FRANCHISOR'S CONFIDENTIAL OPERATIONS MANUAL

#### 9.1    Franchisor Shall Loan Franchisee the Confidential Operations Manual

During the Term, Franchisor shall provide Franchisee with access to the Confidential Operations Manual (which if tangible, shall be considered a loan to Franchisee for the Term and if electronic, such access shall be deemed temporary for the duration of the Term). Franchisee shall conduct the Franchised Center in strict accordance with the provisions set forth in the Confidential Operations Manual. The Confidential Operations Manual may consist of one (1) or more separate manuals and other materials as designated by Franchisor and may be in written or electronic form. Franchisor owns the copyrights in the Confidential Operations Manual; Franchisee shall not copy or duplicate the Confidential Operations Manual in whole or in part; provided that Franchisee may print out portions on an as needed basis of the electronic version of the Confidential Operations Manual strictly for Franchisee's own use in operating the Franchised Center and for no other purpose. The Confidential Operations Manual shall, at all times, remain the sole property of Franchisor and shall immediately be returned to Franchisor, along with all user names, passwords and access codes to access the Confidential Operations Manual electronically, upon expiration or termination of the Term or destroyed, at the direction of Franchisor, and any portions of the Confidential Operations Manual printed from the electronic version by Franchisee shall be promptly destroyed, as certified by Franchisee. If Franchisee's Confidential Operations Manual is lost or destroyed, Franchisor may supply a replacement Confidential Operations Manual to Franchisee or otherwise make available to Franchisee an electronic version of the Confidential Operations Manual, and Franchisee shall pay Franchisor's costs and expenses related to such replacement.

#### 9.2    Franchisor May Modify the Confidential Operations Manual

9.2.1    Franchisor has the right to add to, delete from, update, revise to or otherwise modify the Confidential Operations Manual, from time to time, to reflect changes in the specifications, standards, operating procedures and rules prescribed by Franchisor; provided, however, that no such addition, deletion, update, revision or modification shall materially alter Franchisee's fundamental status and rights under this Agreement. Franchisor may make such modifications without prior notice to Franchisee. Franchisee shall immediately, upon notice (e-mail acceptable) from Franchisor, adopt any such changes and shall ensure that its copy of the Confidential Operations Manual is up-to-date at all times.

9.2.2    At Franchisor's option, Franchisor may post some or all of the Confidential Operations Manual on a restricted Web site, intranet, or extranet to which Franchisee will have access. For purposes of this Agreement, "**Web site**" means an interactive electronic document contained in a network of computers linked by communications software, including, without limitation, the Internet and World Wide Web home pages. If Franchisor does so, Franchisee agrees to monitor and access the Web site, intranet, or extranet for any updates to the Confidential Operations Manual. Any password, user name or access code or other digital identification necessary to access the Confidential Operations Manual on a Web site, intranet or extranet will be deemed to be Franchisor's proprietary information, subject to Section 7 above.

9.2.3    If a dispute as to the contents of the Confidential Operations Manual arises, the terms of the most recent form of the Confidential Operations Manual available on Franchisor's intranet, shall be controlling.

**9.3**     <u>Franchisee Must Maintain the Confidentiality of the Confidential Operations Manual</u>

The Confidential Operations Manual contains Franchisor's Trade Secrets and other Confidential Information and shall be kept confidential by Franchisee both during the Term and subsequent to the expiration and non-renewal or termination of the Term. If in paper form or stored on computer-readable media, Franchisee shall at all times ensure that its copy is available at the Approved Location in a current and up-to-date manner, and is adequately secured (by passcode, lock or other similar measures) at the Approved Location. If in electronic form, Franchisee shall maintain the Confidential Operations Manual in a password-protected file. Franchisee shall only grant authorized personnel access subject to confidentiality obligations access to the Confidential Operations Manual. Franchisee shall not disclose, duplicate or otherwise use any portion of the Confidential Operations Manual in an unauthorized manner.

## 10.     <u>FRANCHISE SYSTEM</u>

**10.1**     <u>Franchisee Shall Comply with Franchisor's Requirements, Specifications, Standards, Operating Procedures and Rules</u>

Franchisee understands and acknowledges the importance of Franchisor's high and uniform standards of quality, operations and service and the necessity of operating the Franchised Center in strict conformity with the System. Franchisee shall strictly comply, and shall cause the Franchised Center to strictly comply, with all requirements, specifications, standards, operating procedures and rules set forth in this Agreement, the Confidential Operations Manual or other communications supplied to Franchisee by Franchisor.

**10.2**     <u>Franchisor May Modify the System</u>

Franchisor has the right to change or modify the System from time to time, including, without limitation, the adoption and use of new or modified Marks or copyrighted materials, and computer hardware, software, equipment, inventory, supplies or sales and marketing techniques, as well as décor and other specifications in connection with the look and feel of the Franchised Center. Franchisee shall accept and use any such changes in, or additions to, the System as if they were a part of this Agreement as of the date Franchisee receives notice of such change or addition. Franchisee shall make such expenditures as such changes, additions or modifications in the System may require. However, Franchisee shall not be required to implement or conform to any such changes, additions or modifications if the cost to do so would exceed (a) FOUR THOUSAND DOLLARS ($4,000.00) during the first (1st) year of the Term; (b) FORTY THOUSAND DOLLARS ($40,000.00) during the initial Term; or (c) FOUR THOUSAND DOLLARS ($4,000.00) during the final year of the Term if Franchisee provides written notice of its intention not to renew the Franchise (which amounts may be increased consistent with increases to the Consumer Price Index, [U.S. City Average, all items, 1982-84=100], as published by the United States Department of Labor, Bureau of Labor Statistics. In addition, if Franchisor requires Franchisee to implement or conform to any changes, additions, or modifications in the System that will cost the Franchisee more than FIFTEEN THOUSAND DOLLARS ($15,000.00), then Franchisor shall offer nine (9) months, from the date Franchisor notifies Franchisee in writing of such change, additions, or modifications in the System, to implement such changes, additions, or modifications in the System or, in the alternative at Franchisor's sole option, Franchisor may elect to immediately pay for such changes, additions, or modifications in the System and Franchisee shall have up to nine (9) months to reimburse Franchisor. Any required expenditure for changes or upgrades to the System shall be in addition to expenditures for repairs and maintenance as required in Section 13.6. Notwithstanding the foregoing limitations, Franchisee shall be required to make any and all improvements or modifications whenever required by law, regulation, agency decision or court order.

**10.3**     <u>Franchisor May Vary Standards, Materials or Specifications for any Franchisee</u>

Franchisee acknowledges that because complete and detailed uniformity under many varying conditions may not be possible or practical, Franchisor has the right to vary standards, materials or specifications for any franchisee based upon that particular franchisee's qualifications, the peculiarities of the particular site or circumstances, the demographics of the trade area, business potential, existing business practices or any other condition that Franchisor deems to be of importance to the successful operation of any particular European Wax Center. Franchisor shall not be required to disclose or grant to Franchisee a like or similar variance under this Agreement. Franchisee will have no recourse against Franchisor on account of any variation from standard

27

specifications and practices granted to any other franchisee and will not be entitled to require Franchisor to grant Franchisee a like or similar variation.

## 11. ADVERTISING AND PROMOTIONAL ACTIVITIES

### 11.1 Grand Opening Advertising

Prior to, and/or during a period of approximately three (3) months following the initial opening of the Franchised Center, Franchisee shall spend a minimum of $12,000 on local advertisement and promotion of the initial opening ("**Grand Opening Advertising**"). Franchisee shall be required to purchase European Wax Center Marketing Materials from Franchisor, its applicable Affiliates or a third party designated by Franchisor for use in Franchisee's Grand Opening Advertising. These materials shall be furnished to Franchisee as a part of the Start-up Marketing Package. Prior to their use, all materials to be used in Grand Opening Advertising must be approved by Franchisor through the process set forth in Section 11.2.2. Grand Opening Advertising expenditures shall be in addition to any Local Advertising expenditures and Marketing Fund Contributions.

### 11.2 Local Advertising

11.2.1 Franchisee shall continuously promote the Franchised Center. Every month, Franchisee shall spend at least two percent (2%) of the previous month's Gross Sales on advertising, promotions and public relations within the immediate locality surrounding the Franchised Center ("**Local Advertising**"). Such expenditures shall be made directly by Franchisee, subject to the approval of Franchisor. Franchisee shall periodically be required to purchase European Wax Center Marketing Materials from Franchisor or its Affiliates for use in Franchisee's Local Advertising in accordance with Franchisor's requirements and specifications. Franchisor shall provide general guidelines for conducting Local Advertising. Within thirty (30) days after the end of each month, Franchisee shall furnish to Franchisor an accurate accounting of the expenditures on Local Advertising for the preceding month.

11.2.2 Franchisee shall submit to Franchisor, for its prior approval, all advertising and promotional materials to be used by Franchisee including, but not limited to, ad copy, coupons, flyers and scripts. Franchisor shall use reasonable efforts to provide notice of approval or disapproval within twenty (20) days from the date all requested material is received by Franchisor. If Franchisor does not approve submitted materials within twenty (20) days, such materials shall be deemed to have not received the required approval. Franchisee shall not use any marketing or promotional material prior to approval by Franchisor.

11.2.3 Franchisee acknowledges that if it enters into any contract or binding arrangement to use any unapproved advertising, it is doing so at its own risk and therefore Franchisee may be obligated to pay for advertising or promotional materials which Franchisor will not allow to be used for the Franchised Center.

### 11.3 Marketing Fund

11.3.1 Franchisor has established and administers, through its Affiliate, EWC MFund, Inc. as well as possibly other Affiliates from time to time, a System-wide marketing, advertising and promotion fund to assist in Franchisor's regional and national advertising ("**Marketing Fund**"). Franchisee shall be required to contribute weekly to the Marketing Fund an amount specified by Franchisor and which Franchisor may adjust, from time to time, and which shall not exceed 1% of Gross Sales ("**Marketing Fund Contributions**"). Marketing Fund Contributions shall be made at the time and in the manner provided for Royalty Fees in Section 3.4. Franchisor shall notify Franchisee at least thirty (30) days before implementing or changing Marketing Fund Contribution requirements. The Marketing Fund shall be maintained and administered by Franchisor or its designee as follows:

11.3.2 Franchisor shall oversee all marketing programs, with sole control over the creative concepts, materials and media used in such programs, and the placement and allocation thereof. Marketing Fund activities are intended to promote general public recognition and acceptance of the Marks and use of the System, and Franchisor, its Affiliates, and their designees are not obligated to make expenditures for the Franchised Center on a basis equivalent or proportionate to the Marketing Fund charges or to ensure that any particular Franchised Center benefits directly or proportionately from Marketing Fund activities or expenditures, and Franchisor does not warrant that any particular franchisee will benefit directly or *pro rata* from expenditures by the Marketing Fund. The

28

program(s) may be local, regional or System-wide. Franchisor does not warrant the success or effectiveness of any particular marketing program.

11.3.3 Franchisee's Marketing Fund Contributions may be used to meet the costs of, or reimburse Franchisor for, its costs of, producing, maintaining, administering and directing consumer advertising (including, without limitation, the cost of preparing and conducting television, radio, Internet, magazine, newspaper, and direct mail advertising campaigns and other public relations activities; developing and/or hosting an Internet web page or site and similar activities; employing advertising agencies to assist therein; and providing promotional brochures and other marketing materials to franchisees). Marketing Fund Contributions may be used to pay: (i) all reasonable costs associated with developing, preparing, producing, directing, administering, researching, conducting, and disseminating Marketing Fund activities, as well as the reasonable administrative costs and overhead incurred by Franchisor, or any of its Affiliates, with respect to the foregoing (including the reasonable cost of salaries and overhead for Franchisor's and its Affiliates' personnel involved in Marketing Fund activities); and (ii) the cost of collecting and accounting for the Marketing Fund. Franchisor or its Affiliates may (but will not be obligated to) (i) loan money to be used for Marketing Fund activities and Franchisor reserves the right to charge interest at then-current market rates with respect to such loans, and (ii) use Marketing Fund contributions to repay any such loan plus interest. All Marketing Fund Contributions will be maintained in a separate account from the monies of Franchisor and shall not be used to defray any of Franchisor's general operating expenses, except for such reasonable costs and expenses, if any, that Franchisor may incur in activities reasonably related to the administration of the Marketing Fund.

11.3.4 Franchisor shall endeavor to spend all Marketing Fund Contributions on marketing programs and promotions during Franchisor's fiscal year within which such contributions are made. If excess amounts remain in any Marketing Fund at the end of such fiscal year, all expenditures in the following fiscal year(s) shall be made first out of such excess amounts, including any interest or other earnings of the Marketing Fund, and next out of prior year contributions and then out of current contributions.

11.3.5 Although Franchisor intends the Marketing Fund to be of perpetual duration, Franchisor reserves the right to, at any time: (i) modify or reconstitute the local, regional, national or international scope of the Marketing Fund activities; and (ii) terminate the Marketing Fund activities and establish methods of funding Marketing Fund activities other than payment to the Marketing Fund. The Marketing Fund shall not be terminated, however, until all Marketing Fund Contributions have been expended for advertising and promotional purposes or returned to Franchisee and other franchisees on a *pro rata* basis based on their Marketing Fund Contributions made during the preceding twelve (12) month period.

11.3.6 Each European Wax Center operated by Franchisor, or an Affiliate of Franchisor, in the United States shall make Marketing Fund Contributions at the same rate as franchisees.

11.3.7 An accounting of the operation of the Marketing Fund shall be prepared annually and shall be available to Franchisee upon request. Such request must be made no earlier than ninety (90) days and no later than one hundred eighty (180) days after the end of such fiscal year. Franchisor retains the right to have the Marketing Fund reviewed, audited and reported on, at the expense of the Marketing Fund, by an independent certified public accountant selected by Franchisor.

11.3.8 Franchisee acknowledges that the Marketing Fund is not a trust and Franchisor assumes no fiduciary duty with regard to administering, use, or expenditure of the Marketing Fund.

11.3.9 Franchisor and its representatives have the right, but no obligation, to use collection agents and institute legal proceedings to collect Marketing Fund contributions at the Marketing Fund's expense. Franchisor and its representatives also may forgive, waive, settle, and compromise all claims by or against the Marketing Fund. Franchisor and its representatives may at any time defer or reduce contributions of a franchisee and, upon thirty (30) days prior written notice to Franchisee, reduce or suspend Marketing Fund contributions and operations for one (1) or more periods of any length and terminate (and, if terminated, reinstate) the Marketing Fund.

11.3.10 If the Marketing Fund is terminated, all unspent monies will be distributed to the contributors on a pro rata basis in proportion to their respective Marketing Fund contributions during the preceding twelve (12) month period.

29

**11.4** **Special Marketing Programs; Cooperative Advertising**

Franchisor has the right, but not the obligation, to create one or more Cooperative Advertising programs for the benefit of European Wax Centers located within a particular region. Franchisor has the right to collect and designate all or a portion of the Local Advertising to payments or contributions to Franchisor for the funding of any such Cooperative Advertising program. Franchisor has the right to determine the composition of all geographic territories and market areas for the implementation of each Cooperative Advertising program and to require that Franchisee participate in such Cooperative Advertising programs when established within Franchisee's region. If a Cooperative Advertising program is implemented in a particular region, Franchisor has the right to establish an advertising council to self-administer the Cooperative Advertising program. Franchisee shall participate in the council according to the council's rules and procedures and Franchisee shall abide by the council's decisions. Should Franchisor establish a Cooperative Advertising program or programs with or without an advertising council, Franchisor has the right, but not the obligation, to change, dissolve or merge such program(s) and/or council(s) at any time.

In addition, Franchisor and its Affiliates may establish, coordinate, affiliate with, and require Franchisee's participation in special marketing programs. Special marketing programs may vary in duration, apply on a local, regional, national basis, or involve clusters or groups of Franchised Centers utilizing services on a shared basis. Examples of Special marketing programs include cooperative advertising programs referenced above, sales and marketing programs and customer satisfaction programs. Special marketing programs have a cost to Franchisee that is in addition to the Marketing Fund. In such an event, Franchisee may, but is not obligated to, allocate a portion of the Local Advertising to payments or contributions to Franchisor for the funding of such a special marketing program. Franchisee may elect to participate in such activities or Franchisor may require participation.

**11.5** **Internet Advertising**

Franchisee may not establish a presence on, or market using, the Internet, including on any social media site such as Facebook, Twitter or YouTube, in connection with the Franchised Center without Franchisor's prior written consent. Franchisee shall not establish, create or operate an Internet site or Web site or social media page using a domain name or uniform resource locator containing the Marks or the words "European Wax Center", "EWC" or any variation thereof. Franchisee shall not advertise on the Internet, including on any social media page, using the "European Wax Center" name and any other Mark. Franchisor has established and maintains an Internet Web site at the uniform resource locator www.waxcenter.com that provides information about the System and the services that Franchisor and its franchisees provide. Franchisor may (but is not required to) include at the European Wax Center Web site an interior page containing information about the Franchised Center. If Franchisor includes such information on the European Wax Center Web site, Franchisor has the right to require Franchisee to prepare all or a portion of the page, at Franchisee's expense, using a template that Franchisor provides. All such information shall be subject to Franchisor's approval prior to posting. Franchisor retains the sole right to market on the Internet, including the use of Web sites, domain names, uniform resource locators, keywords, linking, search engines (and search engine optimization techniques), banner ads, meta-tags, marketing, auction sites, e-commerce and co-branding arrangements. Franchisee may be requested to provide content for Franchisor's Internet marketing and shall be required to follow Franchisor's intranet and Internet usage rules, policies and requirements. Franchisor retains the sole right to use the Marks on the Internet, including on Web sites, social media sites, including Facebook, Twitter and YouTube, as domain names, directory addresses, search terms and meta-tags, and in connection with linking, marketing, co-branding and other arrangements. Franchisor retains the sole right to approve any linking to, or other use of, the European Wax Center Web site.

## 12. ACCOUNTING, RECORDS AND REPORTING OBLIGATIONS

**12.1** **Franchisee Shall Maintain Full, Complete and Accurate Books, Records and Accounts**

During the Term, Franchisee shall maintain full, complete and accurate books, records and accounts in accordance with generally accepted accounting principles or other reasonable standards required by Franchisor. Franchisor acknowledges that such books, records and accounts may not be maintained at the Franchised Center, however Franchisee shall make such books, records and accounts available to Franchisor for auditing purposes at a location reasonably acceptable to Franchisor. Franchisee shall retain during the Term, and for seven (7) years thereafter (unless otherwise required by applicable law), all books and records related to the Franchised Center including, without limitation, enrollment records, purchase orders, invoices, payroll records, sales tax records, state

30

and federal tax returns, bank statements, cancelled checks, deposit receipts, cash receipts and disbursement journals, general ledgers, and any other financial records designated by Franchisor or required by law.

### 12.2 Franchisee Shall Submit Gross Sales Reports

Franchisee shall maintain an accurate record of Gross Sales and its sales of European Wax Center Products and shall deliver to Franchisor a signed and verified statement of Gross Sales ("**Gross Sales Report**") for the week ending each Saturday in a form that Franchisor approves or provides in the Confidential Operations Manual. The Gross Sales Report for the preceding week must be provided to Franchisor by the close of business on Tuesday of each week as provided in Section 3.4.

### 12.3 Franchisee Shall Submit Financial Statements to Franchisor

Upon Franchisor's request, Franchisee shall supply to Franchisor, in a form approved by Franchisor, financial statements, which shall be prepared in accordance with GAAP applied on a consistent basis, and such other periodic reports in the manner and at the time specified in the Confidential Operations Manual or otherwise in writing by Franchisor or its representatives.

### 12.4 Franchisee Shall Submit Other Reports

Franchisee shall submit to Franchisor copies of all state sales tax returns that are required to be filed with the appropriate governmental agency and such other records as Franchisor or its representatives may reasonably request from time to time or as specified in the Confidential Operations Manual. Franchisor shall have the right to release financial and operational information relating to the Franchised Center to Franchisor's lenders or prospective lenders or to such other Persons as Franchisor reasonably determines, including to other franchisees and their employees agents and representatives or the franchise network as a whole. Franchisee shall certify as true and correct all reports to be submitted pursuant to this Agreement.

### 12.5 Computer/Point of Sale Systems

12.5.1 Franchisee shall purchase, install and use a point-of-sale system and other applicable computer systems consisting of hardware and software in accordance with Franchisor's specifications and shall upgrade such systems in accordance with Franchisor's requirements specified from time to time within a reasonable amount of time. Franchisee acknowledges that Franchisor may modify such specifications at any time and from time to time, which may result in additional costs to Franchisee, including costs incurred to acquire new or modified hardware or software and/or communication capabilities and to obtain service and support for such hardware, software or communication capabilities. As part of Franchisee's obligations to acquire and maintain such required hardware and software, Franchisor may require Franchisee to obtain a license to use certain proprietary software developed by Franchisor, its Affiliates or third parties. Franchisee may be required to pay a monthly fee for use of any such software.

12.5.2 Franchisor shall, from time to time, determine which features of the point-of-sale system shall be accessible to Franchisee, as more particularly set forth in the Confidential Operations Manual.

12.5.3 Franchisor shall have full unrestricted access to all of Franchisee's computer and point-of-sale data and systems and all related information by means of direct access, either in person or by telephone, modem or Internet (as determined by Franchisor), in part to permit Franchisor to verify Franchisee's compliance with its obligations under this Agreement. Such access will also allow Franchisor to retrieve any and all information concerning the operation of the Franchised Center, including all information related to sales and information about guests; provided Franchisor shall comply with all applicable laws related to its use and access of any personal information about guests, and to maintain Franchisee's Point-of-Sale Server and the Centralized Point-of-Sale System Server, and Franchisor reserves the right, without notice, to modify any programming as necessary that is inconsistent with the programming specifications and guidelines for packages, memberships, client rewards, client loyalty and other programs as outlined in the Confidential Operations Manual. Franchisee shall take all necessary steps to ensure that Franchisor has such access on an ongoing basis and Franchisee shall not install any software or make any hardware modifications that may hamper or interfere with the operation of any required hardware or software in accordance with Franchisor's specifications.

31

12.5.4 Franchisee shall maintain high-speed Internet access for the Approved Location in accordance with Franchisor's then-current specifications and requirements.

12.5.5 Franchisee shall have sole responsibility for maintaining its computer hardware and software, including the security of all information secured on any of its computer hardware and software, and all access codes, passwords and user names used to access such hardware and software and the System in general, and shall be responsible for any and all consequences that may arise if any such computer hardware or software is not properly operated, maintained, protected and/or upgraded or any consequences as a result of Franchisee's hardware and software interfacing with Franchisor's, Franchisor's Affiliates or any third party's computer system.

12.5.6 If Franchisor believes that the security and/or the integrity of the network has been compromised, Franchisor may, without notice, temporarily terminate Franchisee's access to the network for the period of time reasonably necessary to repair such integrity and/or security breach.

12.5.7 In no event will Franchisor's actions intentionally disrupt the normal operation of the Franchised Center or will Franchisor be liable to Franchisee for any damages or other liability as a result of Franchisor terminating such access, except to the extent Franchisor acted grossly negligent or was willful in any misconduct.

12.5.8 Franchisee shall solely incur such costs in connection with obtaining and updating all computer hardware and software as required by Franchisor in connection with Franchisee's operation of the Franchised Center.

12.5.9 In order to maintain the integrity and security of the entire Franchise network, and the Centralized Point-of-Sale System Server, all network components (routers, modems, etc.) will be managed and secured exclusively by Franchisor only. Franchisee will not have access to any network components. However, Franchisor will not prohibit Franchisee's access to the Franchised Center by such control.

12.5.10 In the event that Franchisor believes that the security and/or the integrity of the network has been compromised, Franchisor may, without notice, temporarily terminate Franchisee's access to the network for the period of time reasonably necessary to repair such integrity and/or security breach. In no event will Franchisor's actions intentionally disrupt the normal operation of the Franchised Center or will Franchisor be liable to Franchisee for any damages or other liability as a result of Franchisor terminating such access, except to the extent Franchisor acted grossly negligent. Franchisee understands that terminated access to the network will terminate Franchisee's access to all centralized data used in connection with any package, membership, gift certificate or gift card, and any other offsite redemption/transfer point-of-sale operations.

**12.6     Surveillance Camera System**

If Franchisee elects to purchase and install a surveillance camera system consisting of cameras and other equipment in accordance with Franchisor's specifications, then Franchisor shall have rights to have full access to the surveillance system to conduct real time surveillance of the Franchised Center, the system data and all related information by means of remote access or in person access.

**12.7     Telephone and Music System**

Franchisee shall purchase and install a phone and music system in accordance with Franchisor's specifications and shall upgrade such system in accordance with Franchisor's requirements.

**12.8     Franchisor May Inspect Franchisee**

Franchisor or its designee has the right, during normal business hours, to examine, copy and audit the books, records and tax returns of Franchisee. If the audit or any other inspection should reveal that any payments to Franchisor or its Affiliates have been underpaid, then Franchisee shall immediately pay to Franchisor or its applicable Affiliates the amount of the underpayment plus interest from the date such amount was due until paid at the rate of eighteen percent (18%) per annum (or the highest rate allowed by the law of the state where Franchisee is located, whichever is lower). If the audit or any other inspection should reveal that Franchisee has not spent two

32

percent (2%) of its monthly Gross Sales on Local Advertising or if the inspection discloses an underpayment of three percent (3%) or more of the amount due for any period covered by the audit, Franchisee shall, in addition to any other payments required above, reimburse Franchisor for any and all costs and expenses connected with the inspection (including, without limitation, travel expenses and reasonable legal and professional fees). The foregoing remedies shall be in addition to any other remedies Franchisor may have.

### 12.9    Franchisor May Inspect Franchisee's Records

At Franchisor's request, Franchisee shall authorize and direct any third parties, including accounting professionals, to release to Franchisor all accounting and financial records arising from or relating to the operation of the Franchised Center including, but not limited to, records evidencing Gross Sales, profits, losses, income, tax liabilities, tax payments, revenues, expenses, and any correspondence, notes, memoranda, audits, business records, or internal accounts within said third parties' possession, custody or control, and to continue to release such records to Franchisor on a monthly basis for the length of the unexpired Term or until such time as Franchisor withdraws its request. Franchisee shall execute all documents necessary to facilitate the release of records referenced in this Agreement to Franchisor.

### 13.    FRANCHISEE SHALL COMPLY WITH FRANCHISOR'S STANDARDS OF OPERATION

### 13.1    Franchisee Shall Only Sell Franchisor's Authorized Products and Services and Purchase from Approved Suppliers

13.1.1    Franchisee acknowledges that the reputation and goodwill of the System is based in large part on offering high quality products and services to its customers in a consistent manner. Accordingly, Franchisee shall provide or offer for sale through, or use in its operation of, the Franchised Center only those supplies, signs, equipment, inventory and other items and services that Franchisor from time to time approves (and which are not thereafter disapproved) and that comply with Franchisor's specifications and quality standards. If required by Franchisor, any such items or services shall be purchased only from "**Approved Suppliers**" that Franchisor designates or approves (which might include, or be limited to, Franchisor or an Affiliate). Franchisee shall not offer for sale, sell or provide through the Franchised Center or from the Approved Location any products or services that Franchisor has not approved.

13.1.2    Unless otherwise not permitted under applicable law, Franchisee shall offer all products and services designated by Franchisor. Franchisee shall implement any additions and changes to the products and services offered by the Franchised Center that Franchisor requires.

13.1.3    Without limiting the foregoing, Franchisee may not offer or sell any products or promotional packages that compete with any promotions disseminated by Franchisor.

13.1.4    Subject to applicable laws, Franchisor may prescribe prices that Franchisee may charge customers for products and services offered by the Franchised Center.

### 13.2    Franchisee Shall Sell All European Wax Center Products

13.2.1    Franchisor and its Affiliates, developed or acquired and may continue to develop a cohesive line of products, such as depilatory wax, gloves, powder, pre-depilatory oil, table paper, lotion, after wax moisturizer, hand sanitizer and other items specially suited for use by Franchisor or for resale in European Wax Centers referred to throughout this Agreement, collectively, as European Wax Center Products. In order to maintain the consistency, quality and uniformity of the System, Franchisor or its Affiliates shall make the European Wax Center Products available to Franchisee in reasonable quantities in accordance with the procedures for ordering, handling and shipping that Franchisor may determine from time to time, provided that Franchisee is in compliance with this Agreement and all other agreements with Franchisor and any Affiliate.

13.2.2    Franchisee acknowledges and agrees that the European Wax Center Products developed or acquired by Franchisor and its Affiliate are distinctive as a result of being developed pursuant to Franchisor and its Affiliate's experience and are inextricably interrelated with the Marks. Franchisee agrees to order and purchase all of its requirements of European Wax Center Products exclusively from Franchisor, an Affiliate or a supplier

33

designated by Franchisor.  Franchisee agrees to, at all times, maintain an inventory of European Wax Center Products as necessary to operate the Franchised Center at full capacity.

**13.3     Franchisee Shall Only Purchase from Suppliers Approved by Franchisor**

13.3.1    Franchisor shall provide Franchisee, in the Confidential Operations Manual or otherwise in writing, with a list of specifications and, if required, a list of Approved Suppliers for some or all of the supplies, signs, equipment and other approved or specified items and services, and Franchisor may, from time to time, issue revisions to such list.  If Franchisor or an Affiliate is an Approved Supplier, Franchisee shall execute a standard form purchase, lease, license or supply agreement or purchase order for the items to be supplied by Franchisor or its Affiliate.

13.3.2    If Franchisee desires to utilize any services or products that Franchisor has not approved (for services and products that require supplier approval), Franchisee shall first send Franchisor sufficient information, specifications and/or samples for Franchisor to determine whether the service or product complies with its standards and specifications, or whether the supplier meets its Approved Supplier criteria.  Franchisee shall bear all reasonable expenses incurred by Franchisor in connection with determining whether it shall approve an item, service or supplier.  Franchisor will decide within a reasonable time (usually thirty [30] days) after receiving the required information whether Franchisee may purchase or lease such items or services or from such supplier. Approval of a supplier may be conditioned on reasonable requirements related to the frequency of delivery, standards of service, consistency, reliability and general reputation.

13.3.3    Nothing in this Section 13.3 shall be construed to require Franchisor to approve any particular supplier, or to require Franchisor to make available to prospective suppliers, standards and specifications that Franchisor, in its discretion, deems confidential.

13.3.4    Notwithstanding anything contrary in this Agreement, Franchisor has the right to review, from time to time, its approval of any items or suppliers.  Franchisor may revoke its approval of any item, service or supplier at any time, and in its sole discretion, by notifying Franchisee and/or the supplier.  Franchisee shall, at its own expense, promptly cease using, selling or providing any items or services disapproved by Franchisor and shall promptly cease purchasing from suppliers disapproved by Franchisor.

13.3.5    Franchisor has the right to designate certain products and services, not otherwise authorized for general use as part of the System, to be offered locally or regionally based upon such reasonable factors as Franchisor determines including, but not limited to, Franchisee qualifications, test marketing and regional or local differences.  Franchisor has the right, in its sole discretion from time to time, to give its consent to one (1) or more franchisees to provide certain products or services not authorized for general use as part of the System.  Such consent will be based upon the factors set forth in Section 10.3 and shall not create any rights in Franchisee to provide the same products or services.

13.3.6    Franchisee acknowledges that Franchisor (or its Affiliates, as the case may be) may realize revenue, profit or mark-up on the supply of any products or services sold to Franchisee by Franchisor (or its Affiliates) and Franchisor (or its Affiliates) shall be entitled, to the fullest extent permitted by law, to retain such revenue, profit or mark-up for its own account without accounting to or sharing same with the Franchisee. Additionally, Franchisee acknowledges and agrees that Franchisor (or its Affiliates) may receive, and shall be entitled to retain for its sole use and benefit, to the fullest extent permitted by law, discounts, volume rebates, allowances, incentives or other similar advantages, benefits or amounts from suppliers, directly or indirectly, by reason of such supplier furnishing products or services to Franchisee that Franchisee is required to purchase in connection with the Franchised Center. Franchisor (or its Affiliates) may keep all such discounts, volume rebates, allowances, incentives or other similar advantages, benefits or amounts for its own account and benefit, without sharing them with Franchisee or advising Franchisee of the existence, amount or nature of same.

*The list of preferred and/or approved suppliers, vendors and service providers are listed based on a number of factors Franchisor deems relevant, including previous experience with the System; Franchisor's or its Affiliates' or other franchisees' previous experiences; recommendations Franchisor has received from other third parties; reputation in the industry; willingness to provide preferred pricing for franchisees and other factors Franchisor considers relevant in its discretion.  However, by listing any third party supplier, vendor or service provider as a preferred and/or approved provider or otherwise recommending any third party, or any advice or*

34

*recommendations Franchisor may offer with respect to any such party, is not, and in no shall be deemed, a representation or guarantee by Franchisor, its Affiliates or any of their respective employees and representatives as to the services being performed by these third parties. Franchisee is recommended to consult with legal advisors and other professional advisors when engaging any third party to provide services or other products and supplies for Franchisee and the Franchised Center and to review any agreements required to be executed by Franchisee in connection with the provision of such services, products and/or supplies.*

### 13.4 Franchisee Shall Sell All Approved Package and Membership Programs

13.4.1 Franchisee shall institute and sell all Approved Package and Membership Programs as specified in the Confidential Operations Manual, from time to time or otherwise provided or made available to Franchisee in writing. At such times as required by Franchisor, as specified in the Confidential Operations Manual or otherwise in writing by Franchisor, Franchisee shall deliver to Franchisor a signed and verified statement confirming Franchisee's compliance with all Approved Package and Membership Programs.

13.4.2 All customer and prospective customer and member information is confidential, is the property of Franchisor, and shall be used in strict adherence to Franchisor's policies and procedures as stated in the Confidential Operations Manual. Franchisee shall grant access and extend certain privileges to any customer who presents a valid prepaid service pass or membership card, no matter where such prepaid service pass or membership card was issued or purchased. Franchisee shall accept as payment any valid prepaid service pass or such other indication of prepayment or credit, no matter where such credit was issued or such prepayment was made.

13.4.3 Should Franchisee desire to institute an unapproved package or membership program that does not compete with an Approved Package or Membership Program, Franchisee shall obtain Franchisor's prior written consent, which may be withheld by Franchisor in its sole reasonable discretion. At Franchisor's option, any package or membership program proposed by Franchisee may be adopted for use throughout the System by Franchisor as an Approved Package and Membership Program. Should Franchisor, at its option, determine not to approve the proposed package or membership program for use throughout the System, Franchisor shall consent, (unless Franchisor has a reasonable basis to withhold such consent), to Franchisee instituting such package or membership program in the operation of the Franchised Center.

13.4.4 All suggestions, comments or other feedback provided by Franchisee to Franchisor, including, without limitation, any proposed package or membership program shall be owned by Franchisor and shall be free to use, disclose, reproduce, license or otherwise distribute, and exploit all suggestions, comments or other feedback provided by Franchisee to Franchisor as it sees fit, entirely without obligation or restriction of any kind on account of intellectual property rights or otherwise.

13.4.5 Franchisor shall reimburse Franchisee for services redeemed as part of an Approved Package or Membership Program in accordance with its standard practices, which may include through the clearing house described in Section 3.8 above, or otherwise set forth in the Confidential Operations Manual or other writings provided by Franchisor.

### 13.5 Approved Customer Rewards and Loyalty Programs

Franchisor and its Affiliates may develop customer rewards, loyalty programs and other promotional programs and policies for customers of European Wax Centers ("**Approved Customer Rewards and Loyalty Programs**").

Franchisee shall institute all Approved Customer Rewards and Loyalty Programs and other promotional programs and policies implemented by Franchisor, from time to time, as specified in the Confidential Operations Manual or otherwise by Franchisor in writing. Franchisee acknowledges and agrees that, in all phases of such promotional programs, the decision of Franchisor shall be final and binding.

### 13.6 Appearance and Condition of the Franchised Center

13.6.1 Franchisee shall maintain the Franchised Center and the Approved Location in "like new" condition, and shall repair or replace furnishings, equipment, fixtures and signage as necessary to comply with the health and safety standards and specifications of Franchisor and Franchisee's lessor and any applicable laws or

35

regulations. The expense of such maintenance shall be borne by Franchisee and shall be in addition to any required System modifications, as described in Section 10.2.

13.6.2 Franchisee shall post all signage, posters, business cards, catalogs, and other promotional materials, at locations and in the manner specified by Franchisor in the Confidential Operations Manual or otherwise in writing from time to time. Franchisee shall also comply with all standards and specifications set forth in the Confidential Operations Manual or otherwise provided by Franchisor in writing, from time to time, regarding the print quality and other specifications for all signage, posters, business cards, catalogs, and other promotional materials.

13.6.3 All signage, posters, business cards, catalogs, and other promotional materials in the Franchised Center must contain Franchisee's then-current pricing.

13.6.4 Franchisor may require Franchisee to purchase any or all of the signage, posters, business cards, catalogs, and other promotional materials required by Franchisor to be purchased from Franchisor or its Affiliate or an Approved Supplier.

13.6.5 Franchisee shall, at its sole cost, promptly comply with all applicable laws now or hereafter enacted with respect to the Franchised Center whether in order to meet the special needs of Franchisee or by reason of the occupancy thereof or otherwise, and Franchisee shall make all alterations and additions to the Franchised Center required by applicable governmental authorities with respect thereto. Without limiting the generality of the foregoing, Franchisee shall, at its sole cost, promptly comply with all requirements of the Americans With Disabilities Act ("**ADA**") with respect to the Franchised Center.

### 13.7 Management of the Franchised Center

The Franchised Center shall, at all times, be under the direct supervision of Franchisee's Designated Manager. The Designated Manager shall devote his or her full-time efforts to the management of the day-to-day operation of the Franchised Center. "**Full-time**" means the expenditure of at least thirty-five (35) hours per week, excluding vacation, sick leave and similar absences. Franchisee shall keep Franchisor informed, in writing, at all times of the identity of its Designated Manager. Franchisee must not engage in any business or other activities that will conflict with its obligations under this Agreement.

### 13.8 Hours of Operation of the Franchised Center

Franchisee shall keep the Franchised Center open for business during normal business hours for European Wax Centers as specified in the Confidential Operations Manual or otherwise by Franchisor in writing from time to time. Any deviations from the required hours first must be approved in writing by Franchisor which approval may be revoked or rescinded by Franchisor at any time on notice.

### 13.9 No Discrimination

Franchisee may not discriminate in the conduct and operation of its Franchised Center against any person or group of persons because of the marital status, physical or mental disability, genetic information, race, creed, color, sex, age, national origin or ancestry of such person or group of persons.

### 13.10 Franchisee Shall Secure All Necessary Licenses and Permits and Comply with All Applicable Laws

Franchisee shall secure and maintain in force all required licenses, permits and certificates necessary for the operation of the Franchised Center and shall operate the Franchised Center in full compliance with all applicable laws, ordinances and regulations. Franchisee shall ensure that each of its employees has any certifications or licenses required by applicable law. Franchisor makes no representation to Franchisee with regard to any legal requirements that Franchisee must satisfy or comply with in connection with the operation of the Franchised Center. Franchisee shall be solely responsible for investigating and complying with all such laws, ordinances and regulations with regard to the operation of the Franchised Center.

36

**13.11 Franchisee Shall Provide Franchisor Notification of All Proceedings Against Franchisee**

Franchisee shall notify Franchisor in writing of the commencement of any action, suit or proceeding involving Franchisee or the Franchised Center, and of the issuance of any order, writ, injunction, judgment, award or decree that may affect the operation or financial condition of the Franchised Center not more than five (5) days after notice of such commencement or issuance. Franchisee shall deliver to Franchisor, not more than five (5) days after Franchisee's receipt thereof, a copy of any inspection report, warning, certificate or rating by any governmental agency relating to any health or safety law, rule or regulation that reflects Franchisee's failure to meet and maintain the highest applicable rating or Franchisee's noncompliance or less than full compliance with any applicable law, rule or regulation.

**13.12 Franchisee shall Comply with Good Business Practices**

Franchisee acknowledges that the quality of service, and every detail of appearance and demeanor of Franchisee and its employees and other representatives, is material to this Agreement and the relationship created and licenses granted by this Agreement. Therefore, Franchisee shall endeavor to maintain high standards of quality and service in the operation of the Franchised Center. Franchisee shall at all times give prompt, courteous and efficient service to customers of the Franchised Center. The Franchised Center shall in all dealings with its customers, vendors, employees and the general public, adhere to the highest standards of honesty, fair dealing and ethical conduct, which Franchisee acknowledges Franchisor's interest in, in order to protect the goodwill of the System and the Marks. If Franchisor deems that Franchisee did not fairly handle a complaint, Franchisor has the right, but not the obligation to intervene; provided, Franchisee and Franchisor each acknowledge and agree that all personnel of the Franchised Center are employees of Franchisee and not Franchisor, and that personnel decisions shall be reserved to Franchisee; provided, Franchisee shall use good faith efforts to minimize personnel related matters that may impact the goodwill of the Marks and the System. Franchisor has the right to terminate the Term for repeated violations of this Section. Franchisee shall reimburse Franchisor for all costs incurred by Franchisor in handling complaints for the Franchised Center pursuant to this Section.

**13.13 Franchisee Shall Comply with Franchisor's Uniform Requirements**

Franchisee understands and acknowledges the importance of uniform standards of look and feel of the operations of the Franchise Center and therefore agrees to abide by any uniform requirements stated in the Confidential Operations Manual or otherwise provided by Franchisor in writing. Uniforms, if required, must be purchased from an Approved Supplier, if such is designated, or if none, then a supplier who meets Franchisor's specifications and quality standards for uniforms.

**13.14 Franchisee Shall Accept All Methods of Payment Prescribed for European Wax Centers**

Franchisor may require Franchisee, to the fullest extent permitted by applicable law, accept all forms of payment prescribed by Franchisor in the Confidential Operations Manual or otherwise in writing for payments for goods, services, products, membership plans or other items offered at the Franchised Center. Franchisee shall accept all such permissible forms of payment and shall procure, at its expense, the necessary equipment and/or software and shall have arrangements in place with Visa, MasterCard and such other credit and debit card issuers as Franchisor may designate, from time to time, to enable the Franchised Center to accept such methods of payment from its customers. Franchisee shall comply with terms applicable to such forms of payment, including those prescribed by the Payment Card Industry for credit cards, debit cards and the like.

Franchisee acknowledges that Franchisor and other franchisees currently offer gift cards that are redeemable at European Wax Centers. Without limiting the foregoing, Franchisee shall accept and honor any valid gift cards presented at the Franchised Center. Franchisee shall also otherwise participate in Franchisor's gift card programs and comply with all applicable laws, rules and regulations applicable to the sale, maintenance and redemption of gift cards, including all record keeping requirements. Franchisor shall reimburse Franchisee for gift cards redeemed at the Franchised Center in accordance with its standard practices, which may include through the clearing house described in Section 3.8 above, or otherwise set forth in the Confidential Operations Manual or other writings provided by Franchisor.

37

**13.15** **Franchisee Shall Use Its Best Efforts**

Franchisee shall use its best efforts to promote the Marks and the European Wax Center brand, in an effort to increase the sales and recognition of products and services offered through the Franchised Center. Franchisee shall require all of Franchisee's employees, managers, officers, agents and representatives to make a good faith effort to enhance and improve the System and the sales of all services and products provided as part of the System.

Franchisee shall use all reasonable means to encourage and promote the use of System everywhere. For example, if Franchisee receives a request for services in any other area where a Franchised Center is located, Franchisee shall refer such request to Franchisor or such other Franchised Center. Franchisee will not, without obtaining Franchisor's prior consent, associate or affiliate with any other organization that requires Franchisee to refer business to other members of that organization.

Unless Franchisee obtains Franchisor's prior approval, which approval may be withheld in Franchisor's sole discretion, Franchisee will ensure that no part of the Franchised Center is used for or to further or promote or divert business to: (i) any business (including any other business operated by Franchisee or its Affiliates or in which Franchisee, its Affiliates or a principal of Franchisee or its Affiliates owns or holds an ownership interest) not operated under a trade name or trademark owned by Franchisor or any of its Affiliates; or (ii) any other business or concession.

**13.16** **E-mail**

Franchisee shall, at all times and at Franchisee's expense, maintain an e-mail address and account for communicating with Franchisor. Franchisee may change its e-mail address by giving written notice of such change of address to Franchisor.

**13.17** **Data Protection Laws; Personal Information**

Without limiting Franchisee's obligation to comply with all applicable laws in its operation of the Franchised Center, Franchisee will: (i) comply with all applicable data protection and privacy laws; (ii) comply with all of Franchisor's requirements regarding the data protection and privacy laws contained in the Confidential Operations Manual or otherwise, including those required with respect to credit and debit card processing; (iii) refrain from any action or inaction that could cause Franchisor or its Affiliates to breach any applicable data protection or privacy law; (iv) do and execute, or arrange to be done and executed, each act, document and thing necessary or desirable to keep Franchisor and its Affiliates in compliance with any applicable data protection or privacy law; (v) reimburse Franchisor and its Affiliates for any and all costs and expenses, including reasonable attorneys' fees, incurred in connection with the breach by Franchisee of any such data protection or privacy laws; and (vi) permit Franchisor and its Affiliates to use any data or other information each of them gathers concerning Franchisee and its Affiliates in connection with the establishment and operation of European Wax Centers by Franchisor and its Affiliates.

Without limiting the foregoing, Franchisee hereby consents to the disclosure by Franchisor of certain Personal Information concerning Franchisee, its principals and the Franchised Center, namely the identity of Franchisee, including Franchisee's and its principals' name, address and telephone number, in Franchisor's franchise disclosure document, whether or not such disclosure is required by law, and other documents relating to the sale of European Wax Center franchises.

Further, Franchisee hereby consents to the additional disclosure by Franchisor of certain Personal Information concerning Franchisee and the Franchised Center, including the historical performance of the Franchised Center, including sales, revenues, expenses, costs, results of operations, and similar financial information and operating information, and any information regarding the expiration or termination of this Agreement, for any legitimate business purpose, including, provision to other franchisees, a prospective transferee of Franchisee's Franchised Center (or part thereof) or any other purchaser of another European Wax Center franchise.

38

## 14. FRANCHISOR'S ADDITIONAL OPERATIONS ASSISTANCE

### 14.1 Franchisor May Provide General Advice and Guidance to Assist Franchisee

Franchisor and its representatives may, from time to time, be available to render advice, discuss problems and offer general guidance and suggestions to Franchisee by telephone, e-mail, facsimile, newsletters and other methods with respect to planning and operating the Franchised Center. Franchisor shall not charge for this service, however, Franchisor may charge a fee for this service as set forth in the Confidential Operations Manual should Franchisee be deemed to be utilizing this service excessively or in an unintended manner. Franchisor's advice or guidance is generally based upon the experience of Franchisor and its franchisees in operating European Wax Centers. Franchisee shall hold Franchisor and its representatives harmless from any liability that results in connection with any such advice and guidance.

### 14.2 Franchisor May Make Periodic Visits to Assist Franchisee

Franchisor, from time to time, may make or cause its representatives to make periodic visits to the Franchised Center for the purposes of consultation, assistance and guidance with respect to various aspects of the operation and management of the Franchised Center. Franchisee shall implement any required changes or improvements in a timely manner.

## 15. INSURANCE REQUIREMENTS

### 15.1 Types and Amounts of Coverage Required by Franchisee

At its sole expense, Franchisee shall promptly procure (in any event prior to commencement of development at the Approved Location) and maintain in full force and effect during the Term, the types of insurance listed below. All policies (except any workers' compensation insurance) shall expressly name Franchisor as an additional insured and all shall contain a waiver of all subrogation rights against Franchisor and its successors and assigns. Such certificates shall state that said policy or policies shall not be canceled or altered without at least thirty (30) days' prior written notice to Franchisor and shall reflect proof of payment of premiums. In addition to any other insurance that may be required by applicable law, or by lender or lessor, Franchisee shall procure:

| Types of Coverage* | Minimum Requirements* |
|---|---|
| Comprehensive General Liability/Product Liability | $1,000,000 per occurrence/$2,000,000 in the aggregate |
| Private Label Goods | $1,000,000/$2,000,000 and Specifically Listed On Certificate of Insurance |
| Automobile Liability Insurance (Hired/Non-Owned Auto) | $1,000,000 |
| Umbrella (Covering Underlying Employers Liability) | $1,000,000 per occurrence/$1,000,000 in the aggregate |
| Professional Liability | $1,000,000 per occurrence/$1,000,000 in the aggregate |
| Abuse & Misconduct | $100,000 |
| Cyber Liability/Data Breach | $10,000 per occurrence/$50,000 in the aggregate |
| Employment Practices Liability Insurance (EPLI) | $100,000 ($100,000 wage/hour sublimit) |
| Crime/Employee Dishonesty | $10,000 |
| Property/Business Income/Tenants Betterments and Improvements | $150,000 |
| Workers' Compensation | Minimum $100,000 (or higher if your state law requires) |
| Contractual Indemnity/Liability | Franchisor and Landlord Identified as Additional Insureds |
| Business Income & Extra Expense | Actual Loss Sustained Coverage For a Minimum of One Year |

*Note: These are minimum requirements provided by Franchisor based on its experiences and shall in no way be deemed a representation or guaranty that these minimum insurance requirements are sufficient to fully protect Franchisee and its representatives from any cause or event that may occur in operating the Franchised*

*Center. Franchisee should consult with an insurance professional to discuss its insurance needs on an ongoing basis during the Term.*

### 15.2 Franchisor May Increase Future Requirements

Franchisor may reasonably increase the minimum liability protection requirement and require different or additional insurance coverage(s) to reflect inflation, changes in standards of liability, future damage awards or other relevant changes in circumstances.

### 15.3 Carrier Standards for Franchisee's Insurance

All insurance policies required under this Section 15 shall be written by an insurance company licensed in the state in which Franchisee operates and having at least an "A" Rating Classification as indicated in the latest issue of A.M. Best's Key Rating Guide. Although A.M. Best groups "A" and "A-" in the same classification, Franchisor requires an "A" rating.

### 15.4 Franchisee Shall Provide Franchisor Evidence of Franchisee's Insurance Coverage

Franchisee's obligation to procure and maintain insurance coverage as required by this Agreement shall not be limited in any way by reason of any insurance that may be maintained by Franchisor, nor shall Franchisee's performance of this obligation relieve it of liability under the indemnity provisions set forth in Section 21.3. Franchisee shall provide, annually, or more frequently if requested by Franchisor, certificates of insurance showing compliance with the foregoing requirements.

### 15.5 Franchisee's Failure to Maintain Insurance Coverage

Should Franchisee not procure and maintain insurance coverage as required by this Agreement, or if evidence of such insurance is not produced by Franchisee upon request by Franchisor, then, in addition to such failure being a breach of this Agreement by Franchisee, Franchisor has the right (but not the obligation) to immediately procure such insurance coverage and to charge the premiums to Franchisee, which charges, together with a reasonable fee for expenses incurred by Franchisor in connection with such procurement, shall be payable by Franchisee immediately upon notice.

## 16. DEFAULT AND TERMINATION

### 16.1 Termination of Term by Franchisee

Without Franchisor's written consent, Franchisee may not terminate the Term prior to the expiration of the Term, except through legal process resulting from Franchisor's breach of this Agreement which breach results in a material adverse effect on Franchisee. If (i) Franchisee is not currently in material breach of this Agreement or any other agreement between Franchisor and Franchisee and (ii) Franchisor materially breaches this Agreement and fails to cure such breach within forty-five (45) days (or such other reasonable time if additional time is required to cure such breach with reasonable diligence) after written notice of such breach, specifically enumerating all alleged deficiencies, is delivered to Franchisor by Franchisee, Franchisee may terminate the Term. Such termination shall be effective thirty (30) days after delivery to Franchisor of notice that such material breach has not been cured and Franchisee elects to terminate the Term.

### 16.2 Termination of Term by Franchisor

16.2.1 Subject to applicable law, Franchisor will have good cause and the right to terminate the Term, effective immediately upon notice and without providing any opportunity to cure by Franchisee, if Franchisee:

16.2.1.1 made any material misrepresentation or omission in its application for the Franchise or otherwise to Franchisor in the course of entering into this Agreement, which may be learned by Franchisor at any time, even after commencement operations of the Franchised Center;

40

16.2.1.2 fails to timely select an approved site for or establish, equip and commence operations of the Franchised Center pursuant to Section 5 within fifteen (15) days of receiving notice of such default from Franchisor;

16.2.1.3 fails to satisfactorily complete any material training program pursuant to Section 8 within fifteen (15) days of receiving notice of such default from Franchisor;

16.2.1.4 is convicted of or pleads no contest to a felony or other crime or offense that Franchisor determines is likely to adversely affect the reputation of Franchisor, Franchisee, the Marks or the Franchised Center;

16.2.1.5 after notices to cure and five (5) days to cure, fails to refrain from activities, behavior or conduct likely to materially, adversely affect the reputation of Franchisor, Franchisee, the Marks or the Franchised Center;

16.2.1.6 discloses, duplicates or otherwise uses in an unauthorized manner any material portion of the Confidential Operations Manual, the Trade Secrets or the passwords, user names or access codes to access the Confidential Operations Manual or other System information electronically, or any other Confidential Information;

16.2.1.7 breaches Section 7.3 or any owner or other applicable person breaches the terms of their Nondisclosure and Non-Competition Agreement executed pursuant to the terms of this Agreement;

16.2.1.8 subject to Section 22.9, abandons, fails or refuses to actively operate the Franchised Center for five (5) or more consecutive days (unless the Franchised Center has not been operational for a purpose approved by Franchisor), or, if first approved by Franchisor, fails to promptly relocate the Franchised Center following the expiration or termination of the lease for the Approved Location, the destruction or condemnation of the Approved Location or any other event rendering the Approved Location unusable;

16.2.1.9 surrenders or transfers control of the operation of the Franchised Center without Franchisor's approval, makes or attempts to make an unauthorized direct or indirect assignment of the Franchise or an ownership interest in Franchisee, or fails or refuses to assign the Franchise or the interest in Franchisee of a deceased or Incapacitated owner thereof as herein required;

16.2.1.10 fails to maintain the Franchised Center under the primary supervision of a Designated Manager during the ninety (90) days (as may be extended) following the death or Incapacity of Franchisee or any holder of a legal or beneficial interest in Franchisee pursuant to Section 18.6;

16.2.1.11 on two (2) or more separate occasions during the Term intentionally understates any Royalty Fee or any other fees owed to Franchisor by more than three percent (3%) for any accounting period;

16.2.1.12 is adjudicated as bankrupt, becomes insolvent, commits any affirmative act of insolvency, or files any action or petition of insolvency; if a receiver of its property or any part thereof is appointed by a court; if it makes a general assignment for the benefit of its creditors; if a final judgment remains unsatisfied of record for sixty (60) days or longer (unless a *supersedeas* bond is filed); if execution is levied against Franchisee's business or property; if a suit to foreclose any lien or mortgage against its Approved Location or equipment is instituted against Franchisee and not dismissed within sixty (60) days or is not in the process of being dismissed;

16.2.1.13 materially misuses or makes an unauthorized use of any of the Marks or commits any other act that can reasonably be expected to impair the goodwill associated with any of the Marks;

16.2.1.14 fails on two (2) or more separate occasions within any period of twelve (12) consecutive months to pay any Royalty Fee, Marketing Fund Contribution, amounts due for purchases from Franchisor and any Franchisor Affiliate, or other payment when due, or before the end of any grace period, to

41

Franchisor or any Affiliate, whether or not such failures to comply are corrected after notice thereof is delivered to Franchisee;

16.2.1.15    continues without cure after twenty-four (24) hours of learning of any material breach of any health or safety law, ordinance or regulation, or operates the Franchised Center in a manner that presents a health or safety hazard to customers, employees or the public;

16.2.1.16    fails to comply with any applicable material law or regulation within ten (10) days after being given notice of noncompliance;

16.2.1.17    within any period of twelve (12) consecutive months, repeatedly, materially breaches this Agreement or repeatedly fails to comply with material, mandatory specifications, customer service standards or operating procedures prescribed in the Confidential Operations Manual, whether or not previous breaches or failures are cured.  For purposes of this Section, "repeatedly" means three (3) or more instances of breach or failure of any specifications, standard or procedure, whether relating to the same or different breaches or failures;

16.2.1.18    without limiting any other provision of this Section 16.2, within any period of twelve (12) consecutive months, repeatedly fails to comply with good business practices as required pursuant to Section 13.12, whether or not previous breaches or failures are cured.  For purposes of this Section, "repeatedly" means three (3) or more instances of breach or failure of any specifications, standard or procedure, whether relating to the same or different breaches or failures;

16.2.1.19    breaches any other agreement between Franchisor (or any Affiliate) and Franchisee, such that Franchisor or its Affiliate, as the case may be, has the right to terminate such agreement or such agreement automatically terminates;

16.2.1.20    submits to Franchisor a materially false statement confirming Franchisee's compliance with all Approved Package and Membership Programs any time during the Term, or fails to submit such statements when required after the passing of any right to cure such failure provided by this Agreement, if any;

16.2.1.21    in accordance with Section 24.8 of this Agreement, should Franchisee or any of its officers, members, managers, directors, equity holders or controlling owners, during the Term, be designated as a Specially Designated National or Blocked Person; or

16.2.1.22    engages in any activity exclusively reserved to Franchisor.

16.2.2    Except as otherwise provided in Section 16.2.1, Franchisor has the right to terminate the Term for the following breaches and defaults by giving notice of such termination stating the nature of the default; provided, however, that Franchisee may avoid termination by curing such default or breach (or by providing proof acceptable to Franchisor that Franchisee has made all reasonable efforts to cure such default or breach and shall continue to make all reasonable efforts to cure until a cure is effected if such default or breach cannot reasonably be cured before the effective date of the termination) within the specified period:

16.2.2.1    within five (5) days of receiving notice of Franchisee's failure to pay any amounts due to Franchisor;

16.2.2.2    if required by Franchisor, within five (5) days of any such request, fails to have any Person required under Section 7.4 execute a nondisclosure and non-competition agreement, in a form the same as or similar to the Nondisclosure and Non-Competition Agreement attached as Exhibit 2, subject to Franchisor's rights to, in its discretion, limit the geographic scope or length of the restrictive covenants, or have Franchisee obtain from any other personnel described in Section 7.4 an executed nondisclosure agreement, in a form the same as or similar to the Nondisclosure and Non-Solicitation Agreement attached as Exhibit 3; or fails to provide Franchisor with copies of all nondisclosure and non-competition agreements signed pursuant to Section 7.4 if requested by Franchisor;

42

16.2.2.3 within ten (10) days of receiving notice of Franchisee's failure to maintain insurance as specified in Section 15 of this Agreement; or

16.2.2.4 within thirty (30) days of receiving notice of any other default by Franchisee or upon Franchisee's failure to comply with any material, mandatory specification, standard or operating procedure prescribed in the Confidential Operations Manual or otherwise in writing if not cured by Franchisee within that time.

**16.3** **Reinstatement and Extension**

If provisions of this Agreement provide for periods of notice less than those required by applicable law, or provide for termination, cancellation or non-renewal other than in accordance with applicable law, Franchisor may reinstate or extend the Term for the purpose of complying with applicable law by submitting a written notice to Franchisee without waiving any of Franchisor's rights under this Agreement.

**16.4** **Right of Franchisor to Discontinue Services to Franchisee**

If Franchisor delivers to Franchisee a notice of termination pursuant to Section 16.2, then, in addition to Franchisor's other remedies, Franchisor and any Franchisor Affiliate may discontinue sales of any products to Franchisee until such time as Franchisee corrects the default.

**16.5** **Right of Franchisor to Operate Franchised Center**

16.5.1 Following the delivery of a notice of termination pursuant to Section 16.2, and failure by Franchisee to cure such default if permitted by this Agreement, Franchisor shall have the right, but not the obligation, without waiver of any other rights or remedies Franchisor may have under this Agreement, to assume, and Franchisee hereby authorizes Franchisor at Franchisor's election to assume, the operation of the Franchised Center until the earlier of: (a) such time as Franchisee corrects the breach; or (b) ninety (90) days, which such 90-day period may be renewed from time to time as necessary in increments of ninety (90) days for an aggregate period of time of up to an additional two hundred seventy (270) days. Franchisor will periodically discuss the status with Franchisee. In operating the Franchised Center pursuant to this Section 16.5, Franchisor may, in each case on behalf of Franchisee:

16.5.1.1 collect any and all revenues due and payable to the Franchised Center and endorse Franchisee's name on checks received;

16.5.1.2 pay any and all expenses incurred to operate the Franchised Center, including, but not limited to, wages, salaries and other compensation to Franchisee's employees, to Franchisor and persons Franchisor employs on Franchisee's behalf to manage operations of the Franchised Center and to others for professional services;

16.5.1.3 pay any amounts due to Franchisor or Franchisor's Affiliates, including Royalty Fees, Marketing Fund Contributions and amounts due for purchases of products and supplies;

16.5.1.4 incur debts in the ordinary course of business for materials, supplies and other items needs for the operations of the Franchised Center;

16.5.1.5 execute documents or instruments on behalf of Franchisee in connection with such operations; and

16.5.1.6 take any other actions Franchisor deems necessary or appropriate in further of this provision.

16.5.2 Franchisor may charge its then-current management fee, and Franchisor shall be entitled to reimbursement of any expenses Franchisor incurs that are not paid out of the operating cash flow of the Franchised Center.

43

16.5.3    Franchisor shall maintain separate books and records of Franchisor's actions under this Section 16.5. The net proceeds, if any, from Franchisor's operation of the Franchised Center will be deposited into a separate bank account under Franchisor's direction and control on behalf of Franchisee. Upon termination of Franchisor's rights granted in this Section 16.5, such net proceeds, if any, will be distributed to Franchisee or as Franchisee directs. Franchisor will not be liable to Franchisee or any of Franchisee's Affiliates, owners or any other person acting on behalf of or though Franchisee for any actions taken pursuant to this Section 16.5 except for Franchisor's gross negligence or willful misconduct. Franchisee grants Franchisor the right to set off such charges to the account for the payment of any amounts to be paid by Franchisor pursuant to this Section 16.5. Franchisee shall hold harmless and indemnify Franchisor, any Franchisor Affiliate, and all other Franchisor Indemnitees from and against all losses, damages, fines, costs, expenses or liability (including reasonable legal and professional fees and all other costs of litigation) incurred in connection with, or arising from Franchisor's actions in connection with this Section 16.5, excepting those arising only out of Franchisor's gross negligence or willful misconduct.

## 17.    RIGHTS AND DUTIES UPON EXPIRATION OR TERMINATION

### 17.1    Actions to be Taken by Franchisee Upon Termination

Except as otherwise provided in this Agreement, upon termination or expiration of the Term, this Agreement and all rights granted under this Agreement to Franchisee shall terminate and Franchisee shall:

17.1.1    immediately cease to operate the Franchised Center and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of Franchisor; provided, however, that Franchisee's owner(s) is/are permitted to identify themselves as former owners of Franchisee on his or her resume and other job and financing application materials;

17.1.2    cease to use the Trade Secrets and other Confidential Information, the System and the Marks including, without limitation, all signs, slogans, symbols, logos, advertising materials, stationery, forms and any other items that display or are associated with the Marks or similar to the Marks;

17.1.3    upon demand by Franchisor, immediately assign (or, if an assignment is prohibited, sublease for the full remaining term, and on the same terms and conditions as Franchisee's lease) its interest in the lease then in effect for the Approved Location to Franchisor and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within thirty (30) days after termination or expiration of the Term, and Franchisor has the right to pay rent and other expenses directly to the party to whom such payment is ultimately due;

17.1.4    take such action as may be necessary to cancel or assign to Franchisor, at Franchisor's option, any assumed name or equivalent registration filed with state, city or county authorities that contains the name "EUROPEAN WAX CENTER®" or any other Marks, and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within thirty (30) days after termination or expiration of this Agreement;

17.1.5    pay all sums owing to Franchisor and any Affiliate within five (5) days after the effective date of termination or expiration of the Franchise, or any later date that the unpaid amounts due to Franchisor or its Affiliates are determined. In the event of termination of the Term for any default of Franchisee, such sums shall include, but not be limited to, all damages, costs and expenses, including reasonable attorneys' fees with respect to litigation, arbitration, appellate or bankruptcy proceedings, unpaid Royalty Fees, amounts owed for the purchase of products, loss of future Royalty Fee payments incurred by Franchisor as a result of any early termination of the Term, and any other amounts due to Franchisor or any Affiliates;

17.1.6    pay to Franchisor all costs and expenses, including reasonable attorneys' fees, incurred by Franchisor subsequent to the termination or expiration of the Term in obtaining injunctive or other relief for the enforcement of any provisions of this Agreement;

17.1.7    immediately (and in no event later than two (2) days after expiration or termination of the Term), return to Franchisor or destroy (as certified by Franchisee), at Franchisor's direction, the Confidential Operations Manual (and any printed versions of any electronic copy of the Confidential Operations Manual,), Trade Secrets and all other Confidential Information including passwords, access codes, user names to access the

44

Confidential Operations Manual or other System information electronically, all other manuals, training materials, relevant data bases, guest lists, records, files, instructions, brochures, agreements, disclosure statements and any and all other forms or materials provided by Franchisor to Franchisee or used by Franchisee relating to the operation of the Franchised Center (all of which are acknowledged by Franchisee to be Franchisor's property);

17.1.8   cease from using, and assign to Franchisor, all telephone and facsimile listings and numbers, Internet addresses, e-mail addresses domains and social media accounts for the Franchised Center (it being understood by Franchisee that this Section 17.1.8 is not intended as an approval of Franchisee's to use any Internet addresses, e-mail addresses domains or social media accounts and in no way is it intended to contradict those Sections of this Agreement that prohibit such practice, but rather provide for Franchisor's rights in the event Franchisee has used any such Internet addresses, e-mail addresses domains or social media accounts for the Franchised Center), and notify the telephone company and all listing agencies and other applicable third parties of the termination or expiration of Franchisee's right to use any telephone numbers or facsimile numbers, web pages and social media accounts associated with the Marks in any manner and shall authorize transfer of same to or at the direction of Franchisor.  Franchisee acknowledges that all telephone numbers and facsimile numbers, Internet addresses, e-mail addresses and domains and social media pages used in the operation of the Franchised Center constitute assets of Franchisor and Franchisee will promptly execute all documents, including but not limited to, authorization forms, prescribed by Franchisor to transfer and assign any such assets to Franchisor upon termination or expiration of the Term and/or upon Franchisor exercising its purchase rights under Section 17.3; and

17.1.9   comply with all other applicable provisions of this Agreement which expressly or by their nature survive the expiration or termination of the Term shall continue in full force and effect subsequent to and notwithstanding its expiration or termination of the Term and until they are satisfied in full or by their nature expire.

**17.2** **Franchisee Shall Not Unfairly Compete with Franchisor**

17.2.1   Franchisee shall not use or display any Mark or any confusingly similar trademark, in any manner whatsoever, in connection with any other business or purpose or the promotion thereof. Franchisee shall not utilize any designation of origin, description or representation that falsely suggests or represents an association or connection with Franchisor.  This Section is not intended as an approval of Franchisee's right to operate any other businesses and in no way is it intended to contradict those Sections of this Agreement that prohibit such practice.

17.2.2   If Franchisor elects not to receive an assignment or sublease of the Approved Location, Franchisee shall make such modifications or alterations to the Approved Location (including assigning telephone and facsimile numbers to Franchisor) immediately upon termination or expiration of this Agreement as may be necessary to prevent any association between Franchisor or the System and any business subsequently operated by Franchisee or others at the Approved Location.  Franchisee shall make such specific additional changes to the Approved Location as Franchisor may reasonably request for that purpose including, without limitation, removal of all physical and structural features or trade dress identifying or distinctive to the System.  If Franchisee fails or refuses to comply with the requirements of this Section, Franchisor has the right to enter upon the Approved Location for the purpose of making or causing to be made such changes as may be required, at the expense of Franchisee, which expense Franchisee shall pay upon demand.

**17.3** **Franchisor's Option to Purchase Certain Business Assets**

Franchisor has the right (but not the obligation), exercisable by written notice to Franchisee within thirty (30) days after termination or expiration of the Term, to purchase any or all assets of the Franchised Center including leasehold improvements, equipment, supplies and other inventory.  The purchase price shall be equal to the assets' fair market value as agreed to by Franchisor and Franchisee; provided that if no such agreement can be made within five (5) days of Franchisor's written notice to Franchisee, the purchase price shall be determined by an independent appraiser that is acceptable to both Franchisor and Franchisee. If Franchisor and Franchisee cannot agree on an independent appraiser, then the procedures set forth in Section 23.7 should be used to choose the independent appraiser.  If Franchisor elects to exercise this option to purchase, Franchisor may set off all amounts due from Franchisee to Franchisor or Franchisor's Affiliates under this Agreement or otherwise in connection with the Franchised Center, if any, against the purchase price.  Franchisor will not assume any liabilities or obligations of Franchisee in connection with such acquisition, and Franchisee shall indemnify Franchisor and its Affiliates from any claims made against Franchisor or its Affiliates arising out of any such acquisition.

45

The closing of any such acquisition shall occur within thirty (30) days after Franchisor exercises its option by providing written notice to Franchisee, or such later date as may be necessary to comply with any applicable bulk sales or similar law.  At the closing, Franchisor and Franchisee shall each execute and deliver all documents necessary to vest title in such assets in Franchisor, free and clear of all liens and encumbrances, except those reserved under any assumed contracts assumed by Franchisor.  Franchisor may assign this right to a Franchisor Affiliate or other purchaser designated by Franchisor.

By signing this Agreement, Franchisee appoints Franchisor as its lawful attorney-in-fact with respect to the matters contemplated by this Section 17.3, including the right to assign the lease for the Approved Location to Franchisor or any such substitute purchaser, if desired.

### 17.4    Survival of Certain Provisions of this Agreement Following Termination or Expiration of the Term

All obligations of Franchisor and Franchisee that expressly or by their nature survive the expiration or termination of the Term shall continue in full force and effect subsequent to and notwithstanding their expiration or termination and until satisfied or by their nature expire.

## 18.    TRANSFERABILITY OF INTERESTS IN THIS AGREEMENT

### 18.1    Transfer by Franchisor

This Agreement and all rights and duties under this Agreement are fully transferable in whole or in part by Franchisor and such rights will inure to the benefit of any person or entity to whom transferred; provided, however, that with respect to any assignment resulting in the subsequent performance by the assignee of the functions of Franchisor, the assignee shall assume the obligations of Franchisor under this Agreement and Franchisor shall thereafter have no liability for the performance of any obligations contained in this Agreement subject to applicable state law.  Specifically and without limitation to the foregoing, Franchisee expressly agrees and acknowledges that Franchisor may sell its assets, Marks or the System outright to a third party; may make a public offering of Franchisor as securities; may engage in a private placement of some of all of its securities; may merge with or acquire other corporations or entities, or be acquired by another corporation or entity; may undertake a refinancing, recapitalization, leveraged buyout or other economic restructuring; and with regard to any or all active sales, assignments and dispositions, Franchisee expressly and specifically waives any claims, demands or damages arising from or related to the loss of any Marks (or any variation thereof) and/or the loss of association with or identification of EWC Franchise, LLC as Franchisor.

**FRANCHISOR MAY, AT ITS SOLE OPTION, ENTER INTO AN AREA REPRESENTATIVE AGREEMENT PURSUANT TO WHICH AN AREA REPRESENTATIVE WILL PROVIDE SERVICES SPECIFIED TO BE PROVIDED BY FRANCHISOR PURSUANT TO THIS AGREEMENT.  SUCH SERVICES MAY INCLUDE INITIAL TRAINING, OPERATIONS ASSISTANCE, SOLICITATION OF PROSPECTIVE FRANCHISEES, ONGOING SUPPORT, OR PERIODIC QUALITY ASSURANCE VISITS WITH EXISTING FRANCHISEES IN A GIVEN TERRITORY. AN AREA REPRESENTATIVE DOES NOT HAVE AUTHORITY TO BIND FRANCHISOR TO ANY AGREEMENT.  FRANCHISOR RESERVES THE RIGHT TO CHANGE AREA REPRESENTATIVES AND/OR THE SUPPORT SERVICES THE AREA REPRESENTATIVE PROVIDES TO FRANCHISEE OVER TIME.  HOWEVER, FRANCHISOR SHALL ULTIMATELY BE RESPONSIBLE FOR ENSURING THE SUPPORT SERVICES ARE PROVIDED TO FRANCHISEE.**

Nothing contained in this Agreement will require Franchisor or its Affiliates to continue to offer franchises, whether in the event that Franchisor exercises its rights to assign or otherwise transfer its rights in this Agreement or otherwise.

### 18.2    Transfer by Franchisee

The rights and duties along with the Franchise granted in this Agreement are personal to Franchisee (or any of its owners), and Franchisor has entered into this Agreement in reliance on the representations given by Franchisee to secure the Franchise, Franchisee's and its owners, as applicable, personal and/or collective skills and Franchisee's financial ability.  Accordingly, neither Franchisee nor any holder of a legal or beneficial interest in Franchisee may

46

sell, assign, convey, give away, pledge, mortgage, sublicense or otherwise transfer, whether by operation of law or otherwise, any interest in this Agreement, the Franchise granted by this Agreement, the Approved Location used in operating the Franchised Center, its assets or any part or all of the ownership interest in Franchisee, or fractionalize any rights of Franchisee, without the prior written approval of Franchisor, which prior written approval shall not be unreasonably withheld. For the avoidance of doubt, it is expressly understood that any transfers in any holding company or other business or legal entity, including any approved trust, that holds an interest in Franchisee shall be deemed a transfer for purposes of this Agreement. Any purported transfer not approved by Franchisor or otherwise expressly allowed under the terms of this Agreement, shall be null and void and shall constitute a material breach of this Agreement. The restrictions on transferability described in this Section 18.2 and Section 18.3 shall also apply to any purported involuntary transfers by operation of law, death or incapacity, divorce or separation proceedings or transfers through a shell. If Franchisee is in compliance with this Agreement and the transfer is consistent with the terms of this Agreement, Franchisor's consent to any transfer shall be conditioned upon satisfying the following requirements:

18.2.1    Franchisee has complied with the requirements set forth in Section 19, if applicable;

18.2.2    all obligations owed to Franchisor, and all other outstanding obligations relating to the Franchised Center, are fully paid and satisfied;

18.2.3    Franchisee (and any transferring owners, if Franchisee is a business entity) has executed a general release, in a form the same as or similar to the General Release attached as Exhibit 1, of any and all claims against Franchisor, including its officers, directors, shareholders, managers, members, partners, owners, employees and agents (in their corporate and individual capacities) including, without limitation, claims arising under federal, state or local laws, rules or ordinances, and any other matters incident to the transfer of Franchisee's interest in this Agreement or to the transfer of Franchisee's ownership of all or any part of the Franchise; provided, however, that if a general release is prohibited, Franchisee or its owners' all give the maximum release allowed by law;

18.2.4    the transferee has satisfied Franchisor that it meets Franchisor's management, business and financial standards, and otherwise possesses the character and capabilities, including business reputation and credit rating, as Franchisor may require to demonstrate ability to conduct the Franchised Center;

18.2.5    the transferee, if Franchisor requires, executed either the then-current franchise agreement for new franchisees as offered to new franchisees, or if Franchisor has ceased offering franchises, to renewing franchisees generally, which may be substantially different from this Agreement and its Exhibits, including different Royalty Fee and Marketing Fund Contribution rates and other material provisions, or this Agreement, or in the alternative, has executed, along with Franchisee, an assignment and assumption agreement in a form acceptable to Franchisor in which the transferee has agreed to assume all obligations, debts and liabilities under this Agreement or with respect to the Franchised Center. If a new Franchise Agreement is executed, Franchisor has the right to limit its term to the remaining Term;

18.2.6    the transferee and its principals have executed a general release, in a form the same as or similar to the General Release attached as Exhibit 1, of any and all claims against Franchisor and its officers, directors, shareholders, managers, members, partners, owners, employees and agents (in their corporate and individual capacities), with respect to any representations regarding the Franchise or the business conducted pursuant thereto or any other matter that may have been made to the transferee by Franchisee; provided, however, that if a general release is prohibited, the transferee and its principals shall give the maximum release allowed by law;

18.2.7    Franchisee has provided Franchisor with a complete copy of all contracts and agreements and related documentation between Franchisee and the prospective transferee relating to the intended sale or transfer of the Franchise;

18.2.8    Franchisee, or the transferee, has paid to Franchisor a transfer fee in the amount of twenty percent (20%) of the then current Franchise Fee for new franchises;

18.2.9    if the transferee is an entity, such entity will be duly organized, in good standing in its state of formation, and validly existing for the purpose of owning and operating the Franchised Center duly authorized to conduct such business;

47

18.2.10 if the transferee is an entity, it has caused its organizational governing documents (e.g. bylaws, operating agreement, trust agreement or the like) and each of its stock certificates or other ownership interest certificates to conspicuously indicate in a form satisfactory to Franchisor that such ownership interest is held subject to, and that further assignment or transfer thereof is subject to, all restrictions imposed upon transfers and assignments by this Agreement, and if the transferee has not done so previously, at Franchisor's request, the transferee and/or Franchisee will deliver copies to Franchisor of all resolutions of Franchisee's and transferee's board of directors or similar governing body authorizing entry into all documents required to consummate the sale, purchase, assignment and assumption along with copies of all of the foregoing organizational documents, and any amendment to any such documents;

18.2.11 if the transferee is an entity, all holders of a legal or beneficial interest in the transferee of five percent (5%) or greater shall have executed a personal guaranty in a form the same as or similar to the standard form Unlimited Guaranty and Assumption of Obligations attached as Exhibit 4, and each such person's spouse shall have executed a joinder to such Unlimited Guaranty and Assumption of Obligations attached to such guaranty;

18.2.12 Franchisee or the transferee has obtained all necessary consents and approvals by third parties (such as the lessor of the Approved Location) and all applicable federal, state and local laws, rules, ordinances and requirements applicable to the transfer have been complied with or satisfied;

18.2.13 the term of the transferred franchise shall be the unexpired Term, including all renewal rights, subject to any and all conditions applicable to such renewal rights in accordance with this Agreement;

18.2.14 if the transferee is an entity, all of the holders of a legal and beneficial interest in the transferee have executed, along with the transferee, and delivered to Franchisor a nondisclosure and non-competition agreement in a form the same as or similar to the standard form Nondisclosure and Non-Competition Agreement attached as Exhibit 2;

18.2.15 the transferee has executed a Franchise Certificate a form the same as or similar to the standard form Franchise Certificate attached as Exhibit 5;

18.2.16 if the transferee is an entity, it shall identify a Franchisee Designated Representative as required for new franchisees under this Agreement; and

18.2.17 the transferee and its Designated Manager shall complete, to Franchisor's satisfaction, a training program in substance similar to the initial training described in Section 8.1, it being understood that no Designated Manager shall assume the management of the day-to-day operation of the Franchised Center until it has completed the initial training program.

Franchisor's consent to a transfer of any interest in this Agreement, or of any ownership interest in the Franchised Center, shall not constitute a waiver of any claims Franchisor may have against Franchisee or the transferee, nor shall it be deemed a waiver of Franchisor's right to demand compliance with the terms of this Agreement.

**18.3** **Restrictions on Transfer by Franchisee to a Controlled Entity**

18.3.1 If Franchisee wishes to transfer this Agreement or any interest in this Agreement to a corporation, limited liability company or other legal entity that is entirely owned by Franchisee or its current owners ("**Controlled Entity**"), which Controlled Entity was formed for the financial planning, tax or other convenience of Franchisee, or if Franchisee is an entity and its owners desire to transfer any existing equity to other current owners of Franchisee, Franchisor's consent to any such transfer shall be conditioned upon the satisfaction of the following requirements, as applicable, subject to applicable state law:

18.3.1.1 the Controlled Entity is newly organized and in good standing in its state of formation, and its charter provides that its activities are confined exclusively to the operation of the Franchised Center;

18.3.1.2    Franchisee or some or all of the current holders of a legal or beneficial interest in Franchisee own all of the equity and voting power of the outstanding stock or other capital interest in the Controlled Entity;

18.3.1.3    Franchisee (and any transferring owners, if Franchisee is an entity) has executed a general release, in a form the same as or similar to the General Release attached as Exhibit 1, of any and all claims against Franchisor, including its officers, directors, shareholders, managers, members, partners, owners, employees and agents (in their corporate and individual capacities) including, without limitation, claims arising under federal, state or local laws, rules or ordinances, and any other matters incident to the transfer of Franchisee's interest in this Agreement or to the transfer of Franchisee's or its owners' ownership of all or any part of the Franchise; provided, however, that if a general release is prohibited, Franchisee shall give the maximum release allowed by law;

18.3.1.4    all obligations of Franchisee to Franchisor or any Affiliate are fully paid and satisfied; provided, however, that neither Franchisee nor any such Controlled Entity shall be required to pay a transfer fee as required pursuant to Section 18.2.8, except that Franchisor may require a reasonable administrative fee to be paid by Franchisee to cover legal, professional and other administrative expenses to be incurred by Franchisor in connection with such transfer (not expected to exceed $2,500.00);

18.3.1.5    the Controlled Entity, along with Franchisee, has executed an assignment and assumption agreement in a form acceptable to Franchisor in which the Controlled Entity has agreed to assume all obligations, debts and liabilities under this Agreement or with respect to the Franchised Center;

18.3.1.6    Franchisee has provided Franchisor with a complete copy of all contracts and agreements and related documentation between Franchisee and the Controlled Entity relating to the intended transfer of the Franchise;

18.3.1.7    Franchisee and/or the Controlled Entity has obtained all necessary consents and approvals by third parties (such as the lessor of the Approved Location) and all applicable federal, state and local laws, rules, ordinances and requirements applicable to the transfer have been complied with or satisfied;

18.3.1.8    all holders of a legal or beneficial interest in the Controlled Entity of five percent (5%) or greater shall have executed a personal guaranty in a form the same as or similar to the standard form Unlimited Guaranty and Assumption of Obligations attached as Exhibit 4, and each such person's spouse shall have executed a joinder to such Unlimited Guaranty and Assumption of Obligations attached to such guaranty;

18.3.1.9    all of the holders of a legal and beneficial interest in Controlled Entity have executed, along with the Controlled Entity, and delivered to Franchisor a nondisclosure and non-competition agreement in a form the same as or similar to the standard form Nondisclosure and Non-Competition Agreement attached as Exhibit 2;

18.3.1.10    the term of the transferred franchise shall be the unexpired Term, including all renewal rights, subject to any and all conditions applicable to such renewal rights in accordance with this Agreement;

18.3.1.11    the Controlled Entity has executed a Franchise Certificate a form the same as or similar to the standard form Franchise Certificate attached as Exhibit 5;

18.3.1.12    the Controlled Entity shall identify a Franchisee Designated Representative as required for new franchisees under this Agreement;

18.3.1.13    each stock certificate or other ownership interest certificate of the Controlled Entity has conspicuously endorsed upon the face thereof a statement in a form satisfactory to Franchisor that it is held subject to, and that further assignment or transfer thereof is subject to, all restrictions imposed upon transfers and assignments by this Agreement; and

49

18.3.1.14 copies of the Controlled Entity's articles of incorporation or organization, bylaws, operating agreement, and other governing regulations or documents, including resolutions of the board of directors or similar governing body authorizing entry into all documents required to consummate the sale, purchase, assignment and assumption, have been promptly furnished to Franchisor, and any amendment to any such documents shall also be furnished to Franchisor immediately upon adoption.

18.3.2 Franchisor's consent to a transfer of any interest in this Agreement, or of any ownership interest in the Franchised Center, shall not constitute a waiver of any claims Franchisor may have against Franchisee or the Controlled Entity, nor shall it be deemed a waiver of Franchisor's right to demand compliance with the terms of this Agreement.

### 18.4 Franchisor's Disclosure to Transferee

Franchisor may, without liability of any kind or nature whatsoever to Franchisee, to make available for inspection by any intended transferee of Franchisee all or any part of Franchisor's records relating to this Agreement, the Franchised Center or to the history of the relationship of Franchisor and Franchisee. Franchisee hereby specifically consents to such disclosure by Franchisor and shall release and hold Franchisor harmless from and against any claim, loss or injury resulting from an inspection of Franchisor's records relating to the Franchised Center by an intended transferee identified by Franchisee.

### 18.5 Advertising the Sale of the Franchisee

Franchisee shall not, without prior written consent of Franchisor, place in, on or upon the location of the Franchised Center, or in any communication media, any form of advertising relating to the sale of the Franchised Center or the rights granted under this Agreement.

### 18.6 Transfer by Death or Incapacity

18.6.1 Upon the death or Incapacity of Franchisee (if Franchisee is an individual) or any holder of a majority of the legal or beneficial interest in Franchisee (if Franchisee is an entity), the appropriate representative of such person (whether administrator, personal representative or trustee) shall, within a reasonable time not exceeding ninety (90) days following such event (which such 90-day period may be renewed from time to time by Franchisor as necessary in increments of ninety (90) days for an aggregate period of time of up to two hundred seventy (270) days), transfer such individual's interest in the Franchised Center or in Franchisee to a third party approved by Franchisor. Such transfers, including transfers by will or inheritance, shall be subject to the conditions for assignments and transfers contained in this Agreement, unless prohibited by the laws of the state wherein Franchisee was located or resided, with such choice of law provision being applicable only for this Section 18.6. During such ninety (90) day period, the Franchised Center must remain at all times under the primary management of a Designated Manager who otherwise meets Franchisor's qualifications.

18.6.2 Following such a death or Incapacity of such person as described in this Section 18.6, if necessary in Franchisor's discretion, Franchisor shall have the right, but not the obligation, to assume operation of the Franchised Center until the earlier of: (a) the deceased or incapacitated owner's interest is transferred to a third party approved by Franchisor; or (b) ninety (90) days, which such 90-day period may be renewed from time to time as necessary in increments of ninety (90) days for an aggregate period of time of up to an additional two hundred seventy (270) days. Franchisor will periodically discuss the status with the Franchisee or its heirs. Franchisor shall be given access to the Franchised Center, and not be held liable for trespass or any related tort. In the event Franchisor exercises its right to operate the Franchised Center during any such period under this Section 18.6.2, the terms and conditions set forth in Section 16.5 shall apply in the same manner to Franchisor's operation of the Franchised Center as if fully set forth in this Section. Franchisor may charge its then-current management fee as stated in the Confidential Operations Manual from time to time, , and Franchisor shall be entitled to reimbursement of any expenses Franchisor incurs that are not paid out of the operating cash flow of the Franchised Center.

### 18.7 No Release of Transferor.

No sale, assignment, transfer, conveyance, encumbrance or gift of any interest in Franchisee or this Agreement will relieve the transferor of the obligations of such transferor contained in this Agreement or in any Unlimited Guaranty and Assumption of Obligations executed by such person, as the case may be, unless expressly

authorized by Franchisor in writing. Each Unlimited Guaranty and Assumption of Obligations executed in connection with this Agreement shall remain in full force and effect before and after any such sale, assignment, transfer, conveyance, encumbrance or gift of any interest in Franchisee or this Agreement.

## 19. RIGHT OF FIRST REFUSAL

### 19.1 Submission of Offer

If Franchisee or any of its owners proposes to sell or transfer, except as allowed in Section 18.3 above, any ownership interest in the Franchise, Franchisee, or in the Franchised Center (including assets it owns outside the normal course of its business), Franchisee shall give Franchisor the first right to accept or refuse the offer to purchase. The offer must be a bona fide invitation to purchase, and must be signed and submitted in writing to Franchisor. The offer shall have all pertinent documents attached, including any contract or due diligence materials. The offer applies to the assets and interests contemplated in this Section and do not include assets or interests unrelated to the Franchised Center.

### 19.2 Sale or Transfer to Family Members

Section 19.1 of this Agreement shall be inapplicable in its entirety if the sale or transfer under Section 19.1 is to a family member or with respect to ownership interests in Franchisee, to any other current owner of Franchisee; provided, that the requirements under Section 18.2 and Section 18.3, as applicable, of this Agreement remain in effect and nothing in this Section 19.2 is a waiver to their application.

### 19.3 Franchisor's Right to Purchase

Franchisor shall have thirty (30) days (following the receipt of the offer to purchase) to accept all material terms of Franchisee's offer to purchase. If Franchisor elects to accept the offer, it shall deliver written confirmation to Franchisee. Franchisor has the right to substitute cash for the fair market value of any form of payment proposed in such offer. Franchisor's credit shall be deemed at least equal to the credit of any competing buyer. After providing notice to Franchisee of Franchisor's intent to exercise this right of first refusal, Franchisor shall have up to sixty (60) days to close the purchase on the same terms set out in the invitation to purchase. Franchisor shall be entitled to receive from Franchisee all customary representations and warranties given by Franchisee as the seller of the assets or such ownership interest or, at Franchisor's election, such representations and warranties contained in the proposal.

### 19.4 Non Exercise of Right of First Refusal

If Franchisor does not exercise its right of first refusal within thirty (30) days from the date of delivery of all such documents, the offer or proposal may be accepted by Franchisee or any of its owners, subject to Franchisor's prior written approval as required by Section 18.2 or Section 18.3, as the case may be. Should the sale fail to close within one hundred twenty (120) days after the offer is delivered to Franchisor, or if there is a material change to the terms, Franchisor's right of first refusal shall renew and be implemented in accordance with this Section.

## 20. BENEFICIAL OWNERS OF FRANCHISEE

Franchisee represents, and Franchisor enters into this Agreement in reliance upon such representation, that the individuals identified in the Franchise Certificate as the only holders of a legal or beneficial interest in Franchisee and/or the Franchised Center. Franchisee further represents to Franchisor that the individuals identified in the Franchise Certificate as officers, directors and/or managers of Franchisee, as the case may be, are the duly elected and qualified officers, directors and/or managers of Franchisee, as the case may be.

## 21.    RELATIONSHIP OF FRANCHISOR AND FRANCHISEE AND INDEMNIFICATION

### 21.1    Description of Relationship of Franchisor and Franchisee

21.1.1    This Agreement is purely a contractual relationship between Franchisor and Franchisee and does not appoint or make Franchisee an agent, legal representative, joint venturer, partner, employee, servant or independent contractor of Franchisor for any purpose whatsoever.  This Agreement does not establish a fiduciary of relationship between Franchisor and Franchisee.

21.1.2    Franchisee may not represent or imply to third parties that Franchisee is an agent or employee of Franchisor, and Franchisee is in no way authorized to make any contract, agreement, warranty or representation on behalf of Franchisor, or to create any obligation, express or implied, on Franchisor's behalf. During the Term, and any extension or renewal of this Agreement, Franchisee shall hold itself out to the public only as a franchisee and an owner of the individually owned and operated Franchised Center operating the Franchised Center pursuant to a franchise from Franchisor. Franchisee shall take such affirmative action as may be necessary to do so including, without limitation, exhibiting a notice of that fact in a conspicuous place on the Approved Location and on all forms, stationery or other written materials, the content of which Franchisor has the right to specify.

21.1.3    Under no circumstances shall Franchisor be liable for any act, omission, contract, debt nor any other obligation of Franchisee, including those incurred by Franchisor while operating the Franchised Center on behalf of Franchisee pursuant to the terms set forth in Section 16.5 and/or 18.6 of this Agreement respectively. Franchisor shall in no way be responsible for any injuries to persons or property resulting from the operation of the Franchised Center. Any third party contractors and vendors retained by Franchisee to convert or construct the premises are independent contractors of Franchisee alone.

### 21.2    Franchisor May Act in its Own Interest

Unless otherwise specifically provided in this Agreement with respect to certain issues, whenever this Agreement requires Franchisee to obtain Franchisor's written consent or permits Franchisee to take any action or refrain from taking any action, Franchisor is free to act in its own self-interest without any obligation to act reasonably, to consider the impact on Franchisee or to act subject to any other standard of care limiting Franchisor's right, except as may be provided by statute or regulation.

### 21.3    Indemnification by Franchisee

Franchisee shall hold harmless and indemnify Franchisor, any Affiliate, all holders of a legal or beneficial interest in Franchisor and all officers, directors, executives, managers, members, partners, owners, employees, agents, area representatives, and their respective successors and assigns (collectively "**Franchisor Indemnitees**") from and against all losses, damages, fines, costs, expenses or liability (including reasonable legal and professional fees and all other costs of litigation) incurred in connection with any action, suit, demand, claim, investigation or proceeding, or any settlement thereof, that arises from or is based upon Franchisee's (a) ownership or operation of the Franchised Center; (b) violation, breach or asserted violation or breach of any federal, state or local law, regulation or rule; (c) breach of any representation, warranty, covenant, or provision of this Agreement or any other agreement between Franchisee and Franchisor (or an Affiliate); (d) defamation of Franchisor or the System; (e) acts, errors or omissions committed or incurred in connection with the Franchised Center, including any negligent or intentional acts; or (f) infringement, violation or alleged infringement or violation of any Mark, patent or copyright or any misuse of the Confidential Information.  The obligations of this Section 21.3 shall expressly survive the termination of the Term.

### 21.4    Franchisor's Right to Retain Counsel

Franchisee shall give Franchisor immediate notice of any such action, suit, demand, claim, investigation or proceeding that may give rise to a claim for indemnification by a Franchisor Indemnitee. Franchisor has the right to retain counsel of its own choosing in connection with any such action, suit, demand, claim, investigation or proceeding. In order to protect persons, property, Franchisor's reputation or the goodwill of others, Franchisor has the right to, at any time without notice, take such remedial or corrective actions as it deems expedient with respect to any action, suit, demand, claim, investigation or proceeding if, in Franchisor's sole judgment, there are grounds to believe any of the acts or circumstances listed above have occurred.  Franchisee shall cooperate with Franchisor in

52

its handling of any such action, suit, demand, claim, investigation or proceeding. If Franchisor's exercise of its rights under this Section causes any of Franchisee's insurers to refuse to pay a third party claim, all cause of action and legal remedies Franchisee might have against such insurer shall automatically be assigned to Franchisor without the need for any further action on either party's part. Under no circumstances shall Franchisor be required or obligated to seek coverage from third parties or otherwise mitigate losses in order to maintain a claim against Franchisee. The failure to pursue such remedy or mitigate such loss shall in no way reduce the amounts recoverable by Franchisor from Franchisee.

## 22. GENERAL CONDITIONS AND PROVISIONS

### 22.1 No Waiver

No failure of Franchisor to exercise any power reserved to it under this Agreement, or to insist upon strict compliance by Franchisee with any obligation or condition under this Agreement, and no custom nor practice of Franchisor or Franchisee in variance with the terms under this Agreement, shall constitute a waiver of Franchisor's right to demand exact compliance with the terms of this Agreement. Waiver by Franchisor of any particular default by Franchisee shall not be binding unless in writing and executed by Franchisor and shall not affect nor impair Franchisor's right with respect to any subsequent default of the same or of a different nature. Subsequent acceptance by Franchisor of any payment(s) due shall not be deemed to be a waiver by Franchisor of any preceding breach by Franchisee of any terms, covenants or conditions of this Agreement.

### 22.2 Franchisor Entitled to Injunctive Relief

As any breach by Franchisee of any of the restrictions contained in Sections 6, 7, 9 and 17 would result in irreparable injury to Franchisor, and as the damages arising out of any such breach would be difficult to ascertain, in addition to all other remedies provided by law or in equity, Franchisor shall be entitled, as a matter of right, to an injunction from any court of competent jurisdiction restraining any further violation by Franchisee of this Agreement without any requirement to show any actual damage, irreparable harm or establish a balance of convenience or to post any bond or other security. Such right to an injunction shall be cumulative and in addition to, and not in limitation of, any other rights and remedies that Franchisor may have at law or in equity. Franchisor's right to seek injunctive relief will not affect Franchisor's or Franchisee's waiver of jury trial and covenant to arbitrate all disputes in accordance with Section 23.7. Franchisor's rights herein shall include pursuing injunctive relief through arbitration or in a state or federal court.

### 22.3 Addresses and Procedures for Sending Communications

All notices, requests, consents and other communications required or permitted under this Agreement shall be provided in writing and shall be (as elected by the person giving such notice) hand delivered by messenger or courier service, provided by e-mail (provided in each case that such writing is also provided using a non-electronic form of delivery), or mailed (airmail if international) by registered or certified mail (postage prepaid), return receipt requested or otherwise by a nationally recognized overnight express courier (e.g., FedEx) addressed to:

| If to Franchisor: | Franchise Development |
| | EWC Franchise, LLC |
| | The Village at Gulfstream Park |
| | 600 Silks Run, Suite 2270 |
| | Hallandale Beach, FL 33009 |
| | E-mail: legal@waxcenter.com |
| | |
| If to Franchisee: | EWC Michigan Management Inc |
| | Attn: Farzana A. Khan |
| | 2 Emil Street |
| | Princeton Junction, NJ 08550 |
| | E-mail: Shehzad.khan@waxcenter.com |

or to such other address or e-mail address as any party may designate to the other by notice complying with the terms of this Section (provided that updates to a party's notice address or e-mail may be provided strictly by e-mail

(without any need for non-electronic delivery) to the e-mail address set forth above, as may be updated from time to time pursuant to the terms of this Section 22.3). Each such notice will be deemed delivered (A) on the date delivered if by personal delivery, (B) on the date provided by e-mail with confirmed answer back, (C) on the date upon which the return receipt is signed or delivery is refused or the notice is designated by the postal authorities as not deliverable, as the case may be, if mailed; or (D) upon the date scheduled for delivery after such notice is sent by a nationally recognized overnight express courier.

Notwithstanding anything to the contrary contained within this Section 22.3, any notices Franchisor is required or authorized to deliver to Franchisee in order to advise Franchisee of alleged violations of Franchisee's covenants or other agreements contained in this Agreement (but for the avoidance of doubt, a form of non-electronic delivery shall accompany any termination notices provided under this Agreement) shall be deemed to have been duly given or served upon Franchisee by Franchisor if provided by e-mail (without any need for non-electronic delivery) to the e-mail address provided in this Section 22.3; provided a copy of such e-mail is also provided to the e-mail address for the Franchisee Designated Representative then on file, if different, with Franchisor (such initial e-mail address to be provided in the Franchise Certificate provided by Franchisee with this Agreement, which may be updated from time to tome pursuant to the terms of this Section 22.3).

### 22.4    Unlimited Guaranty and Assumption of Obligations

All holders of a legal or beneficial interest in Franchisee of five percent (5%) or greater shall be required to execute, as of the date of this Agreement, the Unlimited Guaranty and Assumption of Obligations attached as Exhibit 4, through which such holders agree to assume and discharge all of Franchisee's obligations under this Agreement and to be personally liable under this Agreement for all of the same. Each such holder of a legal or beneficial interest in Franchisee shall be required to obtain a joinder to such Unlimited Guaranty and Assumption of Obligations by their spouse, if any, to bind such spouse's interest in jointly held property, if any, held by the equity holder. If any applicable holder of a legal or beneficial interest in Franchisee delivers an Unlimited Guaranty and Assumption of Obligations to Franchisor without the signature of his or her spouse, then Franchisee hereby represents to Franchisor that such holder has no spouse.

### 22.5    Approvals

Whenever this Agreement requires the prior approval or consent of Franchisor, Franchisee shall make a timely written request to Franchisor for such approval, and except as otherwise provided in this Agreement, any approval or consent granted shall be effective only if in writing. Franchisor makes no warranties, conditions or guarantees upon which Franchisee may rely, and assumes no liability or obligation to Franchisee or any third party to which it would not otherwise be subject, by providing any waiver, approval, advice, consent or services to Franchisee in connection with this Agreement, or by reason of any neglect, delay or denial of any request for approval.

### 22.6    Entire Agreement

This Agreement, its exhibits and the documents referred to in this Agreement and, if Franchisee is an Area Representative, Franchisee's Area Representative Agreement shall be construed together and constitute the entire, full and complete agreement between Franchisor and Franchisee concerning the subject matter of this Agreement and shall supersede all prior agreements. No other representation, oral or otherwise (other than those within Franchisor's European Wax Center Disclosure Document), has induced Franchisee to execute this Agreement, and there are no representations (other than those within Franchisor's European Wax Center Disclosure Document), inducements, promises or agreements, oral or otherwise, between the parties not embodied in this Agreement, that are of any force or effect with respect to the matters set forth in or contemplated by this Agreement or otherwise. Nothing in this Agreement is intended to disclaim the representations Franchisor made in Franchisor's European Wax Center Disclosure Document that was furnished to Franchisee, if Franchisor was required by law to provide to Franchisee Franchisor's European Wax Center Disclosure Document. No amendment, change or variance from this Agreement shall be binding on either party unless executed in writing by both parties.

### 22.7    Severability and Modification

Each paragraph, part, term and provision of this Agreement shall be considered severable. If any paragraph, part, term or provision in this Agreement is ruled to be unenforceable, unreasonable or invalid, such

ruling shall not impair the operation of or affect the remaining portions, paragraphs, parts, terms and provisions of this Agreement, and the latter shall continue to be given full force and effect and bind Franchisor and Franchisee; and such unenforceable, unreasonable or invalid paragraphs, parts, terms or provisions shall be deemed not part of this Agreement; provided, however, if Franchisor determines that a finding of invalidity adversely affects the basic consideration of this Agreement, Franchisor has the right to, at its option, terminate the Term.

**22.8     Headings are for Convenience Only**

All captions in this Agreement are intended solely for the convenience of Franchisor and Franchisee, and none shall be deemed to affect the meaning or construction of any provision of this Agreement.

**22.9     Force Majeure**

Whenever a period of time is provided in this Agreement for either party to perform any act, except for Franchisee's payment of monies to Franchisor or any Franchisor Affiliate, neither party shall be liable nor responsible for any delays due to strikes, lockouts, casualties, acts of God, war, terrorism, governmental regulation or control or other causes beyond the reasonable control of Franchisor and Franchisee, and the time period for the performance of such act shall be extended for the amount of time of the delay. This clause shall not result in an extension of the Term.

**22.10     Timing is of the Essence**

Except as set forth in Section 22.9, failure to perform any act within the time required or permitted by this Agreement shall be a breach of this Agreement.

**22.11     Withholding Payments**

22.11.1 Franchisee shall not, for any reason, withhold payment of any Royalty Fees or other amounts due to Franchisor or to any of its Affiliates. Franchisee shall not withhold or offset any amounts, damages or other monies allegedly due to Franchisee against any amounts due to Franchisor. The right to set off is hereby expressly waived by Franchisee. No endorsement or statement on any payment for less than the full amount due to Franchisor will be construed as an acknowledgment of payment in full, or an accord and satisfaction, and Franchisor has the right to accept and cash any such payment without prejudice to Franchisor's right to recover the full amount due, or pursue any other remedy provided in this Agreement or by law.

22.11.2 Franchisor has the right to apply any payments made by Franchisee against any of Franchisee's past due indebtedness as Franchisor deems appropriate. Franchisor may set off, against amounts owed to Franchisee, amounts due under this Agreement by Franchisee to Franchisor.

**22.12     Further Assurances**

Franchisor and Franchisee will each execute and deliver, or cause the execution and delivery of, such further instruments, contracts, forms or other documents, and will perform such further acts, as may be necessary or desirable to perform or complete any term, covenant or obligation contained in this Agreement.

**22.13     Third-Party Beneficiaries**

Except with respect to Franchisor's applicable Affiliates who shall have rights to enforce this Agreement directly, as well as any applicable Franchisor Indemnitee who also shall have the right to enforce Franchisee's indemnification obligations herein directly, anything to the contrary notwithstanding, nothing in this Agreement is intended, nor shall be deemed, to confer upon any other person or legal entity other than Franchisor or Franchisee, and their respective successors and assigns as may be contemplated by this Agreement, any rights or remedies under this Agreement.

### 22.14 Multi-State Addenda

Attached as Exhibit 6 to this Agreement (the "**Multi-State Addenda**") and incorporated herein by reference, as applicable, are additional terms and conditions applicable to franchisees and their principals based in certain states within the United States of America. Each provision of the Multi-State Addenda shall be effective only to the extent that the jurisdictional requirements of the applicable state law are applicable to the provisions of this Agreement are met independent of the Multi-State Addenda. To the extent the Multi-State Addenda shall be deemed to be inconsistent with any terms or conditions of this Agreement (including its exhibits or attachments thereto [other than the applicable Multi-State Addenda]), the terms of the Multi-State Addenda shall control.

### 22.15 This Agreement May be Signed in One or More Counterparts

This Agreement may be executed in one (1) or more counterparts, each of which will be deemed an original, but all of which taken together will constitute one (1) and the same instrument. Confirmation of execution by electronic transmission of a facsimile or .pdf signature page will be binding upon any party so confirming.

### 23. DISPUTE RESOLUTION

### 23.1 Choice of Law

Except to the extent this Agreement or any particular dispute is governed by the U.S. Trademark Act of 1946 or other federal law, this Agreement shall be governed by and construed in accordance with the laws of the State of Florida (without reference to its conflict of laws principles), excluding any law regulating the sale of franchises or governing the relationship between a franchisor and franchisee, unless the jurisdictional requirements of such laws are met independently without reference to this Section. The Federal Arbitration Act shall govern all matters subject to arbitration. References to any law refer also to any successor laws and to any published regulations for such law as in effect at the relevant time. References to a governmental agency also refer to any regulatory body that succeeds the function of such agency.

### 23.2 Consent to Jurisdiction

Any action brought by either Franchisor or Franchisee, except those claims required by this Agreement or by law, to be submitted to arbitration, shall be brought in the appropriate state or federal court located in or serving Broward County, Florida, or at Franchisor's principal place of business, if different. Franchisor and Franchisee each waive all questions of personal jurisdiction or venue for the purposes of carrying out this provision. Franchisor and Franchisee each hereby submit to service of process by registered mail, return receipt requested or by any other manner provided by law. Claims for injunctive relief or other equitable relief may be brought by Franchisor where Franchisee is located. This exclusive choice of jurisdiction and venue provision shall not restrict the ability of either Franchisor or Franchisee to confirm or enforce judgments or arbitration awards in any appropriate jurisdiction.

### 23.3 Cumulative Rights and Remedies

No right or remedy conferred upon or reserved to Franchisor or Franchisee by this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy in this Agreement or by law or equity provided or permitted, but each shall be in addition to every other right or remedy. Nothing contained in this Agreement shall bar Franchisor's right to obtain injunctive relief against threatened conduct that may cause it loss or damages, including obtaining restraining orders and preliminary and permanent injunctions.

### 23.4 Limitations of Claims

To the extent permitted by law, any claim concerning the Franchised Center or this Agreement or any related agreement will be barred unless an action for a claim is commenced within one (1) year from the date on which Franchisee knew or should have known, in the exercise of reasonable diligence, of the facts giving rise to the claim.

**23.5** **Limitation of Damages**

FRANCHISEE WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT OR CLAIM FOR ANY PUNITIVE OR EXEMPLARY DAMAGES AGAINST FRANCHISOR AND AGREES THAT IF THERE IS A DISPUTE WITH FRANCHISOR, FRANCHISEE WILL BE LIMITED TO THE RECOVERY OF ACTUAL DAMAGES SUSTAINED BY IT INCLUDING REASONABLE LEGAL AND PROFESSIONAL FEES, SUBJECT TO THE LIMITATIONS HEREIN. EXCEPT FOR THE PARTIES' INDEMNIFICATION OBLIGATIONS AND THE CONFIDENTIALITY AND NON-COMPETITION OBLIGATIONS PURSUANT TO THIS AGREEMENT OR WITH RESPECT TO WILLFUL MISCONDUCT OR GROSS NEGLIGENCE, OR AS OTHERWISE SET FORTH IN THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY SPECIAL, INCIDENTAL, INDIRECT, CONSEQUENTIAL OR CONTINGENT DAMAGES WHATSOEVER, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF REVENUE, PROFITS, LOSS OF BUSINESS OPPORTUNITY OR BUSINESS INTERRUPTION, FOR INJURIES TO PERSONS (INCLUDING DEATH) OR PROPERTY, WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH A LOSS, OR WHETHER THE CLAIM IS FOR BREACH OF CONTRACT, TORT, BREACH OF WARRANTY, NEGLIGENCE OR OTHERWISE. THE ESSENTIAL PURPOSE OF THIS SECTION IS TO LIMIT THE POTENTIAL LIABILITY OF EACH PARTY ARISING OUT OF THE TERMS AND CONDITIONS OF THIS AGREEMENT. IN ANY CLAIM OR ACTION BROUGHT BY FRANCHISEE AGAINST FRANCHISOR CONCERNING THIS AGREEMENT, FRANCHISEE'S TOTAL RECOVERABLE DAMAGES AND FRANCHISOR'S TOTAL LIABILITY SHALL NOT EXCEED AND SHALL BE LIMITED TO REFUND OF FRANCHISEE'S FRANCHISE FEE AND ROYALTY FEE PAYMENTS.

**23.6** **Waiver of Jury Trial**

FRANCHISEE AND FRANCHISOR EACH IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, WHETHER AT LAW OR EQUITY, BROUGHT BY EITHER OF THEM.

**23.7** **Arbitration**

This Agreement evidences a transaction involving commerce and, therefore, the Federal Arbitration Act, Title 9 of the United States Code is applicable to the subject matter contained in this Agreement. Except for controversies or claims relating to the ownership of any of Franchisor's Marks or the unauthorized use or disclosure of Franchisor's Trade Secrets or other Confidential Information, covenants against competition and other claims for injunctive relief, all disputes arising out of or relating to this Agreement or to any other agreements between Franchisor and Franchisee, or with regard to interpretation, formation or breach of this or any other agreement between Franchisor and Franchisee, shall be settled by binding arbitration conducted in Broward County, Florida, in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect. The proceedings shall be held by a single arbitrator agreed upon by Franchisor and Franchisee or otherwise appointed by the Circuit Court for the State of Florida and located in Broward County, Florida. The decision of the arbitrator shall be final and binding upon Franchisor and Franchisee. Judgment upon the award rendered by the arbitrator may be entered in any court having personal and subject matter jurisdiction.

Franchisee acknowledges that it has read the terms of this binding arbitration provision and affirms that this provision is entered into willingly and voluntarily and without any fraud, duress or undue influence on the part of Franchisor or any of Franchisor's agents or employees.

**23.8** **Remedies in the Event of Breach of This Agreement**

Franchisee and Franchisor agree if any legal proceedings are brought for the enforcement of this Agreement, in addition to any other relief to which the successful or prevailing party may be entitled, the successful or prevailing party will be entitled to recover all of its legal and professional fees, investigative fees, administrative fees billed by such party's attorneys and other professionals, court costs and all expenses, including, without limitation, all fees, taxes, costs and expenses incident to arbitration, appellate, and post-judgment proceedings, incurred by the successful or prevailing party in that action or proceeding.

57

## 24. ACKNOWLEDGMENTS

### 24.1 Receipt of this Agreement and the Franchise Disclosure Document

Franchisee represents and acknowledges that it has received, read and understands this Agreement and Franchisor's Franchise Disclosure Document; and that Franchisor has accorded Franchisee ample time and opportunity to consult with advisors of its own choosing about the potential benefits and risks of entering into this Agreement. Franchisee represents and acknowledges that it has received, at least fourteen (14) calendar days prior to the date on which this Agreement was executed, the Disclosure Document required by the Trade Regulation Rule of the Federal Trade Commission entitled Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures.

### 24.2 Consultation by Franchisee

Franchisee represents that it has been urged to consult with its own advisors with respect to the legal, financial and other aspects of this Agreement, the business franchised hereby and the prospects for that business. Franchisee represents that it has either consulted with such advisors or has deliberately declined to do so.

### 24.3 True and Accurate Information

Franchisee represents that all information set forth in any and all applications, financial statements and submissions to Franchisor is true, complete and accurate in all material respects, and Franchisee acknowledges that Franchisor is relying upon the truthfulness, completeness and accuracy of such information.

### 24.4 Risk

Franchisee represents that it has conducted an independent investigation of the business contemplated by this Agreement and acknowledges that, like any other business, an investment in a European Wax Center involves business risks and that the success of the venture is dependent, among other factors, upon the business abilities and efforts of Franchisee. Franchisor makes no representations or warranties, express or implied, in this Agreement or otherwise, as to the potential success of the business venture contemplated hereby.

### 24.5 No Guarantee of Success

FRANCHISEE ACKNOWLEDGES THAT NO REPRESENTATIONS, PROMISES, INDUCEMENTS, GUARANTEES, WARRANTIES CONDITIONS, OR ESTIMATES OF ANY KIND REGARDING FINANCING, NET PROFITS, GROSS PROFITS, NET SALES, GROSS SALES, COSTS OR EXPENSES OF FRANCHISEES GENERALLY OR OF ANY FRANCHISED CENTER WERE MADE BY OR ON BEHALF OF FRANCHISOR, EXCEPT AS SET FORTH IN THE DISCLOSURE DOCUMENT, WHICH HAVE LED FRANCHISEE TO ENTER INTO THIS AGREEMENT. FRANCHISEE UNDERSTANDS THAT WHETHER FRANCHISEE SUCCEEDS IN THE DEVELOPMENT OF A FRANCHISE IS DEPENDENT UPON FRANCHISEE'S AND ITS OWNERS' AND PERSONNEL'S EFFORTS, BUSINESS JUDGMENTS, THE PERFORMANCE OF FRANCHISEE'S EMPLOYEES, MARKET CONDITIONS AND VARIABLE FACTORS BEYOND FRANCHISOR'S CONTROL OR INFLUENCE. FRANCHISEE FURTHER UNDERSTANDS THAT SOME FRANCHISEES ARE MORE, OR LESS SUCCESSFUL THAN OTHER FRANCHISEES, AND THAT FRANCHISOR HAS MADE NO REPRESENTATION THAT FRANCHISEE WILL DO AS WELL AS ANY OTHER FRANCHISEE.

### 24.6 Franchisee's Representations and Warranties

Franchisee represents and warrants to Franchisor that:

24.6.1 Franchisee is duly organized, validly existing and in good standing under the laws of its jurisdiction of formation, and Franchisee possesses the organizational power to validly own its properties and conduct its business;

58

24.6.2    Franchisee has the power to execute, deliver, and carry out the terms and conditions of this Agreement, and this Agreement has been duly authorized, executed and delivered by Franchisee and constitutes the valid, legal and binding agreement and obligation of Franchisee in accordance with the terms of this Agreement, except as may be limited by applicable bankruptcy, insolvency, reorganization and other laws and equitable principles affecting creditors' rights generally from time to time in effect; and

24.6.3    Franchisee's execution of this Agreement and its performance of its obligations under this Agreement will not result in (i) the breach of any term or condition of, or constitute a default under, any term or condition of any contract, agreement, arrangement, or other commitment to which Franchisee or any holder of a legal or beneficial interest in Franchisee is a party or by which Franchisee or such holder of a legal or beneficial interest in Franchisee is bound (*including any agreement not to compete*), or constitute an event which, with notice, lapse of time or both, would result in such a breach or event of default nor (ii) to Franchisee's knowledge, result in the violation by Franchisee or any such holder of a legal or beneficial interest in Franchisee of any applicable statute, rule, regulation, ordinance, code, judgment, order, injunction or decree.

**24.7    Notice of Potential Franchisor and Affiliate Profit.**

Franchisee acknowledges that Franchisor and Franchisor's Affiliates will make available to Franchisee goods, products and/or services for use in the Franchise on terms which Franchisor and its Affiliates will make a profit. Franchisee acknowledges that Franchisor and Franchisor's Affiliates are entitled to said profits and/or consideration.

**24.8    Anti-Terrorism and Money Laundering Representation**

Franchisee certifies that: (i) neither it nor its officers, members, managers, directors, equity holders or controlling owners is acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order, the United States Department of Justice, or the United States Treasury Department as a terrorist, "Specially Designated National or Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control; (ii) neither it nor its officers, members, managers, directors, equity holders or controlling owners is engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity or nation; and (iii) neither it nor its officers, members, managers, directors, equity holders or controlling owners is in violation of Presidential Executive Order 13224, the USA Patriot Act, the Bank Secrecy Act, the Money Laundering Control Act or any regulations promulgated pursuant thereto. Should Franchisee or any of its officers, members, managers, directors, equity holders or controlling owners, during the Term, be designated Specially Designated National or Blocked Person, Franchisor may, at its sole option, terminate this Agreement.

**24.9    Franchisor Must Sign Franchise Agreement to be Effective.**

The provision of this Agreement and its related agreements and documents to Franchisee for examination, and if applicable, execution, negotiation does not constitute an offer for a Franchise, shall not bind Franchisor in any way nor does it provide any franchise rights associated with acquiring a Franchise, it being understood that this Agreement shall become effective and binding only upon execution and delivery of this Agreement by Franchisee and by Franchisor. No act or omission of any Area Representative or any other Person shall alter, change or modify any of the provisions of this Section 24.9.

**24.10    Franchisee Minimum Deliverables Upon Signing this Franchise Agreement.**

Franchisee shall deliver to Franchisor, or cause to be delivered to Franchisor, each of the following:

(i)        this Agreement, signed by an authorized representative of Franchisee;

(ii)       the Franchise Fee, as described in Section 3.1;

59

(iii)     a Nondisclosure and Non-Competition Agreement, in substantially the same form attached to this Agreement as Exhibit 2, for each equity holder of Franchisee at the time of the Effective Date, signed by an authorized representative of Franchisee on the one hand, and such equity holder on the other;

(iv)     an Unlimited Guaranty and Assumption of Obligations, in substantially the same form attached to this Agreement as Exhibit 4, signed by each holder of a legal or beneficial interest in Franchisee of five percent (5%) or greater, along with the joinder each such holder's spouse, if any, to bind such spouse's interest in jointly held property, if any, held by the equity holder;

(v)     Franchisor's then-current form questionnaire, in substantially the same form attached to Franchisor's Franchise Disclosure Document; and

(vi)     a Franchise Certificate, in substantially the same form attached to this Agreement as Exhibit 5 (a "Franchise Certificate"), signed by an authorized representative of Franchisee, certifying, as applicable, Franchisee's organizational documents, good standing, ownership and management information, as of the Effective Date.

The foregoing shall not in any way limit Franchisor's rights to request any additional documents that may be required pursuant to this Agreement, from time to time.

IN WITNESS WHEREOF, the parties to this Agreement, intending to be legally bound hereby have duly executed this Agreement.

**FRANCHISOR:**

EWC FRANCHISE, LLC

By: _____

Name: Joshua Coba

Title: Vice President

**FRANCHISEE:**

EWC MICHIGAN MANAGEMENT INC

By: _____
Farzana A. Khan, President

## SCHEDULE 1 TO THE FRANCHISE AGREEMENT

### MAP OF PROTECTED TERRITORY

N/A

SITE NOT YET DETERMINED

## EXHIBIT 1 TO THE FRANCHISE AGREEMENT

### GENERAL RELEASE

This General Release is made and given on this _____ day of _____, 20____ by _____, ("**RELEASOR**") an individual/corporation/ limited liability company/partnership with a principal address of _____ _____, in consideration of:

_____ the execution by EWC FRANCHISE, LLC, a Florida limited liability company ("**RELEASEE**"), of a successor Franchise Agreement or other renewal documents renewing the franchise (the "**Franchise**") granted to RELEASOR by RELEASEE pursuant to that certain Franchise Agreement (the "**Franchise Agreement**") between RELEASOR and RELEASEE; or

_____ RELEASEE'S consent to RELEASOR'S assignment of its rights and duties under the Franchise Agreement; or

_____ RELEASEE'S consent to RELEASOR'S assumption of rights and duties under the Franchise Agreement; or

_____ RELEASEE'S refund of fifty percent (50%) of the Franchise Fee RELEASOR paid to RELEASEE,

and other good and valuable consideration, the adequacy of which is hereby acknowledged, and accordingly RELEASOR hereby, to the fullest extent permitted by law, releases and discharges RELEASEE, RELEASEE'S parent and affiliated entities, and its and their officers, directors, shareholders, members, managers, employees, representatives and agents (whether acting in an agency capacity or in their individual capacities), and RELEASEE'S heirs, successors, beneficiaries and assigns, as applicable, each of whom is intended as a beneficiary of this Release, from any and all causes of action, suits, debts, damages, judgments, executions, claims and demands whatsoever, in law or in equity, that RELEASOR and RELEASOR'S heirs, executors, administrators, successors and assigns had, now have or may have, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the date of this RELEASE, whether known or unknown, arising out of or related to the Franchise or the Franchise Agreement, including, without limitation, claims arising under federal, state and local laws, rules and ordinances.

RELEASOR covenants not to sue or to assert, prosecute or maintain, directly or indirectly, in any form, any claim or cause of action against any RELEASEE with respect to any matter, cause, omission, act, or thing whatsoever; occurring in whole or in part on or at any time prior to the date of this Release, and which is subject to such release provided for in this Release. RELEASOR represents and warrants that RELEASOR has not filed nor made any claims, charges, complaints, or actions of any type, whether legal, equitable, or administrative, against any RELEASEE.

[For California - *RELEASOR expressly waives and relinquishes any and all released claims and likewise waives to the fullest extent permitted by law, the provisions, rights and benefits of Section 1542 of the California Civil Code, which provides: "GENERAL RELEASE; EXTENT. A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."]*

This General Release shall not be amended or modified unless such amendment or modification is in writing and is signed by RELEASOR and RELEASEE.

IN WITNESS WHEREOF, RELEASOR has executed this General Release as of the date first above written.

RELEASOR: *EXHIBIT ONLY, DO NOT SIGN*
(type/print name)

By: _____

Name: _____

Title: _____
(or, if an individual)

Signed: *EXHIBIT ONLY, DO NOT SIGN*

Name printed: _____

## ACKNOWLEDGMENT

State of _____ )
) ss
County of _____ )

On this ____ day of _____, 20____ before me personally came _____, known to me to be the same person whose name is signed to the foregoing General Release, and acknowledged the execution thereof for the uses and purposes therein set forth, [and who did swear and say that he/she is the _____, (title) of _____ (company name), and he/she has the authority to execute said General Release].

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

(NOTARIAL SEAL)

*EXHIBIT ONLY, DO NOT SIGN*
Notary Public
My Commission expires:

## EXHIBIT 2 TO THE FRANCHISE AGREEMENT

### NONDISCLOSURE AND NON-COMPETITION AGREEMENT

This Nondisclosure and Non-Competition Agreement (this "**Agreement**") is entered into and effective as of the _____ day of _____, 20_____, by and between _____ ("**Franchisee**") (d/b/a a European Wax Center), and _____ ("**Individual**").

### RECITALS:

A.  Franchisee is a party to that certain Franchise Agreement dated _____, 20__ ("**Franchise Agreement**") by and between Franchisee and EWC Franchise, LLC, a successor-in-interest by merger to EWC Franchise Group, Inc. ("**Franchisor**").

B.  Franchisee desires Individual to have access to and review certain Trade Secrets and other Confidential Information, which are defined and more particularly described below.

C.  Franchisee is required by the Franchise Agreement to have Individual execute this Agreement prior to providing Individual access to said confidential materials.

D.  Individual understands the necessity of not disclosing any such information to any other party or using such information to compete against Franchisor, Franchisee or any other franchisee of Franchisor in any business that directly or indirectly, (i) offers (or grants franchises or licenses to others to operate a business that offers) hair removal products or services the same as or substantially similar to those provided by European Wax Centers, or (ii) in which the Trade Secrets and other Confidential Information could be used to the disadvantage of Franchisor, any Affiliate of Franchisor or its franchisees or area representatives (a "**Competitive Business**"); provided, however, that the term "Competitive Business" shall not apply to (a) any business operated by a Person or its Affiliates under an agreement with Franchisor in connection with the System, or (b) any business operated by a publicly-held entity in which an applicable Person and its Affiliates collectively own less than a five percent (5%) legal or beneficial interest.

**NOW, THEREFORE**, in consideration of the mutual promises and undertakings set forth herein, and intending to be legally bound hereby, Franchisee and Individual hereby mutually agree as follows:

1.  Trade Secrets and Confidential Information.

(a)  Individual understands that Franchisor and Franchisee each possess and will possess Trade Secrets and other Confidential Information that are important to the operation of a European Wax Center.

(b)  For the purposes of this Agreement,

"**Confidential Information**" means technical and non-technical information used in or related to the System that is not commonly known by or available to the public, including, without limitation, the Trade Secrets and information contained in the Confidential Operations Manual and training guides and materials. In addition, any other information identified as confidential when delivered or made available by Franchisor or Franchisee shall be deemed Confidential Information. For the avoidance of doubt, guest (customer) information shall be deemed Confidential Information;

"**Marks**" means the trademark "EUROPEAN WAX CENTER®," and such other trade names, trademarks, service marks, trade dress, designs, graphics, logos, emblems, insignia, fascia, slogans, drawings and other commercial symbols as Franchisor may designate to be used in connection with the European Wax Center franchise System;

"**Person**" means a human being, a legal or business entity devised or constructed by for the purpose of carrying out business activities under the name of such devised or constructed entity, which shall not be limited to sole proprietorships, corporations, partnerships, limited liability companies, or other entities; and in the case of entities, a Person shall include, any other entity with a majority or controlling interest in another entity, as well as the individual officers, directors, and other Persons controlling the activities of such entity;

"**System**" means the uniform standards, methods, procedures and specifications, revisions or modifications Franchisor advances for the operation of European Wax Centers; and

"**Trade Secret**" is information in any form (including, but not limited to, materials and techniques, technical or non-technical data, formulas, patterns, compilations, programs, devices, methods, techniques, drawings, processes, financial data, financial plans, product plans, passwords, lists of actual or potential customers or suppliers) related to or used in European Wax Centers or otherwise in the System, that is not commonly known by or available to the public and that information: (a) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other Persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

(c) Confidential Information shall not include, however, any information that: (i) is now or subsequently becomes generally available to the public through no fault of Individual or Franchisee or Franchisee's employees, agents, officers, directors, shareholders, managers, members or other representatives; (ii) Franchisee or Individual can demonstrate was rightfully in its possession, without obligation of nondisclosure, prior to disclosure pursuant to this Agreement; (iii) is independently developed without the use of any Confidential Information; or (iv) is rightfully obtained from a third party who has the right, without obligation of nondisclosure, to transfer or disclose such information.

(d) Any information expressly designated by Franchisor or Franchisee as "Trade Secrets" or "Confidential Information" shall be deemed such for all purposes of this Agreement, but the absence of designation shall not relieve Individual of his or her obligations under this Agreement in respect of information otherwise constituting Trade Secrets or Confidential Information. Individual understands Franchisor's and/or Franchisee's providing of access to the Trade Secrets and other Confidential Information creates a relationship of confidence and trust between Individual, Franchisor and Franchisee with respect to the Trade Secrets and other Confidential Information.

2. <u>Confidentiality/Non-Disclosure.</u>

(a) Individual shall not communicate or divulge to (or use for the benefit of) any other Person, with the sole exception of Franchisee or other employees agents or representatives of Franchisee who are bound by duties of non-disclosure, now or at any time in the future, any Trade Secrets or other Confidential Information. At all times from the date of this Agreement, Individual must take all steps reasonably necessary and/or requested by Franchisee or Franchisor to ensure that the Confidential Information and the Trade Secrets are kept confidential pursuant to the terms of this Agreement. Individual must comply with all applicable policies, procedures and practices that Franchisor and/or Franchisee have established and may establish from time to time with regard to the Confidential Information and the Trade Secrets.

(b) Individual may not in any manner or at any time, either directly or indirectly use any part of the Confidential Information or the Trade Secrets except in connection with the operation of the European Wax Center business, and in no case in any manner detrimental to Franchisee, Franchisor or their respective affiliates.

(c) Individual's obligations under Section 2(a) of this Agreement shall continue in effect after termination of Individual's relationship with Franchisee, regardless of the reason or reasons for termination, and whether such termination is voluntary or involuntary, and Franchisee and Franchisor are each entitled to communicate Individual's obligations under this Agreement to any future customer or employer to the extent deemed necessary by Franchisor and/or Franchisee for protection of its rights under this Agreement and regardless of whether Individual or any of its affiliates or assigns becomes an investor, partner, joint venturer, broker, distributor or the like in the European Wax Center franchise System.

(d)     Upon termination of Individual's relationship with Franchisee, regardless of the reason or reasons for termination, and whether such termination is voluntary or involuntary, or at any other time when requested by Franchisor, Franchisee and/or their respective affiliates, Individual shall immediately deliver to Franchisee (or Franchisor and/or its affiliates, as appropriate and as directed), all Confidential Information and other property in Individual's possession, or under Individual's care and control, belonging to Franchisee and/or Franchisor and/or their respective affiliates. The provisions of this Section 2(d) shall survive any such termination of Individual's relationship with Franchisee.

**3.     Non-Competition.**

(a)     Individual acknowledges that Franchisee and Franchisor would be unable to protect the Trade Secrets and other Confidential Information against unauthorized use or disclosure and would be unable to encourage a free exchange of ideas and information among European Wax Center franchisees and area representatives if Individual and members of Individual's immediate family and household were permitted to hold an interest in or perform services for any Competitive Business. Therefore, during the term of the Franchise Agreement, neither Individual nor any member of Individual's immediate family and household), may, either directly or indirectly, for themselves, or through, on behalf of or in conjunction with any Person:

(i)     divert or attempt to divert any business or customer of a European Wax Center to any Competitive Business, by direct or indirect inducement or otherwise;

(ii)     do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks or the System;

(iii)     carry on, be engaged in or take part in, render services to, or own or share in the earnings of any Competitive Business anywhere in the United States; or

(iv)     solicit or otherwise attempt to induce or influence any employee or other business associate of Franchisor or any other European Wax Center, or any franchisee or area representative of the System, to compete against, or terminate or modify his, her or its employment or business relationship with, Franchisor, any such franchisee or area representative or any other European Wax Center.

In addition to the in-term non-competition restrictive covenants set forth above in this Section 3(a), for a period of two (2) years after the expiration or termination of the Franchise Agreement, regardless of the cause of expiration or termination, neither Individual nor any member of Individual's immediate family and household), may, either directly or indirectly, for themselves, or through, on behalf of or in conjunction with any Person:

(i)     divert or attempt to divert any business or customer of a European Wax Center to any Competitive Business, by direct or indirect inducement or otherwise;

(ii)     do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks or the System;

(iii)     carry on, be engaged in or take part in, render services to, or own or share in the earnings of any Competitive Business within fifty (50) miles of any other European Wax Center operating under the System and the Marks at the time of such expiration or termination; or

(iv)     solicit or otherwise attempt to induce or influence any employee or other business associate of Franchisor or any other European Wax Center, or any franchisee or area representative of the System, to compete against, or terminate or modify his, her or its employment or business relationship with, Franchisor, any such franchisee or area representative or any other European Wax Center.

Any assignment or other transfer of the Franchise Agreement, or of Individual's complete interest in, or affiliation with, Franchisee (in each and every capacity, including as owner, employee, consultant or otherwise), shall be

deemed, for purposes of Individual's obligations under this Section only, as the expiration or termination of the Franchise Agreement.

(b)     If Individual operates any other business, Individual shall not use or display any of the Marks, or any confusingly similar trademark, in any manner whatsoever in connection with such other business and/or the promotion thereof. Individual shall not utilize in such other business any designation of origin, description or representation that falsely suggests or represents an association or connection with Franchisor. This Section 3(b) is not intended as an approval of Individual's right to operate other businesses and in no way is it intended to contradict those Sections of this Agreement or the Franchise Agreement that prohibit such practice.

4.     Reasonableness of Restrictions.

Individual acknowledges that each of the terms set forth in this Agreement, including the restrictive covenants, is fair and reasonable and is reasonably required for the protection of Franchisee, Franchisor, and the Trade Secrets and other Confidential Information, the System and the Marks, and Individual waives any right to challenge these restrictions as being overly broad, unreasonable or otherwise unenforceable. If, however, a court of competent jurisdiction determines that any such restriction is unreasonable or unenforceable, then Individual shall submit to the reduction of any such activity, time period or geographic restriction necessary to enable the court to enforce such restrictions to the fullest extent permitted under applicable law. Franchisee may, upon the direction from Franchisor at any time, reduce the scope, restricted activities and/or duration of any of the restrictive covenants effective immediately upon notice to Individual. It is the desire and intent of both Franchisee and Individual that the provisions of this Agreement shall be enforced to the fullest extent permissible under the laws and public policies applied in any jurisdiction where enforcement is sought.

5.     Non-Disparagement.

Individual agrees and covenants that Individual will not, at any time, either directly or indirectly, and shall cause Individual's affiliates and members of its family not to, make, publish or communicate to any person or entity or in any public forum (including through social media) any defamatory or disparaging remarks, comments or statements concerning Franchisor, its Affiliates, any franchisees or area representatives and/or any of their respective employees, agents and representatives, or the System or its Marks, other than as part of the judicial, arbitration or other dispute resolution process in connection with any litigation, mediation, arbitration or administrative or other judicial proceeding arising under any claim brought in connection with this Agreement or the Franchise Agreement, or other than when compelled to testify under oath by subpoena, regulation or court order.

6.     Relief for Breaches of Confidentiality, Non-Solicitation, Non-Disparagement and Non-Competition.

Individual further acknowledges that an actual or threatened violation of the covenants contained in this Agreement will cause Franchisee and Franchisor immediate and irreparable harm, damage and injury that cannot be fully compensated for by an award of damages or other remedies at law. Accordingly, Franchisee and Franchisor shall be entitled, as a matter of right, to seek an injunction from any court of competent jurisdiction restraining any further violation by Individual of this Agreement without any requirement to show any actual damage, irreparable harm or establish a balance of convenience or to post any bond or other security. Such right to seek an injunction shall be cumulative and in addition to, and not in limitation of, any other rights and remedies that Franchisee and Franchisor may have at law or in equity.

7.     Miscellaneous.

(a)     If any legal proceedings are brought for the enforcement of this Agreement, in addition to any other relief to which the successful or prevailing party may be entitled, the successful or prevailing party shall be entitled to recover all of its legal and professional fees, investigative fees, administrative fees billed by such party's attorneys and other professionals, court costs and all expenses, including, without limitation, all fees, taxes, costs and expenses incident to arbitration, appellate, and post-judgment proceedings incurred by the successful or prevailing party in that action or proceeding.

(b)     This Agreement shall be effective as of the date this Agreement is executed and shall be binding upon the successors and assigns of Individual and shall inure to the benefit of Franchisee, its subsidiaries, successors and assigns.

(c)     The failure of either party to insist in any one (1) or more instances upon performance of any terms and conditions of this Agreement shall not be construed a waiver of future performance of any such term, covenant or condition of this Agreement and the obligations of either party with respect thereto shall continue in full force and effect.

(d)     The headings in this Agreement are included solely for convenience and shall not affect, or be used in connection with, the interpretation of this Agreement.

(e)     In the event that any part of this Agreement shall be held to be unenforceable or invalid, the remaining parts of this Agreement shall nevertheless continue to be valid and enforceable as though the invalid portions were not a part of this Agreement.

(f)     The existence of any claim or cause of action Individual might have against Franchisee or Franchisor will not constitute a defense to the enforcement by Franchisee or Franchisor of this Agreement.

(g)     Except as otherwise expressly provided in this Agreement, no remedy conferred upon Franchisee or Franchisor pursuant to this Agreement is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to every other remedy given pursuant to this Agreement or now or hereafter existing at law or in equity or by statute or otherwise. No single or partial exercise by any party of any right, power or remedy pursuant to this Agreement shall preclude any other or further exercise thereof.

(h)     Individual and Franchisee each acknowledge that Individual's compliance with the terms of this Agreement is also critical to Franchisor. Accordingly, Individual and Franchisee each agree and acknowledge that even though Franchisor is not a party to this Agreement and does not have any obligations under this Agreement, Franchisor shall be a third party beneficiary of Individual's agreements and covenants under this Agreement and Franchisor shall be entitled to all rights and remedies conferred upon Franchisee and Franchisor under this Agreement. Accordingly, Individual and Franchisee each agree that Franchisor may enforce such rights and promises in its own right (without being required to obtain consent from Franchisee or add Franchisee as a party to any proceedings for such enforcement).

(i)     This Agreement may be executed in one (1) or more counterparts, each of which will be deemed an original, but all of which taken together will constitute one (1) and the same instrument. Confirmation of execution by electronic transmission of a facsimile or .pdf signature page will be binding upon any party so confirming.

(j)     This Agreement shall be governed by, and construed and enforced in accordance with, the internal laws of Florida, without regard to principles of conflicts of laws. Franchisee and Individual each hereby irrevocably consent and submit to the non-exclusive jurisdiction of the Courts of Broward County, Florida, and waives any objection based on venue or forum non conveniens with respect to any action instituted therein arising under this Agreement, in each case whether arising in contract, tort, equity or otherwise, and agrees that any dispute arising out of this Agreement shall be heard only in the courts described above.

(k)     Individual may not assign or delegate his or her duties or obligations under this Agreement.

(l)     This Agreement constitutes the entire agreement between Individual on the one hand, and Franchisee and/or Franchisor on the other, with respect to the subject matter of this Agreement. This Agreement supersedes any prior agreements, negotiations and discussions between Individual, Franchisee and/or Franchisor with respect to the subject matter of this Agreement. This Agreement cannot be altered or amended except by an agreement in writing signed by Individual, Franchisee and Franchisor.

INDIVIDUAL CERTIFIES THAT HE OR SHE HAS READ THIS AGREEMENT CAREFULLY, AND UNDERSTANDS AND ACCEPTS THE OBLIGATIONS THAT IT IMPOSES WITHOUT RESERVATION.  NO PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO INDIVIDUAL TO INDUCE THE SIGNING OF THIS AGREEMENT.

[Signatures Appear on Following Page]

IN WITNESS WHEREOF, Franchisee has caused this Agreement to be executed by its duly authorized representative, and Individual has executed this Agreement, all being done as of the day and year first above written.

WITNESS:                                                   FRANCHISEE:


_EXHIBIT ONLY, DO NOT SIGN_ _____        By: _EXHIBIT ONLY, DO NOT SIGN_ _____

Print Name:_____        Name: _____

                                                   Title: _____


WITNESS:                                                   INDIVIDUAL:


_EXHIBIT ONLY, DO NOT SIGN_ _____          Signature: _EXHIBIT ONLY, DO NOT SIGN_ _____

Print Name:_____        Printed Name: _ _____

## EXHIBIT 3 TO THE FRANCHISE AGREEMENT

## NONDISCLOSURE AND NON-SOLICITATION AGREEMENT

This Nondisclosure and Non-Solicitation Agreement (this "**Agreement**") is executed by the undersigned ("**Individual**") as of the date set forth in the signature block below and is provided for the benefit of EWC Franchise, LLC, a successor-in-interest by merger to EWC Franchise Group, Inc., and its affiliates (collectively, "**Franchisor**") and _____ and its affiliates (collectively, "**Franchisee**").

### RECITALS:

A.      Franchisee is a party to that certain Franchise Agreement with Franchisor.

B.      Franchisee desires Individual to have access to and review certain Trade Secrets and other Confidential Information, which are defined and more particularly described below.

C.      Franchisee is required by its Franchise Agreement to have Individual execute this Agreement prior to providing Individual access to said confidential materials.

D.      Individual understands the necessity of not disclosing any such information to any other party.

**NOW, THEREFORE**, in consideration of the mutual promises and undertakings set forth in this Agreement and Individual's employment or other ongoing relationship with Franchisee and its access to such Trade Secrets and other Confidential Information, and intending to be legally bound hereby, Individual agrees, for the benefit of Franchisor and Franchisee as follows:

1.      <u>Trade Secrets and Confidential Information.</u>

(a)      Individual understands that Franchisor and Franchisee each possess and will possess Trade Secrets and other Confidential Information that are important to the operation of a European Wax Center.

(b)      For the purposes of this Agreement,

"**Confidential Information**" means technical and non-technical information used in or related to the System that is not commonly known by or available to the public, including, without limitation, the Trade Secrets and information contained in the Confidential Operations Manual and training guides and materials. In addition, any other information identified as confidential when delivered or made available by Franchisor or Franchisee shall be deemed Confidential Information. For the avoidance of doubt, guest (customer) information shall be deemed Confidential Information;

"**Marks**" means the trademark "EUROPEAN WAX CENTER®," and such other trade names, trademarks, service marks, trade dress, designs, graphics, logos, emblems, insignia, fascia, slogans, drawings and other commercial symbols as Franchisor may designate to be used in connection with the European Wax Center franchise System;

"**Person**" means a human being, a legal or business entity devised or constructed by for the purpose of carrying out business activities under the name of such devised or constructed entity, which shall not be limited to sole proprietorships, corporations, partnerships, limited liability companies, or other entities; and in the case of entities, a Person shall include, any other entity with a majority or controlling interest in another entity, as well as the individual officers, directors, and other Persons controlling the activities of such entity;

"**System**" means the uniform standards, methods, procedures and specifications, revisions or modifications Franchisor advances for the operation of European Wax Centers; and

"**Trade Secret**" is information in any form (including, but not limited to, materials and techniques, technical or non-technical data, formulas, patterns, compilations, programs, devices, methods, techniques, drawings, processes, financial data, financial plans, product plans, passwords, lists of actual or potential customers or suppliers) related to or used in European Wax Centers or otherwise in the System, that is not commonly known by or available to the public and that information: (a) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other Persons who can obtain economic

value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

(c) Confidential Information shall not include, however, any information that: (i) is now or subsequently becomes generally available to the public through no fault of Individual or Franchisee or Franchisee's employees, agents, officers, directors, shareholders, managers, members or other representatives; (ii) Franchisee or Individual can demonstrate was rightfully in its possession, without obligation of nondisclosure, prior to disclosure pursuant to this Agreement; (iii) is independently developed without the use of any Confidential Information; or (iv) is rightfully obtained from a third party who has the right, without obligation of nondisclosure, to transfer or disclose such information.

(d) Any information expressly designated by Franchisor or Franchisee as "Trade Secrets" or "Confidential Information" shall be deemed such for all purposes of this Agreement, but the absence of designation shall not relieve Individual of his or her obligations under this Agreement in respect of information otherwise constituting Trade Secrets or Confidential Information. Individual understands Franchisor's and/or Franchisee's providing of access to the Trade Secrets and other Confidential Information creates a relationship of confidence and trust between Individual, Franchisor and Franchisee with respect to the Trade Secrets and other Confidential Information.

2. Confidentiality/Non-Disclosure.

(a) Individual shall not communicate or divulge to (or use for the benefit of) any other Person, with the sole exception of Franchisee or other employees agents or representatives of Franchisee who are bound by duties of non-disclosure, now or at any time in the future, any Trade Secrets or other Confidential Information. At all times from the date of this Agreement, Individual must take all steps reasonably necessary and/or requested by Franchisee or Franchisor to ensure that the Confidential Information and the Trade Secrets are kept confidential pursuant to the terms of this Agreement. Individual must comply with all applicable policies, procedures and practices that Franchisor and/or Franchisee have established and may establish from time to time with regard to the Confidential Information and the Trade Secrets.

(b) Individual may not in any manner or at any time, either directly or indirectly use any part of the Confidential Information or the Trade Secrets except in connection with the operation of the European Wax Center business, and in no case in any manner detrimental to Franchisee, Franchisor or their respective affiliates.

(c) Individual's obligations under Section 2(a) and Section 2(b) of this Agreement shall continue in effect after termination of Individual's relationship with Franchisee, regardless of the reason or reasons for termination, and whether such termination is voluntary or involuntary, and Franchisee and Franchisor are each entitled to communicate Individual's obligations under this Agreement to any future customer or employer to the extent deemed necessary by Franchisor and/or Franchisee for protection of its rights under this Agreement and regardless of whether Individual or any of its affiliates or assigns becomes an investor, partner, joint venturer, broker, distributor or the like in the European Wax Center franchise System.

(d) If Individual operates any other business, Individual shall not use or display any of the Marks, or any confusingly similar trademark, in any manner whatsoever in connection with such other business and/or the promotion thereof. Individual shall not utilize in such other business any designation of origin, description or representation that falsely suggests or represents an association or connection with Franchisor or the European Wax Center franchise System. This Section 2(d) is not intended as an approval of Individual's right to operate other businesses and in no way is it intended to contradict those Sections of this Agreement or the Franchise Agreement that prohibit such practice.

(e) Upon termination of Individual's relationship with Franchisee, regardless of the reason or reasons for termination, and whether such termination is voluntary or involuntary, or at any other time when requested by Franchisor, Franchisee and/or their respective affiliates, Individual shall immediately deliver to Franchisee (or Franchisor and/or its affiliates, as appropriate and as directed), all Confidential Information and other property in Individual's possession, or under Individual's care and control, belonging to Franchisee and/or Franchisor and/or their respective affiliates.

3. Non-Solicitation.

(a) Individual acknowledges that Franchisee and Franchisor would be unable to protect the Trade Secrets and other Confidential Information against unauthorized use or disclosure and would be unable to

encourage a free exchange of ideas and information among European Wax Center franchisees and area representatives if Individual and members of Individual's immediate family and household were permitted to engage in certain activities. Therefore, neither Individual nor any member of Individual's immediate family and household), may, either directly or indirectly, during the term of Individual's employment or other relationship with Franchisee, for themselves, or through, on behalf of or in conjunction with any Person:

(i)     divert or attempt to divert any business or customer of a European Wax Center to any competitive business, by direct or indirect inducement or otherwise;

(ii)    do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks or the System; or

(iii)   solicit or otherwise attempt to induce or influence any employee or other business associate of Franchisor or any other European Wax Center, or any franchisee or area representative of the System, to compete against, or terminate or modify his, her or its employment or business relationship with, Franchisor, any such franchisee or area representative or any other European Wax Center.

In addition to the in-term non-solicitation restrictive covenants set forth above in this Section 3(a), for a period of two (2) years after the termination of Individual's employment or other relationship with Franchisee and the European Wax Center franchise system, regardless of the cause of termination, neither Individual nor any member of Individual's immediate family and household), may, either directly or indirectly, for themselves, or through, on behalf of or in conjunction with any Person:

(iv)    divert or attempt to divert any business or customer of a European Wax Center to any competitive business, by direct or indirect inducement or otherwise;

(v)     do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks or the System; or

(vi)    solicit or otherwise attempt to induce or influence any employee or other business associate of Franchisor or any other European Wax Center, or any franchisee or area representative of the System, to compete against, or terminate or modify his, her or its employment or business relationship with, Franchisor, any such franchisee or area representative or any other European Wax Center.

4.     Reasonableness of Restrictions.

Individual acknowledges that each of the terms set forth in this Agreement, including the restrictive covenants, is fair and reasonable and is reasonably required for the protection of Franchisee, Franchisor, and the Trade Secrets and other Confidential Information, the System and the Marks, and Individual waives any right to challenge these restrictions as being overly broad, unreasonable or otherwise unenforceable. If, however, a court of competent jurisdiction determines that any such restriction is unreasonable or unenforceable, then Individual shall submit to the reduction of any such activity, time period or geographic restriction necessary to enable the court to enforce such restrictions to the fullest extent permitted under applicable law. Franchisee may, upon the direction from Franchisor at any time, reduce the scope, restricted activities and/or duration of any of the restrictive covenants effective immediately upon notice to Individual. It is the desire and intent of both Franchisee and Individual that the provisions of this Agreement shall be enforced to the fullest extent permissible under the laws and public policies applied in any jurisdiction where enforcement is sought.

5.     Non-Disparagement.

Individual agrees and covenants that Individual will not, at any time, either directly or indirectly, and shall cause Individual's affiliates and members of its family not to, make, publish or communicate to any person or entity or in any public forum (including through social media) any defamatory or disparaging remarks, comments or statements concerning Franchisor, its Affiliates, any franchisees or area representatives and/or any of their respective employees, agents and representatives, or the System or its Marks, other than as part of the judicial, arbitration or other dispute resolution process in connection with any litigation, mediation, arbitration or administrative or other judicial proceeding arising under any claim brought in connection with this Agreement or the Franchise Agreement, or other than when compelled to testify under oath by subpoena, regulation or court order.

6.     Relief for Breaches of Confidentiality; Non-Solicitation and Non-Disparagement.

Individual further acknowledges that an actual or threatened violation of the covenants contained in this Agreement will cause Franchisee and Franchisor immediate and irreparable harm, damage and injury that cannot be fully compensated for by an award of damages or other remedies at law. Accordingly, Franchisee and Franchisor shall be entitled, as a matter of right, to seek an injunction from any court of competent jurisdiction restraining any further violation by Individual of this Agreement without any requirement to show any actual damage, irreparable harm or establish a balance of convenience or to post any bond or other security. Such right to seek an injunction shall be cumulative and in addition to, and not in limitation of, any other rights and remedies that Franchisee and Franchisor may have at law or in equity.

7. Miscellaneous.

(a) If any legal proceedings are brought for the enforcement of this Agreement, in addition to any other relief to which the successful or prevailing party may be entitled, the successful or prevailing party shall be entitled to recover all of its legal and professional fees, investigative fees, administrative fees billed by such party's attorneys and other professionals, court costs and all expenses, including, without limitation, all fees, taxes, costs and expenses incident to arbitration, appellate, and post-judgment proceedings incurred by the successful or prevailing party in that action or proceeding.

(b) This Agreement shall be effective as of the date this Agreement is executed by Individual and shall be binding upon the successors and assigns of Individual and shall inure to the benefit of Franchisee, Franchisor and their respective its affiliates, successors and assigns.

(c) The failure of either party to insist in any one (1) or more instances upon performance of any terms and conditions of this Agreement shall not be construed a waiver of future performance of any such term, covenant or condition of this Agreement and the obligations of either party with respect thereto shall continue in full force and effect.

(d) The headings in this Agreement are included solely for convenience and shall not affect, or be used in connection with, the interpretation of this Agreement.

(e) In the event that any part of this Agreement shall be held to be unenforceable or invalid, the remaining parts of this Agreement shall nevertheless continue to be valid and enforceable as though the invalid portions were not a part of this Agreement.

(f) The existence of any claim or cause of action Individual might have against Franchisee or Franchisor will not constitute a defense to the enforcement by Franchisee or Franchisor of this Agreement.

(g) Except as otherwise expressly provided in this Agreement, no remedy conferred upon Franchisee or Franchisor pursuant to this Agreement is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to every other remedy given pursuant to this Agreement or now or hereafter existing at law or in equity or by statute or otherwise. No single or partial exercise by any party of any right, power or remedy pursuant to this Agreement shall preclude any other or further exercise thereof.

(h) Individual acknowledges that Individual's compliance with the terms of this Agreement is critical to Franchisee and Franchisor. Accordingly, Individual agrees and acknowledges that each of Franchisee and Franchisor, while not parties to this Agreement and who do not have any obligations under this Agreement, are intended beneficiaries of Individual's agreements and covenants under this Agreement in favor of Franchisee and Franchisor, and Franchisee and Franchisor shall each be entitled to all rights and remedies conferred upon Franchisee and Franchisor under this Agreement. Accordingly, Individual agrees that Franchisor and Franchisee may each enforce such rights and promises in its own right (without being required to obtain consent from any other person or add any other person as a party to any proceedings for such enforcement).

(i) This Agreement shall be governed by, and construed and enforced in accordance with, the internal laws of Florida, without regard to principles of conflicts of laws. Franchisee and Individual each hereby irrevocably consent and submit to the non-exclusive jurisdiction of the Courts of Broward County, Florida, and waives any objection based on venue or forum non conveniens with respect to any action instituted therein arising under this Agreement, in each case whether arising in contract, tort, equity or otherwise, and agrees that any dispute arising out of this Agreement shall be heard only in the courts described above.

(j) Individual may not assign or delegate his or her duties or obligations under this Agreement.

(k) Nothing in this Agreement shall be construed to provide Individual with any guarantee of, or agreement for, employment and/or continued employment with Franchisee. Nothing in this Agreement shall be construed to affect in any manner the existing rights of Franchisee with regard to Individual's employment with Franchisee.

(l) All covenants, agreements, representations and warranties made by Individual in this Agreement, including those set forth in Section 2 (Confidentiality/Non-Disclosure) and Section 3 (Non-Solicitation) shall survive the execution and delivery of this Agreement and the termination of Individual's employment or other relationship with Franchisee.

(m) This Agreement constitutes the entire agreement between Individual on the one hand, and Franchisee and/or Franchisor on the other, with respect to the subject matter of this Agreement. This Agreement supersedes any prior agreements, negotiations and discussions between Individual, Franchisee and/or Franchisor with respect to the subject matter of this Agreement. This Agreement cannot be altered or amended except by an agreement in writing signed by Individual, Franchisee and Franchisor. Confirmation of execution by electronic transmission of a facsimile, .pdf or other electronic signature page will be binding upon any party so confirming.

**INDIVIDUAL CERTIFIES THAT HE OR SHE HAS READ THIS AGREEMENT CAREFULLY, AND UNDERSTANDS AND ACCEPTS THE OBLIGATIONS THAT IT IMPOSES WITHOUT RESERVATION. NO PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO INDIVIDUAL TO INDUCE THE SIGNING OF THIS AGREEMENT. INDIVIDUAL ACKNOWLEDGES THAT IT HAS BEEN ADVISED TO SEEK ADVICE OF ITS OWN COUNSEL WITH RESPECT TO THIS AGREEMENT.**

[Signature Appears on Following Page]

IN WITNESS WHEREOF, Individual has executed this Agreement, all being done as of the day and year written below.

WITNESS:                                          INDIVIDUAL:


*EXHIBIT ONLY, DO NOT SIGN* _____        Signature: *EXHIBIT ONLY, DO NOT SIGN* _____

Print Name:_____        Printed Name: _____

                                                   Title: _____

                                                   Date: _____

**EXHIBIT 4 TO THE FRANCHISE AGREEMENT**

**UNLIMITED GUARANTY AND ASSUMPTION OF OBLIGATIONS**

This Unlimited Guaranty and Assumption Of Obligations (this "**Guaranty**") is given this _____ day of _____, 20\_\_\_, by _____ (each, a "**Personal Guarantor**").

In consideration of, and as an inducement to, the execution of that certain Franchise Agreement dated as the same date of this Guaranty (the "**Agreement**") by EWC Franchise, LLC, as successor-in-interest by merger to EWC Franchise Group, Inc. ("**Franchisor**"), each of the undersigned Personal Guarantors hereby personally and unconditionally guarantees to Franchisor and its successors and assigns, for the term of the Agreement and thereafter as provided in the Agreement, that _____ ("**Franchisee**") shall punctually pay and perform each and every undertaking, agreement and covenant set forth in the Agreement (collectively, "**Guaranteed Obligations**"). Each of the undersigned Personal Guarantors shall be personally bound by, and personally liable for, Franchisee's breach of any provision in the Agreement, including those relating to monetary obligations and obligations to take or refrain from taking specific actions or engaging in specific activities, such as those contemplated by Section 7 of the Agreement. Each of the undersigned Personal Guarantors waives: (a) acceptance and notice of acceptance by Franchisor of the foregoing undertakings; (b) notice of demand for payment of any indebtedness or non-performance of any Guaranteed Obligations; (c) protest and notice of default to any party with respect to the indebtedness or non-performance of any Guaranteed Obligations; (d) any right it may have to require that an action be brought against Franchisee or any other Person as a condition of liability; (e) the benefit of any circumstances, defense or statute of limitations affecting its liability which might otherwise discharge a guarantor or hinder prompt enforcement of this Guaranty, (f) any requirement that Franchisor proceed against or exhaust any collateral or security which Franchisor may now hold or obtain, and (g) any and all other notices and legal or equitable defenses to which it may be entitled.

Each of the undersigned Personal Guarantors, jointly and severally, represent as follows: (a) each of the undersigned Personal Guarantors has the capacity to enter into, perform and deliver this Guaranty; (b) this Guaranty constitutes the legal, valid, binding and enforceable obligations of each of the undersigned Personal Guarantors; and (c) each of the undersigned Personal Guarantors has independent means of obtaining reports and financial information about Franchisee, and Franchisor has no obligation, either prior to the execution of this Guaranty or any time thereafter, to notify any of the undersigned Personal Guarantors concerning Franchisee's financial condition or of any event or occurrence affecting Franchisee's financial condition or business operation.

Each of the undersigned Personal Guarantors further consents and agrees that: (a) its direct and immediate liability under this Guaranty shall be joint and several with all other applicable guarantors of Franchisee's obligations under the Agreement and shall include any property held jointly with any other applicable guarantors, including any interest held as a result of such property being community property or jointly held property, as joint tenants, tenants by the entirety, or otherwise; (b) it shall render any payment or performance required under the Agreement upon demand if Franchisee fails or refuses punctually to do so; (c) such liability shall not be contingent or conditioned upon pursuit by Franchisor of any remedies against Franchisee or any other Person; (d) such liability shall not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence which Franchisor may, from time to time, grant to Franchisee or to any other Person including, without limitation, the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which shall in any way modify or amend this Guaranty, which shall be continuing and irrevocable during the Term; and (e) this Guaranty shall remain in full force and effect before and after any sale, assignment, transfer, conveyance, encumbrance or gift of any interest in Franchisee or the Agreement.

None of the undersigned Personal Guarantors may delegate any of his, her or its rights, obligations or liabilities under this Guaranty. The provisions of this Guaranty may not be amended, supplemented, waived or changed orally, but only by a writing signed by the party as to whom enforcement of any such amendment, supplement, waiver or modification is sought and Franchisor, and making specific reference to this Guaranty.

This Guaranty shall be binding upon each undersigned Personal Guarantor and his or her heirs, executors, administrators, successors and assigns and shall inure to the benefit of Franchisor and its successors, endorsees, transferees and assigns. Without limiting any other provision of this Guaranty, each Personal Guarantor expressly agrees that, as applicable, such Personal Guarantor's death shall not serve as a revocation of or otherwise affect the guaranty made in this Guaranty and that such Personal Guarantor's estate and heirs shall continue to be liable under this Guaranty with respect to any Guaranteed Obligations created or arising after such Personal Guarantor's death. Franchisor may at any time, without notice to any of the undersigned Personal Guarantors, transfer or assign to any Person any of the Guaranteed Obligations, or any interest therein, and each and every immediate and successive

assignee or transferee of the Guaranteed Obligations, or any interest therein, shall, to the extent of its interest, be entitled to the benefits of this Guaranty to the same extent as if such assignee or transferee were Franchisor.

The validity, interpretation and enforcement of this Guaranty and any dispute arising out of the relationship between each Personal Guarantor and Franchisor, whether in contract, tort, equity or otherwise, shall be governed by the internal laws of the State of Florida (without giving effect to principles of conflicts of law).

Each of the undersigned Personal Guarantors hereby irrevocably consents and submits to the non-exclusive jurisdiction of the Courts of the State of Florida and the United States District Court located in or serving Broward County, Florida and waives any objection based on venue or forum non conveniens with respect to any action instituted therein arising under this Guaranty, the Agreement or in any way connected with or related or incidental to the dealings of each of the undersigned Personal Guarantors and Franchisor in respect of this Guaranty, the Agreement or the transactions related hereto or thereto, in each case whether now existing or hereafter arising and whether in contract, tort, equity or otherwise, and agrees that any dispute arising out of the relationship between the undersigned Personal Guarantors or Franchisee and Franchisor or the conduct of any such Persons in connection with this Guaranty, the Agreement or otherwise shall be heard only in the courts described above (except that Franchisor may bring any action or proceeding against the undersigned Personal Guarantors or his, her or its property in the courts of any other jurisdiction which Franchisor deems necessary or appropriate in order to realize on any collateral at any time granted by Franchisee or the undersigned Personal Guarantors to Franchisor or to otherwise enforce its rights against any of the undersigned Personal Guarantors or his, her or its property).

This Guaranty may be executed in one (1) or more counterparts, each of which will be deemed an original, but all of which taken together will constitute one (1) and the same instrument. Confirmation of execution by electronic transmission of a facsimile or .pdf signature page will be binding upon any party so confirming.

This Guaranty represents the entire understanding and agreement between the undersigned Personal Guarantors and Franchisor with respect to the subject matter of this Guaranty, and supersedes all other negotiations, understandings and representations (if any) made by and between such parties. Capitalized terms used in this Guaranty and not otherwise defined shall have the meaning set forth in the Agreement.

IN WITNESS WHEREOF, this Guaranty has been entered into the day and year first before written.

**PERSONAL GUARANTOR**

*EXHIBIT ONLY, DO NOT SIGN*
Personally and Individually (Printed Name)

Personally and Individually (Signature)

HOME ADDRESS

TELEPHONE NO.:_____
PERCENTAGE OF OWNERSHIP
IN FRANCHISEE:_____%

**PERSONAL GUARANTOR**

*EXHIBIT ONLY, DO NOT SIGN*
Personally and Individually (Printed Name)

Personally and Individually (Signature)

HOME ADDRESS

TELEPHONE NO.: _____
PERCENTAGE OF OWNERSHIP
IN FRANCHISEE: _____%

**PERSONAL GUARANTOR**

Personally and Individually (Printed Name)

Personally and Individually (Signature)

HOME ADDRESS

**PERSONAL GUARANTOR**

Personally and Individually (Printed Name)

Personally and Individually (Signature)

HOME ADDRESS

_____
_____
_____

TELEPHONE NO.:_____
PERCENTAGE OF OWNERSHIP
IN FRANCHISEE:_____%

**PERSONAL GUARANTOR**

_____
Personally and Individually (Printed Name)

_____
Personally and Individually (Signature)

HOME ADDRESS

_____
_____
_____
_____

TELEPHONE NO.:_____
PERCENTAGE OF OWNERSHIP
IN FRANCHISEE:_____%

_____
_____
_____

TELEPHONE NO.: _____
PERCENTAGE OF OWNERSHIP
IN FRANCHISEE: _____%

**PERSONAL GUARANTOR**

_____
Personally and Individually (Printed Name)

_____
Personally and Individually (Signature)

HOME ADDRESS

_____
_____
_____
_____

TELEPHONE NO.: _____
PERCENTAGE OF OWNERSHIP
IN FRANCHISEE: _____%

**Joinder of Spouse**. Each of the undersigned, being a spouse of a Personal Guarantor, if applicable, executes this Joinder to acknowledge its fairness and that it is in such spouse's best interests, and to bind such spouse's interest, if any, in property held by the Personal Guarantor, including any interest held as a result of such property being community property or jointly held property, as joint tenants, tenants by the entirety, or otherwise. Accordingly, each of the undersigned, being a spouse of a Personal Guarantor, agrees to be bound by the provisions of this Unlimited Guaranty and Assumption of Obligations, as amended or restated from time to time, in order to bind such spouse's interest, if any, in property held by the Personal Guarantor, including any interest held as a result of such property being community property or jointly held property, as joint tenants, tenants by the entirety, or otherwise, as if such undersigned spouse was a personal guarantor as well pursuant to this Unlimited Guaranty and Assumption of Obligations. The undersigned is aware that the legal, financial and related matters contained in this Unlimited Guaranty and Assumption of Obligations and the Agreement to which it relates are complex and that he/she is free to seek independent professional guidance or counsel with respect to this Joinder. If any Personal Guarantor delivers this Unlimited Guaranty and Assumption of Obligations to Franchisor without the signature of his or her spouse below, then he or she hereby represents to Franchisor that he or she has no spouse.

**SPOUSE**

_EXHIBIT ONLY, DO NOT SIGN_____
Personally and Individually

Print Name: _____
Print Name of Your Spouse: _____

HOME ADDRESS:

_____
_____

TELEPHONE NO.:_____

**SPOUSE**

_EXHIBIT ONLY, DO NOT SIGN_____
Personally and Individually

Print Name: _____
Print Name of Your Spouse: _____

HOME ADDRESS:

_____
_____

TELEPHONE NO.: _____

**EXHIBIT 5 TO THE FRANCHISE AGREEMENT**

**FRANCHISE CERTIFICATE**

**[see attached form of]**

*Note: If the franchise entity is held through multiple levels of ownership, such as through one or more holding companies, the certificate will be modified to obtain information about such other applicable ownership entities.*

**[FRANCHISEE ENTITY]**

Franchise Certificate

_____, 20__

       This Franchise Certificate (the "*Certificate*") is delivered in connection with that certain EWC Franchise, LLC Franchise Agreement (the "*Franchise Agreement*"), by and between EWC Franchise, LLC ("*Franchisor*") and _____ ("*Franchisee*"). Capitalized terms not defined in this Certificate shall have the meaning given to those terms in the Franchise Agreement.

       By signing below, each of the undersigned do hereby certify to Franchisor that:

       1.    Attached hereto as <u>Exhibit A</u> is a true and correct copy of the [Articles of Organization/Articles of Incorporation/Other Applicable Corporate Charter] of the Franchisee (the "*Charter*") and such Charter is in full force and effect as of the date hereof and has not been amended other than as appearing on <u>Exhibit A</u>.

       2.    Attached hereto as <u>Exhibit B</u> is a true and correct copy of the [Operating Agreement/Partnership Agreement/Shareholders Agreement/Bylaws/Other Applicable Governing Documents] of the Franchisee (the "*Franchisee Governing Agreement(s)*"), and such Franchisee Governing Agreement(s) is/are in full force and effect as of the date hereof and has not been amended other than as appearing on <u>Exhibit B</u>.

       3.    Attached hereto as <u>Exhibit C</u> is a true and correct copy of a certificate of good standing of Franchisee as issued by the office of the Secretary of State or other applicable governmental entity of the state in which Franchisee was formed, confirming Franchisee's good standing as of the date of the Franchise Agreement.

       4.    The following-named person is Franchisee's Franchisee Designated Representative:

**Franchisee Designated Representative:**

Name:_____

Home Address:_____

_____

_____

Telephone No.:_____

E-mail address: _____

Percentage of ownership in Franchisee: _____%

       5.    The following-named persons are collectively all of the equity holders of Franchisee:

**Holders of Legal or Beneficial Interest:**

Name:_____      Name: _____

Home Address:_____      Home Address: _____

_____      _____

Telephone No.:_____      Telephone No.: _____

E-mail address: _____      E-mail address: _____

Percentage of ownership: _____%      Percentage of ownership _____%

Name:_____      Name: _____

Home Address:_____      Home Address: _____

_____      _____

Telephone No.:_____      Telephone No.: _____

E-mail address: _____      E-mail address: _____

Percentage of ownership: _____%      Percentage of ownership _____%

6. The following-named persons are collectively all of the authorized managers, directors, officers and other representatives of Franchisee, holding the position or positions set forth opposite his or her name:

**Officers, Directors and/or Managers:**

Name:_____    Name: _____
Position/Title:_____    Position/Title: _____
Home Address:_____    Home Address: _____

_____    _____
Telephone No.:_____    Telephone No.: _____
E-mail address: _____    E-mail address: _____


Name:_____    Name: _____
Position/Title:_____    Position/Title: _____
Home Address:_____    Home Address: _____

_____    _____
Telephone No.:_____    Telephone No.: _____
E-mail address: _____    E-mail address: _____


IN WITNESS WHEREOF, each of the undersigned, by signing below, certifies the accuracy of the information set forth in this Certificate as of the date of the Franchise Agreement.

By: _*EXHIBIT ONLY, DO NOT SIGN*_____
Print Name: _____

By: _*EXHIBIT ONLY, DO NOT SIGN*_____
Print Name: _____

By: _*EXHIBIT ONLY, DO NOT SIGN*_____
Print Name: _____

By: _*EXHIBIT ONLY, DO NOT SIGN*_____
Print Name: _____

Exhibit A to Franchise Certificate

Charter

Exhibit B to Franchise Certificate

Franchisee Governing Agreement(s)

Exhibit C to Franchise Certificate

Good Standing

## EXHIBIT 6 TO THE FRANCHISE AGREEMENT

## MULTI-STATE ADDENDA

### FOR THE STATE OF CALIFORNIA

1.    New Section 17.5 is inserted into the Franchise Agreement and states as follows:

> If termination is the result of Franchisee's default, Franchisee will pay to Franchisor a lump sum payment (as liquidated damages for causing the premature termination of the Term and not as a penalty) equal to the total of all Royalty Fee payments for: (a) the twenty-four (24) calendar months of operation of Franchisee preceding Franchisee's default; (b) the period of time Franchisee has been in operation preceding the notice, if less than twenty-four (24) calendar months, projected on a twenty-four (24) calendar month basis; or (c) any shorter period as equals the unexpired term at the time of termination. The parties acknowledge that a precise calculation of the full extent of the damages that Franchisor will incur on termination of the Term as a result of Franchisee's default is difficult and the parties desire certainty in this matter and acknowledge that the lump sum payment provided under this Section is reasonable in light of the damages for premature termination that Franchisor will incur. This payment is not exclusive of any other remedies that Franchisor may have, including attorneys' fees and costs.

2.    In recognition of the requirements of the California Franchise Investment Law, Cal. Corp. Code §§31000-3516 and the California Franchise Relations Act, Cal. Bus. And Prof. Code §§20000-20043, the Franchise Agreement for EWC Franchise, LLC is amended as follows:

> The California Franchise Relations Act provides rights to Franchisee concerning termination or non-renewal of the Franchise Agreement that may supersede provisions in the Franchise Agreement, specifically Sections 4.2 and 16.2.

> Section 16.2.1.12, which terminates the Franchise Agreement upon the bankruptcy of the Franchisee, may not be enforceable under federal bankruptcy law (11 U.S.C. Section 101, *et seq.*).

> Section 7.3 contains a covenant not to compete that extends beyond the expiration or termination of the Agreement; this covenant may not be enforceable under California Law.

> The Franchise Agreement requires litigation to be conducted in a court located outside of the State of California. This provision might not be enforceable for any cause of action arising under California law.

> The Franchise Agreement requires application of the laws of a state other than California. This provision might not be enforceable under California law.

> Section 23.7 requires binding arbitration. The arbitration will occur at the forum indicated in Section 23.7 with the costs being borne by the non-prevailing party. Prospective franchisees are encouraged to consult legal counsel to determine the applicability of California and federal laws (such as Business and Professions Code Section 20040.5, Code of Civil Procedure Section 1281, and the Federal Arbitration Act) to any provisions of the Franchise Agreement restricting venue to a forum outside of the State of California.

> Paragraph 1 of this Addendum contains a liquidated damages clause. Under California Civil Code Section 1671, certain liquidated damages clauses are unenforceable.

### FOR THE STATE OF CONNECTICUT

1.    Section 3.1, "Franchise Fee," is amended to delete the following:

> The Franchise Fee shall be deemed fully earned upon execution of this Agreement and is nonrefundable, except under certain conditions set forth under Sections 5.2, 5.5 and 8.3.

2.    Section 8, "Training and Assistance," is amended by the addition of the following language to the original language that appears therein:

> The required training shall commence no more than sixty (60) days after execution of this Agreement"

3. Section 8, "Training and Assistance" is amended by the deletion of the following language to the original language that appears therein:

Franchisor shall return to Franchisee fifty percent (50%) of the Franchise Fee paid by Franchisee upon Franchisor's receipt of a general release, the same as or similar to the General Release attached as Exhibit 1, releasing any and all claims against Franchisor, any Affiliate and their officers, directors, shareholders, managers, members, partners, owners, employees and agents (in their corporate and individual capacities).

4. Section 9, "Confidential Operations Manual," is amended by the addition of the following language to the original language that appears therein:

"Franchisor will provide or make available an electronic version of the Confidential Operations Manual to the Franchisee no later than thirty (30) days after execution of this Agreement"

## FOR THE STATE OF HAWAII

In recognition of the requirements of the Hawaii Franchise Investment Law, Hawaii Revised Statutes, Title 26, Chapter 482E *et seq.*, the Franchise Agreement for EWC Franchise, LLC is amended as follows:

The Hawaii Franchise Investment Law provides rights to Franchisee concerning non-renewal, termination and transfer of the Franchise Agreement. If the Agreement, and more specifically Sections 4.2, 16.2 and 18, contains a provision that is inconsistent with the Hawaii Franchise Investment Law, the Hawaii Franchise Investment Law shall control.

Sections 4.2.9, 18.2.3, 18.2.6 and 18.3.1.3 require Franchisee to sign a general release as a condition of renewal or transfer of the franchise and Sections 5.2, 5.5 and 8.3 require Franchisee to sign a general release as a condition to receiving a refund of a portion of the Franchise Fee following a termination of the franchise; such release shall exclude claims arising under the Hawaii Franchise Investment Law.

Section 16.2.1.12, which terminates the Franchise Agreement upon the bankruptcy of the Franchisee, may not be enforceable under federal bankruptcy law (11 U.S.C. Section 101, *et seq.*).

## FOR THE STATE OF IDAHO

In recognition of the requirements of the Idaho Code, Title 29, Chapter 1, Section 29-110 (Limitations on Right to Sue – Franchise Agreement), the Franchise Agreement for EWC Franchise, LLC is amended as follows:

Section 23.2 is amended to add:

Notwithstanding any provision in this Agreement to the contrary, in the event Franchisee is a business entity organized under the laws of the state of Idaho or is an individual resident of Idaho, jurisdiction and venue for court litigations shall be in Idaho, and any provision in this Agreement that designates jurisdiction or venue in a forum outside the State of Idaho is void.

Section 23.4 is amended to add:

Notwithstanding any provision in this Agreement to the contrary, in the event Franchisee is a business entity organized under the laws of the state of Idaho or is an individual resident of Idaho, any provision in this Agreement which limits the time frame in which either party may enforce its rights is void.

Section 23.7 is amended to add:

Notwithstanding any provision in this Agreement to the contrary, in the event Franchisee is a business entity organized under the laws of the state of Idaho or is an individual resident of Idaho, any provision in this Agreement which restricts either party from enforcing its rights under this Agreement by the usual proceedings in ordinary tribunals is void.

**FOR THE STATE OF ILLINOIS**

In recognition of the requirements of the Illinois Franchise Disclosure Act, 815 ILCS 705, the Franchise Agreement for EWC Franchise, LLC is amended as follows:

Sections 4.2.9, 5.2, 5.5, 8.3, 18.2.3, 18.2.6 and 18.3.1.3 are amended to add:

No general release shall be required as a condition of renewal or transfer or as a condition to receiving a refund of a portion of the Franchise Fee following a termination of the Franchise that is intended to require Franchisee to waive compliance with the Illinois Franchise Disclosure Act, 815 ILCS 705.

Sections 16, 17 and 23 are amended to add:

The conditions under which the Franchise Agreement can be terminated and Franchisee's rights upon termination or non-renewal, as well as the application by which Franchisee must bring any claims, may be governed by the Illinois Franchise Disclosure Act, 815 ILCS 705/19 and 705/20.

Sections 23.1 and 23.2 are amended to add:

The Franchise Agreement shall be governed by Illinois Law. Jurisdiction and venue for court litigations shall be in Illinois. Any provision in the Franchise Agreement that designates jurisdiction or venue in a forum outside the State is void, provided that a Franchise Agreement may provide for arbitration in a forum outside of Illinois.

Section 23.4 is amended to add:

No action for liability under the Illinois Franchise Disclosure Act shall be maintained unless brought before the expiration of three (3) years after the act or transaction constituting the violation upon which it is based, the expiration of one (1) year after Franchisee becomes aware of facts or circumstances reasonably indicating that he may have a claim for relief in respect to conduct governed by the Act, or ninety (90) days after delivery to Franchisee of a written notice disclosing the violation, whichever shall first expire.

Section 23.6 is deleted in its entirety.

2. Any condition, stipulation, or provision purporting to bind any person acquiring any Franchise to waive compliance with any provision of this Act or any other law of this State is void. This Section shall not prevent any person from entering into a settlement agreement or executing a general release regarding a potential or actual lawsuit filed under any of the provisions of this Act, nor shall it prevent the arbitration of any claim pursuant to the provisions of Title 9 of the United States Code.

**FOR THE STATE OF INDIANA**

In recognition of the requirements of the Indiana Deceptive Franchise Practices Law, IC 23-2.2.7 and the Indiana Franchise Disclosure Law, IC 23-2-2-2.5, the Franchise Agreement for EWC Franchise, LLC is amended as follows:

Sections 4.2.9, 5.2, 5.5, 8.3, 18.2.3, 18.2.6 and 18.3.1.3 do not provide for a prospective general release of claims against Franchisor that may be subject to the Indiana Deceptive Franchise Practices Law or the Indiana Franchise Disclosure Law.

Section 16 is amended to prohibit unlawful unilateral termination of a franchise unless there is a material violation of the Franchise Agreement and termination is not in bad faith.

Section 7.3 is amended subject to Indiana Code 23-2-2.7-1(9) to provide that post-term non-competitor covenants shall have a geographical limitation of the territory granted to Franchisee.

Section 21.3 is amended to provide that Franchisee shall not be required to indemnify Franchisor for any liability imposed upon Franchisor as a result of Franchisee's reliance upon or use of procedures or products that were required by Franchisor, if such procedures or products were utilized by Franchisee in the manner required by Franchisor.

Section 23.1 is amended to provide that in the event of a conflict of law, the Indiana Franchise Disclosure Law, IC 23-2-2.5, and the Indiana Deceptive Franchise Practices Law will prevail.

Section 23.2 is amended to provide that Franchisee may commence litigation in Indiana for any cause of action under Indiana law.

Section 23.7 is amended to provide that arbitration between Franchisor and Franchisee shall be conducted in Indiana or a site mutually agreed upon.

## FOR THE STATE OF MARYLAND

In recognition of the requirements of the Maryland Franchise Registration and Disclosure Law, Md. Code Ann., Bus. Reg. §§14-201-14-233, the Franchise Agreement for EWC Franchise, LLC is amended as follows:

Sections 4.2.9, 18.2.3, 18.2.6 and 18.3.1.3 require Franchisee to sign a general release as a condition of renewal or transfer of the franchise and Sections 5.2, 5.5, 8.3 require Franchisee to sign a general release as a condition of receiving a refund of a portion of the Franchise fee following termination of the franchise; such release shall exclude claims arising under the Maryland Franchise Registration and Disclosure Law.

Section 16.2.1.12, which terminates the Franchise Agreement upon the bankruptcy of the Franchisee, may not be enforceable under federal bankruptcy law (11 U.S.C. Section 101, *et seq.*).

Section 23.1 requires that the franchise be governed by the laws of the State of Florida; however, in the event of a conflict of laws to the extent required by the Maryland Franchise Registration and Disclosure Law, the laws of the State of Maryland shall prevail.

Sections 23.2 and 23.7 require litigation or arbitration to be conducted in the State of Florida; the requirement shall not limit any rights Franchisee may have under the Maryland Franchise Registration and Disclosure Law to bring suit in the State of Maryland.

Any Section of the Franchise Agreement or any questionnaire requiring Franchisee to assent to any release, estoppel or waiver of liability as a condition of purchasing the Franchise are not intended to, nor shall they act as a, release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

Section 23.4 is amended to the extent that any claims arising under the Maryland Franchise Registration and Disclosure Law may be brought within three (3) years after the grant of the franchise.

2.      Any portion of the Franchise Agreement which requires prospective franchisees to disclaim the occurrence and/or acknowledge the non-occurrence of acts would constitute a violation of the Maryland Franchise Registration and Disclosure Law. Any such representations are not intended to nor shall they act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

## FOR THE STATE OF MINNESOTA

In recognition of the Minnesota Franchise Law, Minn. Stat., Chapter 80C, Sections 80C.01 through 80C.22, and the Rules and Regulations promulgated pursuant thereto by the Minnesota Commission of Securities, Minnesota Rule 2860.4400, et. seq., the parties to the attached Franchise Agreement agree as follows:

Sections 4 and 16 are amended to add that with respect to franchises governed by Minnesota Law, Franchisor shall comply with Minnesota Statutes, Section 80C.14, Subd. 3-5, which requires, (except in certain specified cases) (1) that Franchisee be given 90 days' notice of termination (with 60 days to cure) and 180 days' notice of non-renewal of the Agreement; and (2) that consent to the transfer of the franchise will not be unreasonably withheld.

Sections 4.2.9, 5.2, 5.5, 8.3, 18.2.3, 18.2.6 and 18.3.1.3 do not provide for a prospective general release of any claims against Franchisor which may be subject to the Minnesota Franchise Law. Minn. Rule 2860.4400D prohibits a franchisor from requiring a franchisee to assent to a general release.

Section 6 is amended to add that as required by Minnesota Franchise Act, Franchisor shall reimburse Franchisee for any costs incurred by Franchisee in the defense of Franchisee's right to use the Marks, so long as Franchisee was using the Marks in the manner authorized by Franchisor, and so long as Franchisor is timely notified of the claim and is given the right to manage the defense of the claim including the right to compromise, settle or otherwise resolve the claim, and to determine whether to appeal a final determination of the claim. Franchisor will reasonably protect Franchisee's rights to use the Marks.

Section 22.2 is amended to provided that Franchisor is entitled only to <u>seek</u> an injunction or other equitable relief. Section 22.2 is further amended to add that a court will determine if a bond is required.

Section 23.4 of the Franchise Agreement shall be amended to provide that no action may be commenced pursuant to the Franchise Agreement more than three (3) years after the cause of action accrues in accordance with Minnesota Statutes, Section 80C.17, Subd. 5.

Minnesota Statutes, Section 80C.21 and Minnesota Rules 2860.4400(J) prohibit Franchisor from requiring litigation to be conducted outside Minnesota, requiring waiver of a jury trial, or requiring Franchisee to consent to liquidated damages, termination penalties or judgment notes. In addition, nothing in the Disclosure Document or Franchise Agreement can abrogate or reduce (1) any of Franchisee's rights as provided for in Minnesota Statutes, Chapter 80C or (2) Franchisee's rights to any procedure, forum, or remedies provided for by the laws of the jurisdiction.

## FOR MINNESOTA FRANCHISEES ONLY (PLEASE SEE SECTION 22.14 OF THE FRANCHISE AGREEMENT):

## ACKNOWLEDGED AND AGREED:

FRANCHISOR:

EWC FRANCHISE, LLC

By: _____
Name: _____
Title: _____

FRANCHISEE:

_____
(type/print name)
By: _____
Name: _____
Title: _____

[or, if an individual]

Signed: _____
Name Printed: _____

**FOR THE STATE OF NEW YORK**

In recognition of the requirements of the General Business Laws of the State of New York, Article 33, §§ 680 through 695, the Franchise Agreement for EWC Franchise, LLC is amended as follows:

Sections 4.2.9, 5.2, 5.5, 8.3, 18.2.3, 18.2.6 and 18.3.1.3 require Franchisee to sign a general release as a condition of renewal, transfer or receiving a refund of a portion of the Franchise Fee following termination of the franchise; such release shall exclude claims arising under the General Business Laws.

Under Section 18.1, Franchisor shall not transfer and assign its rights and obligations under the Franchise Agreement unless the transferee is able to perform the Franchisor's obligations under the Franchise Agreement, in Franchisor's good faith judgment, so long as it remains subject to the General Business Laws of the State of New York.

Section 21.3 is amended to provide that Franchisee shall not be required to indemnify Franchisor for any liability imposed upon Franchisor as a result of Franchisee's reliance upon or use of procedures or products that were required by Franchisor, if such procedures or products were utilized by Franchisee in the manner required by Franchisor.

Section 23.1 requires that the franchise be governed by the laws of the state the Franchisor's principal business is then located, such a requirement will not be considered a waiver of any right conferred upon the Franchisee by Article 33 of the General Business Laws.

**FOR THE STATE OF NORTH DAKOTA**

The North Dakota Securities Commission requires that certain provisions contained in the Agreement be amended to be consistent with North Dakota Law, including the North Dakota Franchise Investment Law, North Dakota Century Code Addendum, Chapter 51-19, Sections 51-19-01 *et seq.* Such provisions in the Agreement are hereby amended as follows:

Under Sections 4.2.9, 5.2, 5.5, 8.3, 18.2.3, 18.2.6 and 18.3.1.3, the execution of a general release upon renewal, termination or transfer shall be inapplicable to franchises operating under the North Dakota Franchise Investment Law to the extent that such a release excludes claims arising under the North Dakota Franchise Investment Law.

Section 7 is amended to add that the prevailing party in any enforcement action is entitled to recover all costs and expenses including attorneys' fees.

Sections 17.1.5 and 17.1.6 are amended to state:

If Franchisor or Franchisee is required to enforce this Agreement through judicial proceedings, the prevailing party shall be entitled to reimbursement of its costs, including reasonable accounting and legal fees in connection with such proceeding.

Section 7.3 is amended to add that covenants not to compete upon termination or expiration of the Franchise Agreement are generally unenforceable in the State of North Dakota except in limited instances as provided by law.

Section 23.1 is amended to state that in the event of a conflict of laws, North Dakota Law shall prevail.

Section 23.2 is amended to add that any action may be brought in the appropriate state or federal court in North Dakota.

Section 23.4 is amended to state that the statute of limitations under North Dakota Law shall apply.

Sections 23.5 and 23.6 are deleted in their entireties.

Section 23.7 is amended to state that arbitration involving a franchise purchased in North Dakota must be held either in a location mutually agreed upon prior to the arbitration, or if the parties cannot agree on a location, the arbitrator shall determine the location; and is amended to state that the statute of limitations under North Dakota Law shall apply.

**FOR THE STATE OF OHIO**

The Ohio Business Opportunity Plan Law requires that certain provisions contained in the Agreement be amended to be consistent with Ohio Law. Such provisions in the Agreement are hereby amended as follows:

Section 23.1 is amended to state that in the event of a conflict of laws, Ohio law shall prevail.

Section 23.2 is amended to add that any action may be brought in the appropriate state or federal court in Ohio.

Section 23.4 is amended to state that the statute of limitations under Ohio Law shall apply.

## FOR THE STATE OF RHODE ISLAND

In recognition of the requirements of The Rhode Island Franchise Investment Act §19-28.1-14, the Franchise Agreement for EWC Franchise, LLC is amended as follows:

Sections 4.2.9, 5.2, 5.5, 8.3, 18.2.3, 18.2.6 and 18.3.1.3 require Franchisee to sign a general release as a condition of renewal, transfer, or receipt of a refund of a portion of the Franchise Fee following termination of the franchise; such release shall exclude claims arising under The Rhode Island Franchise Investment Act.

Sections 23.1, 23.2 and 23.7 are amended to state that restricting jurisdiction or venue to a forum outside the state of Rhode Island or requiring the application of the laws of another state is void with respect to a claim otherwise enforceable under The Rhode Island Franchise Investment Act.

## FOR THE COMMONWEALTH OF VIRGINIA

Section 16.2.1.12 of the Franchise Agreement which terminates the Franchise Agreement upon the bankruptcy of the Franchisee may not be enforceable under federal bankruptcy law (11 U.S.C. Section 101, *et seq.*).

Section 16.2.1.19 of the Franchise Agreement will not be applicable to the Franchise Agreement signed by the Virginia franchisee entering into the attached agreement.

Pursuant to Section 13.1-564 of the Virginia Retail Franchising Act, it is unlawful for a franchisor to cancel a franchise without reasonable cause. If any grounds for default or termination stated in the Franchise Agreement does not constitute "reasonable cause," as that term may be defined in the Virginia Retail Franchising Act or the laws of Virginia, that provision may not be enforceable.

Pursuant to Section 13.1-564 of the Virginia Retail Franchising Act, it is unlawful for a franchisor to use undue influence to induce a franchisee to surrender any right given to him under the franchise. If any provision of the Franchise Agreement involves the use of undue influence by the franchisor to induce a franchisee to surrender any rights given to him under the franchise, that provision may not be enforceable.

## FOR THE STATE OF WASHINGTON

In recognition of the requirements of the Washington Franchise Investment Protection Act, Washington Rev. Code §§19.100.010 – 19.100.940, the Franchise Agreement for EWC Franchise, LLC is amended as follows:

The Washington Franchise Investment Protection Act provides rights to Franchisee concerning non-renewal and termination of the Franchise Agreement. If the Agreement contains a provision that is inconsistent with the Act, the Act shall control.

Sections 4.2.9, 5.2, 5.5, 8.3, 18.2.3, 18.2.6 and 18.3.1.3 require Franchisee to sign a general release as a condition of renewal transfer or receipt of a refund of a portion of the Franchise Fee following termination of the franchise; such release shall exclude claims arising under the Washington Franchise Investment Protection Act.

Section 23.1 requires that the Franchise Agreement be governed by the laws of the State of Florida; such a requirement may be unenforceable in the event of a conflict with the Washington Franchise

Investment Protection Act. In the event of a conflict of laws, the provisions of the Washington Franchise Investment Protection Act, Chapter 19.100 RCW shall prevail.

In any arbitration involving a franchise purchased in Washington, the arbitration site shall be either in the state of Washington, or in a place mutually agreed upon at the time of the arbitration or as determined by the arbitrator.

Provisions such as those that unreasonably restrict or limit the statute of limitations period for claims under the Act, or which unreasonably restrict other rights or remedies available to a franchisee under the Act, such as a waiver of the right to a jury trial may not be enforceable.

Transfer fees are collectable to the extent that they reflect the Franchisor's reasonable estimated or actual costs in effecting a transfer.

The state of Washington has a statute, RCW 19.100.180 which may supersede the Franchise Agreement in your relationship with Franchisor including the areas of termination and renewal of your franchise. There may also be court decisions which may supersede the Franchise Agreement in your relationship with Franchisor including the areas of termination and renewal of your franchise.

A release or waiver of rights executed by a franchisee shall not include rights under the Washington Franchise Investment Protection Act except when executed pursuant to a negotiated settlement after the agreement is in effect and where the parties are represented by independent counsel.

## FOR THE STATE OF WISCONSIN

The Wisconsin Fair Dealership Law Title XIV-A Ch. 135, Sec. 135.01-135.07 shall supersede any conflicting terms of the Franchise Agreement.

## EXHIBIT 7 TO THE FRANCHISE AGREEMENT

## LETTER AGREEMENT REGARDING

## APPROVED LOCATION AND PROTECTED TERRITORY

_____, 20__

[INSERT FRANCHISEE NAME AND ADDRESS]

> Re: _EWC Franchise, LLC Franchise Agreement (the "Franchise Agreement")_ [1]_, dated _____, 20__
> Lease Approval; Approved Location and Protected Territory_

Dear _____:

This truly is an exciting time. Now that you have received lease approval for your location in _____, we would like to document for purposes of the Franchise Agreement: (1) the street address of the Approved Location for your Franchised Center and (2) the agreed upon Protected Territory for your franchise. By signing below, you acknowledge and agree that the description of the Approved Location and the Protected Territory set forth in this letter agreement shall satisfy each of our obligations set forth in Section 2 of the Franchise Agreement to insert and describe such terms in the Franchise Agreement and shall be binding on both you, as the Franchisee, and us, as the Franchisor, as if fully set forth therein.

**Approved Location**:

For purposes of the Franchise Agreement, the street address for the Approved Location shall be:
_____.

**Protected Territory**:

For purposes of the Franchise Agreement, Franchisee's Protected Territory based on the above Approved Location is described by the map set forth as **Schedule 1** to this letter agreement.

Please confirm the foregoing by signing this letter in the space provided below and returning the signed letter to Franchisor. Except as supplemented by this letter agreement, all of the terms and provisions of our Franchise Agreement shall remain in full force and effect. This letter agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Confirmation of execution by electronic transmission of a facsimile or .pdf signature page shall be binding. _**Please understand that the effectiveness of this letter is conditioned on the full execution of the lease documents for the Approved Location.**_

Sincerely,

EWC Franchise, LLC

By:_____
Name: _____
Title: _____

AGREED AND ACKNOWLEDGED:

[FRANCHISEE]

By: _EXHIBIT ONLY, DO NOT SIGN_
Name: _____
Title:_____
Date: _____

---

[1] Capitalized terms used in this letter agreement but not otherwise defined shall have the meaning set forth in the Franchise Agreement.

**Schedule 1 to Letter Agreement**

Protected Territory

## NONDISCLOSURE AND NON-COMPETITION AGREEMENT

This Nondisclosure and Non-Competition Agreement (this "**Agreement**") is entered into and effective as of the 13th day of May, 2015, by and between EWC Michigan Management Inc ("**Franchisee**") (d/b/a a European Wax Center), and Farzana A. Khan ("**Individual**").

### RECITALS:

A. Franchisee is a party to that certain Franchise Agreement dated as of the same date hereof ("**Franchise Agreement**") by and between Franchisee and EWC Franchise, LLC, a successor-in-interest by merger to EWC Franchise Group, Inc. ("**Franchisor**").

B. Franchisee desires Individual to have access to and review certain Trade Secrets and other Confidential Information, which are defined and more particularly described below.

C. Franchisee is required by the Franchise Agreement to have Individual execute this Agreement prior to providing Individual access to said confidential materials.

D. Individual understands the necessity of not disclosing any such information to any other party or using such information to compete against Franchisor, Franchisee or any other franchisee of Franchisor in any business that directly or indirectly, (i) offers (or grants franchises or licenses to others to operate a business that offers) hair removal products or services the same as or substantially similar to those provided by European Wax Centers, or (ii) in which the Trade Secrets and other Confidential Information could be used to the disadvantage of Franchisor, any Affiliate of Franchisor or its franchisees or area representatives (a "**Competitive Business**"); provided, however, that the term "Competitive Business" shall not apply to (a) any business operated by a Person or its Affiliates under an agreement with Franchisor in connection with the System, or (b) any business operated by a publicly-held entity in which an applicable Person and its Affiliates collectively own less than a five percent (5%) legal or beneficial interest.

NOW, THEREFORE, in consideration of the mutual promises and undertakings set forth herein, and intending to be legally bound hereby, Franchisee and Individual hereby mutually agree as follows:

1. <u>Trade Secrets and Confidential Information.</u>

(a) Individual understands that Franchisor and Franchisee each possess and will possess Trade Secrets and other Confidential Information that are important to the operation of a European Wax Center.

(b) For the purposes of this Agreement,

"**Confidential Information**" means technical and non-technical information used in or related to the System that is not commonly known by or available to the public, including, without limitation, the Trade Secrets and information contained in the Confidential Operations Manual and training guides and materials. In addition, any other information identified as confidential when delivered or made available by Franchisor or Franchisee shall be deemed Confidential Information. For the avoidance of doubt, guest (customer) information shall be deemed Confidential Information;

"**Marks**" means the trademark "EUROPEAN WAX CENTER®," and such other trade names, trademarks, service marks, trade dress, designs, graphics, logos, emblems, insignia, fascia, slogans, drawings and other commercial symbols as Franchisor may designate to be used in connection with the European Wax Center franchise System;

"**Person**" means a human being, a legal or business entity devised or constructed by for the purpose of carrying out business activities under the name of such devised or constructed entity, which shall not be limited to sole proprietorships, corporations, partnerships, limited liability companies, or other entities; and in the case of entities, a Person shall include, any other entity with a majority or controlling interest in another entity, as well as the individual officers, directors, and other Persons controlling the activities of such entity;

"**System**" means the uniform standards, methods, procedures and specifications, revisions or modifications Franchisor advances for the operation of European Wax Centers; and

"**Trade Secret**" is information in any form (including, but not limited to, materials and techniques, technical or non-technical data, formulas, patterns, compilations, programs, devices, methods, techniques, drawings, processes, financial data, financial plans, product plans, passwords, lists of actual or potential customers or suppliers) related to or used in European Wax Centers or otherwise in the System, that is not commonly known by or available to the public and that information: (a) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other Persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

(c) Confidential Information shall not include, however, any information that: (i) is now or subsequently becomes generally available to the public through no fault of Individual or Franchisee or Franchisee's employees, agents, officers, directors, shareholders, managers, members or other representatives; (ii) Franchisee or Individual can demonstrate was rightfully in its possession, without obligation of nondisclosure, prior to disclosure pursuant to this Agreement; (iii) is independently developed without the use of any Confidential Information; or (iv) is rightfully obtained from a third party who has the right, without obligation of nondisclosure, to transfer or disclose such information.

(d) Any information expressly designated by Franchisor or Franchisee as "Trade Secrets" or "Confidential Information" shall be deemed such for all purposes of this Agreement, but the absence of designation shall not relieve Individual of his or her obligations under this Agreement in respect of information otherwise constituting Trade Secrets or Confidential Information. Individual understands Franchisor's and/or Franchisee's providing of access to the Trade Secrets and other Confidential Information creates a relationship of confidence and trust between Individual, Franchisor and Franchisee with respect to the Trade Secrets and other Confidential Information.

2. Confidentiality/Non-Disclosure.

(a) Individual shall not communicate or divulge to (or use for the benefit of) any other Person, with the sole exception of Franchisee or other employees agents or representatives of Franchisee who are bound by duties of non-disclosure, now or at any time in the future, any Trade Secrets or other Confidential Information. At all times from the date of this Agreement, Individual must take all steps reasonably necessary and/or requested by Franchisee or Franchisor to ensure that the Confidential Information and the Trade Secrets are kept confidential pursuant to the terms of this Agreement. Individual must comply with all applicable policies, procedures and practices that Franchisor and/or Franchisee have established and may establish from time to time with regard to the Confidential Information and the Trade Secrets.

(b) Individual may not in any manner or at any time, either directly or indirectly use any part of the Confidential Information or the Trade Secrets except in connection with the operation of the European Wax Center business, and in no case in any manner detrimental to Franchisee, Franchisor or their respective affiliates.

(c) Individual's obligations under Section 2(a) of this Agreement shall continue in effect after termination of Individual's relationship with Franchisee, regardless of the reason or reasons for termination, and whether such termination is voluntary or involuntary, and Franchisee and Franchisor are each entitled to communicate Individual's obligations under this Agreement to any future customer or employer to the extent deemed necessary by Franchisor and/or Franchisee for protection of its rights under this Agreement and regardless of whether Individual or any of its affiliates or assigns becomes an investor, partner, joint venturer, broker, distributor or the like in the European Wax Center franchise System.

(d) Upon termination of Individual's relationship with Franchisee, regardless of the reason or reasons for termination, and whether such termination is voluntary or involuntary, or at any other time when requested by Franchisor, Franchisee and/or their respective affiliates, Individual shall immediately deliver to Franchisee (or Franchisor and/or its affiliates, as appropriate and as directed), all Confidential Information and other property in Individual's possession, or under Individual's care and control, belonging to Franchisee and/or Franchisor and/or their respective affiliates. The provisions of this Section 2(d) shall survive any such termination of Individual's relationship with Franchisee.

3. Non-Competition.

(a) Individual acknowledges that Franchisee and Franchisor would be unable to protect the Trade Secrets and other Confidential Information against unauthorized use or disclosure and would be unable to encourage a free exchange of ideas and information among European Wax Center franchisees and area

representatives if Individual and members of Individual's immediate family and household were permitted to hold an interest in or perform services for any Competitive Business. Therefore, during the term of the Franchise Agreement, neither Individual nor any member of Individual's immediate family and household), may, either directly or indirectly, for themselves, or through, on behalf of or in conjunction with any Person:

(i)     divert or attempt to divert any business or customer of a European Wax Center to any Competitive Business, by direct or indirect inducement or otherwise;

(ii)    do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks or the System;

(iii)   carry on, be engaged in or take part in, render services to, or own or share in the earnings of any Competitive Business anywhere in the United States; or

(iv)    solicit or otherwise attempt to induce or influence any employee or other business associate of Franchisor or any other European Wax Center, or any franchisee or area representative of the System, to compete against, or terminate or modify his, her or its employment or business relationship with, Franchisor, any such franchisee or area representative or any other European Wax Center.

In addition to the in-term non-competition restrictive covenants set forth above in this Section 3(a), for a period of two (2) years after the expiration or termination of the Franchise Agreement, regardless of the cause of expiration or termination, neither Individual nor any member of Individual's immediate family and household), may, either directly or indirectly, for themselves, or through, on behalf of or in conjunction with any Person:

(i)     divert or attempt to divert any business or customer of a European Wax Center to any Competitive Business, by direct or indirect inducement or otherwise;

(ii)    do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks or the System;

(iii)   carry on, be engaged in or take part in, render services to, or own or share in the earnings of any Competitive Business within fifty (50) miles of any other European Wax Center operating under the System and the Marks at the time of such expiration or termination; or

(iv)    solicit or otherwise attempt to induce or influence any employee or other business associate of Franchisor or any other European Wax Center, or any franchisee or area representative of the System, to compete against, or terminate or modify his, her or its employment or business relationship with, Franchisor, any such franchisee or area representative or any other European Wax Center.

Any assignment or other transfer of the Franchise Agreement, or of Individual's complete interest in, or affiliation with, Franchisee (in each and every capacity, including as owner, employee, consultant or otherwise), shall be deemed, for purposes of Individual's obligations under this Section only, as the expiration or termination of the Franchise Agreement.

(b)     If Individual operates any other business, Individual shall not use or display any of the Marks, or any confusingly similar trademark, in any manner whatsoever in connection with such other business and/or the promotion thereof. Individual shall not utilize in such other business any designation of origin, description or representation that falsely suggests or represents an association or connection with Franchisor. This Section 3(b) is not intended as an approval of Individual's right to operate other businesses and in no way is it intended to contradict those Sections of this Agreement or the Franchise Agreement that prohibit such practice.

4.      Reasonableness of Restrictions.

Individual acknowledges that each of the terms set forth in this Agreement, including the restrictive covenants, is fair and reasonable and is reasonably required for the protection of Franchisee, Franchisor, and the Trade Secrets and other Confidential Information, the System and the Marks, and Individual waives any right to challenge these restrictions as being overly broad, unreasonable or otherwise unenforceable. If, however, a court of competent jurisdiction determines that any such restriction is unreasonable or unenforceable, then Individual shall submit to the reduction of any such activity, time period or geographic restriction necessary to enable the court to enforce such restrictions to the fullest extent permitted under applicable law. Franchisee may, upon the direction from Franchisor at any time, reduce the scope, restricted activities and/or duration of any of the

restrictive covenants effective immediately upon notice to Individual. It is the desire and intent of both Franchisee and Individual that the provisions of this Agreement shall be enforced to the fullest extent permissible under the laws and public policies applied in any jurisdiction where enforcement is sought.

5.      Non-Disparagement.

Individual agrees and covenants that Individual will not, at any time, either directly or indirectly, and shall cause Individual's affiliates and members of its family not to, make, publish or communicate to any person or entity or in any public forum (including through social media) any defamatory or disparaging remarks, comments or statements concerning Franchisor, its Affiliates, any franchisees or area representatives and/or any of their respective employees, agents and representatives, or the System or its Marks, other than as part of the judicial, arbitration or other dispute resolution process in connection with any litigation, mediation, arbitration or administrative or other judicial proceeding arising under any claim brought in connection with this Agreement or the Franchise Agreement, or other than when compelled to testify under oath by subpoena, regulation or court order.

6.      Relief for Breaches of Confidentiality, Non-Solicitation, Non-Disparagement and Non-Competition.

Individual further acknowledges that an actual or threatened violation of the covenants contained in this Agreement will cause Franchisee and Franchisor immediate and irreparable harm, damage and injury that cannot be fully compensated for by an award of damages or other remedies at law. Accordingly, Franchisee and Franchisor shall be entitled, as a matter of right, to seek an injunction from any court of competent jurisdiction restraining any further violation by Individual of this Agreement without any requirement to show any actual damage, irreparable harm or establish a balance of convenience or to post any bond or other security. Such right to seek an injunction shall be cumulative and in addition to, and not in limitation of, any other rights and remedies that Franchisee and Franchisor may have at law or in equity.

7.      Miscellaneous.

(a)      If any legal proceedings are brought for the enforcement of this Agreement, in addition to any other relief to which the successful or prevailing party may be entitled, the successful or prevailing party shall be entitled to recover all of its legal and professional fees, investigative fees, administrative fees billed by such party's attorneys and other professionals, court costs and all expenses, including, without limitation, all fees, taxes, costs and expenses incident to arbitration, appellate, and post-judgment proceedings incurred by the successful or prevailing party in that action or proceeding.

(b)      This Agreement shall be effective as of the date this Agreement is executed and shall be binding upon the successors and assigns of Individual and shall inure to the benefit of Franchisee, its subsidiaries, successors and assigns.

(c)      The failure of either party to insist in any one (1) or more instances upon performance of any terms and conditions of this Agreement shall not be construed a waiver of future performance of any such term, covenant or condition of this Agreement and the obligations of either party with respect thereto shall continue in full force and effect.

(d)      The headings in this Agreement are included solely for convenience and shall not affect, or be used in connection with, the interpretation of this Agreement.

(e)      In the event that any part of this Agreement shall be held to be unenforceable or invalid, the remaining parts of this Agreement shall nevertheless continue to be valid and enforceable as though the invalid portions were not a part of this Agreement.

(f)      The existence of any claim or cause of action Individual might have against Franchisee or Franchisor will not constitute a defense to the enforcement by Franchisee or Franchisor of this Agreement.

(g)      Except as otherwise expressly provided in this Agreement, no remedy conferred upon Franchisee or Franchisor pursuant to this Agreement is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to every other remedy given pursuant to this Agreement or now or hereafter existing at law or in equity or by statute or otherwise. No single or partial exercise by any party of any right, power or remedy pursuant to this Agreement shall preclude any other or further exercise thereof.

(h)     Individual and Franchisee each acknowledge that Individual's compliance with the terms of this Agreement is also critical to Franchisor. Accordingly, Individual and Franchisee each agree and acknowledge that even though Franchisor is not a party to this Agreement and does not have any obligations under this Agreement, Franchisor shall be a third party beneficiary of Individual's agreements and covenants under this Agreement and Franchisor shall be entitled to all rights and remedies conferred upon Franchisee and Franchisor under this Agreement. Accordingly, Individual and Franchisee each agree that Franchisor may enforce such rights and promises in its own right (without being required to obtain consent from Franchisee or add Franchisee as a party to any proceedings for such enforcement).

(i)     This Agreement may be executed in one (1) or more counterparts, each of which will be deemed an original, but all of which taken together will constitute one (1) and the same instrument. Confirmation of execution by electronic transmission of a facsimile or .pdf signature page will be binding upon any party so confirming.

(j)     This Agreement shall be governed by, and construed and enforced in accordance with, the internal laws of Florida, without regard to principles of conflicts of laws. Franchisee and Individual each hereby irrevocably consent and submit to the non-exclusive jurisdiction of the Courts of Broward County, Florida, and waives any objection based on venue or forum non conveniens with respect to any action instituted therein arising under this Agreement, in each case whether arising in contract, tort, equity or otherwise, and agrees that any dispute arising out of this Agreement shall be heard only in the courts described above.

(k)     Individual may not assign or delegate his or her duties or obligations under this Agreement.

(l)     This Agreement constitutes the entire agreement between Individual on the one hand, and Franchisee and/or Franchisor on the other, with respect to the subject matter of this Agreement. This Agreement supersedes any prior agreements, negotiations and discussions between Individual, Franchisee and/or Franchisor with respect to the subject matter of this Agreement. This Agreement cannot be altered or amended except by an agreement in writing signed by Individual, Franchisee and Franchisor.

**INDIVIDUAL CERTIFIES THAT HE OR SHE HAS READ THIS AGREEMENT CAREFULLY, AND UNDERSTANDS AND ACCEPTS THE OBLIGATIONS THAT IT IMPOSES WITHOUT RESERVATION. NO PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO INDIVIDUAL TO INDUCE THE SIGNING OF THIS AGREEMENT.**

[Signatures Appear on Following Page]

IN WITNESS WHEREOF, Franchisee has caused this Agreement to be executed by its duly authorized representative, and Individual has executed this Agreement, all being done as of the day and year first above written.

FRANCHISEE:

WITNESS:

EWC Michigan Management Inc

Print Name: _____

By: _____
Farzana A. Khan, President

WITNESS:

INDIVIDUAL:

Signature: _____

Print Name: _____

Printed Name: Farzana A. Khan

## NONDISCLOSURE AND NON-COMPETITION AGREEMENT

This Nondisclosure and Non-Competition Agreement (this "**Agreement**") is entered into and effective as of the 13th day of May, 2015, by and between EWC Michigan Management Inc ("**Franchisee**") (d/b/a a European Wax Center), and Mohammed Shehzad Khan ("**Individual**").

### RECITALS:

A.     Franchisee is a party to that certain Franchise Agreement dated as of the same date hereof ("**Franchise Agreement**") by and between Franchisee and EWC Franchise, LLC, a successor-in-interest by merger to EWC Franchise Group, Inc. ("**Franchisor**").

B.     Franchisee desires Individual to have access to and review certain Trade Secrets and other Confidential Information, which are defined and more particularly described below.

C.     Franchisee is required by the Franchise Agreement to have Individual execute this Agreement prior to providing Individual access to said confidential materials.

D.     Individual understands the necessity of not disclosing any such information to any other party or using such information to compete against Franchisor, Franchisee or any other franchisee of Franchisor in any business that directly or indirectly, (i) offers (or grants franchises or licenses to others to operate a business that offers) hair removal products or services the same as or substantially similar to those provided by European Wax Centers, or (ii) in which the Trade Secrets and other Confidential Information could be used to the disadvantage of Franchisor, any Affiliate of Franchisor or its franchisees or area representatives (a "**Competitive Business**"); provided, however, that the term "Competitive Business" shall not apply to (a) any business operated by a Person or its Affiliates under an agreement with Franchisor in connection with the System, or (b) any business operated by a publicly-held entity in which an applicable Person and its Affiliates collectively own less than a five percent (5%) legal or beneficial interest.

**NOW, THEREFORE**, in consideration of the mutual promises and undertakings set forth herein, and intending to be legally bound hereby, Franchisee and Individual hereby mutually agree as follows:

1.     <u>Trade Secrets and Confidential Information.</u>

(a)     Individual understands that Franchisor and Franchisee each possess and will possess Trade Secrets and other Confidential Information that are important to the operation of a European Wax Center.

(b)     For the purposes of this Agreement,

"**Confidential Information**" means technical and non-technical information used in or related to the System that is not commonly known by or available to the public, including, without limitation, the Trade Secrets and information contained in the Confidential Operations Manual and training guides and materials. In addition, any other information identified as confidential when delivered or made available by Franchisor or Franchisee shall be deemed Confidential Information. For the avoidance of doubt, guest (customer) information shall be deemed Confidential Information;

"**Marks**" means the trademark "EUROPEAN WAX CENTER®," and such other trade names, trademarks, service marks, trade dress, designs, graphics, logos, emblems, insignia, fascia, slogans, drawings and other commercial symbols as Franchisor may designate to be used in connection with the European Wax Center franchise System;

"**Person**" means a human being, a legal or business entity devised or constructed by for the purpose of carrying out business activities under the name of such devised or constructed entity, which shall not be limited to sole proprietorships, corporations, partnerships, limited liability companies, or other entities; and in the case of entities, a Person shall include, any other entity with a majority or controlling interest in another entity, as well as the individual officers, directors, and other Persons controlling the activities of such entity;

"**System**" means the uniform standards, methods, procedures and specifications, revisions or modifications Franchisor advances for the operation of European Wax Centers; and

"**Trade Secret**" is information in any form (including, but not limited to, materials and techniques, technical or non-technical data, formulas, patterns, compilations, programs, devices, methods, techniques, drawings, processes, financial data, financial plans, product plans, passwords, lists of actual or potential customers or suppliers) related to or used in European Wax Centers or otherwise in the System, that is not commonly known by or available to the public and that information: (a) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other Persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

(c) Confidential Information shall not include, however, any information that: (i) is now or subsequently becomes generally available to the public through no fault of Individual or Franchisee or Franchisee's employees, agents, officers, directors, shareholders, managers, members or other representatives; (ii) Franchisee or Individual can demonstrate was rightfully in its possession, without obligation of nondisclosure, prior to disclosure pursuant to this Agreement; (iii) is independently developed without the use of any Confidential Information; or (iv) is rightfully obtained from a third party who has the right, without obligation of nondisclosure, to transfer or disclose such information.

(d) Any information expressly designated by Franchisor or Franchisee as "Trade Secrets" or "Confidential Information" shall be deemed such for all purposes of this Agreement, but the absence of designation shall not relieve Individual of his or her obligations under this Agreement in respect of information otherwise constituting Trade Secrets or Confidential Information. Individual understands Franchisor's and/or Franchisee's providing of access to the Trade Secrets and other Confidential Information creates a relationship of confidence and trust between Individual, Franchisor and Franchisee with respect to the Trade Secrets and other Confidential Information.

2. <u>Confidentiality/Non-Disclosure</u>.

(a) Individual shall not communicate or divulge to (or use for the benefit of) any other Person, with the sole exception of Franchisee or other employees agents or representatives of Franchisee who are bound by duties of non-disclosure, now or at any time in the future, any Trade Secrets or other Confidential Information. At all times from the date of this Agreement, Individual must take all steps reasonably necessary and/or requested by Franchisee or Franchisor to ensure that the Confidential Information and the Trade Secrets are kept confidential pursuant to the terms of this Agreement. Individual must comply with all applicable policies, procedures and practices that Franchisor and/or Franchisee have established and may establish from time to time with regard to the Confidential Information and the Trade Secrets.

(b) Individual may not in any manner or at any time, either directly or indirectly use any part of the Confidential Information or the Trade Secrets except in connection with the operation of the European Wax Center business, and in no case in any manner detrimental to Franchisee, Franchisor or their respective affiliates.

(c) Individual's obligations under Section 2(a) of this Agreement shall continue in effect after termination of Individual's relationship with Franchisee, regardless of the reason or reasons for termination, and whether such termination is voluntary or involuntary, and Franchisee and Franchisor are each entitled to communicate Individual's obligations under this Agreement to any future customer or employer to the extent deemed necessary by Franchisor and/or Franchisee for protection of its rights under this Agreement and regardless of whether Individual or any of its affiliates or assigns becomes an investor, partner, joint venturer, broker, distributor or the like in the European Wax Center franchise System.

(d) Upon termination of Individual's relationship with Franchisee, regardless of the reason or reasons for termination, and whether such termination is voluntary or involuntary, or at any other time when requested by Franchisor, Franchisee and/or their respective affiliates, Individual shall immediately deliver to Franchisee (or Franchisor and/or its affiliates, as appropriate and as directed), all Confidential Information and other property in Individual's possession, or under Individual's care and control, belonging to Franchisee and/or Franchisor and/or their respective affiliates. The provisions of this Section 2(d) shall survive any such termination of Individual's relationship with Franchisee.

3. <u>Non-Competition</u>.

(a) Individual acknowledges that Franchisee and Franchisor would be unable to protect the Trade Secrets and other Confidential Information against unauthorized use or disclosure and would be unable to encourage a free exchange of ideas and information among European Wax Center franchisees and area

representatives if Individual and members of Individual's immediate family and household were permitted to hold an interest in or perform services for any Competitive Business. Therefore, during the term of the Franchise Agreement, neither Individual nor any member of Individual's immediate family and household), may, either directly or indirectly, for themselves, or through, on behalf of or in conjunction with any Person:

(i) divert or attempt to divert any business or customer of a European Wax Center to any Competitive Business, by direct or indirect inducement or otherwise;

(ii) do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks or the System;

(iii) carry on, be engaged in or take part in, render services to, or own or share in the earnings of any Competitive Business anywhere in the United States; or

(iv) solicit or otherwise attempt to induce or influence any employee or other business associate of Franchisor or any other European Wax Center, or any franchisee or area representative of the System, to compete against, or terminate or modify his, her or its employment or business relationship with, Franchisor, any such franchisee or area representative or any other European Wax Center.

In addition to the in-term non-competition restrictive covenants set forth above in this Section 3(a), for a period of two (2) years after the expiration or termination of the Franchise Agreement, regardless of the cause of expiration or termination, neither Individual nor any member of Individual's immediate family and household), may, either directly or indirectly, for themselves, or through, on behalf of or in conjunction with any Person:

(i) divert or attempt to divert any business or customer of a European Wax Center to any Competitive Business, by direct or indirect inducement or otherwise;

(ii) do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks or the System;

(iii) carry on, be engaged in or take part in, render services to, or own or share in the earnings of any Competitive Business within fifty (50) miles of any other European Wax Center operating under the System and the Marks at the time of such expiration or termination; or

(iv) solicit or otherwise attempt to induce or influence any employee or other business associate of Franchisor or any other European Wax Center, or any franchisee or area representative of the System, to compete against, or terminate or modify his, her or its employment or business relationship with, Franchisor, any such franchisee or area representative or any other European Wax Center.

Any assignment or other transfer of the Franchise Agreement, or of Individual's complete interest in, or affiliation with, Franchisee (in each and every capacity, including as owner, employee, consultant or otherwise), shall be deemed, for purposes of Individual's obligations under this Section only, as the expiration or termination of the Franchise Agreement.

(b) If Individual operates any other business, Individual shall not use or display any of the Marks, or any confusingly similar trademark, in any manner whatsoever in connection with such other business and/or the promotion thereof. Individual shall not utilize in such other business any designation of origin, description or representation that falsely suggests or represents an association or connection with Franchisor. This Section 3(b) is not intended as an approval of Individual's right to operate other businesses and in no way is it intended to contradict those Sections of this Agreement or the Franchise Agreement that prohibit such practice.

4. Reasonableness of Restrictions.

Individual acknowledges that each of the terms set forth in this Agreement, including the restrictive covenants, is fair and reasonable and is reasonably required for the protection of Franchisee, Franchisor, and the Trade Secrets and other Confidential Information, the System and the Marks, and Individual waives any right to challenge these restrictions as being overly broad, unreasonable or otherwise unenforceable. If, however, a court of competent jurisdiction determines that any such restriction is unreasonable or unenforceable, then Individual shall submit to the reduction of any such activity, time period or geographic restriction necessary to enable the court to enforce such restrictions to the fullest extent permitted under applicable law. Franchisee may, upon the direction from Franchisor at any time, reduce the scope, restricted activities and/or duration of any of the

restrictive covenants effective immediately upon notice to Individual. It is the desire and intent of both Franchisee and Individual that the provisions of this Agreement shall be enforced to the fullest extent permissible under the laws and public policies applied in any jurisdiction where enforcement is sought.

     5.     Non-Disparagement.

Individual agrees and covenants that Individual will not, at any time, either directly or indirectly, and shall cause Individual's affiliates and members of its family not to, make, publish or communicate to any person or entity or in any public forum (including through social media) any defamatory or disparaging remarks, comments or statements concerning Franchisor, its Affiliates, any franchisees or area representatives and/or any of their respective employees, agents and representatives, or the System or its Marks, other than as part of the judicial, arbitration or other dispute resolution process in connection with any litigation, mediation, arbitration or administrative or other judicial proceeding arising under any claim brought in connection with this Agreement or the Franchise Agreement, or other than when compelled to testify under oath by subpoena, regulation or court order.

     **6.**     Relief for Breaches of Confidentiality, Non-Solicitation, Non-Disparagement and Non-Competition.

Individual further acknowledges that an actual or threatened violation of the covenants contained in this Agreement will cause Franchisee and Franchisor immediate and irreparable harm, damage and injury that cannot be fully compensated for by an award of damages or other remedies at law. Accordingly, Franchisee and Franchisor shall be entitled, as a matter of right, to seek an injunction from any court of competent jurisdiction restraining any further violation by Individual of this Agreement without any requirement to show any actual damage, irreparable harm or establish a balance of convenience or to post any bond or other security. Such right to seek an injunction shall be cumulative and in addition to, and not in limitation of, any other rights and remedies that Franchisee and Franchisor may have at law or in equity.

     7.     Miscellaneous.

(a)     If any legal proceedings are brought for the enforcement of this Agreement, in addition to any other relief to which the successful or prevailing party may be entitled, the successful or prevailing party shall be entitled to recover all of its legal and professional fees, investigative fees, administrative fees billed by such party's attorneys and other professionals, court costs and all expenses, including, without limitation, all fees, taxes, costs and expenses incident to arbitration, appellate, and post-judgment proceedings incurred by the successful or prevailing party in that action or proceeding.

(b)     This Agreement shall be effective as of the date this Agreement is executed and shall be binding upon the successors and assigns of Individual and shall inure to the benefit of Franchisee, its subsidiaries, successors and assigns.

(c)     The failure of either party to insist in any one (1) or more instances upon performance of any terms and conditions of this Agreement shall not be construed a waiver of future performance of any such term, covenant or condition of this Agreement and the obligations of either party with respect thereto shall continue in full force and effect.

(d)     The headings in this Agreement are included solely for convenience and shall not affect, or be used in connection with, the interpretation of this Agreement.

(e)     In the event that any part of this Agreement shall be held to be unenforceable or invalid, the remaining parts of this Agreement shall nevertheless continue to be valid and enforceable as though the invalid portions were not a part of this Agreement.

(f)     The existence of any claim or cause of action Individual might have against Franchisee or Franchisor will not constitute a defense to the enforcement by Franchisee or Franchisor of this Agreement.

(g)     Except as otherwise expressly provided in this Agreement, no remedy conferred upon Franchisee or Franchisor pursuant to this Agreement is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to every other remedy given pursuant to this Agreement or now or hereafter existing at law or in equity or by statute or otherwise. No single or partial exercise by any party of any right, power or remedy pursuant to this Agreement shall preclude any other or further exercise thereof.

(h)      Individual and Franchisee each acknowledge that Individual's compliance with the terms of this Agreement is also critical to Franchisor. Accordingly, Individual and Franchisee each agree and acknowledge that even though Franchisor is not a party to this Agreement and does not have any obligations under this Agreement, Franchisor shall be a third party beneficiary of Individual's agreements and covenants under this Agreement and Franchisor shall be entitled to all rights and remedies conferred upon Franchisee and Franchisor under this Agreement. Accordingly, Individual and Franchisee each agree that Franchisor may enforce such rights and promises in its own right (without being required to obtain consent from Franchisee or add Franchisee as a party to any proceedings for such enforcement).

(i)      This Agreement may be executed in one (1) or more counterparts, each of which will be deemed an original, but all of which taken together will constitute one (1) and the same instrument. Confirmation of execution by electronic transmission of a facsimile or .pdf signature page will be binding upon any party so confirming.

(j)      This Agreement shall be governed by, and construed and enforced in accordance with, the internal laws of Florida, without regard to principles of conflicts of laws. Franchisee and Individual each hereby irrevocably consent and submit to the non-exclusive jurisdiction of the Courts of Broward County, Florida, and waives any objection based on venue or forum non conveniens with respect to any action instituted therein arising under this Agreement, in each case whether arising in contract, tort, equity or otherwise, and agrees that any dispute arising out of this Agreement shall be heard only in the courts described above.

(k)      Individual may not assign or delegate his or her duties or obligations under this Agreement.

(l)      This Agreement constitutes the entire agreement between Individual on the one hand, and Franchisee and/or Franchisor on the other, with respect to the subject matter of this Agreement. This Agreement supersedes any prior agreements, negotiations and discussions between Individual, Franchisee and/or Franchisor with respect to the subject matter of this Agreement. This Agreement cannot be altered or amended except by an agreement in writing signed by Individual, Franchisee and Franchisor.

**INDIVIDUAL CERTIFIES THAT HE OR SHE HAS READ THIS AGREEMENT CAREFULLY, AND UNDERSTANDS AND ACCEPTS THE OBLIGATIONS THAT IT IMPOSES WITHOUT RESERVATION. NO PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO INDIVIDUAL TO INDUCE THE SIGNING OF THIS AGREEMENT.**

[Signatures Appear on Following Page]

IN WITNESS WHEREOF, Franchisee has caused this Agreement to be executed by its duly authorized representative, and Individual has executed this Agreement, all being done as of the day and year first above written.

FRANCHISEE:

WITNESS:

EWC Michigan Management Inc

Print Name: SHEHZAD KHAN

By: _____

Farzana A. Khan, President

WITNESS:

INDIVIDUAL:

Print Name: FARZANA KHAN

Signature: _____

Printed Name: Mohammed Shehzad Khan

## UNLIMITED GUARANTY AND ASSUMPTION OF OBLIGATIONS

This Unlimited Guaranty and Assumption Of Obligations (this "**Guaranty**") is given this 13th day of May, 2015, by Farzana A. Khan and Mohammed Shehzad Khan (each, a "**Personal Guarantor**").

In consideration of, and as an inducement to, the execution of that certain Franchise Agreement dated as the same date of this Guaranty (the "**Agreement**") by EWC Franchise, LLC, as successor-in-interest by merger to EWC Franchise Group, Inc. ("**Franchisor**"), each of the undersigned Personal Guarantors hereby personally and unconditionally guarantees to Franchisor and its successors and assigns, for the term of the Agreement and thereafter as provided in the Agreement, that EWC Michigan Management Inc ("**Franchisee**") shall punctually pay and perform each and every undertaking, agreement and covenant set forth in the Agreement (collectively, "**Guaranteed Obligations**"). Each of the undersigned Personal Guarantors shall be personally bound by, and personally liable for, Franchisee's breach of any provision in the Agreement, including those relating to monetary obligations and obligations to take or refrain from taking specific actions or engaging in specific activities, such as those contemplated by Section 7 of the Agreement. Each of the undersigned Personal Guarantors waives: (a) acceptance and notice of acceptance by Franchisor of the foregoing undertakings; (b) notice of demand for payment of any indebtedness or non-performance of any Guaranteed Obligations; (c) protest and notice of default to any party with respect to the indebtedness or non-performance of any Guaranteed Obligations; (d) any right it may have to require that an action be brought against Franchisee or any other Person as a condition of liability; (e) the benefit of any circumstances, defense or statute of limitations affecting its liability which might otherwise discharge a guarantor or hinder prompt enforcement of this Guaranty, (f) any requirement that Franchisor proceed against or exhaust any collateral or security which Franchisor may now hold or obtain, and (g) any and all other notices and legal or equitable defenses to which it may be entitled.

Each of the undersigned Personal Guarantors, jointly and severally, represent as follows: (a) each of the undersigned Personal Guarantors has the capacity to enter into, perform and deliver this Guaranty; (b) this Guaranty constitutes the legal, valid, binding and enforceable obligations of each of the undersigned Personal Guarantors; and (c) each of the undersigned Personal Guarantors has independent means of obtaining reports and financial information about Franchisee, and Franchisor has no obligation, either prior to the execution of this Guaranty or any time thereafter, to notify any of the undersigned Personal Guarantors concerning Franchisee's financial condition or of any event or occurrence affecting Franchisee's financial condition or business operation.

Each of the undersigned Personal Guarantors further consents and agrees that: (a) its direct and immediate liability under this Guaranty shall be joint and several with all other applicable guarantors of Franchisee's obligations under the Agreement and shall include any property held jointly with any other applicable guarantors, including any interest held as a result of such property being community property or jointly held property, as joint tenants, tenants by the entirety, or otherwise; (b) it shall render any payment or performance required under the Agreement upon demand if Franchisee fails or refuses punctually to do so; (c) such liability shall not be contingent or conditioned upon pursuit by Franchisor of any remedies against Franchisee or any other Person; (d) such liability shall not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence which Franchisor may, from time to time, grant to Franchisee or to any other Person including, without limitation, the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which shall in any way modify or amend this Guaranty, which shall be continuing and irrevocable during the Term; and (e) this Guaranty shall remain in full force and effect before and after any sale, assignment, transfer, conveyance, encumbrance or gift of any interest in Franchisee or the Agreement.

None of the undersigned Personal Guarantors may delegate any of his, her or its rights, obligations or liabilities under this Guaranty. The provisions of this Guaranty may not be amended, supplemented, waived or changed orally, but only by a writing signed by the party as to whom enforcement of any such amendment, supplement, waiver or modification is sought and Franchisor, and making specific reference to this Guaranty.

This Guaranty shall be binding upon each undersigned Personal Guarantor and his or her heirs, executors, administrators, successors and assigns and shall inure to the benefit of Franchisor and its successors, endorsees, transferees and assigns. Without limiting any other provision of this Guaranty, each Personal Guarantor expressly agrees that, as applicable, such Personal Guarantor's death shall not serve as a revocation of or otherwise affect the guaranty made in this Guaranty and that such Personal Guarantor's estate and heirs shall continue to be liable under this Guaranty with respect to any Guaranteed Obligations created or arising after such Personal Guarantor's death. Franchisor may at any time, without notice to any of the undersigned Personal Guarantors, transfer or assign to any Person any of the Guaranteed Obligations, or any interest therein, and each and every immediate and successive assignee or transferee of the Guaranteed Obligations, or any interest therein, shall, to the extent of its interest, be entitled to the benefits of this Guaranty to the same extent as if such assignee or transferee were Franchisor.

The validity, interpretation and enforcement of this Guaranty and any dispute arising out of the relationship between each Personal Guarantor and Franchisor, whether in contract, tort, equity or otherwise, shall be governed by the internal laws of the State of Florida (without giving effect to principles of conflicts of law).

Each of the undersigned Personal Guarantors hereby irrevocably consents and submits to the non-exclusive jurisdiction of the Courts of the State of Florida and the United States District Court located in or serving Broward County, Florida and waives any objection based on venue or forum non conveniens with respect to any action instituted therein arising under this Guaranty, the Agreement or in any way connected with or related or incidental to the dealings of each of the undersigned Personal Guarantors and Franchisor in respect of this Guaranty, the Agreement or the transactions related hereto or thereto, in each case whether now existing or hereafter arising and whether in contract, tort, equity or otherwise, and agrees that any dispute arising out of the relationship between the undersigned Personal Guarantors or Franchisee and Franchisor or the conduct of any such Persons in connection with this Guaranty, the Agreement or otherwise shall be heard only in the courts described above (except that Franchisor may bring any action or proceeding against the undersigned Personal Guarantors or his, her or its property in the courts of any other jurisdiction which Franchisor deems necessary or appropriate in order to realize on any collateral at any time granted by Franchisee or the undersigned Personal Guarantors to Franchisor or to otherwise enforce its rights against any of the undersigned Personal Guarantors or his, her or its property).

This Guaranty may be executed in one (1) or more counterparts, each of which will be deemed an original, but all of which taken together will constitute one (1) and the same instrument. Confirmation of execution by electronic transmission of a facsimile or .pdf signature page will be binding upon any party so confirming.

This Guaranty represents the entire understanding and agreement between the undersigned Personal Guarantors and Franchisor with respect to the subject matter of this Guaranty, and supersedes all other negotiations, understandings and representations (if any) made by and between such parties. Capitalized terms used in this Guaranty and not otherwise defined shall have the meaning set forth in the Agreement.

IN WITNESS WHEREOF, this Guaranty has been entered into the day and year first before written.

| **PERSONAL GUARANTOR** | **PERSONAL GUARANTOR** |
|---|---|
| **Farzana A. Khan** | **Mohammed Shehzad Khan** |
| Personally and Individually (Printed Name) | Personally and Individually (Printed Name) |
| Personally and Individually (Signature) | Personally and Individually (Signature) |
| HOME ADDRESS | HOME ADDRESS |
| 2 Emil Street | 2 Emil Street |
| Princeton Junction, NJ 08550 | Princeton Junction, NJ 08550 |
| TELEPHONE NO.: 801-349-5300 | TELEPHONE NO.: 801-557-6550 |
| PERCENTAGE OF OWNERSHIP IN FRANCHISEE: 50.00% | PERCENTAGE OF OWNERSHIP IN FRANCHISEE: 50.00% |

| **PERSONAL GUARANTOR** | **PERSONAL GUARANTOR** |
|---|---|
| Personally and Individually (Printed Name) | Personally and Individually (Printed Name) |
| Personally and Individually (Signature) | Personally and Individually (Signature) |
| HOME ADDRESS | HOME ADDRESS |
| TELEPHONE NO.: | TELEPHONE NO.: |
| PERCENTAGE OF OWNERSHIP IN FRANCHISEE: _____% | PERCENTAGE OF OWNERSHIP IN FRANCHISEE: _____% |

[SEE JOINDER OF SPOUSE ATTACHED]

**Joinder of Spouse**. Each of the undersigned, being a spouse of a Personal Guarantor, if applicable, executes this Joinder to acknowledge its fairness and that it is in such spouse's best interests, and to bind such spouse's interest, if any, in property held by the Personal Guarantor, including any interest held as a result of such property being community property or jointly held property, as joint tenants, tenants by the entirety, or otherwise. Accordingly, each of the undersigned, being a spouse of a Personal Guarantor, agrees to be bound by the provisions of this Unlimited Guaranty and Assumption of Obligations, as amended or restated from time to time, in order to bind such spouse's interest, if any, in property held by the Personal Guarantor, including any interest held as a result of such property being community property or jointly held property, as joint tenants, tenants by the entirety, or otherwise, as if such undersigned spouse was a personal guarantor as well pursuant to this Unlimited Guaranty and Assumption of Obligations. The undersigned is aware that the legal, financial and related matters contained in this Unlimited Guaranty and Assumption of Obligations and the Agreement to which it relates are complex and that he/she is free to seek independent professional guidance or counsel with respect to this Joinder. If any Personal Guarantor delivers this Unlimited Guaranty and Assumption of Obligations to Franchisor without the signature of his or her spouse below, then he or she hereby represents to Franchisor that he or she has no spouse.

**SPOUSE**

N/A
Personally and Individually

Print Name:_____
Print Name of Your Spouse:_____

HOME ADDRESS:

TELEPHONE NO.:_____

**SPOUSE**

N/A
Personally and Individually

Print Name:_____
Print Name of Your Spouse:_____

HOME ADDRESS:

TELEPHONE NO.:_____

## FRANCHISEE DISCLOSURE QUESTIONNAIRE

As you know, EWC Franchise, LLC and you are preparing to enter into one or more Franchise Agreements for the operation of a European Wax Center franchise. In the Franchisee Disclosure Questionnaire, EWC Franchise, LLC will be referred to as "we" or "us." The purpose of this Questionnaire is to determine whether any statements or promises were made to you that we did not authorize and that may be untrue, inaccurate or misleading, and to be certain that you understand the limitations on claims that may be made by you by reason of the offer and sale of the franchise and operation of the European Wax Center business. Please review each of the following questions carefully and provide honest and complete responses to each question.

1.  Did you receive a copy of our Disclosure Document (and all exhibits and attachments) at least (a) 14 calendar days prior to signing the Franchise Agreement, or (b) if you are a resident of **New York or Rhode Island**, at the earlier or the first personal meeting or 10 business days before the execution of the franchise or other agreement or payment of any consideration, (c) if you are a resident of **Iowa**, at the earlier or the first personal meeting or 14 calendar days before the execution of the franchise or other agreement or payment of any consideration or (d) if you are a resident of **Michigan**, at the earlier of 10 business days before the execution of any binding agreement or payment of any consideration? Yes __X__ No _____

    If "No", please explain? (Attach additional pages, if necessary.)

    _____

    _____

2.  Have you personally studied and reviewed carefully our Disclosure Document and Franchise Agreement (and all their respective exhibits, attachments and addenda)?
    Yes __X__ No _____

    If "No", please explain? (Attach additional pages, if necessary.)

    _____

    _____

3.  If we made any unilateral changes to the Franchise Agreement, did you receive a copy of the complete revised agreement at least seven calendar days prior to the date on which the Franchise Agreement was executed? Yes __X__ No _____

    If "No", please explain? (Attach additional pages, if necessary.)

    _____

    _____

4.  Do you understand all of the information contained in both the Disclosure Documents and the Franchise Agreement (including all of their respective exhibits, attachments and addenda)?
    Yes __X__ No _____

    If "No", what parts do you not understand? (Attach additional pages, if necessary.)

    _____

    _____

5.  Have you discussed the benefits and risks of operating a European Wax Center with an attorney, accountant or other professional advisor?
    Yes __X__ No _____

*Please understand that we strongly encourage each franchisee to speak with an attorney or other trusted advisor before signing a European Wax Center franchise agreement.*

6. Do you feel that you understand the benefits and risks of operating a European Wax Center?
Yes __X__ No _____

*If "No", again, we strongly advise that you speak with an attorney or other trusted advisor before signing a European Wax Center franchise agreement to ensure that you do understand the benefits and risks of operating a European Wax Center.*

7. Do you understand that the success or failure of your business will depend in large part upon your skills, experience and abilities, competition from other businesses, your location, interest rates, inflation, labor and supply costs, your personnel, lease terms and other economic and business factors that we or our employees, agents and other representatives do not control? Further, do you understand that the economic and business factors that exist at the time you open your franchise may change over time?
Yes __X__ No _____

If "No", what parts do you not understand? (Attach additional pages, if necessary.)

_____

_____

8. Has any employee or other person speaking on our behalf, including, for this purpose any area representative, made any statement, claim or promise of any kind concerning the sales, revenues, earnings, income, profits or operating expenses of a European Wax Center, and/or any statement, claim or promise of any kind concerning the potential sales, revenues, earnings, income, profits or operating expenses that you may incur in operating a European Wax Center?
Yes _____ No __X__

If "Yes", please provide in detail the statements, claims or promises that were made. (Attach additional pages, if necessary.)

_____

_____

9. Has any employee or other person speaking on our behalf, including, for this purpose any area representative, made any statement, claim or promise concerning a European Wax Center that is contrary to, or different from, the information contained in the Disclosure Document?
Yes _____ No __X__

If "Yes", please provide in detail the statements, claims or promises that were made. (Attach additional pages, if necessary.)

_____

_____

10. Has any employee or other person speaking on our behalf, including, for this purpose any area representative, made any statement, claim or promise concerning the likelihood of success that you should or might expect to achieve from operating a European Wax Center?
Yes _____ No __X__

If "Yes", please provide in detail the statements, claims or promises that were made. (Attach additional pages, if necessary.)

_____

11. Has any employee or other person speaking on our behalf, including, for this purpose any area representative, made any statement, claim, promise or agreement concerning the advertising, marketing, training, support service or assistance that we will furnish to you that is contrary to, or different from, the information contained in the Disclosure Document?
Yes _____ No __X__

If "Yes", please provide in detail the statements, claims or promises that were made. (Attach additional pages, if necessary.)

_____

_____

12. Do you understand that that the franchise granted is for the right to operate a European Wax Center at the Approved Location (as defined in the Franchise Agreement) and includes a limited protected territory, subject to our rights in the Franchise Agreement? YES

If "No", what parts do you not understand? (Attach additional pages, if necessary.)

_____

_____

13. Do you understand that the Franchise Agreement contains the entire agreement between you and us concerning the franchise for the European Wax Center franchise, meaning that any prior oral or written statements not set out in the Franchise Agreement will not be binding? YES

If "No", what parts do you not understand? (Attach additional pages, if necessary.)

_____

_____

14. Do you understand that you are bound by the non-compete covenants (both in-term and post-term) listed in Section 7 of the Franchise Agreement (as well as your Non-Disclosure and Non-Competition Agreement) and that an injunction is an appropriate remedy to protect the interests of the European Wax Center® system if you violate the covenant(s)? YES

If "No", what parts do you not understand? (Attach additional pages, if necessary.)

_____

_____

15. Do you understand that you will pay the then-current price in effect at the time for certain inventory and supply products that you purchase from us or our affiliate, EWC Franchise Distribution, LLC, including the wax used in your European Wax Center, and that we and our affiliates may derive revenue from the sale of such products to you by charging more than our wholesale purchase price from the manufacturers? YES

If "No", what parts do you not understand? (Attach additional pages, if necessary.)

_____

16. Do you understand that in all dealings with you, our officers, directors, employees and agents act only in a representative capacity and not in an individual capacity and such dealings are solely between you and us?

Yes _____ No _____    YES

If "No", what parts do you not understand? (Attach additional pages, if necessary.)

_____

_____

15. Do you understand that in any transfers of your ownership in the franchisee entity, whether direct or indirect, require compliance with the terms of Section 18 and Section 19, as applicable, of the Franchise Agreement?

Yes _____ No _____    YES

If "No", what parts do you not understand? (Attach additional pages, if necessary.)

_____

_____

17. No franchise sellers, other than any individuals identified on my Receipt to the Disclosure Document, were involved in offering the franchise to me, except as follows: (If none, you should write "NONE").

NONE

_____

Please understand that your answers are important to us and that we will rely on them.

By signing this Franchisee Disclosure Questionnaire, you are representing that you have considered each question carefully and responded truthfully to each of the above questions. Please provide additional pages if necessary.

EWC Michigan Management Inc
Name of Franchisee/Applicant

Date: May 4th, 2015

Signature _Farzana Khan_

Farzana A. Khan, individually and as a shareholder and authorized officer of EWC Michigan Management Inc
Name and Title of Person Signing

FARZANA KHAN
President

## FRANCHISEE DISCLOSURE QUESTIONNAIRE

As you know, EWC Franchise, LLC and you are preparing to enter into one or more Franchise Agreements for the operation of a European Wax Center franchise. In the Franchisee Disclosure Questionnaire, EWC Franchise, LLC will be referred to as "we" or "us." The purpose of this Questionnaire is to determine whether any statements or promises were made to you that we did not authorize and that may be untrue, inaccurate or misleading, and to be certain that you understand the limitations on claims that may be made by you by reason of the offer and sale of the franchise and operation of the European Wax Center business. Please review each of the following questions carefully and provide honest and complete responses to each question.

1. Did you receive a copy of our Disclosure Document (and all exhibits and attachments) at least (a) 14 calendar days prior to signing the Franchise Agreement, or (b) if you are a resident of **New York or Rhode Island**, at the earlier or the first personal meeting or 10 business days before the execution of the franchise or other agreement or payment of any consideration, (c) if you are a resident of **Iowa**, at the earlier or the first personal meeting or 14 calendar days before the execution of the franchise or other agreement or payment of any consideration or (d) if you are a resident of **Michigan**, at the earlier of 10 business days before the execution of any binding agreement or payment of any consideration? Yes _X_ No _____

   If "No", please explain? (Attach additional pages, if necessary.)

   _____

   _____

2. Have you personally studied and reviewed carefully our Disclosure Document and Franchise Agreement (and all their respective exhibits, attachments and addenda)? Yes _X_ No _____

   If "No", please explain? (Attach additional pages, if necessary.)

   _____

   _____

3. If we made any unilateral changes to the Franchise Agreement, did you receive a copy of the complete revised agreement at least seven calendar days prior to the date on which the Franchise Agreement was executed? Yes _X_ No _____

   If "No", please explain? (Attach additional pages, if necessary.)

   _____

   _____

4. Do you understand all of the information contained in both the Disclosure Documents and the Franchise Agreement (including all of their respective exhibits, attachments and addenda)? Yes _X_ No _____

   If "No", what parts do you not understand? (Attach additional pages, if necessary.)

   _____

   _____

5. Have you discussed the benefits and risks of operating a European Wax Center with an attorney, accountant or other professional advisor? Yes _X_ No _____

*Please understand that we strongly encourage each franchisee to speak with an attorney or other trusted advisor before signing a European Wax Center franchise agreement.*

6. Do you feel that you understand the benefits and risks of operating a European Wax Center?
Yes _X_ No _____

*If "No", again, we strongly advise that you speak with an attorney or other trusted advisor before signing a European Wax Center franchise agreement to ensure that you do understand the benefits and risks of operating a European Wax Center.*

7. Do you understand that the success or failure of your business will depend in large part upon your skills, experience and abilities, competition from other businesses, your location, interest rates, inflation, labor and supply costs, your personnel, lease terms and other economic and business factors that we or our employees, agents and other representatives do not control? Further, do you understand that the economic and business factors that exist at the time you open your franchise may change over time?
Yes _X_ No _____

If "No", what parts do you not understand? (Attach additional pages, if necessary.)

_____

_____

8. Has any employee or other person speaking on our behalf, including, for this purpose any area representative, made any statement, claim or promise of any kind concerning the sales, revenues, earnings, income, profits or operating expenses of a European Wax Center, and/or any statement, claim or promise of any kind concerning the potential sales, revenues, earnings, income, profits or operating expenses that you may incur in operating a European Wax Center?
Yes _____ No _X_

If "Yes", please provide in detail the statements, claims or promises that were made. (Attach additional pages, if necessary.)

_____

_____

9. Has any employee or other person speaking on our behalf, including, for this purpose any area representative, made any statement, claim or promise concerning a European Wax Center that is contrary to, or different from, the information contained in the Disclosure Document?
Yes _____ No _X_

If "Yes", please provide in detail the statements, claims or promises that were made. (Attach additional pages, if necessary.)

_____

_____

10. Has any employee or other person speaking on our behalf, including, for this purpose any area representative, made any statement, claim or promise concerning the likelihood of success that you should or might expect to achieve from operating a European Wax Center?
Yes _____ No _X_

If "Yes", please provide in detail the statements, claims or promises that were made. (Attach additional pages, if necessary.)

_____

11.     Has any employee or other person speaking on our behalf, including, for this purpose any area representative, made any statement, claim, promise or agreement concerning the advertising, marketing, training, support service or assistance that we will furnish to you that is contrary to, or different from, the information contained in the Disclosure Document?
        Yes _____ No _X_

        If "Yes", please provide in detail the statements, claims or promises that were made. (Attach additional pages, if necessary.)

        _____

        _____

12.     Do you understand that that the franchise granted is for the right to operate a European Wax Center at the Approved Location (as defined in the Franchise Agreement) and includes a limited protected territory, subject to our rights in the Franchise Agreement? YES

        If "No", what parts do you not understand? (Attach additional pages, if necessary.)

        _____

        _____

13.     Do you understand that the Franchise Agreement contains the entire agreement between you and us concerning the franchise for the European Wax Center franchise, meaning that any prior oral or written statements not set out in the Franchise Agreement will not be binding? YES

        If "No", what parts do you not understand? (Attach additional pages, if necessary.)

        _____

        _____

14.     Do you understand that you are bound by the non-compete covenants (both in-term and post-term) listed in Section 7 of the Franchise Agreement (as well as your Non-Disclosure and Non-Competition Agreement) and that an injunction is an appropriate remedy to protect the interests of the European Wax Center® system if you violate the covenant(s)? YES

        If "No", what parts do you not understand? (Attach additional pages, if necessary.)

        _____

        _____

15.     Do you understand that you will pay the then-current price in effect at the time for certain inventory and supply products that you purchase from us or our affiliate, EWC Franchise Distribution, LLC, including the wax used in your European Wax Center, and that we and our affiliates may derive revenue from the sale of such products to you by charging more than our wholesale purchase price from the manufacturers? YES

        If "No", what parts do you not understand? (Attach additional pages, if necessary.)

        _____

16. Do you understand that in all dealings with you, our officers, directors, employees and agents act only in a representative capacity and not in an individual capacity and such dealings are solely between you and us?

Yes _____ No _____  YES

If "No", what parts do you not understand? (Attach additional pages, if necessary.)

_____

_____

15. Do you understand that in any transfers of your ownership in the franchisee entity, whether direct or indirect, require compliance with the terms of Section 18 and Section 19, as applicable, of the Franchise Agreement?  YES

Yes _____ No _____

If "No", what parts do you not understand? (Attach additional pages, if necessary.)

_____

_____

17. No franchise sellers, other than any individuals identified on my Receipt to the Disclosure Document, were involved in offering the franchise to me, except as follows: (If none, you should write "NONE").

_____NONE_____

_____

Please understand that your answers are important to us and that we will rely on them.

By signing this Franchisee Disclosure Questionnaire, you are representing that you have considered each question carefully and responded truthfully to each of the above questions. Please provide additional pages if necessary.

EWC Michigan Management Inc
Name of Franchisee/Applicant

Date: MAY 4 , 2015

Signature

Mohammed Shehzad Khan, individually and as a shareholder and authorized officer of EWC Michigan Management Inc
Name and Title of Person Signing

SHEHZAD KHAN
VICE PRESIDENT

**EWC MICHIGAN MANAGEMENT INC**

Franchise Certificate

May 13, 2015

This Franchise Certificate (the "***Certificate***") is delivered in connection with that certain EWC Franchise, LLC Franchise Agreement (the "***Franchise Agreement***"), by and between EWC Franchise, LLC ("***Franchisor***") and EWC Michigan Management Inc ("***Franchisee***"). Capitalized terms not defined in this Certificate shall have the meaning given to those terms in the Franchise Agreement.

By signing below, each of the undersigned do hereby certify to Franchisor that:

  1. Attached hereto as Exhibit A is a true and correct copy of the Articles of Incorporation of the Franchisee (the "***Charter***") and such Charter is in full force and effect as of the date hereof and has not been amended other than as appearing on Exhibit A.

  2. Attached hereto as Exhibit B is a true and correct copy of the Shareholders Agreement and Bylaws of the Franchisee (the "***Franchisee Governing Agreement(s)***"), and such Franchisee Governing Agreement(s) are in full force and effect as of the date hereof and has not been amended other than as appearing on Exhibit B.

  3. Attached hereto as Exhibit C is a true and correct copy of a certificate of good standing of Franchisee as issued by the office of the Secretary of State or other applicable governmental entity of the state in which Franchisee was formed, confirming Franchisee's good standing as of the date of the Franchise Agreement.

  4. The following-named person is Franchisee's Franchisee Designated Representative:

**Franchisee Designated Representative:**
Name: Mohammed Shehzad Khan
Home Address:
2 Emil Street
Princeton Junction, NJ 08550
Telephone No.: 801-557-6550
Email address: Shehzad.khan@waxcenter.com
Percentage of ownership: 50.00%

  5. The following-named persons are collectively all of the equity holders of Franchisee:

**Holders of Legal or Beneficial Interest:**

| | |
|---|---|
| Name: Farzana A. Khan | Name: Mohammed Shehzad Khan |
| Home Address: | Home Address: |
| 2 Emil Street | 2 Emil Street |
| Princeton Junction, NJ 08550 | Princeton Junction, NJ 08550 |
| Telephone No.: 801-349-5300 | Telephone No.: 801-557-6550 |
| Email address: Farzana.khan@waxcenter.com | Email address: Shehzad.khan@waxcenter.com |
| Percentage of ownership: 50.00% | Percentage of ownership: 50.00% |

  6. The following-named persons are collectively all of the authorized managers, directors, officers and other representatives of Franchisee, holding the position or positions set forth opposite his or her name:

**Officers, Directors and/or Managers:**

| | |
|---|---|
| Name: Farzana A. Khan | Name: Mohammed Shehzad Khan |
| Position/Title: President, Chairman of the Board | Position/Title: Director, VP, Secretary, Treasurer |
| Home Address: | Home Address: |
| 2 Emil Street | 2 Emil Street |
| Princeton Junction, NJ 08550 | Princeton Junction, NJ 08550 |

Telephone No.: <u>801-349-5300</u>

Email address: <u>Farzana.khan@waxcenter.com</u>

Telephone No.: <u>801-557-6550</u>

Email address: <u>Shehzad.khan@waxcenter.com</u>

IN WITNESS WHEREOF, each of the undersigned, by signing below, certifies the accuracy of the information set forth in this Certificate as of the date of the Franchise Agreement.

By: _____

Print Name: <u>Farzana A. Khan</u>

By: _____

Print Name: <u>Mohammed Shehzad Khan</u>

Exhibit A to Franchise Certificate

Charter

[to be attached]

Sep. 8. 2014 4:12PM                                            No. 0879   P. 5/7

(CSCLCD-500 (Rev. 01/14)

## MICHIGAN DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS
## CORPORATIONS, SECURITIES & COMMERCIAL LICENSING BUREAU

| Date Received | (FOR BUREAU USE ONLY) |
|---|---|
| SEP 0 8 2014 | |

This document is effective on the date filed, unless a subsequent effective date within 90 days after received date is stated in the document.

FILED
SEP 08 2014
ADMINISTRATOR
CORPORATIONS DIVISION

Name
EWC Michigan Management Inc
Address
4625 Willoughby, Suite 6

| City | State | ZIP Code |
|---|---|---|
| Holt | MI | 48842 |

EFFECTIVE DATE:

Document will be returned to the name and address you enter above.
If left blank, document will be returned to the registered office.

05730M

## ARTICLES OF INCORPORATION
### For use by Domestic Profit Corporations
(Please read information and instructions on reverse side)

Pursuant to the provisions of Act 284, Public Acts of 1972, the undersigned executes the following Articles:

### ARTICLE I

The name of the corporation is:

EWC Michigan Management Inc

### ARTICLE II

The purpose or purposes for which the corporation is formed is to engage in any activity within the purposes for which corporations may be formed under the Business Corporation Act of Michigan.

### ARTICLE III

The total authorized shares:

1. Common Shares _____ 60,000

   Preferred Shares _____

2. A statement of all or any of the relative rights, preferences and limitations of the shares of each class is as follows:

### ARTICLE IV

1. The name of the resident agent at the registered office is: JAMES BACK

2. The street address of the location of the registered office is:

   4625 WILLOUGHBY, SUITE 6                    HOLT             , Michigan  48842
   (Street Address)                            (City)                      (Zip Code)

3. The mailing address of the registered office if different than above:

   _____      _____ , Michigan _____
   (P.O. Box or Street Address)                 (City)                      (Zip Code)

Sep. 8. 2014 4:12PM

No. 0379 P. 6/7

EWC Michigan Management Inc

## ARTICLE V

The name(s) and address(es) of the incorporator(s) is(are) as follows:

| Name | Residence or Business Address |
| --- | --- |
| SHEHZAD KHAN | 4825 WILLOUGHBY, SUITE 6, HOLT, MI 48842 |
| FARZANA KHAN | 4825 WILLOUGHBY, SUITE 6, HOLT, MI 48842 |

## ARTICLE VI (Optional, Delete if not applicable)

When a compromise or arrangement or plan of reorganization of this corporation is proposed between this corporation and its creditors or any class of them or between this corporation and its shareholders or any class of them, a court of equity jurisdiction within the state, on application of this corporation or of a creditor or shareholder thereof, or an application of a receiver appointed for the corporation, may order a meeting of the creditors or class of creditors or of the shareholders or class of shareholders to be affected by the proposed compromise or arrangement or reorganization, to be summoned in such manner as the court directs. If a majority in number representing 3/4 in value of the creditors or class of creditors, or of the shareholders or class of shareholders to be affected by the proposed compromise or arrangement or a reorganization, agree to a compromise or arrangement or a reorganization of this corporation as a consequence of the compromise or arrangement, the compromise or arrangement of the reorganization, if sanctioned by the court to which the application has been made, shall be binding on all the creditors or class of creditors, or on all the shareholders or class of shareholders and also on this corporation.

## ARTICLE VII (Optional, Delete if not applicable)

Any action required or permitted by the Act to be taken at an annual or special meeting of shareholders may be taken without a meeting, without prior notice, and without a vote, if consents in writing, setting forth the action so taken, are signed by the holders of outstanding shares having not less than the minimum number of votes that would be necessary to authorize or take the action at a meeting at which all shares entitled to vote on the action were present and voted. A written consent shall bear the date of signature of the shareholder who signs the consent. Written consents are not effective to take corporate action unless within 60 days after the record date for determining shareholders entitled to express consent to or to dissent from a proposal without a meeting, written consents dated not more than 10 days before the record date and signed by a sufficient number of shareholders to take the action are delivered to the corporation. Delivery shall be to the corporation's registered office, its principal place of business, or an officer or agent of the corporation having custody of the minutes of the proceedings of its shareholders. Delivery made to a corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.

Prompt notice of taking of the corporate action without a meeting by less than unanimous written consent shall be given to shareholders who would have been entitled to notice of the shareholder meeting if the action had been taken at a meeting and who have not consented to the action in writing. An electronic transmission consenting to an action must comply with Section 407(3).

EWC Michigan Management inc

Use space below for additional Articles or for continuation of previous Articles. Please identify any Article being continued or added. Attach additional pages if needed.

I, (We), the incorporator(s) sign my (our) name(s) this _____8ʰ_____ day of _____ SEPTEMBER _____, _____2014_____

SHEHZAD KHAN          KHAN

FARZANA KHAN

Exhibit B to Franchise Certificate

Franchisee Governing Agreement(s)

[to be attached]

# SHAREHOLDERS OPERATING AGREEMENT
# FOR
# EWC MICHIGAN MANAGEMENT INC

This Shareholders Agreement (the "Agreement") is made and effective September 9, 2014

**BETWEEN:**      **EWC MICHIGAN MANAGEMENT INC.** (the "Company"), a company organized and existing under the laws of the State of MICHIGAN, with its head office located at:

        4625 Willoughby Road, Suite 5,
        Holt, MI, 48842

**AND:**      **SHEHZAD KHAN** (the "First Shareholder"), an individual with her main address located at:

        2 Emil Street
        Princeton Junction, NJ 08550

**AND:**      **FARZANA KHAN** (the "Second Shareholder"), an individual with his main address located at:

        2 Emil Street
        Princeton Junction, NJ 08550

**WITNESSETH:**

WHEREAS, the present distribution of shares of the Company is as follows:

| Name | Number of Shares |
|---|---|
| Shehzad Khan | 500 |
| Farzana Khan | 500 |

WHEREAS, in order to insure the harmonious and successful management and control of the Company, and to provide for an orderly and fair disposition of shares of common stock of the Company now or hereafter owned by any Shareholder;

NOW, THEREFORE, in consideration of the mutual promises of the parties hereto, and intending to be legally bound, the parties hereby agree as follows:

## 1. COMPANY FORMATION

**1.1.**     **Formation.** The Shareholders have formed an S Corporation (the "Company") subject to the provisions of the laws of the Sate of Michigan as currently in effect as of this date. Articles of Incorporation are filed with the Secretary of State.

**1.2.**     **Registered Office And Agent.** The location and name of the registered agent shall be as stated in the Articles of Organization.

**1.3.    Term.** The Company shall continue for a perpetual period.

**1.4.    Continuance Of The Company.** Notwithstanding the provisions of ARTICLE 1.3, in the event of the death, resignation, expulsion, bankruptcy, retirement of a Shareholder, or the occurrence of any other event that terminates the continued ownership of a Shareholder of the Company, the remaining Shareholder shall have the right to continue the business of the Company.

**1.5.    Business Purpose.** The Company shall conduct any and all lawful business deemed appropriate to execute the company's objectives.

**1.6.    Principal Place Of Business.** The location of the principal place of business of the Company shall be as stated in the Articles of Organization or at a location as the Shareholders select.

**1.7    The Shareholders.** The name and place of residence of each Shareholder is listed below at Certification of Shareholders. Shareholders are the owners of this company.

**1.8.    Additional Shares.** Except as otherwise expressly provided in the Agreement, no additional Shareholders may be admitted to the Company through issuance by the Company of new shares in the Company without the prior unanimous written consent of the Shareholders.

**1.9.    Purchase For Investment.** Each Shareholder represents and warrants that he/she is acquiring and has acquired his/her Shares for his/her own investment and not with a view to, or for resale in connection with any distribution thereof or with any present intent of selling any portion thereof.

**1.10.    Shareholder Contributions.** The Shareholders shall contribute cash to the Company as loan from the Shareholder and the Company shall keep record of the amount contributed.

## 2. PROFIT, LOSSES, AND DISTRIBUTIONS

**2.1.    Profits/Losses.** For financial accounting and tax purposes the Company's net profits or net losses shall be determined on a quarterly basis and shall either be allocated to the Shareholders in proportion to each Shareholder's relative capital interest in the Company or retained in the Company for further investment.

**2.2    Distributions.** The Shareholders shall determine and distribute available funds annually or at more frequent intervals as they see fit. Available funds, as referred to herein, shall mean the net cash of the Company available after appropriate provision for expenses and liabilities, as determined by the Shareholders.

## 3. MANAGEMENT AND EMPLOYMENT

**3.1.    Managing Shareholders.** Shareholders electing to be employed as Managing Shareholders shall be responsible for Company Operations and Management.

**3.2.    Powers Of Managing Shareholders.** Managing Shareholders shall take part in the operation of the Company's affairs. A Managing Shareholder will have the authority to solely make decisions without Shareholder approval involving Company transactions up to a dollar amount of $50,000.00 as to:

**(a)** the sale, development lease or other disposition of the Company's assets;

**(b)** the purchase or other acquisition of other assets of all kinds;

**(c)** the management of all or any part of the Company's assets;

**(d)** the borrowing of money and the granting of security interests in the Company's assets;

**(e)** the pre-payment, refinancing or extension of any loan affecting the Company's assets;

**(f)** the compromise or release of any of the Company's claims or debts;

**(g)** the employment of persons, firms or corporations for the operation and management of the company's business.

**(h)** in the exercise of their management powers, the Managing Shareholders are authorized to execute and deliver:

> **(i)** all contracts, conveyances, assignments leases, sub-leases, franchise agreements, licensing agreements, management contracts and maintenance contracts covering or affecting the Company's assets;

> **(ii)** checks, drafts and other orders for the payment of the Company's funds;

> **(iii)** all promissory notes, loans, security agreements and other similar documents; and,

> **(iv)** all other instruments of any other kind relating to the Company's affairs, whether like or unlike the foregoing.

**3.3. Company Information.** Upon request, the Managing Shareholder shall supply to any Shareholder information regarding the Company or its activities. Each Shareholder or his authorized representative shall have access to and may inspect and copy all books, records and materials in the Managing Shareholder's possession regarding the Company or its activities.

**3.4. Exculpation.** Any act or omission of the Managing Shareholders, the effect of which may cause or result in loss or damage to the Company or the Shareholders if done in good faith to promote the best interests of the Company, shall not subject the Managing Shareholders to any liability to the Shareholders.

**3.5. Indemnification.** The Company shall indemnify any person who was or is a party defendant or is threatened to be made a party defendant, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative (other than an action by or in the right of the Company) by reason of the fact that he is or was a Shareholder of the Company, Manager, employee or agent of the Company, or is or was serving at the request of the Company, for instant expenses (including attorney's fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred in connection with such action, suit or proceeding if the Shareholders determine that he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interest of the Company, and with respect to any criminal action proceeding, has no reasonable cause to believe his/her conduct was unlawful. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of "no lo Contendere" or its equivalent, shall not in itself create a presumption that the person did or did not act in good faith and in a manner which he reasonably believed to be in the best interest of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his/her conduct was lawful.

**3.6.    Records.** The Managing Shareholders shall cause the Company to keep at its principal place of business or at another location agreeable by the Shareholders, the following:

**(a)** a current list in alphabetical order of the full name and the last known street address of each Shareholder;

**(b)** a copy of the Certificate of Incorporation, Shareholders Agreement, and the Company Operating Agreement and all amendments;

**(c)** copies of the Company's federal, state and local income tax returns and reports, if any, for the three most recent years;

**(d)** copies of any financial statements of the Company for the three most recent years.

**3.7.    Compensation.** Any Managing Shareholder employed by the Company full-time (40 hours per week) shall be entitled to compensation of up to $72,000 per year, as agreed upon by all Shareholders. Executive positions held by a Shareholder other than Managing Shareholder shall not be compensated for unless approved by other Shareholders. Shareholders employed in other capacities with the Company lower than the management level shall be compensated at the same rate as other employees for that particular position. The Company shall reimburse the Managing Shareholders for all direct out-of-pocket expenses incurred in managing the Company.

**3.8.    Bookkeeping.** The Managing Shareholders shall maintain complete and accurate books of account of the Company's affairs at the Company's principal place of business or at another location agreeable by the Shareholders. Such books shall be kept on such method of accounting as the Shareholders shall select. The company's accounting period shall be the calendar year. The Managing Shareholders shall close the books of account after the close of each calendar year, and shall prepare and send to each Shareholder a statement of such Shareholder's distributive share of income and expense for income tax reporting purposes.

**3.9.    Shareholders Accounts.** The Management Shareholders shall maintain separate capital and distribution accounts for each Shareholder. Each Shareholder's capital account shall be determined and maintained in the manner set forth in Treasury Regulation 1.704-l(b)(2)(iv) and shall consist of his/her initial capital contribution and/or loans to the Company and the Member's share of Company profit and losses if charged to his/her capital account.

## 4.  TRANSFERS OF SHARES

Shareholders may each during their lifetimes transfer all, hut not less than all, of their shares to a Shareholder's spouse or a lineal descendant of a Shareholder, so long as prior to such transfer all the Shareholders amend this Agreement to provide the parties to this Agreement with the rights, remedies and effect provided in this Agreement as if no such transfer had occurred.

Notwithstanding the above, a Shareholder may not transfer, give, convey, sell, pledge, bequeath, donate, assign, encumber or otherwise dispose of any Shares except pursuant to this Agreement.

**4.1.    Transfer to Others.** A Shareholder desiring to dispose of some or all of his/her Shares may do so only pursuant to a bona fide offer to purchase (the "Offer") and after compliance with the following provisions. Such Shareholder shall first give written notice to the other Shareholder ("Continuing Shareholder") of his/her intention to dispose of Shares, identifying the number of Shares he/she desires to dispose of, the proposed purchase price per share and the name of the proposed purchaser and attaching an exact copy of the Offer received by such Shareholder.

**4.2.     The Continuing Shareholders Right to Purchase.** Upon receiving and copy of the Offer, the Continuing Shareholder shall have the right for a period of 30 to purchase the shares which the Offering Shareholder proposes to sell at the proposed purchase price per share. The Continuing Shareholder shall exercise this right to purchase by giving written notice to the Offering Shareholder prior to the expiration of the 30 day period that he/she elects to purchase the shares and setting forth a date and time for closing which shall be not later than 30 days after the expiration of the initial 30 day period. At the time of closing, the Offering Shareholder shall deliver to Continuing Shareholder certificates representing the Shares to be sold, together with stock powers duly endorsed in blank. Said shares shall be delivered by the Offering Shareholder free and clear of any and all liens and encumbrances. All transfer taxes shall be paid by the Offering Shareholder.

**4.3.     Performance of Acceptance.** When exercising the rights granted in Paragraphs 4.2 hereof, Continuing Shareholder must elect to purchase all shares which the Offering Shareholder proposes to sell for the price and upon the same terms for payment of the price as are set forth in the Offer.

**4.4.     Sale to Third Party.** If the Continuing Shareholder does not elect to purchase all of the Shares which the Offering Shareholder proposes to sell, the Offering Shareholder may accept the Offer which the Offering Shareholder mailed with his/her notice to the Company pursuant to Paragraph 4.1 hereof and transfer the Shares which he/she proposes to sell pursuant thereto on the same terms and conditions set forth in such Offer, provided that any transferee of such shares shall be bound by this Agreement, and further provided that if such sale is not completed within 30 days after the date notice is received by the Company under Paragraph 4.1 hereof, all such shares shall again become subject to the restrictions and provisions of this Agreement.

## 5.     SALE UPON DISABILITY OR DEATH

Upon the Disability (as defined below), or the death of a Shareholder (any such event hereinafter a "Event"), such Shareholder (or his heirs, executors, guardian or personal representative) within 60 days after the Event shall offer to sell all, but not less than all, of the Shares owned by the Shareholder. The offer shall be made to the other Shareholder in writing and shall exist for a period of 30 days after the offer has been received by the other Shareholder. For purposes of this Agreement, "Disability" of a particular person means the inability, due to a physical or mental condition, of such person to maintain his employment or other relationship with the Company (including without limitation, fulfilling his duties in any position as an officer, director, consultant, joint venturer, independent contractor, or promoter to or of the Company) or to conduct his normal daily activities on behalf of the Company for any 12 consecutive month period.

## 6.  PURCHASE PRICE

The purchase price for all Shares purchased pursuant to Paragraph 4 hereof shall be determined as follows:

**(a)** the Continuing Shareholder, as the case may be, within 30 days after receipt of any offer referred to in Paragraph 4 above, shall notify the Offering Shareholder of the price at which the Continuing Shareholder is willing to purchase the Shares.
**(b)** in the event the Offering Shareholder objects to the purchase price established in accordance with Paragraph 5(a) above, the Offering Shareholder shall have the right to solicit offers to buy the Shares in accordance with the provisions of Paragraph 4.1. The right to solicit offers shall be subject to the terms and conditions of Section 4.1 and 4.2 hereof, including without limitation, the rights of first refusal and the period during which any right of first refusal must be exercised but shall not be subject to the 30 day period referred to in Paragraph 4.2 of this Agreement.

## 7. PUT AND CALL OPTIONS

**7.1. Put and Call Options.** Each Shareholder shall have the right and option upon the written declaration (a "Declaration") by such Shareholder to the other Shareholder of the occurrence of an "impasse" (as defined below) to sell to the Continuing Shareholder all of his/her Shares, and the Continuing Shareholder shall have the obligation to either:
**(a)** purchase all of such Shares owned by the offering Shareholder at such price as the Offering Shareholder has set, or
**(b)** if the Continuing Shareholder is unable or unwilling to purchase all of the Shares owned by the Offering Shareholder, sell all of his/her Shares to the Offering Shareholder, and the Offering Shareholder shall have the obligation to buy such Shares.

**7.2. Impasse.** An "impasse" shall be conclusively evidenced by:
(i) a Shareholder or his/her respective representative, voting opposite the other Shareholder at a vote at a shareholders meeting or at a vote at a meeting of the Board of Directors of the Company (or failing to attend such meetings upon due notice if such failure results in the lack of a quorum making such vote impossible), which vote is on a material issue, not in the ordinary course of business, and affecting the business, assets or operations of the Company, including, but not limited to, a proposal to merge, liquidate, consolidate or dissolve the Company, or to sell, lease or dispose of all or substantially all of the assets of the Company or to amend the substantive provisions of the Company's bylaws or articles of incorporation, or to issue or redeem stock, or to declare dividends of any kind, and (ii) either Shareholder notifying the other Shareholder within 30 days after such meeting, proposed meeting or vote than an "impasse" has occurred. The put and call rights granted to each Shareholder under this Paragraph 7 are independent of the other rights granted to the Shareholders under the other terms of this Agreement and such rights are not mutually exclusive or inconsistent.

**7.3. Exercise of Option**
The Continuing Shareholder shall exercise any option provided for in this Paragraph 7 within 30 days after receipt of a declaration. Any closing of the sale of Shares pursuant to such exercise shall occur within 60 days after receipt of a Declaration.

**7.4. Purchase Price**
Any purchase or sale of Shares sold pursuant to this Paragraph 7 shall be at the price as set forth in the Declaration delivered by the Shareholder exercising his/her right to sell his/her shares and shall be paid at the closing of the sale of the Shares.

## 8. AGREEMENT BINDING ON ALL PERSONS INTERESTED IN SHARES

Each person who now or hereafter acquires any legal or equitable interest in any Shares shall be bound by the terms of this Agreement. No issuance or transfer of Shares shall be effective and the Company shall not enter any issue or transfer upon the stock books of the Company or issue a certificate in the name of any person unless the Company is satisfied that such person is, and in a manner satisfactory to the Company has acknowledged being, bound by this Agreement.

## 9. CLOSING

Except as otherwise agreed to or expressly provided for herein, closing pursuant to the exercise of a right to purchase or sell Shares pursuant to this Agreement shall be held at the principal offices of the Company.

## 10. ENTRY OF LEGEND UPON STOCK CERTIFICATES

The following legend shall be immediately entered on each stock certificate representing Shares owned by the Shareholders:

"The gift, sale, mortgage, pledge, hypothecation or other encumbering or transfer of the shares of the capital stock represented by this certificate is restricted in accordance with the terms and conditions of a Shareholders Agreement dated September 9, 2014, a copy of which is on file at the principal offices of the Company. Said Shareholders Agreement restricts the ability of the Shareholder to sell, give, pledge, bequeath or otherwise transfer or dispose of this stock certificate and the shares of capital stock represented by it."

## 11. AFTER ACQUIRED SHARES - SUBSEQUENT SHAREHOLDERS

The terms and conditions of this Agreement shall specifically apply not only to Shares owned by Shareholders at the time of execution of this Agreement, but also to any Shares acquired by any Shareholder subsequent to such execution.

## 12. BOARD OF DIRECTORS

At each election of the Board of Directors of the Company, the Shareholders shall vote their Shares to elect two directors of the Company, one director being First Shareholder, or his/her nominee, and one director being Second Shareholder, or his/her nominee.

## 13. INSURANCE

The Company or either Shareholder may, if they so desire, purchase insurance policies on the life of any Shareholder for the purpose of payment for stock purchases or as key man insurance. If any Shareholder on whose life the Company or other Shareholder owns an insurance policy shall at any time during his/her lifetime sell all of his/her Shares, then that Shareholder shall have the right to purchase from the Company or other Shareholder the insurance policy or policies on his/her life at the cash surrender value, if any. The Company or other Shareholder shall deliver the policy or policies on the life of such Shareholder upon payment of the cash surrender value, if any, end shall execute any necessary instruments of transfer and change of beneficiary forms.

## 14. SUBCHAPTER S ELECTION

The Company elects to be taxed as a small business corporation under Subchapter S of the Internal Revenue Code, as amended from time to time (the "code"), or such other provisions of law as may hereafter be applicable to such an election, and for state income tax purposes, if available (hereinafter, an "Election"). Each Shareholder and the Company agree to execute and file the necessary forms for making and maintaining the Election. The Shareholders and the Company agree that they will take such other actions as may be deemed necessary or advisable by counsel to the Company to exercise or maintain the Election.

## 15. AUTHORIZATION

The Company is authorized to enter into this Agreement by virtue of a resolution of Board of Directors.

## 16. NOTICES

Notices and declarations under this Agreement shall be in writing and sent by registered or certified mail, return receipt requested, postage paid, to the Company at its principal offices and to Shareholders at their last address as shown on the records of the Company or at such other address with respect to any party hereto as such party shall notify the other Shareholders and the Company in writing in the manner specified herein.

## 17. TERMINATION

The rights and obligations of the Company and the Shareholders under this Agreement shall terminate upon written agreement of all existing Shareholders.

## 18. SEVERABILITY

The various provisions of this Agreement are severable from each other and from the other provisions of the Agreement, and in the event that any provision in this Agreement shall be held to be invalid or unenforceable by a court of competent jurisdiction, the remainder of this Agreement shall be fully effective, operative and enforceable.

## 19. FREE AND CLEAR OF ENCUMBRANCES

All Shares sold pursuant to the terms of this Agreement shall be free of any and all liens and encumbrances and accompanied by stock powers duly endorsed in blank.

## 20. BINDING EFFECT

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, executors, administrators, successors and assigns.

## 21. GOVERNING LAW

This Agreement shall be construed and interpreted in accordance with the laws of the State of Michigan without reference to conflict of laws principles except to the extent that the community or marital property laws of any state would otherwise be applicable to a particular situation, in which event, such community or marital property laws shall apply to the particular situation.

## 22. ENTIRE AGREEMENT

This instrument contains the entire agreement of the parties and may be changed only by an agreement in writing signed by the Company and all persons then owning Shares.

## 23. COUNTERPARTS

This Agreement may be executed in one or more counterparts each of which shall be deemed an original and all of which together shall be deemed to be one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on the day and year set forth below.

**COMPANY**

_____
**Authorized Signature**

FARZANA KHAN (President)
**Print Name and Title**

may 4th, 2015
**Date**

_____
**Authorized Signature**

SHEHZAD KHAN, VICE PRESIDENT
**Print Name and Title**

MAY/4/2015
**Date**


**SHAREHOLDER**

_____
**Authorized Signature**

FARZANA KHAN (President)
**Print Name and Title**

may 4th, 2015
**Date**

**SHAREHOLDER**

_____
**Authorized Signature**

SHEHZAD KHAN, VICE PRESIDENT
**Print Name and Title**

MAY/4/2015
**Date**

# BYLAWS

## of

# EWC MICHIGAN MANAGEMENT INC.

## ARTICLE I

### Offices

**1.1** **Registered Office and Registered Agent**: The registered office of the corporation shall be located in the State of Michigan at such place as may be fixed from time to time by the Board of Directors upon filing of such notices as may be required by law, and the registered agent shall have a business office identical with such registered office.

**1.2** **Other Offices**: The Corporation may have other offices within or outside the State of New York at such place or places as the Board of Directors may from time to time determine.

## ARTICLE 2

### Shareholder's Meetings

**2.1** **Meeting Place**: All meetings of the shareholders shall be held at the registered office of the corporation, or at such place as shall be determined from time to time by the Board of Directors, and the place at which any such meeting shall be held shall be stated in the notice of the meeting.

**2.2** **Annual Meeting Time**: The annual meeting of the shareholders for the election of directors and for the transaction of such other business as may properly come before the meeting, shall be held each year on January 31, at the hour of 4:00pm, if not a legal holiday, and if a legal holiday, then on the day following, at the same hour.

**2.3** **Annual Meeting - Order of Business**: At the annual meeting of shareholders, the order of business shall be as follows:

(a) Calling of the meeting to order.
(b) Proof of notice of meeting (or filing of waiver).
(c) Reading of minutes of last annual meeting.
(d) Report of officers.
(e) Reports of committees.
(f) Election of directors.
(g) Miscellaneous business.

**2.4 Special Meetings**: Special meetings of the shareholders for any purpose may be called at any time by the President, Board of Directors, or the holders of not less than ten percent of all shares entitled to vote at the meeting.

**2.5 Notice**:
(a) Notice of the time and place of an annual meeting of shareholders shall be given by delivering personally or by mailing a written or printed notice of the same, at least ten days, and not more than fifty days, prior to the meeting, to each shareholder of record entitled to vote at such meeting.

(b) At least ten days and not more than fifty days prior to the meeting, written or printed notice of each special meeting, and the purpose or purposes for which the meeting is called, shall be delivered personally, or mailed to each shareholder of record entitled to vote at such meeting.

**2.6 Voting Record**: At least ten days before each meeting of shareholders, a complete record of the shareholders entitled to vote at such meeting, or any adjournment thereof, shall be made, arranged in alphabetical order, with the address of and number of shares held by each, which record shall be kept on file at the registered office of the corporation for a period of ten days prior to the meeting. The records shall be kept open at the time and place of such meeting for the inspection of any shareholder.

**2.7 Quorum**: Except as otherwise required by law:

(a) A quorum at any annual or special meeting of shareholders shall consist of shareholders representing, either in person or by proxy, a majority of the outstanding capital stock of the corporation, entitled to vote at such meeting.
(b) The voters of a majority in interest of those present at any properly called meeting or adjourned meeting of shareholders at which a quorum as in this paragraph defined is present, shall be sufficient to transact business.

**2.8 Closing of Transfer Books and Fixing Record Date**: For the purpose of determining shareholders entitled to notice of or to vote at any meeting of shareholders, or any adjournment thereof, or entitled to receive payment of any dividend, the Board of Directors may provide that the stock transfer books shall be closed for a stated period not to exceed fifty days nor be less than ten days preceding such meeting. In lieu of closing the stock transfer books, the Board of Directors may fix in advance a record date for any such determination of shareholders, such date to be not more than fifty days, and, in case of a meeting of shareholders, not less than ten days

2

prior to the (late on which the particular action requiring such determination of shareholders is to be taken.

**2.9** **Proxies**: A shareholder may vote either in person or by proxy executed in writing by the shareholder, or his duly authorized attorney-in-fact. No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

**2.10** **Action by Shareholders Without a Meeting**: Any action required or which may be taken at a meeting of shareholders of the corporation, may be taken at a meeting if a consent in writing, setting forth the action so taken, shall be signed by all of the shareholders entitled to vote with respect to the subject matter thereof. Such consent shall have the same force and effect as a unanimous vote of the shareholders.

**2.11** **Waiver of Notice**: A waiver of notice required to be given any shareholder, signed by the person or persons entitled to such notice, whether before or after the time stated therein for the meeting, shall be equivalent to the giving of such notice.

## ARTICLE 3

### Stock

**3.1** **Certificates**: Certificates of stock shall be issued in numerical order, and each shareholder shall be entitled to a certificate signed by the President, or a Vice President, and the Secretary or Assistant Secretary, and may be sealed with the seal of the corporation or a facsimile thereof The signatures of such officers may be facsimiles if the certificate is manually signed on behalf of the transfer agent, or registered by a registrar, other than the corporation itself or an employee of the corporation. If an officer who has signed or whose facsimile signature has been placed upon such certificate ceases to be an officer before the certificate is used, it may be issued by the corporation with the same effect as if the person were an officer on the date of issue.

**3.2** **Transfer**: Transfers of stock shall be made only upon the stock transfer books of the corporation, kept at the registered office of the corporation or at its principal place of business, or at the office of its transfer agent or registrar; and before a new certificate is issued. the old certificate shall be surrendered for cancellation. The Board of Directors may, by resolution, open a share register in any state of the United States, and may employ an agent or agents to keep such register, and to record transfers or shares therein.

**3.3** **Registered Owner**:  Registered shareholders shall be treated by the corporation as the holders in fact of the stock standing in their respective

3

names and the corporation shall not be bound to recognize any equitable or other claim to or interest in any share on the part of any other person, whether or not it shall have express or other notice thereof, except as expressly provided below or by the laws of the State of New York. The Board of Directors may adopt by resolution a procedure whereby a shareholder of the corporation may certify in writing to the corporation that all or a portion of the shares registered in the name of such shareholder are held for the account of a specified person or persons. The resolution shall set forth:

(a) The classification of shareholder who may certify;

(b) The purpose or purposes for which the certification may be made;

(c) The form of certification and information to be contained therein;

(d) If the certification is with respect to a record date or closing of the stock transfer books, the date within which the certification must be received by the corporation; and

(e) Such other provisions with respect to the procedure as are deemed necessary or desirable.

Upon receipt by the corporation of a certification complying with the procedure, the persons specified in the certification shall be deemed, for the purpose or purposes set forth in the certification, to be the holders of record of the number of shares specified in place of the shareholder making the certification.

**3.4** **Mutilated, Lost, or Destroyed Certificates**: In case of any mutilation, loss or destruction of any certificate of stock, another may be issued in its place on proof of such mutilation, loss or destruction. The Board of Directors may impose conditions on such issuance and may require the giving of a satisfactory bond or indemnity to the corporation in such sum as they might determine or establish such other procedures as they deem necessary.

**3.5** **Fractional Shares or Scrip**: The Corporation may:

(a) Issue fractions of a share which shall entitle the holder to exercise voting rights, to receive dividends thereon, and to participate in any of the assets of the corporation in the event of liquidation;

(b) Arrange for the disposition of fractional interests by those entitled thereto;

(c) Pay in cash the fair market value of fractions of a share as of the time when those entitled to receive such shares are determined; or

(d) Issue script in registered or bearer form which shall entitle the holder to receive a certificate for the full share upon surrender of such script aggregating a full share.

4

**3.6 Shares of Another Corporation**: Shares owned by the corporation in another corporation, domestic or foreign, may be voted by such officer, agent or proxy as the Board of Directors may determine or, in the absence of such determination, by the President of the Corporation.

## ARTICLE 4

### Board of Directors

**4.1 Numbers and Powers**: The management of all the affairs, property and interest of the corporation shall be vested in the Board of Directors, consisting of one person who shall be elected for a term of one year, and shall hold office until their successors are elected and qualified. Directors need not be shareholders or residents of the State of New York. In addition to the powers and authorities granted by these Bylaws, and the Articles of Incorporation expressly conferred upon it, the Board of Directors may exercise all such powers of the corporation and do all such lawful acts and things as are not by statute or by the Articles of Incorporation or by these Bylaws directed or required to be exercised or done by the shareholders.

**4.2 Change of Number**: The number of directors may at any time be increased or decreased by amendment of these Bylaws, but no decrease shall have the effect of shortening the term of any incumbent director.

**4.3 Vacancies**: All vacancies in the Board of Directors, whether caused by resignation, death or, otherwise, may be filled by the affirmative vote of a majority of the remaining directors though less than a quorum of the Board of Directors. A director elected to fill any vacancy shall hold office for the unexpired term of his predecessor and until his successor is elected and qualified. Any directorship to be filled by reason of an increase in the number of directors may be filled by the Board of Directors for a term of office continuing only until the next election of directors by the shareholders.

**4.4 Removal of Directors**: At a meeting of shareholders called expressly for that purpose, the entire Board of Directors, or any member thereof, may be removed by a vote of the holders of a majority of shares then entitled to vote at an election of such shareholders.

**4.5 Regular Meetings**: Regular meetings of the Board of Directors or any committee may be held without notice at the registered office of the corporation or at such place or places, either within or without the State of New York, as the Board of Directors or such committee, as the case may be, may from time to time designate. The annual meeting of the Board of Directors shall be held without notice immediately after the adjournment of the annual meeting of shareholders.

5

**4.6** **Special Meetings**: Special meetings of the Board of Directors may be held at any place and at any time and may be called by the Chairman of the Board, the President, Vice President, Secretary or Treasurer, or any two or more directors.

**4.7** **Notice of Meetings**: Unless the Articles of Incorporation provide otherwise, any regular meeting of the Board of Directors may be held without notice of the date, time, place, or purpose of the meeting. Any special meeting of the Board of Directors may preceded by at least two days' notice of the date, time, and place of the meeting, but not of its purpose, unless the Articles of Incorporation of these Bylaws require otherwise. Notice may be given personally, by facsimile, by mail, or in any other manner allowed by law. Oral notification shall be sufficient only if a written record of such notice is included in the Corporation's minute book. Notice shall be deemed effective at the earliest of. (a) receipt; (b) delivery to the proper address or telephone number of the directors as shown in the Corporation's records; or (c) five days after its deposit in the United States mail, as evidenced by the postmark, if correctly addressed and mailed with first-class postage prepaid. Notice of any meeting of the Board of Directors may be waived by any director at any time, by a signed writing, delivered to the Corporation for inclusion in the minutes, either before or after the meeting. Attendance or participation by a director at a meeting unless the director promptly objects to holding the meeting or to the transaction of any business on the grounds that the meeting was not lawfully convened and the director does not thereafter vote for or assent to action taken at the meeting.

**4.8** **Quorum**: A majority of the whole Board of Directors shall be necessary at all meetings to constitute a quorum for the transaction of business.

**4.9** **Waiver of Notice**: Attendance of a director at a meeting shall constitute a waiver of notice of such meeting, except where a director attends for the express purpose of objecting to the transaction of any business because the meeting was not lawfully called or convened. A waiver of notice signed by the director or directors, whether before or after the time stated for the meeting, shall be equivalent to the giving of notice.

**4.10** **Registering Dissent**: A director who is present at a meeting of the Board of Directors at which action on a corporate matter is taken shall be presumed to have assented to such action unless his dissent shall be entered in the minutes of the meeting, or unless he shall file his written dissent to such action with the person acting as the secretary of the meeting, before the adjournment thereof, or shall forward such dissent by registered mail to the Secretary of the corporation immediately after the adjournment of the meeting. Such right to dissent shall not apply to a director who voted in favor of such action.

6

**4.11 <u>Executive and Other Committees</u>**: Standing or special committees may be appointed from its own number by the Board of Directors from time to time and the Board of Directors may from time to time invest such committees with such powers as it may see fit, subject to such conditions as may be prescribed by such Board. An Executive Committee may be appointed by resolution passed by a majority of the full Board of Directors. It shall have and exercise all of the authority of the Board of Directors, except in reference to amending the Articles of Incorporation, adopting a plan of merger or consolidation, recommending sale, lease or exchange or other disposition of all or substantially all the property and assets of the corporation otherwise than in the equal and regular course of business, recommending a voluntary dissolution or a revocation thereof, or amending the Bylaws. All committees so appointed shall keep regular minutes of the transactions of their meetings and shall cause them to be recorded in books kept for that purpose in the office of the corporation. The designation of any such committee and the delegation of authority thereto, shall not relieve the Board of Directors, or any member thereof, of any responsibility imposed by law.

**4.12 <u>Remuneration</u>**: No stated salary shall be paid directors, as such, for their service, but by resolution of the Board of Directors. A fixed sum and expenses of attendance, if any, may be allowed for attendance at each regular or special meeting of such Board; provided, that nothing herein contained shall be construed to preclude any director from serving the corporation in any other capacity and receiving compensation therefore. Member of standing or special committees may be allowed like compensation for attending committee meetings.

**4.13 <u>Loans</u>**: No loans shall be made by the corporation to the directors, unless first approved by the holders of two-thirds of the voting shares. No loans shall be made by the corporation secured by its' own shares.

**4.14 <u>Action by Directors Without a Meeting</u>**: Any action required or which may be taken without a meeting of the directors, or of a committee thereof, may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by all of the directors, or all of the members of the committee, as the case may be. Such consent shall have the same effect as a unanimous vote.

**4.15 <u>Action of Directors by Communications Equipment</u>**: Any action required or which may be taken at a meeting of directors, or of a committee thereof, may be taken by means of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other at the same time.

7

## ARTICLE 5
### Officers

**5.1** **Designations**: The officers of the corporation shall be a President, a Secretary and a Treasurer, who shall be elected by the directors at their first meeting after the annual meeting of shareholders, and who shall hold office until their successors are elected and qualified. Any two or more offices may be held by the same person.

**5.2** **The President**: The president shall preside at all meetings of shareholders and directors, shall have general supervision of the affairs of the corporation, and shall perform all other duties as are incident to his office or are properly required of him by the Board of Directors.

**5.3** **Secretary**: The Secretary shall issue notices for all meetings, except for notices for special meetings of shareholders and special meetings of the directors which are called by the requisite number of shareholders or directors, shall keep the minutes of all meetings, shall have charge of the seal and the corporate books, shall make such reports and perform other duties as are incident to his office, or are properly required of him by the Board of Directors.

**5.4** **The Treasurer**: The Treasurer shall have the custody of all moneys and securities of the corporation and shall keep regular books on account. He shall disburse funds of the corporation in payment of the just demands against the corporation or as may be ordered by the Board of Directors, taking proper vouchers for such disbursements, and shall render to the Board of Directors from time to time as may be required of him, an account of all his transactions as Treasurer and of the financial conditions to his office or that are properly required of him by the Board of Directors.

**5.7** **Vacancies**: Vacancies in any office arising from any cause may be filled by the Board of Directors at any regular or special meeting of the Board.

**5.8** **Other Officers**: Directors may appoint such other officers and agents as it shall deem necessary or expedient, who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board of Directors.

**5.9** **Loans**: No loans shall be made by the corporation to any officer, unless first approved by the holders of two-thirds of the voting shares.

**5.10** **Term - Removal**: The officers of the corporation shall hold office until their successors are chosen and qualify. Any officer or agent elected or appointed by the Board of Directors may be removed at any time, without cause, by the affirmative vote of a majority of the whole Board of Directors,

8

but such removal shall be without prejudice to the contract rights, if any, of the person so removed.

5.11 **Bonds**: The Board of Directors may, by resolution, require any and all of the officers to give bonds to the corporation, with sufficient surety or sureties, conditioned for the faithful performance of the duties of their respective offices, and to comply with such other conditions as may from time to time be required by the Board of Directors.

5.12 **Salaries**: The salaries of the officers shall be fixed from time to time by the Board of Directors, and no officer shall be prevented from receiving such salary by reason of the fact that he is also a director of the corporation.

## ARTICLE 6

### Dividends and Finance

6.1 **Dividends**: Dividends may be declared by the Board of Directors and paid by the corporation out of the unreserved and unrestricted earned surplus of the corporation, or out of the unreserved and unrestricted net earnings of the current fiscal year, or in treasury shares of the corporation, subject to the conditions and limitations imposed by the State of New York. The stock transfer books may be closed for the payment of dividends during such periods of not exceeding fifty days, as from time to time may be fixed by the Board of Directors. The Board of Directors, however, without closing the books of the corporation, may declare dividends payable only to holders of record at the close of business, on any business day not more than fifty days prior to the date on which the dividend is paid.

6.2 **Reserves**: Before making any distribution of earned surplus, there may be set aside out of the earned surplus of the corporation such sum or sums as the directors from time to time in their absolute discretion deem expedient dividends, or for maintaining any property of the corporation, or for any other purpose, and earned surplus of any year not set apart until otherwise disposed of by the Board of Directors.

6.3 **Depositories**: The moneys of the corporation shall be deposited in the name of the corporation in such bank or trust company or trust companies as the Board of Directors shall designate, and shall be drawn out only by check or other order for payment of money signed by such persons and in such manner as may be determined by resolution of the Board of Directors.

## ARTICLE 7

### Notices

9

Except as may otherwise be required by law, any notice to any shareholder or director may be delivered personally or by mail. If mailed, the notice shall be deemed to have been delivered when deposited in the United States mail, addressed to the addressee at his last known address in the records of the corporation, with postage thereon prepaid.

## ARTICLE 8

### Seal

The corporate seal of the corporation shall be in such form and bear such inscription as may be adopted by resolution of the Board of Directors, or by usage of the officers on behalf of the corporation. The procurement of a corporate seal shall be discretionary only, and is not required.

## ARTICLE 9

### Books and Records

The corporation shall keep correct and complete books and record of accounts and shall keep minutes of the proceedings of its shareholders and Board of Directors, and shall keep at its registered office or principal place of business, or at the office of its transfer agent or registrar, a record of its shareholders, giving the names and addresses of all shareholders and the number and class of the shares held by each. Any books, records, and minutes may be in written form or any other form capable of being converted into written form within a reasonable time.

## ARTICLE 10

### Special Corporate Acts

10.1 **Execution of Written Instruments**: Contracts, deeds, documents, and instruments shall be executed by the President alone unless the Board of Directors shall, in a particular situation, designate another procedure for their execution.

10.2 **Signing of Checks or Notes**: Checks, notes, drafts, and demands for money shall be signed by the officer or officers from time to time designated by the Board of Directors.

10.3 **Indemnification of Directors and Officers**: The corporation shall indemnify any and all directors or officers or former directors or former officers or any person who may have served at its request as a director or officer of the corporation or of any other corporation in which it is a creditor, against expenses actually or necessarily incurred by them in connection with the defense or settlement of any action, suit, or proceeding brought or threatened in which they, or any of them, are or might be made parties, or a party, by reason of being or having been directors or officers or a director

10

or an officer of the corporation, or of such other corporation. This indemnification shall not apply, however, to matter as to which such director or officer or former director or officer or person shall be adjudged in such action, suit, or proceeding to be liable for negligence or misconduct in the performance of duty. Such indemnification shall not be deemed exclusive of other rights to which those indemnified may be entitled, under any law, bylaw, agreement, vote of shareholders, or otherwise.

## ARTICLE 11

### Amendments

**11.1 By Shareholders**: These Bylaws may be altered, amended or repealed by the affirmative vote of a majority of the voting stock issued and outstanding at any regular or special meeting of the shareholders.

**11.2 By Directors**: The Board of Directors shall have the power to make, alter, amend and repeal the Bylaws of this corporation. However any such alteration, amendment, or repeal of the Bylaws, may be changed or repealed by the holders of a majority of the stock entitled to vote at any shareholders meeting.

**11.3 Emergency Bylaws**: The Board of Directors may adopt emergency Bylaws, Bylaws: subject to repeal or change by action of the shareholders, which shall be operative during any emergency in the conduct of business of the corporation resulting from an attack on the United States or any nuclear or atomic disaster.

Adopted by resolution of the Corporation's Board of Directors on this Feb 1, 2015

_____
Director – Farzana Khan

_____
Director – Mohammed Shehzad Khan

<u>Exhibit C to Franchise Certificate</u>

<u>Good Standing</u>

<u>[to be attached]</u>



## Department of Licensing and Regulatory Affairs

Lansing, Michigan

This is to Certify That

### EWC MICHIGAN MANAGEMENT INC

was validly incorporated on September 8, 2014, as a Michigan profit corporation, and said corporation is validly in existence under the laws of this state.

This certificate is issued pursuant to the provisions of 1972 PA 284, as amended, to attest to the fact that the corporation is in good standing in Michigan as of this date and is duly authorized to transact business and for no other purpose.

This certificate is in due form, made by me as the proper officer, and is entitled to have full faith and credit given it in every court and office within the United States.





Sent by Facsimile Transmission
1309767

In testimony whereof, I have hereunto set my hand, in the City of Lansing, this 13th day of May, 2015.

Alan J. Schefke, Director
Corporations, Securities & Commercial Licensing Bureau

## RECEIPT

THIS DISCLOSURE DOCUMENT SUMMARIZES CERTAIN PROVISIONS OF THE FRANCHISE AGREEMENT AND OTHER INFORMATION IN PLAIN LANGUAGE. READ THIS DISCLOSURE DOCUMENT AND ALL AGREEMENTS CAREFULLY.

IF EWC FRANCHISE, LLC OFFERS YOU A FRANCHISE, EWC FRANCHISE, LLC MUST PROVIDE THIS DISCLOSURE DOCUMENT TO YOU 14 CALENDAR DAYS BEFORE YOU SIGN A BINDING AGREEMENT WITH, OR MAKE A PAYMENT TO, THE FRANCHISOR OR AN AFFILIATE IN CONNECTION WITH THE PROPOSED FRANCHISE SALE UNLESS OTHERWISE STATED IN YOUR STATE'S ADDENDUM.

MARYLAND, NEW YORK AND RHODE ISLAND REQUIRE A FRANCHISOR TO PROVIDE THE FRANCHISE DISCLOSURE DOCUMENT AT THE EARLIER OF THE FIRST PERSONAL MEETING OR 10 BUSINESS DAYS BEFORE THE EXECUTION OF THE FRANCHISE OR OTHER AGREEMENT OR THE PAYMENT OF ANY CONSIDERATION THAT RELATES TO THE FRANCHISE RELATIONSHIP.

MICHIGAN, OREGON, AND WASHINGTON REQUIRE A FRANCHISOR TO PROVIDE THE FRANCHISE DISCLOSURE DOCUMENT AT LEAST 10 BUSINESS DAYS BEFORE THE EXECUTION OF THE FRANCHISE OR OTHER AGREEMENT OR THE PAYMENT OF ANY CONSIDERATION THAT RELATES TO THE FRANCHISE RELATIONSHIP, WHICHEVER OCCURS FIRST.

IF EWC FRANCHISE, LLC DOES NOT DELIVER THIS DISCLOSURE DOCUMENT ON TIME OR IF IT CONTAINS A FALSE OR MISLEADING STATEMENT, OR A MATERIAL OMISSION, A VIOLATION OF FEDERAL AND STATE LAW MAY HAVE OCCURRED AND SHOULD BE REPORTED TO THE FEDERAL TRADE COMMISSION, WASHINGTON, D.C. 20580 AND THE STATE ADMINISTRATOR LISTED IN EXHIBIT A.

THE FOLLOWING ARE THE NAMES, PRINCIPAL BUSINESS ADDRESS AND TELEPHONE NUMBER OF THE FRANCHISE SELLER OF EWC FRANCHISE, LLC OFFERING THE FRANCHISE (PLEASE CHECK THE APPROPRIATE BOX):

☐ DAVID COBA
600 Silks Run, Ste 2270
Hallandale Beach, FL 33009
(954) 455-8000

☐ JOSHUA COBA
600 Silks Run, Ste 2270
Hallandale Beach, FL 33009
(954) 455-8000

☐ JORDAN KRAMS
600 Silks Run, Ste 2270
Hallandale Beach, FL 33009
(954) 455-8000

☒ _EWC Michigan Management Inc._ ACTS AS EWC FRANCHISE, LLC'S AREA REPRESENTATIVE IN CONNECTION WITH THE OFFERING OF THIS FRANCHISE. ITS ADDRESS IS _2 Emil Street Princeton Junction NJ 08550_ AND ITS TELEPHONE NUMBER IS _801-557-6550_, AREA REPRESENTATIVE'S FRANCHISE SELLER(S) IS/ARE _Farzana Khan and Shehzad Khan_

ISSUANCE DATE: MARCH 24, 2015 OR THE EFFECTIVE DATE IN YOUR STATE, WHICHEVER IS LATER.

I HAVE RECEIVED A FRANCHISE DISCLOSURE DOCUMENT DATED MARCH 24, 2015 INCLUDING THE FOLLOWING EXHIBITS ON THE DATE LISTED BELOW:

A. LIST OF STATE ADMINISTRATORS
B. LIST OF STATE AGENTS FOR SERVICE OF PROCESS
C. FRANCHISE AGREEMENT
D. TABLE OF CONTENTS OF OPERATIONS MANUAL
E. FINANCIAL STATEMENTS
F. LIST OF TERMINATED FRANCHISEES
G. FRANCHISEE DISCLOSURE QUESTIONNAIRE
H. MULTI-STATE ADDENDA

I. CURRENT FRANCHISEES
J. CURRENT AREA REPRESENTATIVES
K. AGREEMENT REGARDING FRANCHISEE LEASE
L. FORM STAGGERED DEVELOPMENT AMENDMENT
M. FORM ACH AUTHORIZATION
N. ILLINOIS SUBFRANCHISOR SUPPLEMENTS (APPLICABLE TO ILLINOIS ONLY)
O. SUMMARY OF CALIFORNIA NEGOTIATED CHANGES (APPLICABLE TO CALIFORNIA ONLY)

EWC FRANCHISE, LLC AUTHORIZES THE RESPECTIVE STATE AGENCIES IDENTIFIED ON EXHIBIT B TO RECEIVE SERVICE OF PROCESS FOR IT IN THE PARTICULAR STATE. PLEASE SIGN AND PRINT YOUR NAME BELOW, DATE AND RETURN ONE COPY OF THIS RECEIPT TO EWC FRANCHISE, LLC AND KEEP THE OTHER FOR YOUR RECORDS.

_4/16/15_
Date of Receipt (Do Not Leave Blank)

Print Name _FARZANA KHAN_

Signature

Return to:
EWC FRANCHISE, LLC
P.O. Box 802208
Aventura, Florida 33280
E-mail: franchise@waxcenter.com

Franchisee Entity (if applicable): _EWC MICHIGAN MANAGEMENT INC._

126

## RECEIPT

THIS DISCLOSURE DOCUMENT SUMMARIZES CERTAIN PROVISIONS OF THE FRANCHISE AGREEMENT AND OTHER INFORMATION IN PLAIN LANGUAGE. READ THIS DISCLOSURE DOCUMENT AND ALL AGREEMENTS CAREFULLY.

IF EWC FRANCHISE, LLC OFFERS YOU A FRANCHISE, EWC FRANCHISE, LLC MUST PROVIDE THIS DISCLOSURE DOCUMENT TO YOU 14 CALENDAR DAYS BEFORE YOU SIGN A BINDING AGREEMENT WITH, OR MAKE A PAYMENT TO, THE FRANCHISOR OR AN AFFILIATE IN CONNECTION WITH THE PROPOSED FRANCHISE SALE UNLESS OTHERWISE STATED IN YOUR STATE'S ADDENDUM.

MARYLAND, NEW YORK AND RHODE ISLAND REQUIRE A FRANCHISOR TO PROVIDE THE FRANCHISE DISCLOSURE DOCUMENT AT THE EARLIER OF THE FIRST PERSONAL MEETING OR 10 BUSINESS DAYS BEFORE THE EXECUTION OF THE FRANCHISE OR OTHER AGREEMENT OR THE PAYMENT OF ANY CONSIDERATION THAT RELATES TO THE FRANCHISE RELATIONSHIP.

MICHIGAN, OREGON, AND WASHINGTON REQUIRE A FRANCHISOR TO PROVIDE THE FRANCHISE DISCLOSURE DOCUMENT AT LEAST 10 BUSINESS DAYS BEFORE THE EXECUTION OF THE FRANCHISE OR OTHER AGREEMENT OR THE PAYMENT OF ANY CONSIDERATION THAT RELATES TO THE FRANCHISE RELATIONSHIP, WHICHEVER OCCURS FIRST.

IF EWC FRANCHISE, LLC DOES NOT DELIVER THIS DISCLOSURE DOCUMENT ON TIME OR IF IT CONTAINS A FALSE OR MISLEADING STATEMENT, OR A MATERIAL OMISSION, A VIOLATION OF FEDERAL AND STATE LAW MAY HAVE OCCURRED AND SHOULD BE REPORTED TO THE FEDERAL TRADE COMMISSION, WASHINGTON, D.C. 20580 AND THE STATE ADMINISTRATOR LISTED IN EXHIBIT A.

THE FOLLOWING ARE THE NAMES, PRINCIPAL BUSINESS ADDRESS AND TELEPHONE NUMBER OF THE FRANCHISE SELLER OF EWC FRANCHISE, LLC OFFERING THE FRANCHISE (PLEASE CHECK THE APPROPRIATE BOX):

☐ DAVID COBA
600 Silks Run, Ste 2270
Hallandale Beach, FL 33009
(954) 455-8000

☐ JOSHUA COBA
600 Silks Run, Ste 2270
Hallandale Beach, FL 33009
(954) 455-8000

☐ JORDAN KRAMS
600 Silks Run, Ste 2270
Hallandale Beach, FL 33009
(954) 455-8000

☒ _EWC Michigan Management Inc_ ACTS AS EWC FRANCHISE, LLC'S AREA REPRESENTATIVE IN CONNECTION WITH THE OFFERING OF THIS FRANCHISE. ITS ADDRESS IS _2 Emil Street Princeton Junction NJ 08550_ AND ITS TELEPHONE NUMBER IS _801-557-6550_. AREA REPRESENTATIVE'S FRANCHISE SELLER(S) IS/ARE _Farzana Khan and Shehzad Khan_

ISSUANCE DATE: MARCH 24, 2015 OR THE EFFECTIVE DATE IN YOUR STATE, WHICHEVER IS LATER.

I HAVE RECEIVED A FRANCHISE DISCLOSURE DOCUMENT DATED MARCH 24, 2015 INCLUDING THE FOLLOWING EXHIBITS ON THE DATE LISTED BELOW:

A. LIST OF STATE ADMINISTRATORS
B. LIST OF STATE AGENTS FOR SERVICE OF PROCESS
C. FRANCHISE AGREEMENT
D. TABLE OF CONTENTS OF OPERATIONS MANUAL
E. FINANCIAL STATEMENTS
F. LIST OF TERMINATED FRANCHISEES
G. FRANCHISEE DISCLOSURE QUESTIONNAIRE
H. MULTI-STATE ADDENDA

I. CURRENT FRANCHISEES
J. CURRENT AREA REPRESENTATIVES
K. AGREEMENT REGARDING FRANCHISEE LEASE
L. FORM STAGGERED DEVELOPMENT AMENDMENT
M. FORM ACH AUTHORIZATION
N. ILLINOIS SUBFRANCHISOR SUPPLEMENTS (APPLICABLE TO ILLINOIS ONLY)
O. SUMMARY OF CALIFORNIA NEGOTIATED CHANGES (APPLICABLE TO CALIFORNIA ONLY)

EWC FRANCHISE, LLC AUTHORIZES THE RESPECTIVE STATE AGENCIES IDENTIFIED ON EXHIBIT B TO RECEIVE SERVICE OF PROCESS FOR IT IN THE PARTICULAR STATE. PLEASE SIGN AND PRINT YOUR NAME BELOW, DATE AND RETURN ONE COPY OF THIS RECEIPT TO EWC FRANCHISE, LLC AND KEEP THE OTHER FOR YOUR RECORDS.

_4/10/15_
Date of Receipt (Do Not Leave Blank)

_SHEHZAD KHAN_
Print Name

_Khan_
Signature

Return to:
EWC FRANCHISE, LLC
P.O. Box 802208
Aventura, Florida 33280
E-mail: franchise@waxcenter.com

Franchisee Entity (if applicable): _EWC MICHIGAN MANAGEMENT INC_

126

Hi Farzana,

Attached to this email is the fully executed Short-Term Extension Agreement. Please do not hesitate to reach out should you have any questions.

Kind regards,

MEREDITH TILLERY

LEGAL COORDINATOR | LEGAL

O: (469) 270-6444 ext. 054

EUROPEAN WAX CENTER WORLD HEADQUARTERS

*5830 GRANITE PARKWAY*

*SUITE 300*

*PLANO, TX 75024*



 @europeanwax **waxcenter.com**

CONFIDENTIALITY NOTICE: The information contained in this email and any attached document contains information, some or all of which may be confidential or privileged, that is intended only for the intended recipient(s). If you are not an intended recipient, you are hereby advised that any review, dissemination, copying, printing or other use or the taking of any other action in reliance upon the information is prohibited. If you feel that you have received this e-mail in error, please immediately notify the sender and delete it and any attached documents from your system.

**From:** Meredith Tillery



EXHIBIT

C

**Sent:** Monday, September 9, 2024 3:09 PM
**To:** farzana khan <farzana.khan@waxcenter.com>
**Cc:** Todd Cherry <Todd.Cherry@myewc.com>; Joyce Wrigley <joyce.wrigley@myewc.com>
**Subject:** Extension of Initial Term | Short-Term Extension Agreement - EWC Michigan Management, Inc.

Dear Farzana,

As you know, the Initial Term of the Franchise Agreement for the location identified above previously expired (or will expire soon), and EWC has not yet had an opportunity to have you sign the Successor Franchise Agreement for this location.

As we work through the backlog of renewals over the coming months, we would like to ensure that the location identified above has an active Short-Term Extension Agreement in place.

Accordingly, after receiving this email, you will receive a second email from DocuSign prompting you to e-sign the attached Short-Term Extension Agreement, which serves to extend (or further extend, as applicable) the Initial Term of the Franchise Agreement through December 31, 2025.

As noted above, EWC is currently working to address the backlog with renewals, so you will receive additional information regarding the steps that will need to be completed in order to sign the Successor Franchise Agreement for this location at some point in the coming months.

If you have any questions about the attached Short-Term Extension Agreement, please let me know.  Otherwise, I will send a copy of the fully executed Short-Term Extension Agreement to you via email once the DocuSign has been completed.

Thank you,

MEREDITH TILLERY

LEGAL COORDINATOR | LEGAL

O: (469) 270-6444 ext. 054

EUROPEAN WAX CENTER WORLD HEADQUARTERS

*5830 GRANITE PARKWAY*

*SUITE 300*

*PLANO, TX 75024*



 @europeanwax **waxcenter.com**

CONFIDENTIALITY NOTICE: The information contained in this email and any attached document contains information, some or all of which may be confidential or privileged, that is intended only for the intended recipient(s). If you are not an intended recipient, you are hereby advised that any review, dissemination, copying, printing or other use or the taking of any other action in reliance upon the information is prohibited. If you feel that you have received this e-mail in error, please immediately notify the sender and delete it and any attached documents from your system.

## Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.



8300 Norman Center Drive
Suite 1000
Minneapolis, MN 55437-1060
General: 952-835-3800
Fax: 952-896-3333
www.larkinhoffman.com

January 8, 2026

Farzana A. Khan
EWC Michigan Management, Inc.
2 Emil Street,
Princeton Junction, New Jersey 08550

VIA OVERNIGHT COURIER
AND EMAIL
Shezad.khan@waxcenter.com

Re:     EWC Michigan Management Inc. – Notice of Expiration, Cease & Desist

Dear Ms. Khan:

This firm represents EWC Franchisor LLC ("EWC"), the franchisor of the European Wax Center® franchise system. EWC and EWC Michigan Management Inc. ("MMI") are parties to the European Wax Center® Franchise Agreement dated May 13, 2015 (collectively with all amendments, addenda, riders, assignments, and supplemental agreements, the "Franchise Agreement"). The terms capitalized and not otherwise defined in this letter have the meanings defined in the Franchise Agreement.

Under the Franchise Agreement, EWC granted MMI the right to operate the European Wax Center® business located at 7300 Orchard Lake Road, West Bloomfield, Michigan 48322 (the "Franchised Center") during the Initial Term of the Franchise Agreement and subject to its terms and conditions. Farzana Khan (collectively with MMI, "you" or "your") signed the Unlimited Guaranty and Assumption of Obligations on May 13, 2015, in which you personally guaranteed MMI's obligations under the Franchise Agreement.

As you know, the Initial Term of the Franchise Agreement previously expired, and by letter dated September 8, 2025, the landlord for the Franchised Center provided notice to MMI that it "must vacate the Premises . . . by December 31, 2025." Based on the notice from the landlord and the fact that the Initial Term of the Franchise Agreement had previously expired, EWC reasonably believed you intended to cease operating the Franchised Center on or before December 31, 2025. Despite the notice from the landlord, however, EWC is aware that you have continued to operate, notwithstanding the expiration of the Initial Term of the Franchise Agreement.

Accordingly, please let this letter serve as formal notice of the expiration of the Initial Term of the Franchise Agreement. Given that the Initial Term of the Franchise Agreement has now expired, you must immediately cease and desist your operation of the Franchised Center and comply with each of your post-expiration obligations under Article 17 of the Franchise Agreement. Additionally, please be advised that EWC will be disabling all vendor services and accounts associated with the Franchised Center following distribution of this letter.

As noted above, upon expiration of the Initial Term, Section 17.1 of the Franchise Agreement requires you to immediately undertake certain obligations, which are summarized for your convenience as follows:



EXHIBIT

D

January 8, 2026
Page 2

1. **Payment of All Outstanding Amounts**. You must pay all outstanding sums due and owing to EWC and its Affiliates arising from the operation of the Franchised Center prior to its closure, including their costs, expenses and attorneys' fees, as well as those incurred in connection with your indemnification obligations under Sections 21.3 of the Franchise Agreement.

2. **Outstanding Gift Card, Rewards Points and Wax Passes**. Notwithstanding the expiration of the Initial Term, you remain responsible for all liabilities associated with wax passes, gift cards, rewards points, and other similar items that were originally sold or otherwise issued at the Franchised Center during the Initial Term.  Accordingly, unless otherwise agreed to in writing by EWC, you must maintain an open and sufficiently funded bank account from which EWC can continue to withdraw payments that subsequently become due in connection with the redemption of wax passes, gift cards, rewards points, and other similar items that were originally sold or issued at the Franchised Center during the Initial Term. Notwithstanding the foregoing, in the event that you fail to maintain an open and sufficiently funded bank account from which EWC can withdraw payments or if you otherwise fail to punctually satisfy any obligation to pay EWC or its Affiliates in connection with subsequent redemptions of wax passes, gift cards, rewards points, and other similar items that were originally sold or otherwise issued at the Franchised Center in accordance with EWC's clearing house procedures, then *you shall be required to render payment to EWC and its Affiliates for the entire balance of all such unpaid amounts and pending liabilities immediately upon demand.*

3. **Obligations Following Expiration of Initial Term**. You must comply with each of the applicable requirements set forth in Article 17 of the Franchise Agreement with respect to the expiration of the Initial Term and the permanent closure of the Franchised Center, and then certify to EWC in writing (e-mail acceptable) that you have completed all such applicable steps.

4. **De-Branding and Deidentification of Franchised Center**. You must completely de-identify the former premises of the Franchised Center as a European Wax Center®, which includes without limitation the removal of all signage with any European Wax Center® insignia, logos, and other trademarks, the removal of all European Wax Center® inventory, trade fixtures, and equipment; provided, however, that any such removal must be consistent with the landlord's requirements and those under the Franchised Center's lease. For the avoidance of doubt, you may reallocate any such inventory, trade fixtures, and equipment to its or its affiliates' other European Wax Center® locations, as well as sell such items at reasonable amounts, subject to EWC's prior written consent, which shall not be unreasonably withheld, conditioned, or delayed, directly to other franchisees within the European Wax Center® franchise system.  In no event may you sell or otherwise distribute European Wax Center® inventory, trade fixtures, equipment, or any other items bearing the European Wax Center® name, logos, or other trademarks through any channel of commercial distribution, including, by way of example and not limitation, e-Bay, Facebook Marketplace, online auction sites, or any other secondary markets. You must also cease using and assign to EWC all telephone and facsimile numbers, internet addresses, email addresses, domains, and social media accounts for the Franchised Center.

5. **Reconciliation**. You must maintain the Franchised Center's local Point-of-Sale System server and provide EWC complete and unrestricted access to the Franchised Center's server in order to reconcile all Gross Sales at the Franchised Center, including Royalty

January 8, 2026
Page 3

Fees and any other amounts that accrued during the Initial Term, and in order for EWC to preserve server data for reconciliation of wax passes, gift cards, rewards points, and other similar items that were originally sold or otherwise issued at the Franchised Center prior to its permanent closure. You remain responsible for all costs and fees associated with processing credit card payments related to the former operation of the Franchised Center, including any costs associated with additional hardware required to process such payments remotely or any service fees associated therewith.

Neither this summary, nor anything in this letter, modifies, amends, supersedes, or replaces the terms and conditions of the Franchise Agreement. You must carefully review the Franchise Agreement, including without limitation Sections 7 and 17, and strictly comply with all the post-expiration obligations detailed therein.

Nothing in this letter is a waiver of any of EWC's rights under the Franchise Agreement, any other agreements, or any of its rights or remedies available under law or equity. To the contrary, EWC reserves all rights and causes of action it has against you, including without limitation its right to commence legal action against you for violating the Franchise Agreement and state and federal laws, seeking injunctive relief, damages, and attorneys' fees. Nothing contained in this letter is intended to constitute an election of any remedy that EWC may be entitled to, nor does it waive any right it may possess in connection with any defaults arising under the Franchise Agreement or any other agreements.

Sincerely,

/s/ R. Henry Pfutzenreuter

R. Henry Pfutzenreuter, for
Larkin Hoffman

Direct Dial: 952-896-3325
Email:  hpfutzenreuter@larkinhoffman.com

4915-6925-8374, v. 4

cc:   **Kurt Smith**, Chief Development Officer
(kurt.smith@myewc.com)

**Todd Cherry**, Assistant General Counsel
(todd.cherry@myewc.com)



January 16, 2026

**DELIVERED VIA EMAIL & FEDEX**: (*farzana.khan@waxcenter.com*)

Farzana A. Khan
EWC Michigan Management, Inc.
2 Emil Street,
Princeton Junction, New Jersey 08550

> **Re:** *Notice of Expiration | Extension Offer | Franchise Agreement Dated December 17, 2014 | Center No. 0671 | Canton, Michigan*

Dear Ms. Khan:

This letter is in reference to that certain franchise agreement dated December 17, 2014 (as amended, supplemented, transferred, assigned, extended, restated, and/or otherwise replaced from time to time, the "<u>Franchise Agreement</u>"[1]), by and between EWC Michigan Management, Inc. ("<u>MMI</u>" or "<u>you</u>") and EWC Franchisor LLC ("<u>EWC</u>"), pursuant to which EWC granted MMI the right to own and operate a European Wax Center® franchised location at 41804 Ford Road, Canton, Michigan 48187 (the "<u>Franchised Center</u>").

The purpose of this letter is to: (a) provide formal notice of the expiration of the extended Initial Term of the Franchise Agreement, effective at 12:01 AM on January 1, 2026; (b) offer the enclosed Amendment to Franchise Agreement (Short-Term Extension) (the "<u>Extension Amendment</u>"), which would further extend the Initial Term until March 31, 2026 for the purpose of providing MMI an opportunity to sell the Franchised Location in a transaction, and to a buyer, approved by EWC pursuant to the terms of the Franchise Agreement; and (c) remind MMI of the conditions for an approved transfer under Section 18, including its obligation to be in complete compliance with the terms of the Franchise Agreement at the time of such transfer.

As you know, EWC and MMI previously entered into an Amendment to Franchise Agreement effective December 18, 2024, which provided that "[t]he Initial Term of the Franchise Agreement shall be extended (or further extended, as applicable) through December 31, 2025." Please be advised that MMI no longer possesses the right to obtain a Successor Franchise for the Franchised Center pursuant to Section 4.2 of the Franchise Agreement, as MMI failed to timely exercise such right and otherwise failed to satisfy each of the conditions required to obtain one. **Accordingly, please let this letter serve as formal notice to MMI of the expiration of the Initial Term of the Franchise Agreement, effective as of 12:01 AM on January 1, 2026**.

Notwithstanding the above, EWC is willing to further extend the Initial Term of the Franchise Agreement through March 31, 2026 in order to provide MMI with an opportunity to sell the Franchised Center, subject to approval of the transaction and the transferee by EWC. To that end, enclosed you will find a copy of the Extension Amendment extending the Initial Term through March 31, 2026, along with the General Release referenced therein. Please return signed copies of the Extension Amendment and the General Release to EWC on or before **January 23, 2026**. If MMI does not return signed copies of the Extension Amendment and General Release to EWC by January 23, 2026, please be advised that MMI must immediately cease operation of the Franchised Center as a European Wax Center® location and comply with all post-expiration obligations under the Franchise Agreement. In the event that MMI fails to return signed copies of Extension Amendment and General Release or to cease operation of the Franchised Center on or before January 23, 2026, EWC will take actions to prevent MMI from continuing to operate the Franchised Center as a European Wax Center® location, which EWC has refrained from doing to this point based upon MMI's request to further extend the Initial Term of the Franchise Agreement.

As discussed above, MMI's right to operate the Franchised Center as a European Wax Center® location expired at 12:01 AM on January 1, 2026, as well as any right to obtain a Successor Franchise. MMI's right to obtain a Successor Franchise under the Franchise Agreement was subject to the conditions set forth in Section 4.2. MMI, however, failed

---

[1] Capitalized terms used in this Notice of Non-Renewal but not otherwise defined shall have the meanings set forth in the Franchise Agreement.

**EXHIBIT**
**E**

to meet those conditions, including without limitation Section 4.2.1, which required MMI to have "complied with all material terms of [the Franchise] Agreement during the Term," Section 4.2.3, which required MMI to pay "all monetary obligations owed by Franchisee to Franchisor," Section 4.2.5, "which required MMI to not be "in default of any provision of this Agreement," and Sections 4.2.6 and 4.2.7, which required MMI to give "written notice of its intent to operate a Successor Franchise not less than nine (9) months . . . prior to the end of the Term" and execute EWC's "then-current form of franchise agreement and related agreements."

As outlined above, MMI also failed to comply with all of the Franchise Agreement's material terms during the Initial Term, which is another condition that MMI was obligated to have satisfied in order to qualify for a Successor Franchise. Additionally, on August 15, 2024, a default judgment was entered against MMI in favor of Antoinette Bush in the amount of $10,000,484.79 in Michigan state court, Case No. 23-203985-NO (the "Lawsuit"), after MMI failed to appear, answer, and defend Ms. Bush's claims, which judgment has remained unsatisfied for more than sixty (60) days in violation of Section 16.2.1.12 of the Franchise Agreement. MMI also failed to procure and maintain the insurance that would cover Ms. Bush's claims in the Lawsuit, as required under Section 15.1 of the Franchise Agreement. Ms. Bush named EWC and its affiliate in the Lawsuit, and despite their demand, MMI further failed to defend and indemnify them as required by Section 21.3 of the Franchise Agreement, causing them to incur significant costs in securing their summary judgment dismissal from the Lawsuit and Ms. Bush's pending appeal, for which MMI remains obligated to reimburse EWC. As a result of the foregoing, MMI has failed to each of the conditions necessary to obtain a Successor Franchise for the Franchised Center.

Additionally, please be advised that the foregoing failures by MMI also constitute defaults pursuant to Section 16.2.2 of the Franchise Agreement. Under Section 16.2.2.1, MMI is in default if it fails to pay all amounts owed to EWC "within five (5) days of receiving notice of Franchisee's failure to pay any amounts due to Franchisor." Under Section 16.2.1.12, MMI is in default if a "a final judgment remains unsatisfied of record for sixty (60) days or longer." For the avoidance of any doubt, and notwithstanding the extension offer discussed above, EWC does not waive any of the defaults described above or its right to take any action based upon those defaults or in connection with any other defaults that may occur under the Franchise Agreement after December 31, 2025.

**As discussed above, if MMI desires to take advantage of EWC's offer to extend the Initial Term of the Franchise Agreement through March 31, 2026, MMI must return to EWC on or before January 23, 2026 signed copies of the enclosed Extension Amendment and the General Release referenced therein**. If MMI does not do so, MMI must immediately comply with all post-expiration obligations under the Franchise Agreement. Please carefully review the Franchise Agreement, including without limitation Sections 7 and 17, as EWC requires strict compliance with all these obligations.

Nothing in this letter shall constitute a waiver of any of EWC's rights under the Franchise Agreement or any other agreements, or any other rights or remedies that EWC may have against MMI or its guarantors at law or in equity. To the contrary, EWC reserves all rights and causes of action it has against MMI and its guarantors, including, without limitation, its right to commence legal action against MMI for violating the Franchise Agreement, its right to enforce any guaranty signed by a guarantor in connection with the Franchise Agreement, and any right to seek injunctive or other equitable relief, as well as damages and attorneys' fees. Nothing contained in this letter is intended to constitute an election of any remedy to which EWC may be entitled, nor does it waive any rights that EWC may possess in connection with any defaults arising under the Franchise Agreement or any other agreements.

Please give the matters discussed in this letter your immediate attention. If you have any questions, please feel free to contact me directly.

Sincerely,

Signed by:

*Kurt Smith*

A1DC28AF57EE4E1...

Kurt Smith
Chief Development Officer
EWC Franchisor LLC
kurt.smith@myewc.com

4928-1731-9304, v. 1

2

**AMENDMENT TO**
**FRANCHISE AGREEMENT**
**(Short-Term Extension)**

This Amendment to Franchise Agreement (this "<u>Amendment</u>"), effective as of January 1, 2026 (the "<u>Effective Date</u>"), is entered into by and between EWC Franchisor LLC, a Delaware limited liability company ("<u>Franchisor</u>"), and **EWC Michigan Management Inc**, a Michigan corporation ("<u>Franchisee</u>"), in connection with that certain Franchise Agreement originally dated **December 17, 2014** (**License No. 0671**), by and between Franchisor and Franchisee (as amended, supplemented, extended, transferred, assigned, restated, and/or otherwise replaced from time to time, the "<u>Franchise Agreement</u>").  All capitalized terms used herein, but not otherwise defined in this Amendment, shall have the meanings ascribed to such terms within the Franchise Agreement.

Franchisee and Franchisor agree as follows:

1.  <u>Term</u>.  The Initial Term of the Franchise Agreement shall be further extended through **March 31, 2026** (the "<u>Extended Initial Term Expiration Date</u>"), unless sooner terminated by Franchisor in accordance with the terms of the Franchise Agreement. Franchisee acknowledges and agrees that the Extended Initial Term Expiration Date provides only an extension and continuation of the Initial Term, subject to the same, continuing, and unmodified terms and conditions of the Franchise Agreement, and this Amendment shall not be construed as offering or granting any new franchise or term.  Franchisee further acknowledges that it neither exercised its right nor satisfied the conditions required to obtain a Successor Franchise as set forth in Section 4.2 of the Franchise Agreement, and, as such, Section 4.2 is hereby stricken from the Franchise Agreement.

2.  <u>Transfer</u>.  If Franchisee transfers all of its interest in the Franchised Center to a bona-fide third-party transferee on or before the Extended Initial Term Expiration Date, and all of the conditions set forth in the Franchise Agreement related to the transfer, including, without limitation, the obligation of Franchisee to cure any then-existing defaults under the Franchise Agreement, as well as the conditions set forth in Section 18 of the Franchise Agreement, have been satisfied by MMI, Franchisor shall grant the transferee a Franchise for the Franchised Center, provided that such transfer, along with the transferee and its owners, satisfy all conditions required by Franchisor, including the execution of all documents by the transferee and its owners required by Franchisor, which shall include Franchisor's then-current franchise agreement, which shall have a Term equal to ten (10) years, less the time period between December 17, 2024 and the closing of such approved transfer. Nothing herein shall be deemed to confer Franchisor's consent to any transfer under the Franchise Agreement.

3.  <u>General Release</u>. Franchisee and each guarantor of Franchisee's obligations under the Franchise Agreement shall execute the General Release attached to this Amendment as <u>Exhibit A</u> contemporaneously with Franchisee's execution of this Amendment.  Franchisee acknowledges and agrees that this Amendment and the extension of the Initial Term provided herein serve as adequate and valuable consideration for the General Release, without which Franchisor would not have entered into this Amendment.

4.  <u>Reservation of Rights</u>. Franchisee acknowledges and agrees that: (a) Franchisor is entering into this Amendment without prejudice or waiver of any of Franchisor's rights under the Franchise Agreement, any other agreements, or any of the rights or remedies available to Franchisor at law or in equity; (b) Franchisor reserves all rights, remedies, and causes of action that it may have against Franchisee and each of its guarantors; and (c) this Amendment does not waive any rights that Franchisor may have in connection with any defaults arising under the Franchise Agreement or any related documents.

5.  <u>Miscellaneous</u>. This Amendment is an amendment to and forms part of the Franchise Agreement. If there is an inconsistency between the terms of this Amendment and the terms of the Franchise Agreement (including any prior amendments thereto), the terms of this Amendment shall control. Except as expressly set forth in this Amendment, the terms and conditions of the Franchise Agreement shall remain unaffected and in full force and effect. This Amendment may be executed in multiple counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Confirmation of execution by electronic transmission of a facsimile or .pdf signature page shall be binding.

Franchisee and Franchisor have each duly executed and delivered this Amendment effective as of the Effective Date.

**FRANCHISEE**:                                              **FRANCHISOR**:

**EWC MICHIGAN MANAGEMENT INC**                             **EWC FRANCHISOR LLC**


By: _____               By: _____

Name:   Farzana Khan                          Name:   Kurt Smith

Title:   President & Chairman of the Board     Title:   Chief Development Officer


License Number: 0671 (Canton, Michigan)

4896-4544-8328, v. 2

**EXHIBIT A TO AMENDMENT**

**GENERAL RELEASE**

This General Release (this "RELEASE") is made and given to be effective on this ___ day of January 2026 (the "Effective Date") by **EWC Michigan Management Inc**, a Michigan corporation ("Michigan Management"), and its principal, **Farzana Khan** (collectively with Michigan Management, "RELEASOR"), in consideration of EWC Franchisor LLC's, a Delaware limited liability company ("RELEASEE"), agreement to extend the Initial Term of that certain European Wax Center Franchise Agreement originally dated **December 17, 2014** (as amended, supplemented, extended, transferred, assigned, restated, and/or otherwise replaced from time to time, the "Franchise Agreement") pursuant to that certain Amendment to Franchise Agreement effective as of January 1, 2026 (the "Extension Amendment"), and for other good and valuable consideration, the adequacy of which is hereby acknowledged, each RELEASOR, to the fullest extent permitted by law, hereby releases and discharges RELEASEE, RELEASEE'S parent and affiliated entities, and its and their officers, directors, shareholders, members, managers, employees, representatives, and agents (whether acting in an agency capacity or in their individual capacities), and RELEASEE'S heirs, successors, beneficiaries, and assigns, as applicable, each of whom is intended as a beneficiary of this RELEASE, from any and all causes of action, suits, debts, damages, judgments, executions, claims and demands whatsoever, in law or in equity, that RELEASOR and RELEASOR'S heirs, executors, administrators, successors, and assigns had, now have, or may later have, upon or by reason of any matter, cause, or thing whatsoever from the beginning of the world to the date of this RELEASE, whether known or unknown, arising out of or in any way related to the original sale and purchase of the Franchise (as defined within the Franchise Agreement), the acquisition of the Franchise, the rights and obligations under the Franchise Agreement, the operation of the Franchised Center (as defined within the Franchise Agreement), or the failure to obtain a Successor Franchise, including, without limitation, all claims arising under federal, state, and local laws, regulations, and ordinances.

Each RELEASOR covenants not to sue or to assert, prosecute, or maintain, directly or indirectly, in any form, any claim or cause of action against any RELEASEE with respect to any matter, cause, omission, act, or, thing whatsoever; occurring in whole or in part on, or at any time prior to, the Effective Date, and which is subject to such release, as set forth herein. Each RELEASOR represents and warrants to RELEASEE that: (a) no RELEASOR has filed or made any claims, charges, complaints, or actions of any type, whether legal, equitable, or administrative, against any RELEASEE; (b) each RELEASOR is the sole owner of all claims, charges, complaints, or actions of any type, whether legal, equitable, or administrative, against any RELEASEE; (c) neither RELEASOR has assigned or transferred, or purported to assign or transfer, to any person or entity, including among themselves, any claim, charge, complaint, or action of any type, whether legal, equitable, or administrative, against any RELEASEE; and (d) each RELEASOR is entering into this RELEASE freely, without coercion or duress, and based on their own judgment and not in reliance upon any representations or promises made by any RELEASEE, apart from those set forth in the Extension Amendment.

The obligations of each RELEASOR under this RELEASE are joint and several with one another, in each and every respect. This RELEASE shall not be amended or modified unless such amendment or modification is in writing and is signed by each RELEASOR and RELEASEE. This RELEASE may be executed in multiple counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Each RELEASOR acknowledges and agrees that the use of electronic signatures shall be of the same legal effect, validity, and enforceability as a manually executed signature. Confirmation of execution by electronic transmission of a facsimile or .pdf signature page shall be binding.

IN WITNESS WHEREOF, each RELEASOR has executed this RELEASE effective as of the Effective Date.

RELEASOR:                                                            RELEASOR:

**EWC MICHIGAN MANAGEMENT INC**


By: _____                    _____

Name: **Farzana Khan**                                           **Farzana Khan**, Individually

Title: **President & Chairman of the Board**


4914-3104-2184, v. 1

1

**From:** Kurt Smith <Kurt.Smith@myewc.com>
**Sent:** Wednesday, March 25, 2026 5:55:11 PM
**To:** Farzana Khan <farzana.khan@waxcenter.com>
**Cc:** Vicki Morris Forward <vicki.morris@myewc.com>; Delaney Buergin
<Delaney.Buergin@myewc.com>; Todd Cherry Forward <Todd.cherry@myewc.com>;
Jessica Thornton <jessica.thornton@myewc.com>
**Subject:** RE: Canton sale

Farzana,

I'm writing to recap our discussion yesterday. I did reiterate that we will not
be renewing Canton, consistent with our past messaging. I did ask if you had
tried to sell the business and you mentioned that you did but the wax pass
liabilities are making it difficult given the extent and size of the liabilities. I
told you I would review those wax pass liabilities and let you know today if I
had any ideas on how to more effectively position the business to sell
quickly. In am still in that process but I'm writing to let you know we will give


EXHIBIT
F

15 more days ( through end of business April 9) extension on operations while we determine if any way to viably sell the business. Consider this email approval of that 15 day extension.

In the meantime, I need to understand how you were positioning the business to sell from a wax pass liability standpoint. Specifically, are you telling the potential buyers that the wax pass liability is the $685K associated with Canton or are you telling them is includes the wax pass liabilities from W. Bloomfield ($472K) and thus a total of $1,157K?

Kurt

---

**From:** Kurt Smith
**Sent:** Tuesday, February 17, 2026 3:55 PM
**To:** farzana khan <farzana.khan@waxcenter.com>
**Cc:** Vicki Morris <vicki.morris@myewc.com>; Delaney Buergin <Delaney.Buergin@myewc.com>
**Subject:** Canton sale

Farzana,

I wanted to reach out to ask how the sale processes is going for Canton?

Our operations team did mention to me that you were asking if there was more time or an opportunity to renew and so I felt like I should reach out to let you know that nothing has changed on our end and so the center will need to be transferred by March 31st or will need to cease operations on that day.

If you are making headway on the sale process, please let us know as we can parallel path to make sure the transfer is efficient and thus in position to get the highest possible price under the circumstances.

Kurt

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.